**PANISH SHEA BOYLE RAVIPUDI LLP**
BRIAN J. PANISH,  NV Bar No. 16123 (*admission pending*)
 panish@psbr.law
RAHUL RAVIPUDI, NV Bar No. 14750
 rravipudi@psbr.law
IAN SAMSON, NV Bar No. 15089
 isamson@psbr.law
ADAM ELLIS, NV Bar No. 14514
 aellis@psbr.law
300 S. Fourth Street, Suite 710
Las Vegas, Nevada 89101
Telephone: 702.560.5520

**HAGENS BERMAN SOBEL SHAPIRO LLP**
Steve W. Berman, Esq. (*pro hac vice forthcoming*)
steve@hbsslaw.com
Stephanie A. Verdoia, Esq. (*pro hac vice forthcoming*)
stephaniev@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(P) (206) 623-7292 (F) (206) 623-0594
-and-
Rio S. Pierce, Esq. (*pro hac vice forthcoming*)
riop@hbsslaw.com
Hannah K. Song, Esq. (*pro hac vice forthcoming*)
hannahso@hbsslaw.com
715 Hearst Ave, Suite 202
Berkley, CA 94710
(P) (206) 623-7292 (F) (206) 623-0594
*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| RICHARD GIBSON, and HERIBERTO VALIENTE, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| MGM RESORTS INTERNATIONAL, CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED, INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC, WYNN RESORTS HOLDINGS, LLC, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ................................................................................. 1

II.    PARTIES ........................................................................................................... 9

III.   JURISDICTION AND VENUE ....................................................................... 11

IV.   FACTUAL BACKGROUND ........................................................................... 11

       A.     The Las Vegas Strip Hotel Market Constitutes a Relevant Antitrust Market .......................................................................................................... 11

       B.     Before Rainmaker Group, Hotel Operators Set Prices Independently ................................................................................................ 13

       C.     The Introduction of Rainmaker Group's Pricing Algorithms Subverted a Competitive Market. ................................................................ 14

       D.     Extensive Economic Research Shows that Usage of Pricing Algorithms Leads to Anticompetitive Effects ..................................................... 18

       E.     "Plus Factors" Indicate the Market for Hotel Rooms in the Las Vegas Strip Hotel Market is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel ................................................................ 20

V.     CLASS ACTION ALLEGATIONS ................................................................. 22

VI.   CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT ................................. 24

FIRST CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE 15 U.S.C. § 1 (On Behalf of Nationwide Class for Injunctive and Equitable Relief and Compensatory Damages) ................................................................ 24

REQUEST FOR RELIEF ......................................................................................... 25

JURY TRIAL DEMANDED .................................................................................... 27

Plaintiffs Richard Gibson and Heriberto Valiente bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons who rented hotel rooms on the Las Vegas Strip[1] in Las Vegas, Nevada (hereinafter "the Las Vegas Strip Hotel Market") directly from a defendant or co-conspirator beginning at least as early as January 24, 2019 through the present. Plaintiffs bring this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiffs demand a trial by jury.

## I.  NATURE OF THE ACTION

1.  Plaintiffs Richard Gibson and Heriberto Valiente challenge an unlawful agreement among Defendants to artificially inflate the prices of hotel rooms on the Las Vegas Strip above competitive levels.

2.  Defendant Hotel Operators[2] are responsible for operating the vast majority of the hotels on the Las Vegas Strip, including well-known hotels such as the Bellagio, Wynn, Caesar's Palace, MGM Grand, and Mandalay Bay.

3.  Hotel Operators on the Las Vegas Strip have replaced their independent pricing and supply decisions with a shared set of pricing algorithms that allow the Hotel Operators to collect supracompetitive prices for their hotel rooms. The Hotel Operators have colluded to adopt these algorithms.

4.  The company that provides the pricing algorithms for Hotel Operators is called Rainmaker Group. Cendyn is a private company focused on providing technology for the hospitality industry. Cendyn acquired the Rainmaker Group in August 2019. Rainmaker Group currently operates as a wholly owned subsidiary of Cendyn.

5.  Academics and government regulators have widely recognized that sharing data among competitors, even through a third-party algorithm, raises significant antitrust concerns

---

[1] As explained more below, The Las Vegas Strip (as used here) is the four-mile stretch in the unincorporated towns immediately south of the City of Las Vegas.

[2] Defendant Operators are Caesars Entertainment, Inc., Treasure Island, LLC, Wynn Resorts Holdings, LLC, MGM Resorts International.

CLASS ACTION COMPLAINT - 1

and is likely to lead to supracompetitive and unlawful prices. As discussed more below, academics have widely documented, with both theoretical literature and empirical examples, that use of pricing algorithms by competitors in a market leads to elevated prices which in turn harms consumers.

6.     Government regulators have also described in detail the concerns raised by this type of algorithmic pricing. Maureen Ohlhausen, when serving as acting Chairperson of the Federal Trade Commission, described how industry-wide usage of a shared algorithm is the type of agreement prohibited by antitrust law: "Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy."[3]

7.     The vast majority of hotels on the Las Vegas Strip use Rainmaker Group's pricing algorithms. Confidential Witness 1 ("CW1"), a former Rainmaker executive, estimated that Rainmaker Group's products are used by 90% of the hotels on the Las Vegas Strip. Confidential Witness 2 ("CW2"), a former Rainmaker employee, recalled a colleague saying, "We're just about in every hotel on the Strip."

8.     Defendant Hotel Operators, who collectively have market power in the Las Vegas Strip Hotel Market, provide real-time pricing and supply information to the Rainmaker Group. This competitive data is taken by the Rainmaker Group and fed through its algorithms, which

---

[3] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust law and Algorithmic Pricing*, FEDERAL TRADE COMMISSION (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf (last visited Jan. 23, 2023).

1    then generate forward-looking, room-specific pricing recommendations to Defendant Hotel

2    Operators.

3            9.      Critically, Rainmaker Group's algorithms are specifically intended to raise profits

4    for Hotel Operators while discouraging them from maximizing occupancy of hotel rooms (*i.e.*,

5    supply). To that end, Dan Skodol, VP of revenue analytics at Rainmaker Group, stated that

6    "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but

7    instead maximizing profits across all revenue streams."[4] Rainmaker Group's chief strategy

8    officer, Amar Duggasani echoed this sentiment, stating, "[I]nstead of optimizing for revenue, a

9    hotel needs to optimize for profit."[5]

10           10.     But this is not how a competitive market works: in a competitive market, any

11   empty hotel room is lost revenue, so a hotel operator would try to fill each hotel room by

12   granting concessions or lowering prices. By contrast, on Rainmaker Group's recommendations

13   and as an integral part of the conspiracy, Hotel Operators kept prices high and some rooms

14   empty, knowing their co-conspirators would not undercut these supracompetitive prices.

15   Information that discourages Hotel Operators from using all of their available supply is critical to

16   maintaining unlawfully elevated prices. CW2 stated that Rainmaker Group's algorithms include

17   information for Hotel Operators on whether a hotel was "overbooked" as well as

18   recommendations related to the revenue of the hotel.

19           11.     Rainmaker Group offers several different pricing algorithms, each of which

20   gathers data from a Hotel Operator's competitors and presents pricing recommendations:

21   GuestRev, RevCaster, and GroupRev. The Rainmaker Group touts that all three "integrate[]

22   seamlessly" together and constitute "the most comprehensive revenue management suite to

---

[4] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB, https://revenue-hub.com/hotel-revenue-management-models/ (last visited Jan. 23, 2023).

[5] Sean O'Neil, *Hotel Revenue Management Software Has Its Pharrell Williams Moment*, PHOCUSWIRE (Apr. 14, 2015), https://www.phocuswire.com/Hotel-revenue-management-software-has-its-Pharrell-Williams-moment (last visited Jan. 23, 2023).

CLASS ACTION COMPLAINT - 3

traditional hotels, casino hotels, and resort hotels" that is "[t]he only solution that also solves for competitive rate shopping."[6]

**Guestrev**

12.     GuestRev is an algorithm specifically tailored for the casino hotel market and is designed to forecast and recommend to Hotel Operators prices for individual travelers. Confidential Witness 3 ("CW3"), a former Rainmaker employee, stated that clients "could decide whether they wanted pricing from nearby casinos—including from competitors—to factor into the pricing recommendations generated by GuestRev." Rainmaker Group touts on its website that GuestRev's pricing recommendations are accepted ***90% of the time meaning that the prices for hotel rooms are set by GuestRev and not normal market forces***. Remarkably, Rainmaker Group specifically touts that GuestRev allows users to price rooms ***independently of overall demand***. This is directly contrary to how pricing functions in a competitive market, where fundamental market forces lead to pricing occurring based upon where the supply and demand curves meet.



**GUESTREV**

# Dynamic pricing solutions

With a 90% rate acceptance, Guestrev offers open pricing recommendations by room type and market segment. Price each room type independently of overall demand based on factors such as perceived value, guests' willingness to pay, and dynamic demand and availability indicators.

Request a demo

---

[6] Nancy Evans, *The Rainmaker Group Acquires Revcaster LLC*, PRWEB (Mar. 17, 2015), https://www.prweb.com/releases/2015/03/prweb12587845.htm (last visited Jan. 23, 2023).

13.     CW2 stated that the GuestRev interface features a color-coded calendar that reflects booking levels, a summary of total revenue, occupancy, and average daily rates, as well as other features such as links to RevCaster. GuestRev features a dashboard that provides Hotel Operators with a snapshot of each day and Rainmaker's pricing recommendations. CW2 said revenue managers at Rainmaker's clients "loved" GuestRev's ability "to give them a dump of data for whatever they were looking for."

14.     The data that Rainmaker Group gathers from Hotel Operators is incredibly granular and such granularity is a sign post for when an exchange of information crosses the line to unlawfulness. CW1 stated that clients sent Rainmaker Group transaction-level data on hotel bookings as well as potential bookings: in CW1's words, "[t]he details of every single booking made or booking attempted," *e.g.*, when someone tried to book a hotel room that was already sold out. CW1 stated that hotels would tell Rainmaker Group "who their competitors were," and Rainmaker would then "shop" the data from those competitors. GuestRev would then use this data to "forecast[] demand."

15.     CW3 confirmed that Hotel Operators provided Rainmaker Group with "an abundance of information," sometimes identifying individual visitors and ranking them based on the dollar amount that those visitors were likely to spend at the casino at each visit. CW3 also stated that GuestRev updated its pricing recommendations daily.

16.     Rainmaker Group enables Hotel Operators to use competitor pricing in implementing their own pricing. According to CW3, clients of Rainmaker Group were able to use competitor pricing to "influence" the pricing recommendations that they received from GuestRev. CW2 stated that Rainmaker Group was "in a lot of the hotels, so that gave us a little leverage to know what the typical hotel was recommending." Najam Khan, General Manager of Treasure Island Vegas, one of the Hotel Operator Defendants, stated that "the system's capacity

1  to factor in competitors' rates and suggest optimal room rates to maximize revenue is one of its

2  best features."[7]

3      **Revcaster**

4      17.    Revcaster is a pricing algorithm or "price comparison tool" that Rainmaker Group

5  added to its repertoire in 2015. Revcaster allows clients to monitor and respond to competitor

6  pricing by collecting market-specific price data from competitors, and creates customizable

7  dashboards that can be used to set prices and increase revenue.

8      18.    Rainmaker Group's chief strategy officer Amar Duggasani stated, "There are no

9  other hotel revenue management solutions that provide a market intelligence and competitor rate

10  shopping solution."[8] An example dashboard includes day-by-day pricing data as well as the



[7] *Rainmaker Revenue Management Solution Secures Key Endorsement*, HOTEL ONLINE (July 26, 2012), https://www.hotel-online.com/News/PR2012_3rd/Jul12_RainmakerTreasure.html (last visited Jan. 23, 2023).

[8] Nancy Nevins, The Rainmaker Group Acquires Revcaster LLC, PRWEB (Mar. 17, 2015), https://www.prweb.com/releases/2015/03/prweb12587845.htm (last visited Jan. 23, 2023).

CLASS ACTION COMPLAINT - 6

options to look at "Rate Shopping" or "Benchmarking" data, which appear to be references to competitor data:[9]

19.     Daniel Wise, President of Revcaster, confirmed that customers using Revcaster "know rates and availability at all properties in their market" and also their "average position against the competition."[10]   One client representative, Vinay Zore, senior director of operations for Westmont Hospitality Group, states that Revcaster allows managers to "know rates and availability at all properties in their market." Specifically, managers can **"click on a comp property and see each room type and its rate."**   Zore also stated that "Revcaster gives my division's GMs a clear, real-time understanding of their comp-set's rates to help us increase revenue." This type of usage of algorithmic pricing is consistent with the kind of algorithmic pricing usage that economists have found will lead to elevated prices.

**GroupRev**

20.     GroupRev is another pricing algorithm introduced by Rainmaker Group in 2017 that forecasts demand for customers that book in groups (for example, groups of 10 or more attending conferences or conventions).[11] According to one Rainmaker customer, Jamie Peña, VP of revenue management at Omni Hotels & Resorts, "Rainmaker's automated group forecasting element is the last missing piece of the puzzle for revenue optimization." Rainmaker estimated that adding group-forecasting capabilities would boost revenues for clients by 2-3 percent.

21.     Defendant Hotel Operators rely on Rainmaker Group's pricing algorithms – GuestRev, Revcaster, and GroupRev – in making pricing decisions as opposed to independently

---

[9] Newsroom, *Rainmaker Group debuts next-generation revcaster platform*, HOTEL MANAGEMENT (Apr. 12, 2017), https://www.hotelmanagement.net/tech/rainmaker-debuts-next-generation-revcaster-platform (last visited Jan. 23, 2023).

[10] *Revcaster Rate Shopping Data Optimizes Rates for Westmont Hospitality Group Properties*, HOTEL ONLINE (Apr. 1, 2015), https://www.hotel-online.com/press_releases/release/revcaster-rate-shopping-data-optimizes-rates-for-westmont-hospitality-group/ (last visited Jan. 23, 2023).

[11] Newsroom, *The Rainmaker Group introduces group forecasting*, HOTEL MANAGEMENT.COM (Mar. 14, 2017), https://www.hotelmanagement.net/tech/rainmaker-group-introduces-group-forecasting (last visited Jan. 23, 2023).

and without collusion setting prices. Borgata Hotel, located in Atlantic City, is operated by Defendant MGM Resorts International. Sue Daigle, a director of revenue management at Borgata, stated that "When I first get to the office, I check two computer monitors. One is our hotel system; the other is Cendyn. Guestrev is literally my right hand. I can't see getting by without it." Daigle stated that she used Guestrev to validate her pricing recommendations to management.[12]

22.     Hotel Operators also understand that their competitors participate in and contribute data to the pricing and forecasting services offered by Rainmaker Group. CW3 stated that Rainmaker Group would hold yearly, in-person conferences that would feature at least 100 attendees. Clients would typically send employees from their revenue management departments, or CEOs or CFOs. CW3 said that it was "not hard" to figure out which companies were using GuestRev because "you're all at a conference for GuestRev users." CW1 stated that Rainmaker would share the names of clients with other clients or prospective clients if they received permission, adding, "The whole hospitality world is so small, and the revenue managers move around from place to place, so everybody knew who was using our system." CW2 confirmed that "Caesars probably knew we were in the Cosmopolitan and vice versa."

23.     Defendant Hotel Operators' use of these pricing algorithms has led to supracompetitive pricing. Travel Weekly found that Las Vegas visitors "paid the highest average daily room rate (ADR) in the city's history in September [2022], a trend that will likely continue." 8 News Now reported that prices were skyrocketing, and "it's truly breaking the bank, with a lack of options or even deals to cut costs." One tourist stated, "They used to offer a lot of offers in Las Vegas especially . . . Like if you go to a casino the hotel is really cheap, but that is not the case right now."

24.     Meanwhile, Defendant Hotel Operators have advertised revenue increases up to 15% when they are collectively using Rainmaker Group products. Tom Walker, Rainmaker

---

[12] *Borgata Hotel Casino & Spa's success with Guestrev*, CENDYN.COM, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/ (last visited Jan. 23, 2023).

Group's Director of Sales for Rainmaker's Gaming/Hospitality Division, has stated that clients that use Rainmaker Group pricing algorithms have seen "returns of up to 15%."[13] Customer testimonials on Rainmaker Group's website describe that clients outperform the market, even through market downturns and in the aftermath of the Covid-19 pandemic. For example, Rainmaker Group client Foxwood reported "producing 70% of the prior year's revenue with 50% of the volume despite closures and restrictions throughout the pandemic."[14] CW1 stated that prices for hotel rooms on high-demand days would increase once clients started working with Rainmaker Group.

25.     The conspiracy Plaintiffs challenge is unlawful under Section 1 of the Sherman Act. Plaintiffs bring this action as a Class Action on behalf of a class of individuals that purchased hotel rooms from Defendant Hotel Operators on the Las Vegas Strip in order to recover damages, trebled, as well as injunctive and other appropriate relief, detailed infra, on behalf of all others similarly situated.

## II.     PARTIES

26.     Plaintiff Richard Gibson is a citizen and resident of the State of Washington. Mr. Gibson regularly travels to Las Vegas, Nevada and stays in hotel rooms managed by Defendants. In 2021, Mr. Gibson stayed at the MGM Grand hotel. In 2022, Mr. Gibson made two trips to Las Vegas, Nevada and stayed at Bally's and the Linq hotel. Mr. Gibson paid higher hotel room prices directly to Defendants by reason of the violation alleged herein. Plaintiff in the future also intends to stay at hotels managed by Defendants.

27.     Plaintiff Heriberto Valiente is a citizen and resident of the State of Florida. Mr. Valiente often travels to Las Vegas, Nevada and stays in hotel rooms managed by Defendants. In 2022, Mr. Valiente made a trip to Las Vegas, Nevada and stayed at the Bellagio. Mr. Valiente

---

[13] *Tom Walker Returns to The Rainmaker Group*, TRAVEL COMMUNICATION.NET (Jan. 25, 2012), https://travelcommunication.net/people/tom-walker-returns-to-the-rainmaker-group/ (last visited Jan. 23, 2023).

[14] *Foxwoods Resort Casino's success with Cendyn's Guestrev*, CENDYN.COM, https://www.cendyn.com/customer-stories/foxwoods-resort-casino-customer-success-story/ (last visited Jan. 23, 2023).

CLASS ACTION COMPLAINT - 9

1   paid higher hotel room prices directly to Defendants by reason of the violation alleged herein.

2   Plaintiff in the future also intends to stay at hotels managed by Defendants.

3       28.     Defendant Hotel Operator MGM Resorts International ("MGM") is a Delaware

4   corporation headquartered in Las Vegas, Nevada.  MGM rents hotel rooms in Las Vegas,

5   Nevada at multiple hotel properties. MGM operates the Bellagio, VDARA at Aria, Aria, Park

6   MGM, New York-New York, MGM Grand, Excalibur, Luxor, Mandalay Bay, and the Four

7   Seasons Hotel. MGM is one of Cendyn's clients and uses its revenue management software.

8       29.     Defendant Cendyn Group, LLC, ("Cendyn") is a Delaware corporation

9   headquartered in Boca Raton, Florida. Cendyn provides software and services to the hotel

10  management industry, including the revenue management software described herein.

11      30.     Defendant The Rainmaker Group Unlimited, Inc. ("Rainmaker Group") is a

12  Georgia corporation headquartered in Alpharetta, Georgia.  Rainmaker Group provides software

13  and services to the hotel management industry, including the revenue management software

14  described herein.

15      31.     Defendant Hotel Operator Caesars Entertainment, Inc., ("Caesars Entertainment")

16  is a Delaware corporation headquartered in Las Vegas, Nevada. Caesars Entertainment rents

17  hotel rooms in Las Vegas, Nevada at multiple hotel properties.  Caesars Entertainment operates

18  Bally's, Caesars Palace, The Cromwell Hotel and Casino, Flamingo Las Vegas, Harrah's Las

19  Vegas, The Linq Hotel and Casino, Paris Las Vegas, Planet Hollywood Resort and Casino.

20  Caesars Entertainment is one of Cendyn's clients and uses its revenue management software.

21      32.     Defendant Hotel Operator Treasure Island, LLC, ("Treasure Island") is a

22  Delaware limited liability company headquartered in Las Vegas, Nevada. Treasure Island rents

23  hotel rooms in Las Vegas, Nevada at Treasure Island Hotel and Casino. Treasure Island is one of

24  Cendyn's clients and uses its revenue management software.

25      33.     Defendant Hotel Operator Wynn Resorts Holdings, LLC, ("Wynn") is a Nevada

26  limited liability company headquartered in Las Vegas, Nevada.   Wynn rents hotel rooms in Las

27  Vegas, Nevada at multiple hotel properties. Wynn operates the Wynn Las Vegas and Encore

28  Wynn Las Vegas. Wynn is one of Cendyn's clients and uses its revenue management software.

### III.   JURISDICTION AND VENUE

34.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

35.   This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Nevada's long-arm statute, Nev. Rev. Stat. § 14.065.

36.   Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of hotel guest rooms.

37.   Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of hotel guest rooms.

38.   Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

### IV.   FACTUAL BACKGROUND

**A.   The Las Vegas Strip Hotel Market Constitutes a Relevant Antitrust Market**

39.   The relevant product market is the market for the rental of hotel rooms and the relevant geographic market is hotels located on "The Las Vegas Strip" in Las Vegas, Nevada. This market is referred to as the "Las Vegas Strip Hotel Market".

40.   Hotel room rentals in Las Vegas, Nevada on the Las Vegas Strip comprise a distinct product and geographic market.  The Strip is a four-mile stretch in the unincorporated towns immediately south of the City of Las Vegas, but it is often referred to as Las Vegas. It is considered "the most expensive 4 mile stretch in the world," and it welcomes 42 million visitors

every year.[15] In 2022, Tripadvisor reported that Las Vegas was the number one most popular U.S. destination that Americans plan to visit.[16] Guests who rent rooms at hotels in Las Vegas know the attractions of the Las Vegas Strip—access to casinos, concerts, events, and shopping—are as much a part of their experience as the room they rent.  Travelers from around the United States and the world specifically visit Las Vegas in order to stay on the Strip, and enjoy the many unique amenities that the Strip offers.

41.     A hotel on the Las Vegas Strip in Las Vegas may compete with other hotels nearby, but would not realistically compete for guests staying in Mesquite, Nevada nearby—even if it had the same rates and hotel amenities. In particular, most hotels on the Las Vegas Strip include integrated casino facilities that provide a unique set of product offerings that are not substitutable with other hotel facilities that do not offer casino facilities.

42.     Consumers do not consider other short-term rentals as substitutes for hotel rooms on the Las Vegas Strip because, among other reasons, the hotels offer unique location and access to amenities for guests of the hotel.

43.     Defendant Hotel Operators hold a dominant market share of hotels on the Las Vegas Strip. There are approximately 30 hotels on the Las Vegas Strip. Defendant Hotel Operators control at least 20 of them, including the following:

- Caesar's Entertainment (Flamingo, The Linq, Caesars Palace, Harrah's, Horseshoe, The Cromwell, Paris, Planet Hollywood)

- MGM Resorts International (Excalibur, Luxor, MGM Grand, Park MGM, New York New York, Bellagio, Mandalay Bay, CityCenter, Cosmopolitan)

- Wynn Resorts (Encore, Wynn)

- Treasure Island

---

[15] Las Vegas Strip Map 2023, https://www.lasvegashowto.com/las-vegas-strip-map (last visited Jan. 23, 2023).

[16] *Las Vegas Ranks No. 1 Most Popular Travel Destination in the U.S. by Tripadvisor for 2022*, VEGAS BUSINESS DIGEST (Jan. 19, 2022), https://www.vegasbusinessdigest.com/las-vegas-ranked-no-1-most-popular-travel-destination-in-the-us-by-tripadvisors/ (last visited Jan. 23, 2023).

**B.      Before Rainmaker Group, Hotel Operators Set Prices Independently**

44.      In a competitive and lawful market, hotel operators would price rooms independently based on their own assessment of how best to compete with other operators. In the hospitality industry, as in many capital-intensive businesses, there is a huge up-front investment required to construct a hotel. Then, the cost is recouped, and profit is made through each hotel room subsequently rented. Any empty hotel room is lost revenue, so a hotel operator in a competitive market tries to fill each hotel room by granting concessions or lowering prices. In accordance with supply and demand fundamentals, hotel operators would attempt to maximize occupancy of their properties.

45.      Rainmaker's parent company, Cendyn, has acknowledged this market dynamic, stating, "[s]ince gaming revenue typically is significantly higher than room revenue, casino hotels have traditionally left money on the table by over-discounting and comping rooms without the real-time data to back up those decisions."[17] Cendyn states that "fixed pricing is a thing of the past . . . [d]ynamic pricing is a tactic that prices each room type based on a set of circumstances: the perceived value of the room type, the guest's willingness to pay, guest profile (such as loyalty status and booking behavior) and/or realtime demand and availability." As Cendyn touts in the image below, this type of "dynamic pricing can also reduce the occurrence of free upgrades and entice your guests to pay an upcharge instead." Dynamic pricing, according to Cendyn, allows users to "maximize top-line revenue." This type of algorithmic pricing, which works to ensure that competitors are collectively taking the same approach to pricing, rather than independently evaluating their pricing in the face of supply and demand, is the kind of conduct that academics have found is likely to lead to anticompetitive effects.

---

[17] *Rainmaker to Present Total Revenue Management Approach for Casino Hotels at INFORMS 2017*, HOSPITALITY TECHNOLOGY (Mar. 28, 2017), https://hospitalitytech.com/rainmaker-present-total-revenue-management-approach-casino-hotels-informs-2017 (last visited Jan. 23, 2023).

CLASS ACTION COMPLAINT - 13



**C.      The Introduction of Rainmaker Group's Pricing Algorithms Subverted a Competitive Market.**

46.      Instead of offering concessions and discounts to entice customers as Hotel Operators would have done in the normal course of competition, Rainmaker Group's pricing algorithms enabled Hotel Operators to set and keep room rates artificially high and defy fundamental supply and demand dynamics.

47.      Following widespread adoption of Rainmaker's pricing algorithms, Defendant Hotel Operators swiftly shifted from the previous competitive status quo to a new strategy, facilitated by Rainmaker: increasing prices notwithstanding market conditions and tolerating the lost revenue resulting from any unrented rooms. In a competitive market, this strategy would quickly fail—any units listed at prices exceeding the market price would be undercut by competitors and thus stay empty. A Hotel Operator with overpriced, empty rooms would eventually go out of business.

CLASS ACTION COMPLAINT - 14

48.     Dan Skodol, a VP of revenue analytics at Rainmaker Group, said that "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but instead maximizing profits across all revenue streams."[18] This is not how a competitive market works: in a competitive market, any empty hotel room is lost revenue, so a Hotel Operator would try to fill each hotel room by granting concessions or lowering prices. Here, Hotel Operators kept prices high and some rooms empty, knowing competitors would not undercut these supracompetitive prices.

49.     Rainmaker Group offers several different pricing algorithms: GuestRev, GroupRev, and Revcaster.

50.     GuestRev is an algorithm specifically tailored for the casino hotel market that is designed to recommend pricing on individual hotel rooms. GuestRev provides pricing recommendations on a daily basis to its clients. Rainmaker Group touts on its website that GuestRev's pricing recommendations are usually accepted by its clients.

51.     One GuestRev client, Borgata, an MGM hotel located in New Jersey, stated that before GuestRev, it "was among the majority of casino hotels that offered two types of rates: comps for highly rated players, and rack rates for all other guests."[19] Now, GuestRev uses Borgata's competitors' data to "continuously perform more than 75 equations" to arrive at "the right rates at the right time."[20] Borgata's Director of Revenue Management stated she uses GuestRev to validate her pricing recommendations to management.

---

[18] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB.COM, https://revenue-hub.com/hotel-revenue-management-models/ (last visited Jan. 23, 2023).

[19] *Borgata Hotel Casino & Spa's success with Guestrev*, CENDYN.COM, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/ (last visited Jan. 23, 2023).

[20] *Id*.

CLASS ACTION COMPLAINT - 15

52.     Rainmaker Group advertises that clients who use GuestRev see dramatic increases in revenue and profitability. For example, for one user, RevPAR "increased by nearly double-digit[s] through the decade of expansion." RevPAR is a metric used to measure hotel performance that is calculated by multiplying a hotel's average daily room rate [ADR] by its occupancy rate.

**RESULTS USING GUESTREV**



53.     In March 2015, Rainmaker Group acquired a private company, RevCaster LLC. At the time of acquisition, Amar Duggasani, Chief Strategy Officer at The Rainmaker Group, said "The Revcaster acquisition is part of our continued strategy to provide effective analytical solutions that increase revenue for operators in the hospitality and gaming industry. There are no other hotel revenue management solutions that provide a market intelligence and competitor rate shopping solution. Our companies share a common culture of customer service and technology innovation that will benefit both companies' clients around the world."

54.     Following the acquisition, Rainmaker Group integrated Revcaster LLC's RevCaster solution into the programs that it offered to Rainmaker Group's clients. Revcaster allows clients to monitor and respond to competitor pricing, by collecting market-specific price data from competitors, and creates customizable dashboards that can be used to set prices and increase revenue. Revcaster is a "competitive rate-shopping instrument . . . [that] provides deep-dive local knowledge and analysis so hoteliers can monitor market changes and maximize ADR

[Average Daily Rate].” Average Daily Rate is one of several key hotel performance indicators that is calculated by dividing total room revenue by the number of rooms sold.

55.     RevCaster provides Rainmaker's customers with detailed information regarding pricing of competitors in the marketplace. RevCaster allows clients to increase their revenues by gathering additional, detailed information regarding their competitors.

56.     GroupRev is another pricing algorithm introduced by Rainmaker Group in 2017 that forecasts demand for customers that book in groups (for example, groups of 10 or more attending conferences or conventions).[21] According to one Rainmaker customer, Jamie Peña, VP of revenue management at Omni Hotels & Resorts, “Rainmaker's automated group forecasting element is the last missing piece of the puzzle for revenue optimization.” Peña praised “[t]he ability to create custom personalized dashboards that display market data in any format . . . [a]nd the data itself is more powerful than ever with the addition of real-time rate shopping.”

57.     Rainmaker Group's algorithms are fueled by information provided by Hotel Operators, including real-time access to their competitively sensitive and nonpublic data on their occupancy, rates, and guests. CW3 stated that Hotel Operators provide Rainmaker Group with various types of internal data, including data on hotel pricing, occupancy, and customer information on individual gamblers. CW1 confirmed that Rainmaker will collect transaction-level data on hotel bookings and potential bookings – “the details of every single booking made or booking attempted.”

58.     Rainmaker Group then feeds that data into an algorithm, which outputs pricing recommendations. CW1 stated, “Every day we would get data from the property management systems – the hotel's system where they take reservations and check people in and out.” CW3 continued that the “data would feed into the algorithm. We were predicting the demand throughout the day, not just before each day.”

---

[21] Newsroom, *The Rainmaker Group introduces group forecasting*, HOTEL MANAGEMENT.NET (Mar. 14, 2017), https://www.hotelmanagement.net/tech/rainmaker-group-introduces-group-forecasting (last visited Jan. 23, 2023).

59.     CW3 stated that Rainmaker Group's algorithms would then recommend prices on a daily basis to Hotel Operators. CW3 stated that pricing recommendations from Rainmaker Group could be directly uploaded into clients' property management systems. CW3 continued that clients of Rainmaker Group could then push those prices directly into their systems.

60.     Rainmaker Customer Success Managers or other employees also regularly communicated with casino and hotel revenue managers regarding the pricing recommendations and data.

61.     Rainmaker Group's algorithms and accompanying pricing recommendations aided Defendant Hotel Operators in exercising collective pricing discipline. Cendyn's marketing materials tout that Rainmaker Group obtains a 90% acceptance rate for its pricing recommendations.

**D.     Extensive Economic Research Shows that Usage of Pricing Algorithms Leads to Anticompetitive Effects**

62.     Extensive economic research documents that the use of pricing algorithms leads to anticompetitive effects, including elevated prices. Modern algorithms can use artificial intelligence to reach the objective of maximizing profits without the need for human intervention.

63.     A growing body of academic research documents that algorithms make it easier for competitors to coordinate on pricing and charge supracompetitive prices. For example, an experimental study published in the American Economic Review found that competing firms, using AI powered algorithmic pricing, would settle, over time, into an equilibrium model where each firm charged supracompetitive prices.[22] The result was robust to asymmetries in cost or demand, or changes in the numbers of players.

---

[22] Calvano, Emilio, Giacomo Calzolari, Vincenzo Denicolo and Sergio Pastorello, Artificial Intelligence, *Algorithmic Pricing and Collusion*, AMERICAN ECONOMIC REVIEW, Vol. 110, No. 10 (Oct. 2020), https://www.aeaweb.org/articles?id=10.1257/aer.20190623 (last visited Jan. 23, 2023).

64.     A recent empirical study examined the effect of adoption of algorithmic pricing on prices for gas stations in Germany. The study found that firms that used algorithmic pricing increased their margins by approximately 9%, and their prices by a corresponding amount.[23]

65.     One academic notes that Uber also sets prices algorithmically, which users recognize in now-regular occurrences of "surge pricing" where prices spike (often to eyewatering levels) at times of high demand. This algorithmic pricing leads to higher prices for customers and higher revenue for Uber, even though Uber's costs do not change significantly during the surge pricing periods. Even though drivers are theoretically independent contractors who could compete against each other, each driver has "agreed to have their prices coordinated and set by the algorithm." This could constitute, as the author puts it, a "twenty-first-century [] techno-cartel."[24] Areeda and Hovenkamp also state that a "practice of interseller price verification . . . would appear to be a naked or at least a nearly naked restraint" in violation of antitrust law.[25]

66.     Government regulators around the world have also expressed concerns about algorithmic pricing's effect on competition.

67.     While serving as acting chairman of the Federal Trade Commission, Maureen Ohlhausen explained in 2017 how multiple firms outsourcing pricing decisions to a single third-party actor – just as the Hotel Operators have done with Rainmaker Group – raises significant antitrust concerns:[26]

---

[23] Stephanie Assad, Emilio Calvano, Giacomo Calzolari, Robert Clark, Vincenzo Denicolo, Daniel Ershov, Justin Johnson, Sergio Pastorello, Andrew Rhodes, Lei Xu, Matthijs Wildenbeest, *Autonomous algorithmic collusion: Economic research and policy implications*, TOULOUSE SCHOOL OF ECONOMICS WORKING PAPER (March 2021), https://www.tse-fr.eu/sites/default/files/TSE/documents/doc/wp/2021/wp_tse_1210.pdf (last visited Jan. 23, 2023).

[24] Salil K. Mehra, *Antitrust and the Robo-Seller: Competition in the Time of Algorithms*, MINN. L. REV., 100, 1323 (2015).

[25] Herbert Hovenkamp & Phillip E. Areeda, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2113 (4th and 5th Ed. 2018-2022).

[26] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust law and Algorithmic Pricing*, FEDERAL TRADE

"What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an oldfashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information. Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob". **Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either**."

68.     Rainmaker Group here plays exactly that role of a guy named Bob. It collects confidential price information from each of the Hotel Operators, and then tells them, through use of various algorithms, how to price.

**E.     "Plus Factors" Indicate the Market for Hotel Rooms in the Las Vegas Strip Hotel Market is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel**

69.     The Las Vegas Strip Hotel Market for the rental of guest rooms from Hotel Operators to guests is characterized by numerous "plus factors" that render the industry susceptible to collusion such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) market concentration, (3) inelastic consumer demand, (4) relative fungibility of hotel rooms, (5) exchanges of competitively sensitive information among horizontal competitors, and (6) numerous opportunities to collude at trade associations and Rainmaker Group conferences.

---

COMMISSION (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf (last visited Jan. 23, 2023).

70.     First, hotel owners and operators face significant barriers to entry. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small hotel properties cost millions of dollars to acquire. Large properties, such as those operated by the Defendant Operators, run, at minimum, into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire. Thus, new entrants into the Las Vegas hotel market are unlikely to discipline cartel pricing. For example, Resorts World is the most recent hotel to open on the Las Vegas Strip. Construction of this hotel started in 2007, and it was not opened until 2021. It is estimated that the hotel cost more than $4 billion to complete. Resorts World is the first new hotel to open on the Las Vegas Strip since the Cosmopolitan, which was opened in 2010.

71.     Second, the Las Vegas Strip Hotel Market is highly concentrated. Rainmaker's client list includes some of the most recognizable names in Las Vegas, and just three Hotel Operators (Caesar's Palace, Wynn, MGM Grand) dominate the Las Vegas Strip market. One study found that as of 2012, MGM and Caesars owned 19 resorts, about 59% of the total market by property count.[27] The study noted that since "unaffiliated resorts tend to be smaller than the ones owned by Caesar's and (particularly) MGM, the companies' total market share is likely higher."  CW2 recalled a colleague saying, "We're just about in every hotel on the Strip."

72.     Third, the demand for hotel guest rooms in Las Vegas is relatively inelastic. Except for an anomalous period during the height of the Covid pandemic, guests who visit Las Vegas have limited realistic and low-cost alternatives to renting from a Hotel Operator. No reasonable substitutes exist to discipline cartel pricing.

73.      Fourth, hotel guest rooms are relatively fungible, particularly within classes of properties. That is, when controlling for certain high-level characteristics of properties—such as the size, amenities, location, or the age of the building—properties within those classes are

---

[27] Schwartz, David G. *Concentration on the Las Vegas Strip: An exploration of the impacts*, GAMING LAW REVIEW AND ECONOMICS 17.9 (2013): 619-634.

relatively fungible. Guests choose hotels within certain overall categories. For example, a guest may choose between the Bellagio and the Wynn.

74.     Fifth, Rainmaker Group and participating Hotel Operators have ample opportunities to collude. Rainmaker Group has hosted in-person "annual user conferences, where feedback is really solicited".[28] The conference gathers Hotel Operators with Rainmaker Group executives to network, exchange insights and ideas, and discuss revenue management tools and new products coming. CW3, who attended Rainmaker user conferences, stated "We kind of all know each other because you all show up to this little conference together." Hotel Operators would typically send employees from their revenue management teams, although CEOs and CFOs might also attend.

75.     Finally, Rainmaker Group advisors have regular contact with Hotel Operators to keep them up to date on their competitors. CW2 stated that Rainmaker staff were "constantly in communication with the hotel" about pricing recommendations and likely held regular meetings with casino staff. Some Hotel Operators met with Rainmaker on a weekly basis, according to CW2.

## V.     CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the Class, which is defined as follows:

77.     All persons that have been direct purchasers of hotel guest room rentals on the Las Vegas Strip from Hotel Operators participating in Cendyn's pricing software, or from a division, subsidiary, predecessor, agent, or affiliate of such Hotel Operator, at any time during the period of January 24, 2019, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.[29]

---

[28] *Cosmopolitan of Las Vegas success story*, CENDYN.COM (June 11, 2019), https://www.cendyn.com/customer-stories/cosmopolitan-las-vegas-success-story-rainmaker/ (last visited Jan. 23, 2023).

[29] Federal and state government entities are excluded from the Class.

CLASS ACTION COMPLAINT - 22

78. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

79. Plaintiffs' claims are typical of those of the Class.

80. Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for hotel rooms than they otherwise would have in a competitive market.

81. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are not antagonistic to the Class.

82. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

83. Questions of law and fact common to the Class include:

    a. Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of hotel rooms in the Las Vegas Strip Hotel Market from competitive levels;

    b. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

    c. If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply in the Las Vegas Strip Hotel Market from competitive levels;

    d. The proper measure of damages; and

    e. The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

84. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

85.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

**VI.     CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT**

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**FOR AGREEMENT IN RESTRAINT OF TRADE**
**15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and**
**Equitable Relief and Compensatory Damages)**

86.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

87.     Beginning at a time currently unknown to Plaintiffs and members of the Class, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

88.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to use pricing algorithms provided by Rainmaker Group that have caused Plaintiffs to pay inflated amounts for hotel rooms in the Las Vegas Strip market.

89.     In furtherance of the contract, combination, or conspiracy, Defendants have committed one or more of the following acts: a) provided information to be used in the operation of the pricing algorithms; b) created and operated algorithms that provided pricing recommendations to Defendants; c) knowingly used algorithms that incorporated information

from other Defendants in setting pricing recommendations; and/or d) set prices based in whole or in part on pricing recommendations provided by Rainmaker Group.

90.     Defendants possess market power in the relevant antitrust market of Las Vegas Strip Hotels.

91.     The relevant product market is the market for the rental of guest rooms and the relevant geographic market is hotels located on the Las Vegas Strip in Las Vegas, Nevada.

92.     Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of supracompetitive prices in the relevant antitrust market of hotel rooms rented on the Las Vegas Strip.

93.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for hotel rooms than they would have paid and will pay in the absence of the conspiracy.

94.     There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

95.     Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under the Rule of Reason.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against Defendants as follows:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

F.    Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.     Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 25, 2023                    Respectfully submitted,


By: */s/ Adam Ellis*
**PANISH SHEA BOYLE RAVIPUDI LLP**
BRIAN J. PANISH, NV Bar No. 16123
(*admission pending*)
RAHUL RAVIPUDI, NV Bar No. 14750
IAN SAMSON, NV Bar No. 15089
ADAM ELLIS, NV Bar No. 14514
300 S. Fourth Street, Suite 710
Las Vegas, Nevada 89101
Telephone: 702.560.5520

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman, Esq. (*pro hac vice forthcoming*)
Stephanie A. Verdoia, Esq. (*pro hac vice forthcoming*)
1301 Second Avenue, Suite 2000
Seattle, Washington 98101

Rio S. Pierce, Esq. (*pro hac vice forthcoming*)
Hannah K. Song, Esq. (*pro hac vice forthcoming*)
715 Hearst Ave, Suite 202
Berkeley, California 94710

*Attorneys for Plaintiffs and the Putative Class*