# Exhibit C

**GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS BOLCH JUDICIAL INSTITUTE,**

**DUKE LAW SCHOOL**

# GUIDELINES AND BEST PRACTICES

# FOR LARGE AND MASS-TORT MDLS

# BOLCH JUDICIAL INSTITUTE, DUKE LAW SCHOOL

## (SECOND EDITION)

Duke Law School
September 2018

TABLE OF CONTENTS

Chapter 1 - Management of Transferred Cases ...................................................1

   MDL Guideline 1 ...................................................................................2

Chapter 2 - Selection and Appointment of Leadership...............................29

   MDL Guideline 2 .................................................................................29

   MDL Guideline 3 .................................................................................34

   MDL Guideline 4 .................................................................................42

Chapter 3 – Lead Counsel Duties ...................................................................51

   MDL Guideline 5 .................................................................................51

   MDL Guideline 6 .................................................................................51

   MDL Guideline 7 .................................................................................53

   MDL Guideline 8 .................................................................................54

   MDL Guideline 9 .................................................................................55

Chapter 4 – Role of Non-Leadership Counsel ...............................................59

   MDL Guideline 10 ...............................................................................59

   MDL Guideline 11 ...............................................................................60

Chapter 5 – Establishment and Use of Common Funds ...............................64

   MDL Guideline 12 ...............................................................................67

Chapter 6 – Federal/State Coordination ........................................................81

   MDL Guideline 13 ...............................................................................81

Chapter 7 – Resolution and Remand .............................................................93

   MDL Guideline 14 ...............................................................................94

Chapter 8 – Settlement Review and Claims-Processing Administration.......108

   MDL Guideline 15 .............................................................................108

   MDL Guideline 16 .............................................................................109

   MDL Guideline 17 .............................................................................109

   MDL Guideline 18 .............................................................................111

   MDL Guideline 19 .............................................................................112

# CHAPTER 2
## SELECTION AND APPOINTMENT OF LEADERSHIP

One of the first challenges in presiding over multidistrict litigation with many parties and separate counsel is the appointment of counsel to lead the litigation. Multidistrict litigation involves numerous parties with common or similar interests but with separate counsel. It is necessary to establish a leadership structure for the plaintiffs, and sometimes for the defendants as well, to ensure the effective management of the litigation. The leadership team is responsible for coordinating discovery and other pretrial work in the cases. They develop the proof necessary for trial, draft motions, work with experts, and communicate with the other side and the court. They must be able to manage all aspects of the litigation. Determining the appropriate leadership structure and selecting the right lawyers to fill the positions is one of the first and most important case-management tasks.

Behind these managerial roles lies another role for plaintiffs' leadership: funding the litigation. In large and mass-tort MDLs, this cost can be exceedingly high; for example, in *Vioxx*, the leadership fronted $41 million. Experienced transferee judges often report underestimating the extent to which finances impacted not only the appointment dynamics, but also the litigation process. Because new entrants often cannot fund (or are perceived as unable to fund) the periodic assessments in addition to their own litigation costs, finance can reinforce the repeat-player dynamic prevalent within committee appointments. Concerned by the unintended overhang of plaintiff financing, a number of judges have begun to explore ways in which the appointment process can be tailored to improve not only demographic diversity but also cognitive and skill-set diversity, as well as enhancing the overall quality of representation afforded by the appointed counsel.

This chapter focuses on the staffing and appointment practices that transferee judges have found effective in enhancing the MDL process. The chapter defines its task capaciously, focusing not only upon the appointment selection but the expectations for the MDL leadership, which will set the parameters and structure for the litigation process. As with the other chapters, the primary focus is on large and mass-tort MDLs, in order to provide the transferee judge with the broadest menu of appointment techniques from which to select in deciding what will work for any given MDL, with the expectation that in simpler cases, the transferee judge may simply select a smaller subset of these options.

> GUIDELINE 2: In an MDL action with many parties with separate counsel, the transferee judge should establish a leadership structure for the plaintiffs, and sometimes for the defendants, to promote the effective management of the litigation.

> BEST PRACTICE 2A: The transferee judge should assess the needs of the litigation in establishing an appropriate leadership structure.

There are many different ways to structure the leadership team; what works for one MDL may be too unwieldy or too streamlined for another. Several factors contribute to the determination of the roles that need to be established and filled by qualified counsel, including

the nature of the claims, the number of cases, and the variety and complexity of interests involved.  The goal is to ensure that the litigation will be managed efficiently and effectively without jeopardizing fairness to the parties.[103]

> BEST PRACTICE 2B: In determining the appropriate leadership structure, the type of cases included in the MDL is often the most important consideration.

Sometimes a fairly simple structure, consisting of a lead counsel and a liaison counsel, is all that is required.  Consumer, securities fraud, and employment class actions in which the plaintiffs generally assert the same or similar claims often fall into this category.[104]  Sometimes the plaintiffs in these types of cases have divergent interests, and separate leadership teams (or at least separate representation on a committee) will be necessary to ensure that the interests of each group are fairly represented.[105]  Similarly, antitrust MDLs often include claims on behalf of both direct and indirect purchasers who must be separately represented.[106]  When separate leadership structures are required, the transferee judge may decide to appoint counsel who will be responsible for coordinating among the teams to ensure that duplication of effort is minimized.[107]

Mass tort and common disaster litigation tend to be the largest MDLs.  Mass-tort litigation can be composed of thousands or even tens of thousands of individual personal-injury lawsuits, third-party payor class actions, and cases brought on behalf of governmental entities.  Courts often appoint a single leadership structure for the plaintiffs in these cases, although the committees tend to be larger than in other types of cases.  Instead of, or in addition to, lead and liaison counsel, courts sometimes appoint an executive committee, assigning specific responsibilities to each member (such as overall leadership of the case, communication with the court, communication with other plaintiffs' counsel, and coordination with lawyers prosecuting related cases in state court).[108]

---

[103] Federal Judicial Center, *MCL* § 10.221 (2004); Federal Judicial Center & National Center for State Courts, *Managing Multidistrict Litigation in Products Liability Cases: A Pocket Guide for Transferee Judges* § 4 (2011).
[104] *See, e.g.,* Initial Case Management Order, *In re Wells Fargo Wage and Hour Employment Practices Litigation* (No. III), MDL 2266, No. 4:11-md-02266 (S.D. Tex. Feb. 24, 2012) (ECF No. 45); Order, *In re Swisher Hygiene, Inc., Securities and Derivative Litigation,* MDL 2384, No. 3:12-md-2384-GCM (W.D.N.C. Oct. 18, 2012) (ECF No. 34); Order Appointing Interim Co-Lead Class Counsel, *In re 5-Hour Energy Marketing and Sales Practices Litigation*, MDL 2438, No. 2:13-mo-02438-PSG-PLA (C.D. Cal. Nov. 8, 2013) (ECF No. 25).
[105] *See In re Facebook, Inc., IPO Securities & Derivative Litigation*, 288 F.R.D. 26 (S.D.N.Y. 2012); Order No. 2: Adopting of Organization Plan and Appointment of Counsel, *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation,* MDL 2151, No. 8:10-ml-02151-JVS-FMO (C.D. Cal. May 14, 2010) (ECF No. 169) (appointing separate leadership structures for personal injury and economic loss plaintiffs, and ensuring that both consumers and non-consumers were represented).
[106] *See, e.g.,* Case Management Order No. 2, *In re Aluminum Warehousing Antitrust Litigation*, MDL 2481, No. 1:13-md-02481-KBF (S.D.N.Y. March 6, 2014) (ECF No. 216).
[107] *See* Order for Appointment of Lead and Liaison Counsel and Preliminary Scheduling Order at 1-2, *In re Target Corporation Customer Data Security Breach Litigation*, MDL 2522, No. 0:14-md-02522-PAM (D. Minn. May 15, 2014) (ECF No. 64).
[108] Court Order: Plaintiffs' Steering Committee, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, 6:11-md-2299-RFD-PJH (W.D. La. Apr. 13, 2012) (ECF No. 560).

Common disaster litigation (like the BP oil spill case) often involves the greatest diversity of interests found in MDLs. The plaintiffs may include private individuals, businesses, emergency responders, and governmental entities, and the claims can vary from personal injury to environmental clean-up to economic losses. A single leadership structure may suffice for these cases as well, although each interest should be represented on a committee.[109]

The bottom line is that there is no one-size-fits-all solution. The challenge lies in balancing the competing goals of adequately staffing and funding the litigation, while ensuring efficiency and controlling costs. The greatest challenge is often to ensure that decisions can be made without delay caused by the need to consult numerous people, while still giving all interested members of the litigation team the opportunity to provide input.

The transferee judge should also keep in mind that leadership needs may change over time. As the case progresses, it may be appropriate to add attorneys to a committee who have been particularly dedicated to the litigation and have contributed to the work on the same level as committee members.[110] It may also become necessary to appoint counsel or committees to serve specific purposes that the judge and parties did not anticipate at the commencement of the litigation. For example, it may become apparent that a proposed class action will have subclasses that require separate representation. If the parties wish to discuss settlement, the judge may decide to appoint lawyers on each side to conduct settlement negotiations, particularly in mass tort or common disaster cases where there are many individual claims and lead counsel need to focus on the ongoing litigation.[111]

> BEST PRACTICE 2C: The transferee judge typically should appoint lead counsel and liaison counsel for the plaintiffs, and often a supporting committee when the litigation is especially large or complex or composed of divergent interests.

> BEST PRACTICE 2C(i):   In cases involving numerous defendants it may be necessary to appoint a leadership team for the defense as well.

While the responsibilities of the defendants' representatives are normally limited to receiving and distributing information and coordinating positions on non-substantive matters, the appointment of a defendants' liaison counsel or other similar representative is often helpful in simplifying the litigation and expediting motion practice. The role of a defense leadership team in multi-defendant cases is often one of coordination, in contrast to the more substantive and strategic role of plaintiffs' leadership. In many cases, it can be extremely beneficial to have leadership on the defense side, in order to carry out an information-distribution function. This function is often bidirectional, disseminating information to all defendants and providing a single point of contact to coordinate with the court and plaintiffs' counsel about logistics, scheduling, and other organizational matters. While defense leadership can coordinate responses between

---

[109] Edward F. Sherman, *The BP Oil Spill Litigation and Evolving Supervision of Multidistrict Litigation Judges*, 30 Miss. C. L. Rev. 237, 240-41 (2011).
[110] Second Amended Court Order: Plaintiffs' Steering Committee, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, 6:11-md-2299-RFD-PJH (W.D. La. June 13, 2013) (ECF No. 2856).
[111] Case Management Order Number 6 (Unified Case Management Plan) at 6-7, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Oct. 3, 2012) (ECF No. 42).

defendants, streamlining arguments and filings, the leadership does not bind other defendants in their responses.

Although some courts appoint firms to serve in leadership positions, it is usually preferable to appoint individual lawyers who can be held accountable and ensure that the case receives consistent attention of a senior partner, rather than risking an excessive degree of delegation to less experienced attorneys.

> BEST PRACTICE 2C(ii): The transferee judge should designate lead counsel who will act for all parties whom they are appointed to represent and are responsible for the overall management of the litigation. The judge should specify at the outset responsibilities assigned to lead counsel, as well as the structure of the entire leadership team and their respective duties.

Typical responsibilities include working with opposing counsel to develop and implement a litigation plan, initiating and conducting discovery, retaining experts, presenting written and oral argument to the court, directing the work of other plaintiffs' counsel, and engaging in settlement discussions. Lead counsel may also serve as the trial attorneys, or may designate other counsel to serve as the principal attorneys at trial. Depending on the size and complexity of the case, it may be appropriate to appoint more than one individual to serve as lead counsel. At the same time, the number should not be so large that it defeats the purpose of appointing someone to lead the litigation. Appointing a committee to support lead counsel is usually more effective than staffing the litigation with numerous co-lead counsel, which can lead to delays in decision making and unnecessary duplication of effort.

> BEST PRACTICE 2C(iii): Although every case is different, the transferee judge should not appoint more than three attorneys to serve as lead counsel in any matter, in light of the potential for inefficiencies and ineffective decision making.

> BEST PRACTICE 2C(iv): The transferee judge should consider the appointment of liaison counsel to serve an administrative role. If the court appoints a liaison, it should specifically define the roles and duties of the liaison at the outset ─ including responsibility for communications between the court and other counsel, maintaining records of all orders, filings and discovery, and ensuring that all counsel are apprised of developments in the litigation. An important aspect of the liaison's role is coordinating with and supporting the clerk of court.

Liaison counsel often has offices in the same location as the court, though that is not necessarily a requirement. Appointing as liaison counsel an attorney who has practiced before the transferee judge can be helpful, since the attorney will already be familiar with the local rules, the judge's practices and preferences, and other court-specific procedures. It is rarely necessary to appoint more than one individual to serve as liaison counsel, and it may be possible to appoint a liaison that is recommended by plaintiffs' counsel. If there are numerous defendants, it may be appropriate to appoint a liaison counsel to coordinate and speak for defendants as well.

BEST PRACTICE 2D: The transferee judge should consider establishing a steering committee, executive committee, or management committee, if the litigation involves numerous complex issues, if there is a substantial amount of work to be done, or if the plaintiffs have different interests that require separate representation.

The type, size, and composition of the committee (or committees) will depend on the number and requirements of the cases composing the MDL. In many cases, a committee will be necessary to support lead counsel in prosecuting the case. Committee members can perform many functions, from consulting with lead counsel on overall case strategy to developing and implementing a litigation plan, managing discovery, preparing briefs, and presenting argument to the court. The committee members may represent different interests in the litigation or bring important skills to the table. For a proposed class action, for example, a committee may include counsel who represent the interests of subclasses.

In mass-tort MDL cases it is often helpful to establish multiple committees. An executive committee, if formed, will typically consist of three to five attorneys who work closely with lead counsel on managing the litigation. Limiting the number of lead counsel and executive committee positions helps to ensure that there is a manageable number of individuals whose buy-in is required for key litigation decisions.

In contrast, the plaintiffs' steering committee is far more variable in size depending on the needs of the particular case. In some cases, the judge may decide not to appoint a steering committee, particularly if the case is simple and manageable, to avoid creating too much infrastructure and hindering rather than expediting or improving case management. In other cases ─ particularly those that are complex, have highly divergent individual fact patterns or a number of competing plaintiff typologies, or multiple defendants ─ a steering committee can ensure that adequate litigation resources are available to the plaintiffs.

Plaintiffs' steering committees are often composed of a broader set of attorneys who each focus on specific aspects of the day-to-day litigation, such as discovery, documents, technology, briefing, science, coordination with state litigation, and trial counsel.[112] The court will thus often seek to ensure that the steering committee members collectively bring diverse skill sets and relevant substantive expertise to bear upon the case. But the judge should also recognize that an important function of the steering committee in large and mass-tort MDLs is to finance the litigation. This recognition should shape not only the criteria for selection, but also is increasingly a factor in considering the appropriate size of the committee.

As noted above, the size of the steering committee is highly variable. Many MDLs proceed efficiently with no committee or only a half-dozen committee members. But particularly large and complex mass-tort MDLs may require a larger steering committee to ensure that the plaintiffs are not at a disadvantage in funding pretrial discovery and have

---

[112] Case Management Order No. 14, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. October 29, 2012) (ECF No. 53); Court Order: Plaintiffs' Steering Committee, *In re Actos (Pioglitazone) Products Liability Litigation*, MDL 2299, 6:11-md-2299-RFD-PJH (W.D. La. Apr. 13, 2012) (ECF No. 560).

sufficient personnel and financial resources to match the defendants.  Only in exceptional cases should more than 20 attorneys be appointed to serve on a steering committee, although there are rare cases in which this is necessary and the imposition of an arbitrary limit may have undesirable consequences.

In large and mass-tort MDLs, the various leadership roles can be filled by counsel with different roles in a way that will satisfy all the needs of the litigation.  For example, the co-lead counsel may provide the strong administrative and communication skills that are required to manage the litigation, while a steering committee may be composed of attorneys with specific skills and the ability to commit substantial time to the ongoing work of the case.  A separate executive committee may include attorneys who can offer essential financial support or who have a significant percentage of the filed cases but will not actively participate in the day-to-day work.  In particularly large and complex mass-tort MDLs, it may also be appropriate to establish separate science and discovery committees, and perhaps a law-and-motions committee.[113] Typically, the need for these committees and their staffing are determined by plaintiffs' counsel.

Finally, experienced transferee judges who have managed MDLs with and without state court liaisons have reported that they find that the appointment of a state court liaison greatly improves the MDL process, particularly in complex MDLs with a variety of state court matters. They report that while they post materials on the MDL website to keep state court judges and counsel updated on the MDL's progress and use many of the coordination techniques described in Chapter 4, a state court liaison adds additional value.  Typically, one state court liaison is appointed for plaintiffs and one for the defense side.  These liaisons are responsible for affirmatively reporting to the transferee judge on the progress of state court litigation, so that the transferee judge hears of updates promptly without having to proactively reach out to the state courts.  Even more important for many judges is the role of the liaison in providing an "early warning" about developments in the state court litigation, so that the judge has insight into the personalities and conflicts, and is therefore well positioned to head issues off before they become problems.  Beyond this single point of contact, appointing counsel to the MDL committees that have cases in both jurisdictions can provide additional sources of information or adjuncts to the appointed liaisons.  (The issues of state-federal coordination are discussed in more detail in Chapter 4.)

> **GUIDELINE 3**: The transferee judge should select lead counsel, liaison counsel, and committee members as soon as practicable after the JPML transfers the litigation.[114]

Because the cases will have already experienced some delay when they arrive in the transferee court, it is important to start the process immediately.  There may be motions pending that were filed before the transfer, responses to complaints due, and outstanding discovery requests.  Putting a leadership structure in place promptly will allow the plaintiffs to take an

---

[113] Case Management Order No. 3, *In re DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation*, MDL 2197, No. 1:10-md-02197-DAK (N.D. Ohio Jan. 26, 2011).
[114] Judicial Panel on Multidistrict Litigation & Federal Judicial Center, *Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Judges* 2 (2d ed. 2014); *Managing Multidistrict Litigation in Products Liability Cases* §§ 3(b) & 4; *MCL* § 22.62.

organized approach to early case-management tasks and give defense counsel someone to communicate with about open issues.

> BEST PRACTICE 3A: Holding the initial conference at the earliest practicable time after the order transferring cases is issued allows the transferee court to promptly set in motion the procedure for appointment of counsel.[115]

> BEST PRACTICE 3A(i):  The initial case-management order should inform counsel that the leadership structure will be discussed at the initial case-management conference and direct them to be prepared to identify case-specific issues that may inform the appropriate structure.[116]   Counsel who intend to seek a leadership position should be required to attend.[117]

While attending to the leadership issues early, it is also important that the transferee judge take the time to carefully frame the proceedings, select the most appropriate leadership structure, and set up the necessary institutional support for the case to proceed smoothly.  The most successful MDLs will move forward expeditiously, without delay but also without a rush that overlooks proper planning.  Judges recognize the balance between needing to quickly get a team in place to move the litigation forward and wanting to have more time to get to know the attorneys and their work product before making the critical decision of which attorneys will lead the litigation.

> BEST PRACTICE 3A(ii):  The transferee judge should take steps to ensure a smooth process for administration of the MDL by confirming that the clerk of court is prepared for and capable of handling the possible (indeed likely) influx of filings that follow transfer of the cases by the JPML,[118] and issuing initial orders that address the filing procedures for counsel to follow before the leadership team is appointed.

As noted in the previous chapter, prior to commencing the application process, the court should ensure that the clerk of the court has the resources for and is otherwise prepared for the inundation of filings that accompany the MDL generally and the appointment process in particular.  Transferee judges note that courts should consider the extent to which counsel from outside the jurisdiction may be filing, because those attorneys often have issues with electronic filing and login credentials, court-specific filing procedures, and pro hac vice requirements.

---

[115] *Managing Multidistrict Litigation in Products Liability Cases* § 3(b).
[116] Preliminary Order on Practice and Procedure Upon Transfer Pursuant to 28 U.S.C. § 1407(a) at 2-3, *In re Monsanto Company Genetically-Engineered Wheat Litigation,* MDL 2473, No. 1:13-md-02473-KHV-KMH (D. Kan. Feb. 3, 2014) (ECF No. 11).
[117] Pretrial Order No. 1 (Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407(a)) at 4, *In re ConAgra Peanut Butter Products Liability Litigation*, MDL 1845, No. 1:07-md-01845-TWT (N.D. Ga. Aug. 10, 2007) (ECF No. 20).
[118] *See generally* Judicial Panel on Multidistrict Litigation & Federal Judicial Center, *Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Court Clerks* (2d ed. 2014).

BEST PRACTICE 3A(iii): At this stage, the transferee judge should consider appointing an interim liaison counsel[119] or encourage counsel to select a proposed liaison counsel prior to the conference, although the formal appointment will be subject to court approval.[120]

The conference gives the transferee judge an opportunity to observe counsel's demeanor and professionalism, get a sense of their leadership qualities, and assess the level of cooperation among counsel. The judge can solicit proposals for the appropriate leadership structure for the litigation and obtain input from counsel about the key substantive and procedural issues that may arise in the course of the litigation, which may impact the type of leadership roles that will be necessary.

One approach some judges have taken is to appoint leadership for a one-year term. While the transferee judge always has the power to add, rescind, or otherwise modify an appointment, a one-year appointment forewarns counsel that if they do not diligently perform their tasks, their appointment will not be renewed. Some judges recommend continuing with annual appointments, while others suggest that after the first year the attorneys' "true colors" have appeared and work habits have developed sufficiently that the enhanced certainty of a standing appointment is preferable.

But others have expressed the view that a longer interim appointment, followed by the usual standing appointment is preferable. Proponents of this approach argue that it takes the judge, and even counsel to a certain extent, months to understand the dynamics within the cases sufficiently well to understand what blocks of plaintiff interests exist. Delaying the appointment process can be helpful in assuring that the various interest groups are each represented. This allows the court to better ensure that not only those structural conflicts requiring separate counsel are represented, but that less serious but equally meaningful conflicts are represented — and in turn that any settlement is more likely to fairly and adequately compensate all plaintiffs.

In underscoring these different approaches, the goal is not only to present two potential ways of timing the appointment of counsel, but to identify the underlying normative challenges that transferee judges are attempting to address in their selection. As a result, the hope is that a transferee judge will be able to assess the needs of the particular MDL, including how mature or advanced the cases within the MDL are, and select an appointment structure that in the context of that MDL will maximize the extent to which all plaintiffs have a voice at the table and that appointed counsel are incentivized to offer exemplary representation to those individuals.

---

[119] Pretrial Order No. 1 at 2, *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, MDL 2066, No. 1:09-SP-80000 (N.D. Ohio July 16, 2009) (ECF No. 12).

[120] Initial Case Management Order at 5-6, *In re Lidoderm Antitrust Litigation*, MDL 2521, No. 3:14-md-2521-WHO (N.D. Cal. Apr. 25, 2014) (ECF No. 21); *Managing Multidistrict Litigation in Products Liability Cases* § 4.

BEST PRACTICE 3B:  Following the conference, the transferee judge should issue an order describing the leadership structure, the procedures for counsel to follow if they intend to seek appointment to any of the roles identified in the order, and the criteria that the transferee judge intends to use in selecting counsel to fill the roles.[121]

Historically, private ordering has been the predominant form of appointment and selection, with lawyers agreeing to who should be appointed lead counsel and to committees and presenting a "slate" of lawyers to the court for consideration.[122]  However, in recent years, some scholars and many transferee judges have begun to question the results of the private-ordering process.[123]  Judges have complained that as leadership appointments have increasingly become the path to substantial common benefit fund awards, the monetary stakes of appointment have generated substantial dysfunction in the incentives of counsel, leading to competitive behaviors that may not result in the appointment of the best possible counsel.

In light of these concerns, many within the MDL community have begun to press for checks by the transferee judges to correct for these systemic misalignments.  Many transferee judges — and even those who have in the past used the private-ordering process — expressed the view that they now see the appointment of counsel as selecting a fiduciary for the class, which will substantially impact the course of the litigation.  Thus, while valuing private ordering and the input of the other plaintiffs' attorneys, there is increasing support for the view that the transferee judge should treat the lawyers' self-selection as one of many considerations in selecting the best leadership team possible.

Some courts still prefer that counsel endeavor to organize a leadership structure themselves; this may take the form of a proposed leadership slate for the court's review and approval with the opportunity for objections.[124]  But most courts now insist on a competitive process and require individual applications.

Whatever approach the judge chooses, the court's expectations should be made clear early in the process so that counsel understand them.  In selecting a selection mechanism and in turn appointing a leadership team, courts should be mindful of the benefits of diversity of all types.  In particular, the strong repeat player dynamic that has historically existed reduces fresh outlooks and innovative ideas, and increases pressure to go along with the group and conform, all of which may negatively impact the plaintiffs whose cases are being pursued in the MDL.  At the same time, leadership needs repeat players who understand the ropes.  Thus a balanced team, with diversity of skills, expertise, prior casework and role, and demographics, should be sought.

---

[121] Pretrial Order No. 1 at 12-14, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, MDL 2179, No. 2:10-md-02179-CJB-SS (E.D. La. August 10, 2010) (ECF No. 2).

[122] *See MCL* § 21.272.

[123] Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, N.Y.U. L. REV. (forthcoming 2015) (draft at 25-27), available at http://ssrn.com/abstract=2437853; Jaime Dodge, *[forthcoming Emory cite]*.

[124] *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); *see also* Procedural Order at 3, *In re Neurografix ('360) Patent Litigation*, MDL 2432, No. 13-md-02432-RGS (D. Mass. Apr. 5, 2013) (ECF No. 3).

BEST PRACTICE 3B(i): The transferee judge should set a schedule that will ensure that leadership is in place within three to four months after the creation of the MDL, or even sooner, to avoid unnecessary delay in proceeding with litigation of the case.

BEST PRACTICE 3C: The judge's primary responsibility in the selection process is to ensure that the lawyers appointed to leadership positions are capable and experienced and that they will responsibly and fairly represent all plaintiffs, keeping in mind the benefits of diversity of experience, skills, and backgrounds.[125]

BEST PRACTICE 3C(i): The transferee judge should develop a straightforward and efficient process for counsel to apply for appointment.  The process should reflect the need to avoid unnecessary divisiveness, while encouraging professionalism and honesty.  The description of the application and selection process should be filed in the public docket in a manner that provides timely notice to all who may be interested in applying.

The selection process will require the transferee judge to consider the qualifications of each individual applicant, as well as the litigation needs, the different skills and experience that each of the lawyers seeking appointment will bring to the role, and how the lawyers will complement one another.  The goal is to establish a diverse team capable of working together to efficiently manage a highly complex proceeding.  Moreover, transferee judges repeatedly suggested that they found that those counsel who lacked ego or the ability to "strut" were often incredibly value team members, able to move the MDL to resolution through a combination of leadership, political savvy, and communication skills.

BEST PRACTICE 3C(ii): Counsel should submit written applications that describe their qualifications to serve in the positions they seek to fill.

The applications do not need to be lengthy, but they should all include the same information to facilitate comparison.[126]  For an MDL involving class actions, counsel should address the considerations for appointment of interim class counsel set forth in Federal Rule of Civil Procedure 23(g).[127]  If the class action involves federal securities claims, counsel must follow the procedures for the appointment of a lead plaintiff outlined by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3).

Some courts prefer to use traditional motion practice, with an opening brief, an opposition, and a reply.  Some courts make their selections based on single submissions from counsel to streamline the process and avoid ad hominem attacks.  Other courts find it helpful for counsel to file short responsive briefs explaining why they should be appointed over other applicants for the same position.

---

[125] *MCL* § 10.22.

[126] Professor Samuel Issacharoff & Hon. R. David Proctor, *Selection and Compensation of Counsel in Multi-District Litigation* at 17 (2012 Transferee Judges Conference Oct. 23, 2012) (on file with author).

[127] Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 7-8 (Federal Judicial Center, 3d ed. 2010).

BEST PRACTICE 3C(iii):  The transferee judge should direct counsel to identify cases in which they have served in a similar leadership capacity, describe their experience in managing complex litigation and their knowledge of the subject matter, and provide information about the resources they have available to contribute to the litigation.[128]

The transferee judge should strongly consider requiring applicants to identify ongoing professional commitments such as other lead-counsel appointments that will compete for their attention and resources, because some courts have found that prominent attorneys may obtain an appointment and then delegate their principal duties to subordinates.  In large and mass-tort MDLs, counsel should offer some background on their clients, including where the clients are located and the law that will govern their claims,[129] and offer a plan for keeping other plaintiffs' counsel updated on developments as the case progresses.

In addition to reviewing the submitted applications, there are many ways for a judge to learn more about the individuals who are vying for appointment.  Judicial colleagues ─ and more recently special masters ─ are a valuable source of information for a transferee judge about the competence and professionalism of counsel who have appeared before them.[130]  The transferee judge may want to require applicants to provide the names of judges and special masters who are familiar with their work in other MDL cases for this purpose.

BEST PRACTICE 3C(iv): In appropriate cases, the transferee judge should conduct interviews of counsel (on the record during an in-court hearing) that have submitted applications for leadership positions, in order to assess the applicants' demeanor and skills.[131]

The value of viewing counsel in a courtroom setting to see how they comport themselves and relate to each other and court staff, and of allowing the judge to inquire about concerns specific to the litigation, is a relatively contentious subject.  Many judges are of the opinion that it is very helpful to see the candidates, particularly those who have not appeared before the court before.  They state that the appearance is but one of many datapoints, but an important one.  Some attorneys express concern that these appearances favor those attorneys whose specialty is in-court appearances, such as motion practice or trial specialists.  But judges who use this approach indicate that they still look to create a team that possesses all of the skills necessary to the litigation, and that the appearance is simply helpful in assessing the in-court skills of those who will be involved in trial or motion practice.  For attorneys who work behind the scenes, these judges will still observe their interactions with other counsel, but will also use the opportunity to inquire about particular areas of concern and substantive skills, putting less weight

---

[128] *MCL* § 22.62.

[129] Order at 2, *In re Actos (Pioglitazone) Products Liability Litigation,* MDL 2299, No. 6:11-md-02299-RFD-PJH (W.D. La. Feb. 13, 2012) (ECF No. 32).

[130] *Ten Steps to Better Case Management* at 2; *see also* Hon. Stanwood R. Duval, Jr., *Considerations in Choosing Counsel for Multidistrict Litigation Cases and Mass Tort Cases*, 74 La. L. Rev. 391, 394 (Winter 2014).

[131] Case Management Order Number 1: Initial Conference Order and Procedural Matters at 14, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Aug. 17, 2012) (ECF No. 4).

on "star-quality."  Some transferee judges have also suggested that the in-person interview helps them assess potential new entrants, whether by identifying which new entrants who have applied are ready for a first appointment or by pressing repeat players for information about junior partners who may bring unique skills and diversity to the MDL.

In questioning applicants, many counsel suggest exploring the assertions made by counsel in their application.  For example, sometimes counsel are listed on complaints with a large number of other firms in order to pool clients and allow each to appear to have a larger number of cases.

Another common complaint involves counsel who are already serving in a number of other MDLs, raising questions among other plaintiffs' counsel about whether those individuals can "really" be actively involved in the leadership of that many cases ─ or will instead be delegating work to junior partners because they are spread too thin to be heavily involved in each case.  This is not to say that there is no value to be added by a "heavyweight"; rather, it is to say that the transferee judge should know what the individual will contribute in order to ensure a properly well-rounded team.  It may also be that by asking the question, the judge finds that the apparent conflict does not exist ─ for example, the other cases do not require a significant time commitment (i.e., have settled) or are related cases that raise similar issues or involve the same defendant and counsel (and thus would bring unique value to leadership).  The suggestion here is simply that the judge look beyond the face of the application, asking hard questions about the individual's contributions to the team in order to get the most accurate picture possible of the ways the team will come together.

Finally, a number of attorneys also suggested that judges ask more questions about financing.  While the ability of an attorney to meet his or her assessment has always been a concern, with new finance mechanisms emerging some attorneys believe that there is a greater need to explore how the attorney will finance the litigation.  The concern is not with whether an attorney has a cash reserve or is instead using a credit line, but with mechanisms for funding in which the funder has a voice in the litigation process, the litigation costs, or settlement sign-off.  Some attorneys see the potential for the development of an undisclosed principal/agent problem in the years to come.

Some judges also informally accept input from defense counsel since they often face the same plaintiffs' lawyers in multiple cases; however, judges should be appropriately skeptical in assessing defense counsel's opinions.  The transferee judge may also appoint lead and liaison counsel first, and then request that they submit a proposal for the membership of any committees the judge has determined will be necessary.[132]

---

[132] Order No. 4, *In re Mirena IUD Products Liability Litigation*, MDL 2434, No. 7:13-md-02434-CS-LMS (S.D.N.Y. May 22, 2013) (ECF No. 103).

BEST PRACTICE 3C(v): The transferee judge should ensure that the selection process is as transparent as possible by providing a general statement of the goals and considerations that guided the selection.

Transparency in the selection process is essential. There is often intense competition among counsel for appointment. Not only do lawyers have legitimate concerns about whether their clients' interests will be adequately represented and whether the litigation will be handled effectively, there is usually a direct correlation between a leadership position and compensation.[133] Leadership roles also confer prestige and experience, can increase the lawyer's chance of future appointments, and may help attract future clients.[134] Because the attorneys designated will be responsible for representing the interests of numerous parties who did not select them as counsel, articulating the basis for the appointments will help instill confidence in their leadership.

Requiring applicants to file their applications in the public docket, rather than submitting them in camera, will encourage professionalism and honesty and avoid the appearance of unfairness. Sensitive information, such as counsel's ability to assist with financing the litigation, may be submitted in camera. Some courts find that the interest in allowing for candid discourse with the court and avoiding the creation of ill will and hostile competition favor in camera submissions. If the transferee judge is not familiar with the attorneys who are seeking appointment, a hearing will usually be informative.[135] When there is little or no competition, it may be appropriate to make appointments without a hearing. There is no single right approach. The judge need only ensure all interested and qualified attorneys have had an opportunity to apply and that the judge has enough information to make an informed decision.

BEST PRACTICE 3C(vi): Even if counsel are able to agree upon a leadership structure themselves, the transferee judge should establish a procedure for the selected lawyers to submit written applications to ensure that they are qualified to lead the litigation.[136]

Although private ordering among counsel can streamline the selection process, it may be susceptible to abuse. For example, a proposed leadership group may include members who are not fully committed to the litigation but are included because their resumes make the group's application more appealing. Counsel may have also entered into improper arrangements to secure a leadership position.[137] The proposed leadership team may exclude lawyers who would bring useful skills or new perspectives to the litigation. The judge will therefore still need to take an active role in the formal appointment process.[138] Courts have a fundamental obligation to ensure that the proceedings will be fairly and efficiently conducted, regardless of the private arrangements among the parties. Independent review will ensure the integrity of the leadership

---

[133] Issacharoff & Proctor, *supra*, note 111, at 3.

[134] *Id.* at 4.

[135] *Id.* at 23; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a).

[136] *MCL* § 22.62; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); Order No. 2, *In re Mirena IUD Products Liability Litigation*, MDL 2434, No. 7:13-md-02434-CS-LMS (S.D.N.Y. May 3, 2013) (ECF No. 65).

[137] *MCL* § 22.62.

[138] *See* Issacharoff & Proctor, *supra* note 111, at 15.

structure and prevent difficulties that could arise later in the litigation if self-appointed counsel become unwilling or unable to perform their duties or incur excessive fees and costs.[139]

> **GUIDELINE 4:** As a general rule, the transferee judge should ensure that the lawyers appointed to the leadership team are effective managers in addition to being conscientious advocates.

In selecting counsel, different factors may be more important depending on the nature of the litigation. Appointing lawyers with diverse perspectives and experience will create a well-rounded and effective team. At least some of the lawyers the transferee judge appoints should have past experience in leading multidistrict litigation. However, lawyers with a history of impressive positions may have spent more time seeking appointments than doing the actual work in the case. Assessing counsels' commitment to the litigation, their past management successes, and their ability to marshal the resources necessary to effectively prosecute the claims are therefore crucial aspects of the selection process.

> **BEST PRACTICE 4A:** In the order appointing counsel, the transferee judge should clearly define the role and responsibilities of each appointed individual within the leadership structure.

The *Manual for Complex Litigation* provides a sample order that outlines the responsibilities of lead and liaison counsel for the plaintiffs and liaison counsel for the defendants.[140] The sample order includes the appointment of a plaintiffs' steering committee but does not allocate any specific responsibilities to its members, instead directing that the members "shall from time to time consult with plaintiffs' lead and liaison counsel in coordinating plaintiffs' pretrial activities and preparing for trial."[141] Since the role that committee members play can be somewhat fluid depending on the course of the litigation, it is usually appropriate to simply note that the committee will assist lead counsel as directed and leave it to lead counsel to assign specific tasks to committee members as they become necessary.[142]

> **BEST PRACTICE 4B:** The transferee judge should appoint lead counsel who have excellent management skills.

The need for lead counsel to have excellent management skills cannot be overstated. Lead counsel must be able to manage a large, complex litigation involving numerous parties with potentially divergent interests. Some lawyers are high-profile litigators or experienced trial attorneys but ineffective leaders. It is critical to appoint individuals who have the proven ability to perform the administrative tasks necessary to effectively manage all of the moving parts of the case. They must also be team players who can work cooperatively with colleagues, opposing

---

[139] *MCL* § 10.224; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a).

[140] *See MCL* § 40.22 (Sample Order re: Responsibilities of Designated Counsel); *see also id.* at § 10.221 (describing the typical roles of liaison counsel, lead counsel, and committees).

[141] *Id.* § 40.22.

[142] *Id.* § 10.222.

counsel, and the court.[143]  Keeping all lawyers involved in the litigation informed of developments in the case can be a demanding task, particularly in large and mass-tort MDLs, and lead and liaison counsel must therefore have excellent communication skills and a strong work ethic.[144]

> BEST PRACTICE 4C: The transferee judge should appoint committee members who have some demonstrated leadership ability because they too must communicate and establish effective working relationships with numerous other lawyers.[145]

Political, personal, and economic differences among counsel can easily disrupt the proceedings.[146]

> BEST PRACTICE 4C(i):  It is essential that the transferee judge appoint a leadership team that is composed of lawyers with a demonstrated track record of successfully working with others, building consensus, and amicably managing disagreements. The transferee judge should be mindful of the importance of harmony among the leadership team, and between the leadership team and both the court and opposing counsel.

> BEST PRACTICE 4C(ii): The transferee judge should appoint lead counsel who are sufficiently experienced and respected to manage multidistrict litigation.

Lead counsel should have prior experience in managing multidistrict and other complex litigation or have demonstrated sufficient skill and experience to manage a complex proceeding. While it may be helpful for committee members to also have some multidistrict litigation experience, they may have other skills or experience that are equally valuable to the litigation, such as class-action expertise, prior litigation of the same claims, experience with federal practice and procedure, electronic discovery, or brief-writing skills.[147]  Each case requires different talents, and new attorneys may bring fresh perspectives to the litigation.[148]

> BEST PRACTICE 4C(iii):  The transferee judge may take into account whether counsel applying for leadership roles have worked together in other cases, their ability to collaborate in the past, divide work, avoid duplication, and manage costs.

The selection of lawyers who have worked together previously may be desirable, in that they have already developed a working relationship and are both to a certain extent vouching for one another.  Moreover, they may have already developed certain systems for handling workflow and comparative advantages that will help expedite the case relative to a leadership committee working together for the first time.  Judges should also be attuned to the potential for negative repeat player dynamics to develop, however.  In considering an application by counsel who have

---

[143] Duval, *supra* note 115, at 392.
[144] *Id.* at 394.
[145] *MCL* § 10.21.
[146] *Ten Steps to Better Case Management* at 3.
[147] Issacharoff & Proctor, *supra* note 111, at 10, 24.
[148] *Id.* at 24; *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); *see also* Duval, *supra* note 115, at 392-93.

previously worked together, the judge may wish to solicit the input of previous MDL judges the proposed counsel appeared before.  The judge should also consider the degree to which each of the counsel has individually been involved in the case in a meaningful way, as well as the risk they will form a coalition that minimizes the input or assignments given to other attorneys, or otherwise wield power in a way that is not most favorable to the plaintiffs as a whole or to other plaintiffs' lawyers.  Counsel may also have developed personal and professional conflicts and antagonisms with other lawyers that would compromise their abilities to effectively manage or contribute to the present litigation, which should be considered in selection.[149]

> BEST PRACTICE 4D: The transferee judge should appoint counsel who have the commitment and resources to effectively serve in the leadership role for which they are selected.  The judge should confirm that the leadership team as a whole will be able to effectively handle the demands of the litigation.[150]

> BEST PRACTICE 4D(i):  The transferee judge should recognize the practical reality that the leadership team may need to finance the litigation but should not allow it to overshadow the need to appoint a functional and diverse team.

In many MDLs the leadership team bears the financial burden of funding the litigation.  This burden can be significant in cases that take several years to reach trial or resolution or that involve a great deal of expert work.  Financial resources should not be the primary reason for this decision, however.

> BEST PRACTICE 4D(ii):  In making its selection decision, the transferee judge should consider the other demands on the applicants' time, including the number of other MDLs in which they are serving in leadership positions.

Multidistrict litigation requires consistent and dedicated oversight and management, and those serving in leadership roles must be able and willing to make the litigation a priority throughout the course of the proceedings.  While some lawyers have many other lawyers and staff members available in their firms, that fact alone does not ensure that they will be able to devote the necessary time and energy to the litigation.  Even lawyers with significant resources at their disposal can overextend themselves.

> BEST PRACTICE 4D(iii):  The transferee judge should consider the number, type, and nature of the applicant's cases in mass tort and common disaster litigation.

Although, as a practical matter, it may be difficult to accurately ascertain the strength of the applicant's cases early in the litigation, lawyers with cases of significant value (whether because of the number, type, or quality of cases) will have a significant incentive to prosecute the litigation as vigorously as possible.  The transferee judge may also consider the location of the applicant's clients because creating a leadership group that represents clients with claims in a variety of states will ensure that the differing interests are adequately represented and that unique state law issues are being given the requisite attention.  Caution should be exercised when

---

[149] *MCL* § 10.224.
[150] Issacharoff & Proctor, *supra* note 111, at 12.

assessing this factor, however, as it could incentivize lawyers to prematurely file cases in multiple jurisdictions.[151]  Also, the most experienced and effective lawyers may not have the largest number of cases.

> BEST PRACTICE 4D(iv): The transferee judge should inquire as to whether an applicant has a significant number of cases pending in related state litigation and the applicant's views about the effective coordination of those cases with the MDL proceedings.

Substantial state and federal cases have raised a concern for some judges that the applicant will have to split its attention and resources between the federal and state proceedings. But there are advantages as well, which transferee judges at times underestimate.  For example, an applicant with a number of state cases could be a good candidate to serve as a liaison with the state litigation or on a settlement committee.  Thus, the transferee judge should inquire about the nature and extent of the counsel's state litigation commitments and counsel's view on the effective coordination of the state and federal proceedings, then make an individualized assessment about whether the attorneys' participation will aid or detract from the MDL proceeding.

> BEST PRACTICE 4E:  The transferee judge should take into account whether the leadership team adequately reflects the diversity of legal talent available and the requirements of the case.[152]

Mass-tort MDL cases affect a large and diverse group of people, and ensuring diversity in the leadership of the cases will enhance public trust in the courts and will improve the likelihood of consideration of diverse ideas and perspectives that MDLs require. Litigants and the civil justice system benefit from the diversity of leadership.[153]  Indeed, the same way that diversity improves companies' bottom lines, litigants and the civil justice system benefit from diversity of leadership.[154]  Yet historically, women and minority lawyers have not been appointed to leadership positions at rates proportionate to their representation in the plaintiffs' bar generally. It cannot be said that there are not enough talented individuals with the education, background and experience to effectively lead MDL litigation to permit greater diversity.[155]

---

[151] *Id.* at 18; *see also* Duval, *supra* note 115, at 393-94.

[152] *See* Duval, *supra* note 115, at 393.

[153] *See, e.g.*, Katherine W. Phillips, *How Diversity Makes Us Smarter*, SCIENTIFIC AMERICAN (Sept. 16, 2014), available at: http://www.scientificamerican.com/article/how-diversity-makes-us-smarter/.

[154] *See, e.g.*, Katherine W. Phillips, *How Diversity Makes Us Smarter*, SCIENTIFIC AMERICAN (Sept. 16, 2014) available at: http://www.scientificamerican.com/article/how-diversity-makes-us-smarter/.

[155] *See, generally,* Jaime Dodge, *Facilitating Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 EMORY L.J. ___ (2014) (noting the "deep bench" of qualified, MDL attorneys but presenting empirical data showing a continuing gender gap in appointments); *see also* Elizabeth J. Cabraser, *Where Are All the Women in the Courtroom*?, Feb. 28, 2014, available at http://www.liefcabraser.com/blog/2014/02/where-are-all-the-women-in-the-courtroom.shtml (noting anecdotally a persistent gender gap in representation, despite outstanding outcomes obtained by female attorneys in recent MDL cases).

Repeat player dynamics continue to persist, restricting diversity across MDL leadership.[156]  Research shows that having a mix of experienced and new players enhances creativity and innovation, leads to better decisionmaking and problem solving, and promotes discussion of novel concepts raised by those who historically have not been in leadership.[157]

Whatever application process is used, the court should bear in mind the value of diversity of all types as a component of obtaining the best possible representation for plaintiffs.  Judges should seek to appoint a diverse group, with respect to not only prior experience and skills, but also gender, race and national origin, age, and sexual orientation. Counsel may in turn consider this in deciding not only which individuals from the firm should seek appointment, but also ─ to the extent slates are still utilized ─ in selecting the slate.

In addition to demographic diversity, the judge should be mindful of creating a team with diversity of experience, balancing the benefits of selecting leadership members who have worked well together in the past with the benefits of having a leadership team that brings different experiences that can be brought to bear in the litigation.  The judge should also seek to ensure a variety of skill sets within the leadership team and the need for heightened financial resources in the executive committee.

Given the lack of commonality requirements in MDLs that are not class actions, substantially different claims may all be included in the same MDL.  In these cases, particularly when there are significant differences among identifiable groups of plaintiffs, the judge should ensure that the leadership is comprised of attorneys that reflect these variations in claims.[158]  In multidistrict litigation that is likely to involve the application of multiple states' laws, geographic diversity may be an important consideration as well.

By taking early control of the process through which counsel are appointed to leadership positions and clearly communicating the criteria for appointment, the court can ensure that composition of the plaintiffs' leadership team reflects the needs of the case and the available talent from a diverse pool.  The court should ensure that slates or, later in the litigation, formation of committees or allocation of work assignments, do not lead to the exclusion of attorneys who bring valuable skills, resources, or perspectives to the litigation.

---

[156] Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, N.Y.U. L. REV. (forthcoming 2015) (draft at 25-27), available at http://ssrn.com/abstract=2437853 presenting empirical study of repeat players in MDLs and noting gender gap within those repeat players); Jaime Dodge, *Facilitating Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 EMORY L.J. ___ (2014) (presenting empirical data on PEC, PSC, and defense-side appointments, and noting a persistent but narrowing gender gap).

[157] Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, N.Y.U. L. REV. (forthcoming 2015) (draft at 25-27), available at http://ssrn.com/abstract=2437853.

[158] See generally ALI, *Principles of the Law of Aggregate Litigation*, section 2.07 (describing structural conflicts necessitating judicial intervention).  *See also* Roger H. Transgrud, *Aggregate Litigation Reconsidered*, 79 GEORGE WASHINGTON L. REV. 293, 303-05 (summarizing debate around structural conflicts of interest between plaintiffs).

BEST PRACTICE 4F:  Attorneys seeking to serve in leadership positions may have
entered into financial arrangements that could raise conflicts of interest.  The
transferee judge should guard against the possible negative implications of these
types of agreements among counsel.

Side agreements regarding leadership positions or the apportionment of fees can affect
how appointed counsel conduct themselves during the litigation and the positions they take.[159]
Before appointing counsel to a leadership role, the transferee judge may want to direct the
applicants to disclose any financial arrangements they have with other counsel to ensure that the
appointments are appropriate and will not give rise to conflicts of interest or otherwise negatively
impact the litigation.[160]

BEST PRACTICE 4G:  The transferee judge should create a process at the outset of
the case for the contemporaneous submission and review of all counsels' time and
expenses.

Periodic review of time records will allow lead counsel and the transferee judge to
monitor the cost of the litigation, identify and eliminate unreasonable billing practices, and, if
necessary, establish a budget for the litigation.[161]  The time records should include descriptions
of the work performed, the hourly billing rate for each attorney and staff member, and any
expenses incurred.[162]  The transferee judge can either direct lead counsel to submit a proposed
process for monitoring and approving time records and expenses or outline a procedure for
counsel to follow.[163]  The court may choose to task lead counsel, liaison counsel, or a designated
committee member with collecting and reviewing the time records for all counsel on a monthly
or quarterly basis. [164]

In large and mass-tort MDLs, some courts find it helpful to appoint a CPA early in the
litigation to assist the committee with tracking fees and costs,[165] while other courts in large-scale
MDL cases appoint a special master or magistrate judge to the role.  Doing so helps to ensure
that lawyers who are submitting fees and costs use an agreed-upon submission process and
remain updated on the financial picture of the litigation and the standards used for approving fees
and costs.  If the fees and expenses are being approved or disapproved rather than merely

---

[159] *MCL* §§ 10.224, 22.62; *see also In re Fine Paper Antitrust Litig.*, 98 F.R.D. 48, 70-76 (E.D. Pa. 1983)
(describing agreements to influence the organizational structure of the leadership team that resulted in rampant
inefficiency and overbilling), *aff'd in part, rev'd in part*, 751 F.2d 562 (3d Cir. 1984).

[160] Issacharoff & Proctor, *supra* note 111, at 16; *see also* Order Setting Initial Conference at 11, *In re Nexium
(Esomeprazole) Products Liability Litigation*, MDL 2404, No. 2:12-ml-02404-DSF-SS (C.D. Cal. Jan. 23, 2013)
(ECF No. 4) (requiring "full disclosure of all agreements and understandings between or among counsel (whether
formal or informal, documented and undocumented" to "consider whether such arrangements are fair, reasonable,
and efficient").

[161] *MCL* § 14.214.

[162] Pretrial Order No. 9, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20,
2010, MDL 2179, No. 2:10-md-02179-CJB-SS (E.D. La. Oct. 8, 2010) (ECF No. 508).

[163] *See id.* at 2-3.

[164] *MCL* § 40.23 (Sample Order re: Attorneys' Time and Expense Records).

[165] Case Management Order No. 10 Appointing Accounting Firm, *In re Effexor (Venlafaxine Hydrochloride)
Products Liability Litigation*, MDL 2458, No. 2:13-md-02458-CMR (E.D. Pa. June 4, 2014) (ECF No. 112).

collected and reviewed, the court may also want to incorporate a secondary review by a special master or magistrate judge to ensure fairness. Many courts require counsel to submit the time records or reports summarizing the fees and expenses to the court on a periodic basis, though it is important to guard against the communication of litigation strategy to the court or defense counsel. The *Manual for Complex Litigation* provides a sample order.[166]

> BEST PRACTICE 4H: In large and mass-tort MDLs, the transferee judge should encourage the leadership team to provide work for the common benefit of the cases to other attorneys who are qualified and available to perform the work, unless doing so would create inefficiency in the prosecution of the claims. The transferee judge should inform the leadership team at the outset if it does not want them to assign work to other counsel.

In most cases, courts expressly authorize other counsel to perform work on the case so long as the work has been assigned and is supervised by lead counsel. Even though they are not part of the leadership structure, additional plaintiffs' counsel can bring different and necessary skills and experience to the litigation and provide the support the leadership team needs to accomplish all the required tasks in the case. At the same time, lead counsel must ensure that distributing work does not lead to inefficiency and unnecessary expense. The number of attorneys participating should not be disproportionate to the needs of the case.

> *Best Practice* 4H(i): The transferee judge should inform the leadership team that the roles and primary responsibilities of lead counsel, liaison counsel, and committee members should not be delegated to other attorneys without prior permission of the court.

Many courts include a provision in the order appointing counsel instructing that leadership appointments are of a personal nature and that other lawyers, including those in the appointed lawyers' law firms, may not perform the key functions assigned to the appointed lawyers without court approval.[167] It is appropriate for the members of the leadership team to draw on the skills and experience of others in their firm in performing certain aspects of their roles, and they may and should delegate some responsibility for the day-to-day tasks to their colleagues. These tasks may include conducting or overseeing facets of offensive or defensive discovery, performing legal research, drafting motions, and working with experts. The appointed attorney must, however, remain ultimately responsible for and participate actively in the ongoing prosecution of the case, direct strategy, and communicate and coordinate with the other members of the leadership team.

---

[166] *MCL* § 40.23.
[167] Case Management Order No. 6 at 3, *In re Effexor (Venlafaxine Hydrochloride) Products Liability Litigation*, MDL 2458, No. 2:13-md-02458-CMR (E.D. Pa. Oct. 31, 2013) (ECF No. 33).

BEST PRACTICE 4I: The transferee judge should direct the leadership team to implement a process for communicating key events, deadlines, and other important information to all plaintiffs' counsel.

The leadership team is responsible for keeping all counsel apprised of developments in the litigation. The judge may want to include a process for doing so in a case management order to ensure that all counsel are aware of the procedures that have been adopted. In smaller MDLs the process can be informal, but in large and mass-tort MDLs, in particular, a more formal process is usually necessary. The litigation team may assign the responsibility for communicating updates to liaison counsel or to a particular committee member, or it may assign each committee member a group of attorneys to keep updated.

BEST PRACTICE 4J: The transferee judge should create a process for receiving regular input from the leadership team and ensuring that the litigation is progressing in an effective and efficient manner.

Many courts hold regularly scheduled status conferences for this purpose, often requiring the members of the leadership team to attend, including trial counsel once trial is imminent or underway.[168] The judge may want to instruct counsel for both sides to meet in advance of the conference and submit an agenda and status conference report a few days before the conference.[169] The conferences will allow the judge to keep track of discovery, motion practice, and any unexpected developments and ensure that the litigation is not subject to unnecessary delays.[170] The judge will also be able to confirm that the leadership structure is working properly and assess whether any new members should be appointed.

Holding these conferences in open court and having a court reporter present to record scheduling changes or substantive discussions and rulings will promote transparency. Some courts allow counsel that are not part of the leadership team to participate by telephone, using a teleconference system that restricts participation to those who have obtained preapproval to speak. Sometimes informal off-the-record conferences are more productive, and one option is to combine the two by holding a short off-the-record meeting with lead and liaison counsel before the monthly conference in open court.[171] The transferee judge may also wish to allow for a "blind" (but not anonymous) process for providing written comments, perhaps initially screened by a special master or magistrate judge before bringing any issues and possible changes to the court's attention.

---

[168] *Managing Multidistrict Litigation in Products Liability Cases* § 3(b); *see also In re Vioxx*, 760 F. Supp. 2d at 643 (noting that the court held monthly status conferences in open court and posted notices and transcripts of the conferences on a website dedicated to the litigation).
[169] Managing Multidistrict Litigation in Products Liability Cases § 3(b); *see also* Case Management Order No. 1 at 10, *In re Atlas Roofing Corporation Chalet Shingle Products Liability Litigation*, MDL 2495, No. 1:13-md-02495-TWT (N.D. Ga. Jan. 16, 2014) (ECF No. 15).
[170] Duval, *supra* note 115, at 394-95.
[171] *Managing Multidistrict Litigation in Products Liability Cases* § 3(b).

BEST PRACTICE 4K: The transferee judge should not hesitate to reconstitute the leadership team if it becomes necessary.

The transferee judge should make sure that the appointed lawyers are the ones doing the work, that they are giving appropriate consideration to managing the case efficiently, and that they are using fair and reasonable methods for assigning and assimilating work.[172]  Some courts appoint members of the leadership team for limited terms, requiring them to reapply, along with any new applicants, on an annual basis.[173]  This approach helps to ensure that they continue to fulfill their duties and offers an established procedure for replacing those who do not.[174]  The transferee judge may also want to require lawyers seeking reappointment to provide their time records for their work on the case and identify the specific tasks they have performed over the prior year.[175]  Requiring counsel to reapply on an annual basis may be more disruptive than beneficial in some cases, and other procedures, like holding regular status conferences, can be implemented to achieve the same accountability.  By staying closely attuned to the progress of the litigation, the judge will be able to address problems as they arise.

---

[172] Issacharoff & Proctor, *supra* note 111, at 14, 15.

[173] *Managing Multidistrict Litigation in Products Liability Cases* § 4(a); *see also* Pretrial Order No. 8 at 2, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, MDL 2179, No. 2:10-md-02179-CJB-SS (E.D. La. Oct. 8, 2010) (ECF No. 506).

[174] Issacharoff & Proctor, *supra* note 111, at 14.

[175] Duval, *supra* note 115, at 393; *see also* Case Management Order Number 4: Appointing Plaintiffs' Leadership Positions at 3-4, *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Sept. 27, 2012) (ECF No. 36).