**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
Stephanie A. Verdoia (*pro hac vice*)
stephaniev@hbsslaw.com
Ted Wojcik (*pro hac vice forthcoming*)
tedw@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Rio S. Pierce (*pro hac vice*)
riop@hbsslaw.com
Abby R. Wolf (*pro hac vice*)
abbyw@hbsslaw.com
715 Hearst Ave, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001

**PANISH SHEA BOYLE RAVIPUDI LLP**
Brian J. Panish (NV Bar No. 16123)
panish@psbr.law
Rahul Ravipudi (NV Bar No. 14750)
rravipudi@psbr.law
Adam Ellis (NV Bar No. 14514)
aellis@psbr.law
Ian Samson (NV Bar No. 15089)
isamson@psbr.law
300 S. Fourth Street, Suite 710
Las Vegas, NV 89101
Telephone:  (702) 560-5520

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| RICHARD GIBSON, and HERIBERTO VALIENTE, <br><br> Plaintiffs, <br><br> v. <br><br> MGM RESORTS INTERNATIONAL, CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED, INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC, WYNN RESORTS HOLDINGS, LLC, <br><br> Defendants. | Case No. 2:23-cv-00140-MMD-DJA <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE** <br><br> **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................... 1

II.     BACKGROUND ............................................................................. 3

III.    LEGAL STANDARD ...................................................................... 5

IV.     ARGUMENT .................................................................................. 6

      A.     Plaintiffs sufficiently allege a hub-and-spoke conspiracy based on Operators' common agreement to use Rainmaker. ................................ 6

            1.     Plaintiffs allege parallel conduct and plus factors. ................. 10

      B.     In the alternative, Plaintiffs plead a rule of reason claim based on a set of vertical agreements between Rainmaker and Defendant Operators. .................. 15

            1.     Operators' vertical agreements with Rainmaker constitute a "contract, combination or conspiracy" within the meaning of Section 1 ................................................................................. 15

            2.     Plaintiffs allege both direct and indirect evidence of harm to competition. ......................................................................... 16

            3.     Defendants do not seriously dispute Plaintiffs' allegations. .................... 19

      C.     Plaintiffs answer *Kendall*'s "basic questions." ................................ 21

V.      CONCLUSION .............................................................................. 24

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4
5
*Alvarado v. Western Range Ass'n,*
No. 22-CV-00249 (MMD) (D. Nev. Mar. 21, 2023)...........................................10

6
7
*Anderson News, L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)...................................................................5

8
*In re Animation Workers Antitrust Litig.,*
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ...............................................15

9
10
*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................ *passim*

11
*Borenstein v. Animal Found.,*
526 F. Supp. 3d 820 (D. Nev. 2021) ...................................................24

12
13
*Brantley v. NBC Universal, Inc.,*
675 F.3d 1192 (2012)..................................................................15, 17

14
15
*In re Broiler Chicken Antitrust Litig.,*
290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................... *passim*

16
*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,*
148 F.3d 1080 (D.C. Cir. 1998)............................................................1

17
18
*City of Moundridge v. Exxon Mobil Corp.,*
2009 WL 5385975 (D.D.C. Sept. 30, 2009) .......................................12

19
20
*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962)..........................................................................21

21
*In re Dealer Mgmt. Sys. Antitrust Litig.,*
2018 WL 6629250 (N.D. Ill. Oct. 22, 2018)........................................24

22
23
*In re Elec. Books Antitrust Litig.,*
859 F. Supp. 2d 671 (S.D.N.Y. 2012)..................................................23

24
25
*Epic Games, Inc. v. Apple, Inc.,*
2023 WL 3050076 (9th Cir. Apr. 24, 2023) .............................17, 18, 19

26
*In re Fresh & Process Potatoes Antitrust Litig.,*
834 F. Supp. 2d 1141 (D. Idaho 2011) ................................................24

27
28
*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986)..........................................................................21

*Great Atl. & Pac. Tea Co. v. F.T.C.*,
   440 U.S. 69 (1979) .................................................................................................. 13

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
   804 F. Supp. 2d 419 (D. Md. 2011) ....................................................................... 6

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
   2014 WL 64657 (N.D. Ill. Jan. 8, 2014) .............................................................. 18

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) .................................................................... 9

*Interstate Cir. v. United States*,
   306 U.S. 208 (1939) ....................................................................................... *passim*

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   2021 WL 5359731 (S.D. Fla. Nov. 17, 2021) ....................................................... 6

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ....................................................................... *passim*

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) .................................................................... 9

*Las Vegas Sun v. Adelson*,
   2020 WL 7029148 (D. Nev. Nov. 30, 2020) ....................................................... 14

*Laumann v. NHL*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012) .................................................................... 9

*Moehrl v. Nat'l Ass'n of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) ..................................................................... 6

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ....................................................................... *passim*

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
   2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022) ........................................... 9, 13, 23

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) .............................................................................. 12

*Newcal Indus., Inv. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ......................................................................... 14, 18

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ........................................................................... 14, 18

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ............................................................... 24

*In re Plasma–Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) .............................................................6, 15, 23

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ......................................................................................17

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ......................................................................................................6

*Sitts v. Dairy Farmers of Am., Inc.*,
   417 F. Supp. 3d 433 (D. Vt. 2019) .............................................................................20

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ......................................................................................21

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) .......................................................................................24

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .......................................................................................13

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ......................................................................................20

*In re Turkey Antitrust Litig.*,
   2022 WL 17093359 (N.D. Ill. Nov. 21, 2022) ...........................................................11

*Twin City Sportservice, Inc. v. Charles O'Finley & Co., Inc.*,
   676 F.2d 1291 (9th Cir. 1982) ....................................................................................18

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ...................................................................................7, 11

*United States v. Diaz*,
   176 F.3d 52 (2d Cir. 1999) .........................................................................................10

*United States v. Masonite Corp.*,
   316 U.S. 265 (1942) ......................................................................................................6

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948) ....................................................................................................11

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ........................................................................................8

*V5 Techs., LLC v. Switch, Ltd.*,
   2018 WL 11409662 (D. Nev. Sept. 28, 2018) ...........................................................18

*Wall Prods. Co. v. Nat'l Gypsum Co.*,
   326 F. Supp. 295 (N.D. Cal. 1971) ............................................................................11

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    561 F.3d 1004 (9th Cir. 2009) ........................................................................................16, 20

**STATUTES**

15 U.S.C. § 1 .......................................................................................................... *passim*

**OTHER AUTHORITIES**

Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust
    Division Delivers Remarks at GCR Live: Law Leaders Global 2023, United
    States Department of Justice (February 2, 2023) ........................................................7

*Report: Average Daily Room Rates Up 30% in March*, NBC 3News (April 26,
    2023) ................................................................................................................3

Stephanie Assad et al., *Autonomous algorithmic collusion: Economic research
    and policy implications,* Toulouse School of Economics Working Paper
    (March 2021) ...............................................................................................19

## I.   INTRODUCTION

At the heart of Plaintiffs' complaint is a modern version of an old story: one in which firms exchange pricing information through, and then outsource pricing decisions to, a single third-party actor—thus breaking the competitive machinery of a normal market. This is a classic "hub-and-spoke" conspiracy, with the only difference that the "hub" at the center is an algorithm, rather than a person or firm. It is also the kind of conduct antitrust laws are intended to prohibit. As the Ninth Circuit has explained, "homespun metaphors for complex economic activities go only so far" because "no matter the configuration they take or the labels we give them," "Section 1 prohibits agreements that unreasonably restrain trade[.]"[1]

Plaintiffs allege that Defendants—specifically, (1) Hotel Operators ("Operators") on the Las Vegas Strip, together with (2) Rainmaker Group ("Rainmaker"), which makes available pricing algorithms—have used Rainmaker's algorithms to elevate hotel room prices above competitive levels. Operators give Rainmaker real-time access to competitive data regarding occupancy, rates, and guests; its algorithms then output pricing recommendations that Operators can accept. Plaintiffs allege, based on Rainmaker's public statements, that these recommendations are accepted 90% of the time, and that Operators know their competitors also use Rainmaker's algorithms—and are thus assured that the supracompetitive prices Rainmaker recommends will not be undercut. Remarkably, this is Rainmaker's sales pitch: company executives have stated publicly "the ultimate goal [of hotel revenue managers] is not chasing after occupancy growth, but instead maximizing profits" and that "[i]nstead of optimizing for revenue, a hotel needs to optimize for profit." Compl. ¶ 9[2].

The result is that Rainmaker's algorithms, collectively used, allow Operators to set and maintain supracompetitive prices. This is not speculation. Prices for Strip hotel rooms are currently at record highs; meanwhile, regulators and academics have voiced concern with precisely what

---

[1] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015); *see also Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) ("Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.").

[2] All paragraph (¶) cites hereafter are to Plaintiffs' complaint, *see* ECF 1.

Plaintiffs allege. ¶¶ 62–68. Indeed, the former acting chair of the FTC has written that, if "a group of competitors sub-contrac[ed] their pricing decision to a common, outside agent that provides algorithmic pricing services," this would be no different from a "guy named Bob" collecting confidential strategy information from competitors and telling them how to price. ¶ 67.

Plaintiffs state a Section 1 claim under two theories. **First**, they allege that Defendants formed a hub-and-spoke conspiracy consisting of Rainmaker (the hub), Operators (the spokes), and a conspiracy among Operators (the rim). Plaintiffs' allegations fall in a long line of cases, beginning with the Supreme Court's 1939 *Interstate* decision, holding that even absent direct evidence that defendants "entered into any agreement with each other," their common assent to a scheme is sufficient to establish a horizontal agreement; that is, by using Rainmaker with the knowledge that other Defendants were as well, and that "cooperation was essential to the successful operation of the plan"[3] (to keep prices high), Operators formed a horizontal conspiracy in restraint of trade.

**Second**, in the alternative, Plaintiffs allege a set of vertical agreements between Operators and Rainmaker to use Rainmaker's pricing algorithms that, assessed in the aggregate, harmed competition. The Ninth Circuit recognizes that a "collection of purely vertical agreements" may unreasonably restrain trade[4], and Plaintiffs allege such a collection here: specifically, they allege that Operators and Rainmaker formed agreements to use Rainmaker's algorithms, and identify both direct evidence (higher prices) and indirect evidence (research demonstrating algorithmic pricing's anticompetitive effects) of harm to competition.

Defendants do not meaningfully challenge either theory in their motion to dismiss. *See* ECF No. 91 (hereafter "Mot."). In fact, Defendants devote a single, cursory footnote to disputing whether Operators' agreements with Rainmaker constitute vertical restraints, *see* Mot. at 11 n.6— and get the law wrong. Similarly, Defendants devote pages of argument to the claim that Plaintiffs fail to allege in sufficient detail a *specific agreement* between Operators to restrain trade. But once again, this argument fundamentally misapprehends both Plaintiffs' claims and the relevant law:

---

[3] *Interstate Cir. v. United States*, 306 U.S. 208, 226–227 (1939).

[4] *Musical Instruments*, 798 F.3d at 1193 n.3.

1   Defendants' brief nowhere acknowledges *Interstate* or the line of cases following it, nor do
2   Defendants seriously challenge Plaintiffs' well-pled allegations (1) that Operators agreed to use
3   Rainmaker while knowing their competitors were also using Rainmaker and (2) these individual
4   agreements were essential to forming a horizontal conspiracy to artificially inflate room prices.
5   This is sufficient to state a claim under Section 1.

## II.   BACKGROUND

7       Defendant Hotel Operators collectively operate at least 20 of the 30 hotels on the Las Vegas
8   Strip,[5] and have market power in the market for hotel rooms there. ¶¶ 2, 8, 39–43. Defendant
9   Cendyn Group, LLC ("Cendyn") acquired Defendant Rainmaker in August 2019; Rainmaker
10  provides three integrated pricing algorithms to Operators that gather real-time pricing and supply
11  information, then generate room-specific pricing recommendations using that data. ¶¶ 8, 11–20.
12  According to Confidential Witness 1 ("CW 1"), a former Rainmaker executive, Rainmaker's
13  products are used by 90% of the hotels on the Las Vegas Strip, ¶ 7, and Rainmaker touts publicly
14  that its pricing recommendations are accepted 90% of the time. ¶ 12. In other words, it is
15  Rainmaker's algorithms, and not normal market forces, that set prices for hotel rooms on the Strip.
16  This has led to supracompetitive pricing: when Plaintiffs filed their complaint in January 2023,
17  reporting indicated that Las Vegas visitors paid the highest average daily room rate in city history
18  in September 2022, ¶ 23—a record broken again in March 2023.[6]

19      Before Rainmaker, Operators priced rooms independently, and in the same way as any
20  hotel trying to maximize profit in a competitive market: by seeking to maximize occupancy, e.g.,
21  by granting concessions or lowering prices to lure customers. ¶¶ 44–45. After Rainmaker,
22  Operators kept prices high and some rooms empty, knowing that because their competitors also
23  gave pricing information to Rainmaker, and in turn relied on its recommendations, they would not
24  undercut these supracompetitive prices. ¶¶ 22, 47. This strategy would fail in a competitive market.
25  But it is Rainmaker's sales pitch: according to Rainmaker executives, "the ultimate goal [of hotel

---

26      [5] As defined in Plaintiffs' complaint, the "Las Vegas Strip" is the four-mile stretch in the
27  unincorporated towns immediately south of the City of Las Vegas. ¶¶ 39–43.

28      [6] *Report: Average Daily Room Rates Up 30% in March*, NBC 3News (April 26, 2023),
    https://tinyurl.com/2p99n5ny.

1  revenue managers] is not chasing after occupancy growth, but instead maximizing profits" and
2  that "[i]nstead of optimizing for revenue, a hotel needs to optimize for profit." ¶ 9.

3      Operators' conspiracy was effectuated by three "seamlessly" integrated Rainmaker
4  algorithms that constitute "the most comprehensive revenue management suite to traditional
5  hotels, casino hotels, and resort hotels" that "solves for competitive rate shopping" (¶ 11):

6      **GuestRev.** GuestRev is an algorithm tailored for the casino hotel market that is designed
7  to forecast and recommend prices for individual travelers. Operators give Rainmaker (1) granular
8  data on bookings—in CW 1's words, "[t]he details of every single booking ever made or booking
9  attempted"—and (2) information on "who their competitors" are; Rainmaker then uses this data,
10 as well as data "shopped" from competitors, to "forecast[] demand" and make daily pricing
11 recommendations. ¶¶ 12–16, 50–52. According to CW 3, a former Rainmaker employee, clients
12 can use competitor pricing to "influence" GuestRev's pricing recommendations. ¶ 16. Plaintiffs
13 allege that Operators used GuestRev in this way: CW 2 stated that Rainmaker was "in a lot of the
14 hotels, so that gave us a little leverage to know what the typical hotel was recommending," while
15 the general manager of Treasure Island Vegas (one of Operators' properties), has stated that
16 GuestRev's "capacity to factor in competitors' rates and suggest optimal room rates to maximize
17 revenue is one of its best features." *Id.* Rainmaker also advertises GuestRev's ability to let users
18 "[p]rice each room type independently of overall demand", ¶ 12—contrary to how pricing works
19 in a competitive market.

20     **RevCaster.** RevCaster is a "market intelligence and competitor rate shopping solution,"
21 offered since 2015, that (1) allows clients to monitor and respond to competitor pricing by
22 collecting market-specific price data from competitors; and (2) creates customizable dashboards
23 with daily pricing data, including competitor data, that can be used to set prices. ¶¶ 17–18, 54.
24 According to RevCaster's founder, users "know rates and availability at all properties in their
25 market" and also their "average position against the competition." ¶ 19.

26     **GroupRev.** GroupRev is an algorithm introduced by Rainmaker Group in 2017 that
27 forecasts demand for customers that book in groups. According to one Rainmaker customer, VP
28 of revenue management at Omni Hotels & Resorts, "Rainmaker's automated group forecasting

element is the last missing piece of the puzzle for revenue optimization." ¶¶ 20, 56.

Rainmaker's algorithms are fueled by real-time access to Operators' competitively sensitive and nonpublic data regarding occupancy, rates, and guests, and output pricing recommendations that can then be uploaded directly into clients' property management systems. ¶¶ 57–59. Rainmaker advertises that these recommendations are in turn accepted 90% of the time. ¶ 12. Further, Plaintiffs allege that individual Operators know that their competitors participate in and contribute data to Rainmaker's pricing and forecasting algorithm and were thus assured that their supracompetitive pricing would not be undercut. ¶¶ 11 n.6, 22, 47, 74.[7] Plaintiffs also allege that the Strip hotel market is characterized by high barriers to entry, high market concentration, inelastic consumer demand, the relative fungibility of hotel rooms, regular exchanges of competitively sensitive information, and numerous opportunities to collude, ¶¶ 69–75—all factors that make it uniquely susceptible to collusion. The result is that Rainmaker's algorithms allow Operators to exercise collective price discipline, i.e., set and maintain supracompetitive prices.

## III.   LEGAL STANDARD

A complaint need only include enough facts to give a defendant fair notice and state a plausible claim.[8] *Twombly* "does not impose a probability requirement at the pleading stage."[9] "The plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible."[10] *Twombly* holds that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof

---

[7] According to three separate confidential witnesses—all former Rainmaker employees—Operators had ample opportunities to collude with one another (and with Rainmaker itself), as Rainmaker hosted annual user conferences attended by Operators' employees, and shared client names with other clients or prospective clients if it received permission to do so. *Id.*

[8] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[9] *Id.* at 556.

[10] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189–90 (2d Cir. 2012) (reversing district court that dismissed complaint because it was "plausible" defendants acted "unilaterally").

of those facts is improbable" and "that a recovery is very remote and unlikely."[11] The Supreme Court has also recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement,[12] and lower courts recognize that "[i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."[13]

## IV.   ARGUMENT

### A.   Plaintiffs sufficiently allege a hub-and-spoke conspiracy based on Operators' common agreement to use Rainmaker.

Defendants devote most of their brief to arguing that Plaintiffs fail to allege the exact nature and operation of the agreement between Operators to restrain trade. But this argument fundamentally misapprehends both Plaintiffs' claims and the relevant law.

"[A]n unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."[14] Specifically, "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."[15] In *Interstate*, a movie theater owner approached theater distributors individually, told each of the contemplated conspiracy, told each that other distributors would be invited to join, and said that cooperation of all the distributors was essential for the conspiracy to work.[16] The distributors agreed, and were subsequently found liable for violating the Sherman Act:

---

[11] *Twombly*, 550 U.S. at 556.

[12] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

[13] *In re Plasma–Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 n.10 (N.D. Ill. 2011); *see also In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2021 WL 5359731, at *19 (S.D. Fla. Nov. 17, 2021) (same); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 781 (N.D. Ill. 2020) (same); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) (same); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 426 n.3 (D. Md. 2011) (same).

[14] *Interstate Cir.*, 306 U.S. at 227.

[15] *United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (internal quotation marks and citation omitted).

[16] *Id.* at 214–220.

by giving their adherence to the conspiracy and agreeing to participate in it, both the theater owner (the hub) and the distributors (the spokes) formed a hub-and-spoke conspiracy. Critically, the Supreme Court found that, even absent direct evidence that the distributors "entered into any agreement with each other," their common assent to the scheme was sufficient to establish a horizontal agreement, i.e., the "rim" of the conspiracy.[17]

Courts recognize that a hub-and-spoke conspiracy may consist "of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'"[18] Regulators have also stated that competitors' common decision to use algorithmic pricing would constitute a hub-and-spoke conspiracy. As former FTC chairman Maureen Ohlhausen wrote in 2017:

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.

¶ 67. Similarly, earlier this year, the Principal Deputy Assistant Attorney General of the Antitrust Division for the Department of Justice stated: "Where competitors adopt the same pricing algorithms, our concern is only heightened. Several studies have shown that these algorithms can lead to tacit or express collusion in the marketplace, potentially resulting in higher prices, or at a minimum, a softening of competition."[19]

The scheme alleged in Plaintiffs' complaint is a little different from the one at issue in *Interstate* or described by former chair Ohlhausen. Rainmaker designed *and marketed* its

---

[17] *Id.* at 226–227 ("While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.").

[18] *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (quoting VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402c (3d ed. 2010) and collecting authorities).

[19] *See* Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023, United States Department of Justice (February 2, 2023), available at https://tinyurl.com/mrxshn2k.

algorithms to facilitate collusion among its users, including Operators. ¶¶ 12, 19, 45. Operators then used Rainmaker's algorithms to input price data as well as to receive (and accept) Rainmaker's profit maximizing recommendations. Plaintiffs allege that Operators were only able to keep prices high, and rooms empty, because they knew that their competitors also used Rainmaker in the same way, i.e., this common knowledge assured Operators their competitors would not undercut Rainmaker's recommended supracompetitive prices. ¶¶ 10, 47–48. That is, by using Rainmaker (the hub) with the knowledge that "others were asked to participate" and "cooperation was essential to successful operation of the plan,"[20] Operators (the spokes) formed a cognizable horizontal agreement in restraint of trade (the rim).

Plaintiffs plead facts to support a plausible inference that Operators knew that "others were asked to participate" in the conspiracy. Most notably, in a March 17, 2015 press release, Rainmaker stated that its "Gaming/Hospitality clients include . . . Caesars Entertainment, MGM Resorts International, [and] Wynn Las Vegas."[21] Rainmaker has publicly touted its agreements with Operators on other occasions, including:

- A 2012 press release from Rainmaker that includes quotes from Najim Khan, General Manager of Treasure Island Vegas, praising Rainmaker and stating that "the system's capacity to factor in competitors' rates and suggest optimal room rates to maximize revenue is one of its best features." ¶ 16.

- An article on Rainmaker's website, titled "Borgata Hotel Casino & Spa's success with Guestrev," featuring an interview with a director of revenue management at Borgata regarding her usage of Rainmaker. Borgata is a hotel in Atlantic City operated by MGM Resorts International. ¶ 21.

- A 2019 video, publicly posted on Rainmaker's website and still available to date, titled "Cosmopolitan of Las Vegas success story" featuring an interview with Collen Birch, Senior Vice President of Revenue Optimization, regarding her experience with Rainmaker. ¶ 74 n.28.

In other words, it was not a secret that Operators used Rainmaker. Plaintiffs also include allegations based on confidential witness testimony that further support the inference that

---

[20] *Interstate*, 306 U.S. at 226.

[21] *See* ¶ 11 n.6 (citing https://tinyurl.com/mpu7fpyd). This press release is incorporated by reference into Plaintiffs' complaint. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Operators understood each had entered into vertical agreements with Rainmaker.[22]

It is therefore plausible to infer that each Operator knew that other Operators entered into vertical agreements with Rainmaker to use its pricing algorithms. In similar circumstances, courts find allegations of a hub-and-spoke conspiracy sufficient based on a combination of (1) vertical agreements and (2) knowledge among horizontal competitors that each was entering into the same vertical agreement. For example, in *Green Mountain*, the court found plaintiffs sufficiently pled a hub-and-spoke conspiracy where they alleged defendants entered into vertical agreements with "the express knowledge of Keurig's anticompetitive agreements with other competitor roasters and brands."[23] The court specifically credited allegations that "the terms of Keurig's agreements with roasters and brands are well known within the market, and each company would have known that its competitors had entered into these agreements." Similarly, in *Olean*, the court found that plaintiffs plausibly alleged the "rim" of a hub-and-spoke conspiracy where defendants "knew that each of them were participating in the information exchange and could decipher the data pertaining to each producer—and because [defendants'] executives . . . allegedly had regular opportunities to meet and discuss production targets at various trade association meetings."[24] Plaintiffs allege similar facts here, i.e., Operators' common knowledge of others' use of Rainmaker in addition to regular opportunities for in-person contact (¶ 22).

Critically, courts do not require plaintiffs alleging similar hub-and-spoke conspiracies to plead that defendants "formally agreed to enter into a conspiracy with one another."[25] Instead,

[22] These include statements from confidential witnesses that Operators attended regular Rainmaker conferences for its pricing algorithms. One stated it was "not hard" to identify which companies were using GuestRev because "you're all at a conference for GuestRev." ¶ 22. Another, a former employee at Rainmaker, stated that "the whole hospitality world is so small . . . so everybody knew who was using our system." *Id.*

[23] *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244–45 (S.D.N.Y. 2019).

[24] *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19 C 8318, 2020 WL 6134982, at *5–6 (N.D. Ill. Oct. 19, 2020).

[25] *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 20-CV-5428 (JMF), 2022 WL 4448621, at *12 (S.D.N.Y. Sept. 23, 2022) (horizontal agreement could by inferred vertical agreements (and a Section 1 violation) where plaintiff had alleged defendants "knew[] that the others would be participating.") (quoting *Laumann v. NHL*, 907 F. Supp. 2d 465, 486–87 (S.D.N.Y. 2012)); *see also In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 482 (S.D.N.Y. 2017) (in

"where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent on that knowledge, they may be considered participants in a horizontal agreement in restraint of trade."[26] This is especially true in cases where vertical agreements not only facilitate, but are essential to the horizontal conspiracy.[27] Plaintiffs plausibly allege that Rainmaker is a compelling service because of its use and integration of competitor data in making price recommendations.

### 1. Plaintiffs allege parallel conduct and plus factors.

Defendants nowhere acknowledge *Interstate* or the line of cases following it. Instead, they argue, first, that Plaintiffs do not plead "any" parallel conduct because they do not allege that Operators "ever subscribed to the same Revenue Management Product or that Hotel Defendants did so at the same time." Mot. at 13. This is wrong factually: Plaintiffs plausibly allege that "90%" of hotels on the Strip use Rainmaker and identify a 2015 Rainmaker press touting Operators as clients. ¶¶ 7, 11 n.6. Defendants also misstate the law, arguing that to plead parallel conduct, Plaintiffs are "required" to "allege that [D]efendants contemporaneously engaged in conduct so similar that a conspiracy can be inferred."[28] Mot. at 13 (citing *Musical Instruments*). But *Musical Instruments* states only that "parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, *may* constitute circumstantial evidence of

---

antitrust conspiracy, a plaintiff need not show the defendant knew (1) "all of the details of the conspiracy, so long as he [or she] knew of its general nature and extent" or (2) "the identities of all the other conspirators; a single act may support an inference of involvement in a conspiracy if of a nature justifying an inference of knowledge of the broader conspiracy.").

[26] *Id.*; *see also United States v. Diaz*, 176 F.3d 52, 99 (2d Cir. 1999) (holding "a jury may find a conspirator can be held responsible for the substantive [anticompetitive acts] committed by his co-conspirators to the extent those [acts] were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if [the conspirator] did not himself participate in [those acts].") (internal quotation marks omitted).

[27] *See Laumann*, 907 F. Supp. 2d at 488 ("[W]hile plaintiffs have not alleged horizontal agreements among the MVPDs, they have plausibly alleged vertical agreements that not only facilitate, but are essential to the horizontal market divisions.").

[28] Plaintiffs nonetheless allege that Rainmaker services allowed Defendants access to daily dynamic, real-time pricing data which could be used to set prices. ¶¶ 15, 45, 50, 54. This Court has already found this type of contemporaneous information sharing as violative of antitrust law. *Alvarado v. Western Range Ass'n*, No. 22-CV-00249 (MMD), ECF No. 43, Order Denying Motion to Dismiss (D. Nev. Mar. 21, 2023), at *12.

anticompetitive behavior."[29] Consistent with this, courts have repeatedly held that "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators"[30] and "have found allegations of defendants joining or effectuating a conspiracy" over periods as long as five years.[31] To prove the existence of a horizontal agreement, Plaintiffs only need to show that, "knowing that concerted action was contemplated and invited, [each Hotel Operator] gave [its] adherence to the scheme and participated in it,"[32] i.e., that each Hotel Operator used Rainmaker with the understanding that its competitors would as well.[33] Plaintiffs do so.

Second, Defendants argue that Plaintiffs fail to sufficiently allege Operators adopted Rainmaker's pricing recommendations. Mot. at 14. But Rainmaker's marketing materials tout that its recommendations are accepted "90%" of the time. ¶ 61. Defendants attempt to nitpick this statistic as over-inclusive and thus unreliable "aggregate information." Mot. at 14. But Plaintiffs also plausibly allege that Operators were incentivized to accept these recommendations in order to set and maintain supracompetitive prices, consistent with Rainmaker's encouragement that "revenue managers must recognize" "maximizing profits," rather than "occupancy growth," as the "ultimate goal." ¶ 48; *see also* ¶ 45.

---

[29] 798 F.3d at 1193 (emphasis added).

[30] *Wall Prods. Co. v. Nat'l Gypsum Co.*, 326 F. Supp. 295, 325 (N.D. Cal. 1971) (citing *Interstate*, 306 U.S. at 226–227); *see also Broiler Chicken*, 290 F. Supp. 3d at 791 ("the Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct" and collecting cases); *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2022 WL 17093359, at *7 (N.D. Ill. Nov. 21, 2022) ("[s]imultaneous action is not a necessary element of parallel conduct") (collecting cases).

[31] *Broiler Chicken*, 290 F. Supp. 3d at 791 (citing, *inter alia*, *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1076 (N.D. Ill. 2011) (finding sufficient allegations of parallel conduct where defendants increased prices over the course of five years)).

[32] *Interstate Cir.*, 306 U.S. at 226.

[33] *See Apple*, 791 F.3d at 324, 317 (observing that "[a] horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties to those agreements knowing about, or agreeing to, the horizontal conspiracy's goals" and noting that "[a]ntitrust law has never required identical motives among conspirators when their independent reasons for joining together lead to collusive action.") (citation and internal quotation marks omitted); *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948) (sufficient if the complaint alleges that the defendant, regardless of its own motive, merely acquiesced in an agreement knowing that it would have anti-competitive effects).

Third, Defendants suggest that Plaintiffs must plead that Operators "priced rooms at the same rate" or their prices "moved in parallel." Mot. at 14–15.[34] This is a red herring. The parallel conduct here is Defendant Operators' use of the same algorithmic approach to pricing that uniformly aimed at maximizing profits across Operators' properties; this chilled competition by leading Operators to take the same approach to pricing. *See, e.g.*, ¶¶ 17–20, 49–59, 63–65. Further, courts do not require uniformity of action to allege parallel conduct and make clear that "[p]rice-fixing can occur even though the price increases are not identical in absolute or relative terms."[35]

Defendants also argue that Plaintiffs' alleged "plus factors" are irrelevant and do not plausibly suggest a conspiracy. Plaintiffs respond to these arguments below.

**Market structure.** Plaintiffs allege that properties on the Strip cost millions to run, ¶ 70; that Operators control at least 20 of the 30 hotels on the Strip and have market power in the market for hotel rooms there, ¶¶ 2, 8, 43, 71; and that demand for hotel rooms on the strip is inelastic, ¶ 72. These facts increase the likelihood of Operators "reaching and enforcing an agreement to restrain trade," because "[t]he fewer the number of participants in the market the easier to reach an agreement to restrain trade and the easier to enforce such an agreement, thus the more plausible the inference of conspiracy."[36] Even Defendants' authorities recognize this.[37]

---

[34] Defendants suggest that Plaintiffs' reliance on reports of historically high pricing among Las Vegas hotels is insufficient to show that individual Operators raised *their* rates. Mot. at 15. But they conveniently ignore that Operators' hotels make up a substantial share of the hotels whose data inform these averages, ¶ 2, as well as allegations that (1) Rainmaker advertises "returns of up to 15%" for its clients, ¶ 24, and (2) the very premise of using Rainmaker (according to Rainmaker's marketing) is to maximize "profitability" rather than "chasing after occupancy growth," ¶¶ 9–10. Defendants also nowhere actually argue that Plaintiffs have failed to allege antitrust injury and, in any event, "[a]n agreement between competitors (a horizontal agreement) satisfies the requirement of showing injury to competition if it reduces competitors' independent decisions about whether and how often to offer to provide services, or fixes prices, or otherwise limits competitors' freedom to compete." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019).

[35] *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940 (RWR), 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009); *see also Broiler Chicken*, 290 F. Supp. 3d at 791–792 (rejecting argument that defendants' production cuts were too varied to allege parallel conduct and collecting cases).

[36] *See Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("[T]he possibility of anticompetitive collusive practices is most realistic in concentrated industries.").

[37] *See Musical Instruments*, 798 F.3d at 1197 n.14 (recognizing industry structure was a plus factor that supported inference of agreement in case where defendants "controlled 90% of text-message services in the United States"); *Dynamic Random Access Memory (DRAM) Indirect*

**Information exchanges and opportunities to collude.** Defendants argue that Plaintiffs fail to allege in sufficient detail how (1) Rainmaker acted as a conduit for exchanging competitively sensitive information between Operators,[38] e.g., information on competitor pricing; and (2) Defendants had opportunities to collude at Rainmaker conferences. Mot. at 18. But they ignore confidential witness testimony that Rainmaker's clients feed its algorithms detailed transaction-level data and receive, in return, data "shopped" from those competitors that Rainmaker used, among other things, to forecast demand. ¶¶ 14–15, 57–60. Plaintiffs also cite confidential witness testimony that Rainmaker users "kind of all know each other" because they "show up to this little [Rainmaker] conference together." ¶¶ 22, 74.

Given the danger posed by competitors' exchange of pricing information, courts find hub-and-spoke allegations sufficient where defendants knowingly participated in an information exchange[39] (in contrast with the authorities cited by Defendants[40]). Consistent with this, the former acting chair of the FTC has stated that, if competitors "sub-contract[ed] their pricing decisions to a common, outside agent that provides algorithmic pricing services," and that algorithm used competitors' information "to maximize industry-wide pricing", this would be an "old fashioned" hub-and-spoke conspiracy. ¶ 67. That sophisticated modern defendants facilitate their conspiracy with a common algorithm, rather than a "guy named Bob", is no bar to antitrust liability. *Id.*

---

*Purchaser Antitrust Litig.*, 28 F. 4th 42, 52 (9th Cir. 2022) ("Extreme market concentration may suggest conspiracy, particularly when accompanied by other plausible plus factor allegations.").

[38] In a footnote, Defendants reiterate the argument that the exchange of information between Rainmaker and Operators is "irrelevant" to any conspiracy between Operators themselves. Mot. at 18 n.9. But as discussed above, this is factually incorrect and contrary to extensive authority holding, since *Interstate*, that parties to vertical agreements "may nonetheless be considered participants in a horizontal restraint of trade." *Nastasi*, 2022 WL 4448621, at *12.

[39] *See, e.g.*, *Olean*, 2020 WL 6134982 at *6 (hub-and-spoke conspiracy adequately alleged where defendants "allegedly knew that each of them were participating in the information exchange and could decipher the data pertaining to each producer—and because executives of the Turkey Defendants allegedly had regular opportunities to meet and discuss production targets at various trade association meeting[.]"); *see generally Great Atl. & Pac. Tea Co. v. F.T.C.*, 440 U.S. 69, 80 (1979) ("Because of the evils of collusive action, the Court has held that the exchange of price information by competitors violates the Sherman Act.").

[40] Defendants cite various cases for the proposition that "mere participation in trade-organization meetings where information is exchanged . . . does not suggest an illegal agreement." Mot. at 18 & n.10. But these cases are distinguishable because, unlike here, there was no allegation that the defendants used meetings in the same way Defendants used Rainmaker, i.e., as a specific mechanism for coordinated price-setting.

1   **Fungibility of demand.** Defendants assert that it is implausible that Operators' properties

2   are "interchangeable or in the same class of properties." Mot. at 18 (citing ¶ 73). But they do not

3   challenge Plaintiffs' alleged market definition and, even if they did, this argument would be

4   premature.[41] Defendants also implicitly misstate the law: a relevant market is not made up of

5   perfect substitutes but includes (a) "all economic substitutes for the product" and (b) "the group or

6   groups of sellers or producers who have actual or potential ability to deprive each other of

7   significant levels of business."[42] Plaintiffs plausibly allege that Operators, who collectively operate

8   20 of the Strip's 30 hotels, have the "actual or potential" ability to deprive each other of significant

9   levels of business.

10   Finally, Defendants argue that Plaintiffs fail to allege facts that would "tend to exclude a

11   plausible and innocuous alternative explanation" for their conduct. Mot. at 19. Tellingly, however,

12   the only "rational" reason Defendants identify for using Rainmaker is that it prevents "over-

13   discounting" and thus delivers "increases in revenue and profitability." Mot. at 19. And Plaintiffs

14   plausibly allege that over-discounting is only prevented if Operators take the same approach to

15   pricing, i.e., use the same algorithm—consistent with theoretical and empirical research. ¶¶ 62–

16   65. As discussed below, Plaintiffs also plead direct and indirect evidence that Operators'

17   agreements with Rainmaker harm competition, and that the mechanism by which Rainmaker

18   delivers higher prices for its users is anticompetitive.[43] And more broadly, Defendants rely for this

19   point on the pleading standard for a RICO (i.e., fraud-based) claim or summary judgement.[44] But

20

21   [41] *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988) ("Our . . . decisions establish that both market definition and market power are essentially questions of fact."); *see also Las Vegas Sun v. Adelson*, No. 2:19-cv-01667-GMN-BNW, 2020 WL 7029148, at *6 (D. Nev. Nov. 30, 2020).

22

23   [42] *Newcal Indus., Inv. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

24   [43] Nor are Plaintiffs' allegations undermined by the endorsements of non-defendant hotels elsewhere, for two reasons. First, the fact that non-defendant hotels have endorsed Rainmaker says nothing about whether, or to what extent, Rainmaker has delivered those hotels comparable (i.e., supracompetitive) increases in profitability. Second, it is plausible—in light of Rainmaker's own public statements and the research cited above—that the same anticompetitive dynamic alleged in Plaintiffs' complaint is present in other markets as well.

25

26

27   [44] *See* Mot. at 13 (citing *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th Cir. 2014) (affirming dismissal of RICO claim)). Defendants also cite *Kelsey K. v. NFL Enterprises, LLC*, 254 F. Supp. 3d 1140, 1144 (N.D. Cal. 2017) for this proposition, which in turn

28

under Rule 8, it is not necessary at the pleading stage that "factual allegations tend to exclude the alternative explanation offered by defendants;"[45] Plaintiffs need only "raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[46] Plaintiffs do so here.

**B.    In the alternative, Plaintiffs plead a rule of reason claim based on a set of vertical agreements between Rainmaker and Defendant Operators.**

Plaintiffs also plead a set of vertical agreements between Operators and Rainmaker whereby each Operator used the same set of Rainmaker pricing algorithms. As the Ninth Circuit held in *Musical Instruments*, a "collection of purely vertical agreements" may unreasonably restrain trade.[47] Purely vertical agreements are analyzed under the rule of reason. To successfully plead a rule of reason claim, a Section 1 claimant must establish: a "1) contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition."[48] Plaintiffs sufficiently allege all three.

    **1.    Operators' vertical agreements with Rainmaker constitute a "contract, combination or conspiracy" within the meaning of Section 1.**

Plaintiffs plead: (1) statements by confidential witnesses that 90% of hotels the Strip use Rainmaker's pricing algorithms, ¶ 7; (2) Rainmaker statements listing Defendants Caesars, MGM, and Wynn Las Vegas among its clients, ¶ 11 n.6; (3) a detailed explanation of the process by which

---

relies on *In re Citric Acid Litig.*, 191 F.3d 1090, 1096 (9th Cir. 1999), where the Ninth Circuit articulated plaintiffs' burden at summary judgment.

[45] *Plasma-Derivative*, 764 F. Supp. 2d at 1002 (even where "[d]efendants make a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with firms' independent self-interest", plaintiffs at the motion to dismiss phase "need only allege a conspiracy which is plausible in light of the competing explanations."); *see also Broiler Chicken*, 290 F. Supp. 3d at 801 ("[T]he Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct. That would be equivalent to 'impos[ing] a probability requirement at the pleading stage,' which *Twombly* expressly does not do.") (quoting *Twombly*, 550 U.S. at 556).

[46] *Twombly*, 550 U.S. at 556 (quotation omitted) ("And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."); *see also In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1209 (N.D. Cal. 2015) ("[T]he plausibility requirement does not require that a plaintiff show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action[.]") (internal quotation omitted).

[47] 798 F.3d at 1193 n.3.

[48] *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (2012).

Defendant Operators provided data to Rainmaker, and then received pricing recommendations generated by its pricing algorithms, ¶¶ 11–21; (4) Rainmaker statements that these pricing recommendations were accepted 90% of the time, ¶ 12; and (5) statements from confidential witnesses that Rainmaker employees met frequently with Operators as part of the business relationship, ¶ 75. These allegations are sufficient to plausibly infer that each Operator entered into an agreement with Rainmaker to use its algorithms; they are cognizable "concerted action" and satisfy the first prong above.[49]

Plaintiffs also allege that these agreements were intended to harm competition; specifically, that Operators understood (a) their competitors were using Rainmaker; and (b) Rainmaker "worked" (i.e., produced supracompetitive prices) by implementing a common pricing strategy among its users. And Rainmaker specifically touted that its algorithms use dynamic pricing that reduce discounting, i.e., "chas[e] after occupancy growth", in order to "optimize for profit" (¶¶ 9, 48)—contrary to pricing practices in a competitive market.[50]

### 2.    Plaintiffs allege both direct and indirect evidence of harm to competition.

To establish "an injury to competition for purposes of" a rule of reason claim, "the claimant

---

[49] *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 561 F.3d 1004, 1010 (9th Cir. 2009), *opinion withdrawn and superseded*, 588 F.3d 659 (9th Cir. 2009) (bilateral exchange agreements were "contracts" within meaning of Section 1 "even without intent to control prices") (citing *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1153–54 (9th Cir. 2003) ("[o]ur antitrust law is clear that [a plaintiff] need not prove intent to control prices or destroy competition to demonstrate the element of an agreement . . . among two or more entities")).

[50] The Supreme Court and Ninth Circuit have made clear that, while intent may be probative in a rule of reason claim, it is not "dispositive." *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988) ("Since the effect on competition is the touchstone of rule of reason analysis, the intent of the defendants is relevant but not dispositive."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1391 (9th Cir. 1984) (under rule of reason, "[t]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.") (quoting *Chicago Board of Trade v. United States*, 246 U.S. 231, 238 (1918)); *see also Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1493 (D.C. Cir. 1984) (reversible error where district court's finding that practice "passed muster under the rule of reason" rested "solely on the fact that it found no anticompetitive *intent*" behind challenged practice) (emphasis in original); 7 Areeda & Hovenkamp, Antitrust Law P1504a, at 401 (3d ed. 2010) ("The defendants' mistaken belief, no matter how sincere, that their collaboration improves competition should be immaterial to the tribunal's decision whether to enjoin it as an unreasonable trade restraint.").

must identify a contract, combination, or conspiracy that has an anticompetitive effect."[51] Plaintiffs "can establish a substantial anticompetitive effect" either "directly or indirectly."[52] To prove a substantial anticompetitive effect *directly*, a plaintiff must provide "proof of actual detrimental effects [on competition] such as reduced output, increased prices, or decreased quality in the relevant market."[53] To prove substantial anticompetitive effects *indirectly*, a plaintiff must prove that the defendant has market power and present "some evidence that the challenged restraint harms competition."[54] Plaintiffs allege direct and indirect evidence that Operators' agreements with Rainmaker harm competition.

**Direct evidence.** Plaintiffs allege that Operators' use of Rainmaker led to higher prices and reduced output. ¶¶ 23, 46–61. Specifically, Plaintiffs' complaint includes:

- extensive public statements from Rainmaker itself boasting that Rainmaker leads to higher prices for hotel rooms, ¶¶ 52–54;

- confirmatory factual allegations that the prices of hotel rooms in the Las Vegas Strip market increased significantly during the class period, ¶ 23;

- allegations, based on confidential witness testimony, that the usage of Rainmaker algorithm led to increased prices during particular periods of time (specifically, on "high demand" days), ¶ 24;

- evidence of reduced output—namely, quotations from Rainmaker executives who articulated that "the ultimate goal is not chasing after occupancy growth, but instead maximizing profits across all revenue streams," ¶ 48.

**Indirect evidence.** Plaintiffs also plead evidence of indirect harm to competition: they allege that (1) Defendants have market power in a relevant market; and (2) "some evidence that the challenged restraint harms competition."[55] "To establish a relevant market, a plaintiff must

---

[51] *Brantley*, 675 F.3d at 1198.

[52] *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (internal citation and quotation omitted).

[53] *Id.*

[54] *Epic Games, Inc. v. Apple, Inc.*, No. 21-16506, 2023 WL 3050076, at *18 (9th Cir. Apr. 24, 2023).

[55] *Id.* at *18 ("To prove substantial anticompetitive effects indirectly, the plaintiff must prove that the defendant has market power and present 'some evidence that the challenged restraint harms competition.'") (citing and quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)).

define both a geographic market and a product market."[56] Plaintiffs sufficiently allege that the Las Vegas Hotel Market is a relevant antitrust market, the rental of hotel guest rooms is the relevant product market, and the Strip is a relevant geographic market. ¶¶ 40–44, 90–91. Even when a motion to dismiss challenges a relevant market (and Defendants' does not) it should generally be denied because "markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."[57]

"Market power is generally inferred from the defendant's possession of a high market share and the existence of "significant barriers to entry."[58] For example, in *Epic Games*, the Ninth Circuit held that Apple's 52–57% market share in the "mobile games transactions" market constituted market power;[59] and in *Twin City*, the Ninth Circuit affirmed a district court's finding of Section 1 liability where the defendant controlled 24% of the relevant market.[60] Plaintiffs allege that Defendants collectively control approximately 65% of the Strip market (20 of 30 hotels). ¶ 43. Further, a confidential witness stated that Rainmaker was used in approximately 90% of the hotels on the Strip. ¶ 7. Plaintiffs also identify significant barriers to entering this market. ¶ 70.

To show indirect evidence of anticompetitive effects, once market power is established, the "inquiry need not always be extensive or highly technical" and "[i]t is sufficient that the Plaintiff prove the defendant's conduct, as matter of economic theory, harms competition."[61] Plaintiffs identify extensive economic evidence that the use of pricing algorithms harms competition. ¶¶ 62–68. For example, a 2021 empirical study found (in line with the predictions of theoretical models) that when gas stations in Germany used algorithms to set prices, their margins

---

[56] *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657, at *4–6 (N.D. Ill. Jan. 8, 2014) (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004)).

[57] *V5 Techs., LLC v. Switch, Ltd.*, No. 2:17-cv-002349-KJD-NJK, 2018 WL 11409662, at *5 n.2 (D. Nev. Sept. 28, 2018) (quoting *Newcal*, 513 F.3d at 1044); *see generally Oahu Gas*, 838 F.2d at 363; *Twin City Sportservice, Inc. v. Charles O'Finley & Co., Inc.*, 676 F.2d 1291, 1299 (9th Cir. 1982).

[58] *Epic Games*, 2023 WL 3050076, at *18.

[59] *Id.*

[60] 676 F.2d at 1301–03.

[61] *Epic Games*, 2023 WL 3050076, at *18.

increased by approximately 9%. Critically, the authors found that algorithm use only raised prices above competitive levels in places where competitors adopted algorithms jointly, and thus that "algorithmic pricing software adoption raises margins *only through its effects on competition*"; by contrast, in areas where (1) a station had no competitors or (2) there were two stations but only one adopted algorithmic pricing, the authors found "no change in mean margins or pricing."[62] In other words, algorithm use among these stations raised prices not by driving efficiency or achieving some pro-competitive result, but instead by undermining normal market competition. Consistent with this, Rainmaker specifically touts that its pricing algorithms use dynamic pricing that reduces discounting—the kind of pricing practice expected in a competitive market.[63]

### 3. Defendants do not seriously dispute Plaintiffs' allegations.

Defendants devote a single footnote to disputing whether Operators' vertical agreements with Rainmaker, standing alone, violate Section 1. Specifically, they argue (1) Plaintiffs fail to identify "any vertical agreement" between Operators and Rainmaker; (2) "any alleged restraint resulting from each individual agreement would need to be analyzed separately;" and (3) Plaintiffs do not plead any facts that any individual vertical agreement harms competition. Mot. at 11 n.6.

**First**, for the reasons above, Plaintiffs plausibly allege a set of vertical agreements between Rainmaker and Defendant Operators based on Rainmaker's public statements and the statements of confidential witnesses, i.e., Plaintiffs sufficiently allege that Operators use Rainmaker's algorithms. These agreements constitute a "contract, combination or conspiracy" under Section 1[64]; the law does not require Plaintiffs to identify the specific contractual terms of the licensing agreements between Rainmaker and Operators at the pleading stage.

**Second**, Defendants argue that any alleged restraint resulting from each individual agreement must be "analyzed separately." But *Musical Instruments* states that a conspiracy

---

[62] *See* Stephanie Assad et al., *Autonomous algorithmic collusion: Economic research and policy implications*, Toulouse School of Economics Working Paper (March 2021), available at https://tinyurl.com/3k66awzp https://tinyurl.com/4nbte2bb at 15 (emphasis added) (cited at ¶ 67).

[63] Rainmaker specifically states that "casino hotels have traditionally left money on the table by over-discounting and comping rooms" and that "dynamic pricing can also reduce the occurrence of free upgrades and entice your guests to pay an upcharge instead." ¶ 45.

[64] *See supra* note 49 and accompanying text.

consisting of "a collection of purely vertical agreements . . . may yet unreasonably restrain trade in violation of Section 1."[65] It also approvingly cites the Seventh Circuit's decision in *Toys "R" Us*, in which the court "endors[ed] the FTC's analysis of the vertical components of a hub-and-spoke conspiracy under the rule of reason."[66] Specifically, in *Toys "R" Us*, the Seventh Circuit affirmed the decision of the FTC commissioners, who had held that an overall set of vertical agreements between Toys "R" Us and various toy manufacturers were collectively anticompetitive under a rule of reason analysis. In particular, the Seventh Circuit credited as supporting market power the fact that the toy manufactures with which Toys "R" Us had entered into the agreements, had collectively, "some 40% of the traditional toy market."[67]

Similarly, in *Gilley*,[68] the Ninth Circuit concluded that individual contracts defendants separately executed could be considered in the aggregate in assessing antitrust liability, finding that the district court erred in prohibiting plaintiffs from "alleg[ing] the cumulative effects of a single Defendant's exchange agreements"[69]—specifically, 44 separate agreements between defendants that the plaintiff alleged had the aggregate effect of raising gas prices above competitive levels.[70] Other courts reject the argument that a court must examine "each agreement with each alleged co-conspirator independently,"[71] as does the leading antitrust treatise, which states that separate vertical agreements sharing a common element may be aggregated in considering their anticompetitive effect.[72]

---

[65] *Musical Instruments*, 798 F.3d at 1193 n.3.

[66] *Id.* at 1192–93 (citing *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 933 (7th Cir. 2000)).

[67] *Toys "R" Us*, 221 F.3d at 937.

[68] While the Ninth Circuit later withdrew *Gilley*, it did so after concluding that the plaintiff's claims were barred by *res judicata* and that dismissal should therefore be affirmed on that ground. *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 668 (9th Cir. 2009). Plaintiffs respectfully submit that *Gilley*'s reasoning is persuasive. *See* CTA9 Rule 36-3.

[69] *Gilley*, 561 F.3d at 1010.

[70] *Id.* at 1007.

[71] *See, e.g.*, *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 470 (D. Vt. 2019).

[72] Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 310 (Fourth & Fifth Editions 2018–2022) ("[S]uppose that the defendant has entered into distinct tying or exclusive dealing contracts with four different purchasers. Each contract individually forecloses approximately 15 percent of the market in question and thus would

Indeed, for a rule of reason claim, a central purpose of the market power inquiry is "to determine whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market."[73] Here, the conspiracy (i.e., set of vertical agreements between Rainmaker and Operators) has the power to hurt competition in the relevant market because Operators possess a dominant market share. This is consistent with long-standing precedent that "[t]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition."[74] Assessing the anticompetitive effect of each agreement one-by-one would thus run contrary to the established principle that

> [t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.[75]

**Third**, Defendants claim that Plaintiffs fail to sufficiently plead that any individual agreement between Operators and Rainmaker harms competition. But as discussed above, (1) this is inconsistent with well-established precedent that the relevant question is whether a set of vertical agreements, considered together, impair competition; and (2) Plaintiffs allege both direct and indirect evidence that Operators' agreements with Rainmaker harm competition.

**C.   Plaintiffs answer *Kendall*'s "basic questions."**

Relying on the Ninth Circuit's decision in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), Defendants also argue that Plaintiffs do not allege in sufficient detail (1) who entered the conspiracy; (2) what Operators did to form an agreement; and (3) when the conspiracy was formed. Mot. at 7–10. But Plaintiffs answer *Kendall*'s questions: the "who" is Operators, whose

---

ordinarily be insufficient to establish a violation. However, in the aggregate the contracts foreclose approximately 60 percent of the market, which is more than sufficient. In such a case it would clearly be improper for the court to examine each agreement with the same defendant separately, conclude that that agreement standing alone is insufficient to establish illegality, and dismiss the complaint without considering the impact of the aggregation.").

[73] *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001).

[74] *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986).

[75] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

employees are plausibly alleged to have used Rainmaker's algorithms and adopted its pricing recommendations; the "what" is the vertical agreements between the Operators and parallel use of Rainmaker's algorithms by each Operator's employees *with the knowledge* that other Operators' employees were doing so as well. These facts plausibly support the inference that Operators intentionally used Rainmaker to fix prices and are sufficient to allege a hub-and-spoke conspiracy or, alternatively, a set of vertical agreements that harmed competition. They are also plainly sufficient to give Defendants "an idea of where to begin" in responding to Plaintiffs' allegations.[76]

**Who and what?** Defendants argue that Plaintiffs' claims fail because they (1) do not allege "what" Operator Defendants did to form an agreement; and (2) do not identify the "specific personnel" who "entered" the conspiracy or precisely what agreement was reached between Operators.[77] Mot. at 7–9. But this ignores Plaintiffs' well-pled allegations regarding the vertical agreements between each Operator and Rainmaker—which are on their own sufficient to state a Section 1 rule of reason claim.[78]

Plaintiffs also sufficiently plead a horizontal conspiracy between Operators. Critically, Defendants' motion is premised on the assumption that Plaintiffs must allege the specific mechanics, such as "calls" or "texts", of how the agreement operated. *See* Mot. at 9. But as explained above, courts have long made clear that "spokes" need not "formally agree[] to enter into a conspiracy with one another" and that, instead, "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent on that knowledge, they may be considered participants in a horizontal agreement in restraint of trade."[79] Plaintiffs allege that (1) Rainmaker's algorithms are used by 90% of the hotels

---

[76] *Kendall*, 518 F.3d at 1047.

[77] Defendants also object that Plaintiffs' complaint "fails to identify" any employee of any Operator who "adopted any price recommended" by Rainmaker. Mot. at 9. But Plaintiffs plausibly allege that Rainmaker's pricing recommendations are, according to the company's own marketing materials, accepted 90% of the time, and Defendants fail to explain why Plaintiffs must name the *specific* employees who accepted these recommendations—likely scores of employees across multiple companies whose identities cannot possibly be known to Plaintiffs—in order to plausibly state a claim, particularly if it was Operators' general policy to accept these recommendations.

[78] *See supra* note 49 and accompanying text.

[79] *Nastasi*, 2022 WL 4448621, at *12.

on the Strip (¶ 7); (2) that Rainmaker's pricing recommendations are accepted 90% of the time (¶ 12); and (3) Operators understood that their competitors used Rainmaker (¶¶ 11 n.6, 22, 74). This is a classic hub-and-spoke conspiracy: Operators provided price information to, and accepted price recommendations from, Rainmaker with knowledge their competitors were doing the same. It is also far more than a "bare allegation of conspiracy" that is "almost impossible to defend against."[80]

**When?** Defendants suggest Plaintiffs must plead exactly when a conspiracy was formed and exactly when Operators began using Rainmaker. Mot. at 9. This is not the law, particularly in conspiracy cases, as Plaintiffs could not know this information without the benefit of discovery—a hurdle courts recognize in rejecting similar arguments.[81] Plaintiffs plausibly allege that (a) Operators have entered agreements with Rainmaker since at least 2012 (¶ 12); (b) Rainmaker cumulatively introduced new pricing algorithms, including RevCaster in 2015 and GroupRev in 2017 (¶¶ 17, 20); (c) Operators know their competitors use Rainmaker (¶¶ 7, 11 n.6, 16, 22); and (d) Operators have regular opportunities to conspire (¶¶ 22, 74). What matters is that Defendants entered vertical agreements with Rainmaker during the class period.[82]

Defendants' authorities do not compel a different result; in all the cases Defendants cite, plaintiffs either (1) did not plead vertical agreements or (2) alleged unsubstantiated horizontal conspiracies whose proof rested on the existence, unlike here, of *specific agreements between defendants*. More broadly, Defendants advance a distorted reading of *Kendall* that implies a level of specificity at the pleadings stage that *Kendall* does not impose—and that courts reject:

> In the wake of *Twombly* and *Kendall*, antitrust defendants have relied on footnote 10 and the who-what-where-when language in *Kendall* to argue that complaints filed against them are deficient—even when complaints contain detailed "evidentiary factual" allegations connecting them to the alleged conspiracy. Many courts have rejected such arguments (including district courts within the Ninth Circuit), concluding that the Supreme Court did not impose the elaborate "who-

---

[80] *Kendall*, 518 F.3d at 1047.

[81] *Broiler Chicken*, 290 F. Supp. 3d at 788 ("Defendants' criticize the lack of details, but when a conspiracy is secret such details will not be available without discovery, and thus cannot be required at the pleading stage."); *Plasma–Derivative*, 764 F. Supp. 2d at n.10.

[82] *See, e.g.*, *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012) ("[A] conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception.").

1    what-where-when" pleading requirement defendants insisted upon.[83]

2        Specifically, courts reject the implication that *Twombly* or *Kendall* requires "*specific*

3    *allegations of time, place, or person*" to plausibly allege a Section 1 claim.[84] As one explained,

4    *Twombly*'s "time, place or person" appears "in dicta, in a footnote, in the context of the Court's

5    comment that, but for the complaint's allegations of parallel conduct, references to an agreement

6    among the [defendants] might not have given the notice required by Rule 8 because the complaint

7    did not give the 'specific time, place or person' involved in the alleged conspiracy.[85] Similarly, in

8    *Kendall*, the Ninth Circuit emphasized that plaintiffs, who alleged a conspiracy among banks to

9    fix fees, did "*not allege any facts*" to support a conspiracy—even after the district court allowed

10   them to conduct discovery before pleading an amended complaint.[86] This is a far cry from the

11   detailed allegations in Plaintiffs' complaint.

12                                  **V.    CONCLUSION**!

13       Plaintiffs respectfully request that Defendants' Motion be denied. However, if the Court

14   determines that their allegations require further factual development, Plaintiffs request leave to

15   amend.[87]

16

17

---

18   [83] *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho 2011)
19   (collecting cases, and finding plaintiffs sufficiently alleged a conspiracy under Section 1 where the
     "who" was "twenty-three [potato] growers", the "what?" was "[m]et and agreed to reduce potato
20   supply and fix prices", the "when" was "Fall 2004", and the "where?" was "[a]n office in
     Blackfoot, Idaho."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-CV-864, 2018 WL 6629250,
21   at *11 (N.D. Ill. Oct. 22, 2018); *Broiler Chicken*, 290 F. Supp. 3d at 788.

     [84] *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005 (E.D. Mich. 2010) (quoting
22   *Twombly*, 550 U.S. at 569 n.14) (emphasis added); *Starr v. Sony BMG Music Entm't*, 592 F.3d
23   314, 325 (2d Cir. 2010) (rejecting argument that *Twombly* imposes an obligation to identify
     specifically the time, place and person as to each allegation of conspiracy).

24   [85] *Packaged Ice*, 723 F. Supp. 2d at 1006; *see also id.* ("[T]he *Twombly* court expressly stated
     that it did 'not require heightened fact pleading of specifics, but only enough facts to state a claim
25   to relief that is plausible on its face'. . . . [s]tated differently, the Court's 'concern [was] not that
     the allegations in the complaint were insufficiently 'particular[ized];' rather, the complaint
26   warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible.'")
     (quoting *Twombly*, 550 U.S. at 569 n.14 & 570).

27   [86] *Kendall*, 518 F.3d at 1048 (emphasis added).

28   [87] *Borenstein v. Animal Found.*, 526 F. Supp. 3d 820, 839 n.3 (D. Nev. 2021) ("In general,
     dismissal of a complaint without leave to amend is proper only if amendment would be futile.").

1    DATED:  May 11, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
    Steve W. Berman (*pro hac vice*)
Stephanie A. Verdoia (*pro hac vice*)
Ted Wojcik (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
stephaniev@hbsslaw.com
tedw@hbsslaw.com

Rio S. Pierce (*pro hac vice*)
Abby R. Wolf (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
riop@hbsslaw.com
abbyw@hbsslaw.com

Rahul Ravipudi (NV Bar No. 14750)
Adam Ellis (NV Bar No. 14514)
Ian P. Samson (NV Bar No. 15089)
PANISH SHEA BOYLE RAVIPUDI LLP
300 S. 4th Street, Suite 710
Las Vegas, NV 89101
Telephone: (702) 560-5520
Facsimile: (702) 975-2515
rravipudi@psblaw.com
aellis@psblaw.com
isamson@psblaw.com

Brian J. Panish (NV Bar No. 16123)
PANISH SHEA BOYLE RAVIPUDI LLP
11111 Santa Monica Blvd., Suite 700
Los Angeles, CA 90025
Telephone: (310) 477-1700
Facsimile: (310) 477-1699
panish@psbrlaw.com

*Counsel for Plaintiffs and the Proposed Class*

1

**<u>CERTIFICATE OF SERVICE</u>**

2          I hereby certify that on May 11, 2023, I electronically filed the foregoing document with

3   the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

4   those attorneys of record registered on the CM/ECF system. All other parties (if any) shall be

5   served in accordance with the Federal Rules of Civil Procedure.

6   DATED:  May 11, 2023

7

8                                    */s/ Steve W. Berman*
                                    Steve W. Berman

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28