*2:23-cv-00140-MMD-DJA - October 13, 2023*

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF NEVADA

 3   RICHARD GIBSON, and           )
     HERIBERTO VALIENTE,           )
 4                                 ) Case No. 2:23-cv-00140-MMD-DJA
                  Plaintiffs,      )
 5                                 ) Las Vegas, Nevada
     vs.                           ) October 13, 2023
 6                                 ) 11:08 a.m. - 12:22 p.m.
     MGM RESORTS INTERNATIONAL,    ) Courtroom 4B
 7   CENDYN GROUP, LLC, THE        ) MOTION HEARING
     RAINMAKER GROUP UNLIMITED,    )
 8   INC., CAESARS ENTERTAINMENT   )
     INC., TREASURE ISLAND, LLC,   )
 9   WYNN RESORTS HOLDINGS, LLC    )
                                   )
10                Defendants.      )
     _____  )  C E R T I F I E D   C O P Y
11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE MIRANDA M. DU
13               UNITED STATES DISTRICT COURT JUDGE

14

15   APPEARANCES:

16   For the Plaintiffs: RIO S. PIERCE, ESQ.
                         HAGENS BERMAN SOBOL SHAPIRO LLP
17                       715 Hearst Avenue, Suite 300
                         Berkeley, California 94710
18                       (510) 725-3000

19

20   (Appearances continued on page 2.)

21   Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

2:23-cv-00140-MMD-DJA - October 13, 2023

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant, MGM Resorts International:

 3         BETHANY WOODARD KRISTOVICH, ESQ.
           MUNGER, TOLLES & OLSON LLP
 4         350 South Grand Avenue, 50th Floor
           Los Angeles, California 90071
 5         (213) 683-9292

 6    -AND-

 7         KYLE W. MACH, ESQ.
           MUNGER, TOLLES & OLSON LLP
 8         560 Mission Street, 27th Floor
           San Francisco, California 94105
 9         (415) 512-4044

10    -AND-

11         TODD L. BICE, ESQ.
           PISANELLI BICE PLLC
12         400 South 7th Street, Suite 300
           Las Vegas, Nevada 89101
13         (702) 214-2100

14    For the Defendant, Cendyn Group, LLC:

15         BRENDAN A. McSHANE, ESQ.
           SADIK HUSENY, ESQ.
16         LATHAM & WATKINS
           505 Montgomery Street, Suite 2000
17         San Francisco, California 94111
           (415) 391-0600
18
      -AND-
19
           SAMUEL MIRKOVICH, ESQ.
20         CAMPBELL & WILLIAMS
           710 South 7th Street, Suite A
21         Las Vegas, Nevada 89101
           (702) 382-5222
22

23    / / / / /

24    / / / / /

25    / / / / /
```

*2:23-cv-00140-MMD-DJA - October 13, 2023*

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant, The Rainmaker Unlimited, Inc.:

 3        NICHOLAS J. SANTORO, ESQ.
          HOLLEY DRIGGS
 4        300 South 4th Street, Suite 1600
          Las Vegas, Nevada 89101
 5        (702) 791-0308

 6   For the Defendant, Caesars Entertainment, Inc.:

 7        BORIS BERSHTEYN, ESQ.
          SAMMUEL BENJAMIN AULD, ESQ.
 8        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          One Manhattan West
 9        New York, New York 10001
          (212) 735-3834
10
     -AND-
11
          ADAM HOSMER-HENNER, ESQ.
12        McDONALD CARANO LLP
          100 West Liberty Street, 10th Floor
13        Reno, Nevada 89501
          (775) 788-2000
14

15   For the Defendant, Treasure Island, LLC:

16        PATRICK J. REILLY, ESQ.
          BROWNSTEIN HYATT FARBER SCHRECK, LLP
17        100 North City Parkway, Suite 1600
          Las Vegas, Nevada 89106
18        (702) 382-2101

19   For the Defendant, Wynn Resorts Holdings, LLC:

20        BRADLEY T. AUSTIN, ESQ.
          SNELL & WILMER LLP
21        3883 Howard Hughes Parkway, Suite 1100
          Las Vegas, Nevada 89169
22        (702) 784-5200

23   / / / / /

24   / / / / /

25   / / / / /
```

1    APPEARANCES CONTINUED:

2    For the Defendant, Wynn Resorts Holdings, LLC:

3         **TAMMY A. TSOUMAS, ESQ.**
          *KIRKLAND & ELLIS LLP*
4         *2049 Century Park East, Suite 3700*
          *Los Angeles, California 90071*
5         *(310) 552-4334*

6                              * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          LAS VEGAS, NEVADA; FRIDAY, OCTOBER 13, 2023; 11:08 A.M.

 2                              --o0o--

 3                    P R O C E E D I N G S

 4          **COURTROOM ADMINISTRATOR:**  Richard Gibson versus MGM

 5   Resorts International, 2:23-cv-140-MMD-DJA.  This is the time

 6   set for a hearing on the motions to dismiss.

 7          Counsel, please make your appearances, starting with

 8   the plaintiff.

 9          **MR. PIERCE:**  Good morning, Your Honor.  Rio Pierce

10   from Hagens Berman for the plaintiffs.

11          **MR. HOSMER-HENNER:**  Adam Hosmer-Henner, McDonald

12   Carano, for Caesars Entertainment.

13          **MR. AULD:**  Sam Auld from Skadden Arps for Caesars.

14          **MR. BERSHTEYN:**  And Boris Bershteyn from Skadden Arps

15   for Caesars.

16          **MR. HUSENY:**  Good morning, Your Honor.  Sadik Huseny

17   of Latham & Watkins for defendant Cendyn Group, LLC.

18          **MS. KRISTOVICH:**  Good morning, Your Honor.  Bethany

19   Kristovich of Munger, Tolles & Olson on behalf of MGM Resorts

20   International.

21          **MR. MACH:**  Good morning, Your Honor.  Kyle Mach from

22   Munger, Tolles & Olson for MGM Resorts International.

23          **MR. BICE:**  Good morning, Your Honor.  Todd Bice on

24   behalf of MGM Resorts.

25          **MR. MIRKOVICH:**  Good morning, Your Honor.  Samuel

1    Mirkovich on behalf of the Cendyn Group.

2          **MR. McSHANE:**   Good morning, Your Honor.   Brendan

3    McShane of Latham & Watkins on behalf of the defendant Cendyn

4    Group.

5          **MR. REILLY:**   Good morning, Your Honor.   Pat Reilly of

6    Brownstein on behalf of Treasure Island.

7          **MS. TSOUMAS:**   Good morning, Your Honor.   Tammy

8    Tsoumas from Kirkland & Ellis on behalf of Wynn Resorts

9    Holdings.

10          **MR. AUSTIN:**   Good morning, Your Honor.   Brad Austin

11    from Snell & Wilmer also on behalf of Wynn Resorts.

12          **MR. SANTORO:**   Good morning, Your Honor.   Nick Santoro

13    on behalf of Rainmaker Group.

14          **THE COURT:**   Well, there are a number of you

15    representing defendants.   So this hearing is set on one

16    motion, that's the joint motion to dismiss, which is ECF

17    Number 91.

18          So, for the record, I have reviewed the brief

19    relating to the joint motion once.   I reviewed the complaint a

20    number of times.   I had hoped to issue a written order on

21    MGM's separate motion.   And as I indicated in the minute

22    order, I don't need to hear argument on that motion.

23    Unfortunately, my aspirational goal I did not meet, but I

24    still plan to issue a written order addressing both motions,

25    not just the one that I said I would address, which is the MGM

```
 1   motion.
 2          So let me hear arguments then.  And who will be
 3   arguing for the defendants in terms of the joint motion?
 4          MR. BERSHTEYN:  Good morning, Your Honor.  Boris
 5   Bershteyn on behalf of Caesars, and I'll be arguing on behalf
 6   of all defendants for the joint motion.
 7          THE COURT:  All right.  Please proceed.
 8          MR. BERSHTEYN:  Your Honor, good morning.  You can
 9   hear me all right?  Can you hear me all right?
10          THE COURT:  No.  So you need to -- yes.  Just make
11   sure you pull the --
12          MR. BERSHTEYN:  How about now?
13          THE COURT:  Yes.
14          MR. BERSHTEYN:  All right.  Perfect.
15          Your Honor, we are mindful of the Court's minute
16   order which asks that the parties be prepared to address what
17   the Court would do if it were to grant our motion to dismiss.
18   Because --
19          THE COURT:  And I can tell you where I am
20   tentatively.  So certainly I -- I didn't review all the cases
21   cited.  I reviewed what I consider to be three primary
22   Ninth Circuit cases:  The *Musical Instruments*, *In re Dynamic*,
23   I think, and *Kendall*.
24          And so in those three cases the Circuit refers to
25   amended complaint which suggests to me that there were initial
```

1    complaint and leave to amend was given.  In two of those cases

2    there were limited discovery allowed.  But I tend to agree

3    with defendants in the motion that I think the complaint fails

4    to state a plausible claim for relief under the pleading

5    standard that I have to apply under binding Ninth Circuit case

6    law.  But I do -- I cannot find that amendment would be

7    futile.

8         Unfortunately, in response to the motion, plaintiffs

9    did not lay out for me what they would be able to allege to

10   cure the deficiency because they don't admit that there are

11   any deficiencies.  So that's kind of where I am.

12        But in reading *Kendall*, I don't agree with the

13   defendants that *Kendall* requires that the complaint has to

14   answer the questions of when, where, who, when, how -- who,

15   when, where, what.  Because, in *Kendall*, the Court found that,

16   even after deposition, the amended complaint did not answer

17   those questions.  But it doesn't mean that you have to answer

18   those questions for the complaint to survive, right, to

19   survive dismissal?

20        **MR. BERSHTEYN:**  Respectfully, Your Honor, I don't

21   think I would read *Kendall* the same way.

22        So what happened in *Kendall* is that the Court

23   permitted some limited discovery prior to adjudicating the

24   motion to dismiss.

25        **THE COURT:**  Should I allow that here?  A request was

1    not made, though.

2        **MR. BERSHTEYN:**  Your Honor, actually a request had

3    been made.  We were served with discovery.  We -- we agreed to

4    provide a certain amount of discovery, but -- this was

5    after -- of course all after the complaint was filed.  And

6    then there was a motion to stay the remainder of discovery

7    litigated before Magistrate Judge Albregts.  The magistrate

8    judge agreed that would -- that what we agreed to provide is

9    sufficient at this stage in light of the papers and the motion

10    to dismiss.  And we have completed that discovery, and --

11        **THE COURT:**  When was that discovery completed?

12        **MR. BERSHTEYN:**  Oh, goodness.  It would have been a

13    month or two ago.

14        **THE COURT:**  So after briefing was completed?

15        **MR. BERSHTEYN:**  Yes, after the briefing on the motion

16    to dismiss because it took some time to brief the stay motion

17    and for the magistrate judge to adjudicate it, and that

18    decision was not appealed to Your Honor.

19        So we are in a situation where some discovery has

20    been allowed, as was the case in *Kendall* and *Musical*

21    *Instruments*, and it's been completed.  But I think where I

22    might part ways, respectfully, with Your Honor is that, now

23    that some discovery has been completed, the plaintiffs here

24    are essentially in the same position as the plaintiffs in

25    *Kendall*.  They have some information, and now they have to

1    answer the *Kendall* questions.  If -- even if Your Honor finds

2    that they couldn't -- didn't have sufficient information to

3    answer them on the initial complaint, they would -- if

4    Your Honor allows amendment, certainly plaintiffs would need

5    to answer it on the amended complaint to match *Kendall*.

6    Though --

7             **THE COURT:**  All right.  So going back to what *Kendall*

8    requires -- I didn't realize -- I recall reading that there

9    was a stay of discovery, and -- but I didn't realize that some

10   limited discovery had been conducted.

11            The -- and so my recollection of stayed discovery

12   relates to prior order that I saw coming out.  I haven't

13   reviewed all the filings on the docket.  But in answering

14   *Kendall*'s questions in the opposition brief, I think that

15   defendants are asking for those questions to be answered with

16   too much specificity.  That's more demanding than I think what

17   *Kendall* requires.  Why don't you address that point?

18            **MR. BERSHTEYN:**  Absolutely.  So let's start with the

19   who.  The -- in *Kendall*, the -- what the plaintiffs have said

20   is essentially the who is the defendant banks.  And here what

21   the plaintiffs say in the -- I think it's page 22 of their

22   brief is that the who is the defendant hotels.  So in a sense

23   we are positioned no differently than --

24            **THE COURT:**  Well, defendant hotel operators who own a

25   combined 20 to -- 20 of the 30 hotels in the Las Vegas Strip.

1    **MR. BERSHTEYN:**  That's -- that's the allegation, but

2    the question who is but who formed the alleged agreement.  And

3    what -- what the Ninth Circuit said in *Kendall* is the

4    defendant banks have hundreds of employees -- they probably

5    have much more than that.  The same is true of the defendant

6    hotels.  What the plaintiffs have to plead in pleading an

7    agreement is who was the human being or the alleged human

8    being who participated in forming the agreement.

9        **THE COURT:**  So are the defendants' position that they

10   have to allege specific individual representatives from each

11   of the hotel operators who were involved in a discussion that

12   resulted in this -- and we'll get to the alleged agreement in

13   a moment.

14       **MR. BERSHTEYN:**  That is our position.  And, in fact,

15   it's not particularly inconsistent with -- with the law cited

16   in plaintiffs' own brief.

17       So if we look at the plaintiffs' -- plaintiffs'

18   opposition brief and look at the -- at the various authorities

19   on which they rely that are sort of examples of -- of District

20   Court cases where the *Kendall* standard was met, there's only

21   one that comes from within Ninth Circuit where the *Kendall*

22   standard would really be directly applicable, and that's the

23   *Potato* case in the District of Idaho.

24       And what the -- what the plaintiffs in that case

25   alleged in order to meet the *Kendall* standard is that there

1   was a meeting at a particular town in Idaho in I believe

2   September 2004, and it was organized by I think Mr. Wada and

3   Mr. Cornelius who were from Wada Farms and Cornelius Farms.

4   There were 23 attendees, and what was discussed at that

5   meeting was a decision among the potato growers to suppress

6   the -- the volume of potatoes to be grown essentially.

7   There's nothing like that alleged in this case.  And that's

8   probably their best -- best authority for a complaint that

9   would survive the *Kendall* questions.

10          And plaintiffs do even worse on the when because they

11  essentially concede in the complaint that the conspiracy began

12  at a time unknown.  I think that's paragraph 87 of the

13  complaint.  And courts, certainly after *Kendall*, in the

14  Ninth Circuit pretty routinely dismiss complaints alleging a

15  conspiracy when it's not alleged when the conspiracy began.

16          And then, finally, there is the what, which we think

17  is particularly important.  And here it's actually not clear

18  from the pleading exactly what it is that they claim the hotel

19  defendants agreed to do, how that agreement was -- how the

20  compliance of that agreement was monitored or enforced.

21          **THE COURT:**  So in terms of the what, I'm -- I agree

22  it could be clearer, but when I read the complaint again this

23  morning -- I'll point out the paragraphs where they alleged

24  the what here.

25          So paragraph 11 alleges that Rainmaker offers

1     different pricing algorithms, and they mention three in the

2     complaint.  And between paragraph -- sorry.  Give me a moment

3     here.  Let me look at my notes.

4             Paragraph 21 also alleges that -- and there were

5     other -- a number of other paragraphs I'll find in a moment.

6     Basically these paragraphs combine alleges that Rainmaker's

7     offer these revenue management programs -- three of them --

8     and that the hotel operators -- in order to use the program,

9     the hotel operators agree to provide nonpublic, specific

10    information about clients, pricing, demand, and so on.  In

11    exchange, Rainmaker then provide recommendations for pricing.

12    That's kind of the gist of the allegation --

13            **MR. BERSHTEYN:**  And I think --

14            **THE COURT:**  -- of the what.

15            **MR. BERSHTEYN:**  And I -- I can address each of those,

16    but let me start with the fundamental point.  Nothing that

17    this paragraph says or that Your Honor just recited describes

18    the agreement among the hotel defendants.  This is a -- this

19    is a case that fundamentally allege -- is -- purports to try

20    to plead a horizontal agreement among hotel defendants.  If

21    you look at paragraph 3, which is the very beginning of the

22    complaint, they say hotel defendants colluded.  Well, that

23    requires an articulation in some clear form of what it is that

24    the hotel defendants agreed to do.

25            Nothing like that is found in that paragraph.  What

1    that paragraph --

2         **THE COURT:**  Well, could the Court reasonably infer

3    that what they're alleging is that the hotel defendants agreed

4    to accept the pricing recommendations that -- from Rainmaker?

5         **MR. BERSHTEYN:**  I don't think Your Honor should infer

6    that because plaintiffs haven't alleged that, and I don't

7    think plaintiffs can allege that consistent with Rule 11.

8         There is no -- it would be -- it would be -- if one

9    of the conditions of using -- let's imagine a world in which a

10   condition of using Rainmaker was that, we give you

11   recommendations, you have to accept them.  That would be very

12   easy to allege, but they don't allege that because they know

13   it's not true.  They -- in fact, it's alleged not to be

14   true --

15        **THE COURT:**  So they allege that Rainmaker provides

16   the pricing recommendations.

17        **MR. BERSHTEYN:**  Yes.

18        **THE COURT:**  But there's no connection after that to

19   what the hotel operators agree or doesn't -- do not agree to

20   do?

21        **MR. BERSHTEYN:**  That -- that -- I'm sorry.

22        **THE COURT:**  Go ahead.

23        **MR. BERSHTEYN:**  They appear to concede that.  So let

24   me -- if you look at -- at the first page of their opposition

25   brief -- so their opposition brief at page 1 reads -- I'm in

1    the second paragraph in the second sentence:  Operators give

2    Rainmaker real-time access to competitive data regarding

3    occupancy rates and guests.  Its -- that's Rainmaker --

4    algorithms then output recommendations that operators can

5    accept.

6            Okay.  That -- that doesn't -- so there's no

7    obligation.  What Rainmaker does to -- I'm sorry.

8            **THE COURT:**  This is my thought that I was thinking

9    earlier.  So can accept.  And can the Court reasonably infer

10   that it's possible that they can possibly state that the hotel

11   operators do accept, which is resulting in price increases,

12   elevated hotel price increases across the Strip?

13           **MR. BERSHTEYN:**  No, Your Honor.  And this is actually

14   a really important point and, to be candid, a somewhat

15   frustrating point about this complaint.  This -- what --

16   whether the -- whether the hotels accept the

17   recommendations -- or agree to accept or even do accept

18   recommendations of Rainmaker is a fact.  If plaintiffs plead a

19   fact, we have to assume it's true for the purpose of this

20   motion.  But what they cannot do but they repeatedly do in

21   this complaint is beat around the bush to try to insinuate a

22   fact without actually pleading it because they know that fact

23   to be untrue.  And the one that -- that Your Honor has focused

24   on is one of those.

25           **THE COURT:**  Because one of the allegations is that

1    the recommendations are accepted 90 percent of the time or

2    90 percent acceptance rate or something to that effect.

3         **MR. BERSHTEYN:**  Yes.  That allegation is not only

4    unhelpful to plaintiffs, it's actually devastating to

5    plaintiffs' case and let me explain why.  That it's accepted

6    90 percent of the time is itself an allegation that it doesn't

7    have to be accepted; right?  I mean, that's their

8    allegation --

9         **THE COURT:**  May not accept it 10 percent of the time;

10   right?  Is that the math?

11        **MR. BERSHTEYN:**  Yes.  But it was -- but the only

12   thing we know is not true based on the complaint is that

13   there's any obligation to accept it because it's not accepted

14   100 percent of the time.

15        Now -- and the plaintiffs are -- are a little coy

16   about what it means to be accepted.  They're accepted --

17   according to Rainmaker's advertisements, they're accepted

18   90 percent of the time by its clients.  Rainmaker has

19   thousands of clients, and the hotel defendants here are a

20   vanishingly small percentage of those.  So to -- you know,

21   so -- so that's why it's not helpful because it doesn't

22   actually tell you anything about what the hotel defendants do.

23        But let's just -- let's just make a leap which the

24   Court, you know, essentially has suggested it might be

25   contemplating making, that the hotel defendants also accept

1    90 percent of the time.  Okay.  So what would that show?

2    There are 31,000 -- there's 99.9 percent of Rainmaker's

3    clients who are not alleged to participate in this conspiracy.

4    For whatever reason, allegedly accept this recommendation

5    90 percent of the time.  What would it prove that so do the

6    hotel defendants?  It would just mean, if it were true, that

7    the hotel defendants do what nonconspirators do.  It doesn't

8    prove any agreement among the hotel defendants.  It would only

9    suggest that the hotel defendants are behaving the way

10   nonconspirators are behaving.

11          The way plaintiffs typically plead an antitrust case

12   is they say, well, you know, here's a period when there was no

13   conspiracy and the prices were low or here's what

14   nonconspirators do, they charge low prices.  And here's what

15   conspirators do, they charge higher prices.  If they want to

16   prove some suspicious behavior among hotel defendants and they

17   allege that everybody accepts Rainmaker's prices 90 percent of

18   the time on average, they would presumably have to allege as a

19   fact that hotel defendants here accepted substantially more

20   than 90 percent of the time, something like 100 percent.  They

21   can't allege either of those things, the 90 or the 100,

22   because they know it's not true.

23          **THE COURT:**  Well, they do allege that

24   traditionally -- so this is interesting because they're

25   relying on a pricing algorithm program to argue that the

2:23-cv-00140-MMD-DJA - October 13, 2023

1    program is really the Bob, if I use the example from the

2    complaint.  But they do allege that the traditional model --

3    profit model for the hotel operators is to maximize occupancy

4    and keep occupancy at a low rate.  Because you already billed

5    the hotel rooms, so of course you want to get them occupied to

6    maximize profit and occupancy.  And that with Rainmaker's

7    pricing algorithms, hotel operators are able to maximize

8    profit by -- well, the inference is accepting the

9    recommendations to price at a noncompetitive level.

10           **MR. BERSHTEYN:**  So I have three --

11           **THE COURT:**  You have three problems with that?

12           **MR. BERSHTEYN:**  -- thoughts about this proposition.

13   The first is the factual allegation here is that Rainmaker

14   goes around to different hospitality, you know, institutions,

15   which is their clients, and say we have -- we've got a product

16   that's going to increase your profits.  That's the allegation.

17   That's what everyone does.  That's what I fundamentally do to

18   my clients; right?  No one goes around saying to their

19   clients, I have a product that's going to increase your sales

20   but it's not going to increase your profits, and so there's

21   nothing at all suspicious or anomalous about that.

22   Everyone --

23           **THE COURT:**  No, there's nothing suspicious about

24   trying to maximize profit.

25           **MR. BERSHTEYN:**  And then there's the question about

1    occupancy.  So we know -- plaintiffs allege no facts about

2    changes in occupancy in Las Vegas among the hotel defendants

3    or anything else that would suggest that the actual -- in

4    real-life, the occupancy levels at the defendant hotels has

5    changed in any way let alone in relation to Rainmaker.  That's

6    the second problem.

7         And the third problem is that this theory that in a

8    competitive world there would be zero -- it's essentially

9    100 percent occupancy at hotels.  It's not a fact alleged.

10   It's a theory that plaintiffs propound.  And that theory,

11   since we're talking about theory, is obviously wrong.  If

12   it -- if in a competitive world -- so I work in Manhattan.

13   There's lots of hotels in Manhattan.  It's a very competitive

14   market.  Somehow I suspect on a given day the Ritz-Carlton

15   probably has an open room, and they don't, as just a matter of

16   common sense, put up that room for 100 bucks the night before.

17   It's just not how real world works.

18        So, you know -- so for the combination of the three

19   of those -- theory of those things, which is that there's

20   nothing at all suspicious about the only fact that's alleged,

21   which is what Rainmaker says, that there's no actual

22   information alleged about occupancy, no facts alleged, and

23   that the theory, which is the only thing that this particular

24   line of attacking plaintiffs is hanging on is -- is their

25   theory.  And it's clearly not the real world, and I don't

```
1    think that the Court should make much of those allegations.
2         THE COURT:  That goes to the defendants' point that
3    the assumption in the complaint is that the hotel rooms are
4    all comparable; right?  That the hotel operations are all
5    comparable.  Because in your Ritz-Carlton example, they don't
6    want to erode their reputation by offering rooms at whatever
7    rate --
8         MR. BERSHTEYN:  Yes, exactly.  Because the
9    Ritz-Carlton presumably knows that, you know, then, you know,
10   maybe cheapskates like me will wait until last minute --
11        THE COURT:  Force sale.
12        MR. BERSHTEYN:  -- to -- yeah.  Exactly.  So that's
13   pretty rational behavior.
14        On the fungibility of rooms -- or maybe Your Honor
15   has another question?
16        THE COURT:  No, go ahead.
17        MR. BERSHTEYN:  Plaintiffs do something that they
18   really can't do, which is have it both ways.  What -- what --
19   on the one hand, plaintiffs claim, well, this is all one
20   market, these are all competitors, it's all fungible.  On the
21   other hand, if you actually look at the way they describe
22   their market, which is at paragraph 73 of the complaint, they
23   say, well, they're fungible within the different classes of
24   rooms, which makes some sense because they're -- you know, as
25   Your Honor doubtless knows, the hotels represented here is --
```

1    certainly the properties of those hotels are not exactly

2    fungible, and then the hotel rooms within them are not

3    fungible.  So the -- the market definition in which, you know,

4    this is all just one fungible market, has some serious

5    problems.  I would say that it is probably the 18th or 19th

6    problem this complaint has, but we may be able to get there if

7    Your Honor perceives certain lines of plaintiffs' reasoning.

8         **THE COURT:**  So while you're on paragraph 73, why

9    don't you look at paragraph 74 which is I think an attempt to

10   allege that there is a suggestion of an agreement in that

11   the -- the -- the hotel operators' employees gather annually

12   at this conference where everybody knows each other and they

13   share information and that's evidence that there's some kind

14   of agreement.  I think that's the allegation.

15        **MR. BERSHTEYN:**  I think that is the implication.  It

16   is pretty much black letter law in these cases that this sort

17   of allegation doesn't move the needle at all, and probably the

18   best example of that is one of the cases with which the Court

19   began, which is *Musical Instruments*.

20             So just to remind the Court about the facts of

21   *Musical Instruments*, the makers of guitars and the retailers

22   of guitars were alleged to conspire to adopt a policy that

23   there would be sort of a minimum advertised price.  There was

24   an association with meetings that all of them were alleged to

25   have attended to -- and it was alleged that they were

1    discussing this particular policy.  And the Federal Trade

2    Commission went after the trade association about the

3    impropriety of those -- alleged impropriety of those

4    discussions.  They filed a complaint, and the association

5    entered a consent decree.  And yet the Ninth Circuit found

6    that those allegations of attendance at those meetings,

7    whatever exchange of information went on there, were

8    insufficient.  So plaintiff --

9         (Simultaneous crosstalk.)

10        THE COURT:  -- different between trade association,

11   which the Ninth Circuit in that case found there's value in,

12   than meetings that Rainmaker organized for their clients

13   exclusively.  And if they have thousands of clients,

14   apparently these meetings, as alleged, they only invite a

15   limited group, 100 attendees for each meeting.

16        MR. BERSHTEYN:  Well --

17        THE COURT:  I remember reading somewhere there was

18   100 attendees at these annual meetings.

19        MR. BERSHTEYN:  I have to say I don't recall that but

20   that is probably my fault.

21        I -- what is not alleged is that any -- is that

22   actual employees of our clients attended those meetings

23   together.  How could Rainmaker holding meetings for its

24   clients, something that all businesses do, be -- be sufficient

25   to imply, you know, an agreement among those clients, let

1    alone an agreement that no one is alleging the clients

2    discussed at those meetings?  Or take...

3         **THE COURT:**  So what about the allegations that

4    confidential witness Number 3 alleges that the -- everyone

5    kind of knew each other at the con -- at the little conference

6    together, and that hotel operators would typically send

7    employees from revenue management teams to attend were they

8    share information about -- well, where they exchange insights

9    and ideas and discuss revenue management tools.

10        **MR. BERSHTEYN:**  So sounds kind of like a bar

11   association meeting or something; right?  Employees of

12   competitors attend it to discuss best practices and more

13   saliently even their own alleged confidential witness, any of

14   the three of them that are all allegedly employees of Cendyn,

15   they can't even place our clients at those meetings.  How

16   could that be evidence of actual agreement among our clients

17   if all that's alleged is that some members of our industry

18   attended a meeting?  You know, what's essentially like kind of

19   a let's just call it a trade association meeting.  Those --

20   those kinds of allegations are almost routinely made in

21   antitrust cases and almost never move -- never, to my

22   knowledge, move the needle.

23        **THE COURT:**  So I don't know if you want to transition

24   to the argument I assume that the Court should not grant leave

25   to amend because the deficiencies cannot be cured, unless you

1    want to give plaintiffs' counsel the opportunity to argue what

2    they're going to do to try to cure it, assuming that they want

3    to cure it, first before you respond.

4          **MR. BERSHTEYN:**  I think that would be procedurally

5    proper.  And I'll just say, you know, if -- for the record, if

6    anything, that it's been five months since plaintiffs made

7    their request to amend the complaint.  It's been four months

8    since we indicated in our brief that that request has not

9    been -- you know, has not been supplied with sufficient detail

10   consistent with Local Rule 15-1.  It's been a week since the

11   Court effectively reminded the parties of the same thing.  We

12   are yet -- the Court or the defendants -- are yet to hear from

13   plaintiffs despite all this passage of time about what it is

14   they now believe they can allege.  So both the Court and we

15   are now being placed in an unfortunate position, despite six

16   months of briefing, of having to respond to whatever it is

17   that plaintiffs will now say in real-time, which is not the

18   way the local rule is supposed to operate.  Nonetheless, if

19   the Court were to entertain plaintiffs' representations, we

20   will certainly -- we will respectfully request an opportunity

21   to respond to --

22          **THE COURT:**  I agree.  And that argument resonates.

23   In fact, I think in the reply defendants cite to one of my

24   prior decisions where I deny leave to amend because there's no

25   specific I think indication as to how amendment would be --

1     how the deficiencies would be cured.  I have to say, I think

2     that was from 2012 or 2013.  Since then, I've been reversed

3     several times by the Ninth Circuit because I decline to give

4     leave to amend in addressing the complaint initially.  Because

5     I think the -- showing that amendment would be futile, at

6     least with the initial complaint, may be rather a high bar to

7     set.  But let me hear from plaintiffs' counsel.

8              **MR. BERSHTEYN:**  Thank you, Your Honor.

9              **MR. PIERCE:**  Good morning, Your Honor.  Can you hear

10    me okay?

11             **THE COURT:**  Yes.

12             **MR. PIERCE:**  I'd like to start with the issue of

13    *Kendall*, and I do want to step back for a second and

14    distinguish between I would say what *Kendall* concerns and what

15    a lot of the cases that follow *Kendall* concern, which is

16    allegations of a secret per se conspiracy.  And in these kinds

17    of cases, plaintiffs are alleging something like bid rigging

18    or market allocation or wage fixing where, you know, it's a

19    secret, illegal conspiracy.  And if we had shown up and said

20    Caesars and Wynn entered into a conspiracy to fix the wages of

21    their employees and didn't provide any details about the

22    nature of that agreement, you would understandably be asking

23    the *Kendall* questions -- who, what, when, why, how -- because

24    that's a secret, illegal conspiracy.

25             But that's not what we're alleging here.  We're

1    alleging fundamentally that this business model, at least

2    applied in these circumstances where, in a highly-concentrated

3    market, a set of competitors is using the same pricing

4    algorithm, is what's being challenged.  So this is a public --

5              THE COURT:  Go ahead.

6              MR. PIERCE:  This is a public conspiracy.  And what

7    we're basing our allegations on is largely the statements of

8    Rainmaker itself explaining how it works.

9              So it's not a situation where what's -- what's

10   happening is secret in the same way of, like, illegal per se

11   conspiracy where obviously the people who participate are not

12   going to publicize what's happening.  What's being challenged

13   here is fundamentally as applied in these circumstances the

14   business model of Rainmaker.  And so I think, you know,

15   defense counsel --

16             THE COURT:  But just because the allegation here is a

17   different type of conspiracy based on this algorithm pricing

18   model doesn't mean that plaintiffs can avoid what is clear

19   in -- in *Bell Atlantic* and the case -- the Ninth Circuit cases

20   I referenced earlier, that the allegations still have to be

21   pled with some specificity for the Court to determine there's

22   a possible claim for relief.

23             MR. PIERCE:  Yes, Your Honor.  And, you know, we

24   think we have pled it in the complaint with some specificity

25   based on many of the allegations that Your Honor was going

```
 1    over with defense counsel.  We would be prepared to add a
 2    great deal of additional specificity in an amended complaint
 3    if we get to that.  We have continued our factual
 4    investigation since our original complaint was filed.  There
 5    was a fair amount of additional material just based on public
 6    sources that we've been able to identify.
 7              We asked for limited discovery.  I would say we got
 8    very limited discovery.  Even the very limited discovery that
 9    we got has identified -- you know, the initial disclosures for
10    certain of the defendants identified the existence of
11    agreements between them and Rainmaker.  I would note we asked
12    for -- part of the limited discovery we asked for was
13    interrogatories about asking them to identify the existence of
14    agreements and identify any meetings that occurred.  That
15    discovery was denied.
16              But regardless, just based on public evidence that
17    we've continued to investigate and the limited discovery we've
18    gotten so far, we think we -- in an amended complaint, if this
19    current complaint has defects, we would be able to provide a
20    great deal of additional specific information.
21              THE COURT:  So why hasn't -- if that's the case --
22              MR. PIERCE:  Yes.
23              THE COURT:  -- why hasn't plaintiffs filed a motion
24    to amend?
25              MR. PIERCE:  Just in our -- in our experience, you
```

1    don't file a motion to amend until the initial complaint is

2    dismissed.  I mean, we don't think the complaint we filed is

3    defective.  But if -- and often, in my experience in these

4    cases, what happens is the judge says the original complaint

5    has certain defects, and then you file an amended complaint

6    that addresses the defects.  So that's sort of the procedural

7    order of operations that we have usually followed.

8            **THE COURT:**  In other districts?

9            **MR. PIERCE:**  In other districts.  And I would say

10   just in general in all of the cases that -- as Your Honor

11   recognized, that was the basic procedure that happened in

12   cases like -- in *Kendall*, *In re DRAM*, in *Musical Instruments*.

13   There was an initial complaint.  The judge dismissed it with

14   leave to amend.  Plaintiffs took another shot, attempted to

15   address the defects, and then -- you know, and then the Court

16   adjudicated it again.  That has been -- and in my own personal

17   practice in other districts, that has been the basic procedure

18   that has been followed.

19           **THE COURT:**  So the basic procedure in other districts

20   is plaintiffs file a complaint that do not contain all the

21   specificity allegations required, wait for the defendants to

22   file a motion to dismiss, wait for the judge to tell you

23   what's deficient, and then you file an amended complaint?

24           **MR. PIERCE:**  Respectfully, Your Honor, we don't think

25   the initial complaint was defective.  But once we're told that

1    it is defective, we will file an amended complaint that

2    attempts to cure the deficiencies.  That's how we have done it

3    in other -- in other districts.

4            **THE COURT:**  So let's focus on the pending motions to

5    dismiss --

6            **MR. PIERCE:**  Of course.

7            **THE COURT:**  -- and one of the primary arguments is

8    what's lacking is -- so the complaint, the way I read it, are

9    low on a lot of details about this algorithm pricing and what

10   Rainmaker offers to their clients, including the hotel

11   operators.  But what is missing to me is the dot that connects

12   the pricing recommendations as counsel -- defense counsel

13   pointed out, the pricing recommendations that Rainmaker

14   provides for their client, assuming that the client provide

15   nonpublic information about pricing, clients, and so on that

16   allows for Rainmaker's algorithms to provide pricing

17   recommendations.  But they're recommendations.  There's no

18   allegations in the complaint for the Court to even infer that

19   these recommendations -- that the hotel operators agree to

20   accept these recommendations and adjust their pricing; right?

21   That horizontal -- the -- is it the spoke part?  That that's

22   missing in the complaint.  That's the what that's missing.

23   How would you propose to cure that?

24           Well, first, do you admit that that's missing?

25           **MR. PIERCE:**  Well, I think that we are going off of

1    Rainmaker's public statement that their recommendations are

2    accepted 90 percent of the time --

3         **THE COURT:**  And you heard that -- the argument as to

4    why that doesn't mean anything, that's meaningless?

5         **MR. PIERCE:**  I heard that, Your Honor.  What I would

6    say is -- and I do also want to take a step back and

7    distinguish here what is concerning about the fact that these

8    pricing recommendations is being accepted is that it involves

9    a set of competitors in a specific market.  If we were -- we

10   are not challenging and I don't think it would be actionable

11   if Rainmaker provides pricing recommendations to a casino that

12   doesn't have any competitors within 200 miles of it.  That is,

13   you know, a single vertical agreement between Rainmaker and a

14   client where there's not the same coordinated pricing strategy

15   that is occurring among competitors.

16        Here we're talking about a set of competitors in a

17   market that we think is at least at the motion to dismiss

18   stage has been plausibly alleged, it is a different thing when

19   a set of competitors in a specific market is all accepting the

20   same pricing recommendations --

21        **THE COURT:**  But that's not the allegation in the

22   complaint, though.  I agree that -- so the allegation is in a

23   way very careful, right, that Rainmaker boasts 90 percent --

24   that their recommendations are accepted -- I forget the exact

25   language.  Either there's a 90 percent acceptance rate or the

1    recommendations are accepted 90 percent of the time or

2    something to that effect.

3         **MR. PIERCE:**  Yes.

4         **THE COURT:**  But it doesn't speak to acceptance by the

5    hotel operators.

6         **MR. PIERCE:**  Well --

7         **THE COURT:**  So I can't make that connection, right,

8    to infer -- to reasonably infer that means that the hotel

9    operators in the Las Vegas Strip accept the recommendations

10   90 percent of the time.  And we can argue about what the --

11   what that means, but I can't even make that inference.

12        **MR. PIERCE:**  Well, Your Honor, I mean, I do think

13   reading the complaint in the light most favorable to

14   plaintiffs, I think a public statement by Rainmaker that its

15   recommendations are accepted 90 percent of the time creates a

16   plausible inference that these defendants are accepting the

17   recommendations.  Also --

18        **THE COURT:**  I don't think I can make that -- even if

19   I construe -- so I accept all well-pleaded allegations as

20   true, construe all reasonable inferences in plaintiffs' favor.

21   But how can I construe that in plaintiffs' favor when the

22   statement is very vague?  That it does not tie to the hotel

23   operators.  So you're asking me to sit -- you're arguing that

24   construing inferences in your client's favor would mean that I

25   have to say that 90 percent acceptance rate applies to the

1    hotel operators?

2         **MR. PIERCE:**  Yes, Your Honor.  And I think that --

3    that is how we would read it.  And I know defense counsel

4    mentioned, you know, that Rainmaker has thousands of clients.

5    I will say, having now spent a fair amount of time reviewing

6    Rainmaker's public documents, the clients that they repeatedly

7    emphasize are a core set of 10 to 20 and -- including all of

8    the defendants.  Those are the clients that they feature in

9    their public statements, in their advertisements.

10        So I know opposing counsel spoke about how there's

11   many, many clients, but the core clients that Rainmaker

12   repeatedly features, are ones that they feature interviews

13   with on their website talking about the utility of Rainmaker,

14   are in large part the defendants themselves.  So when you're

15   talking about Rainmaker making these statements about pricing

16   recommendations and featuring these specific clients, I do

17   think it creates a plausible inference that pricing

18   recommendations that are given are accepted a vast majority of

19   the time.  I think even if you just create a certain baseline

20   of pricing, then it is problematic.  I know in Your Honor's

21   opinion in *Western Range* you talked about how deviations from

22   a price don't necessarily upset the fact that there is a

23   certain uniformative pricing -- pricing practices.

24        I think the same applies here.  If you have a

25   centralized algorithm producing one pricing strategy that's

1    generating recommendations that are accepted a large amount of

2    the time by a set of competitors in a specific market, you

3    have significant antitrust concerns.

4         **THE COURT:**  So assuming I agree with defendants that

5    the complaint is sufficient -- and I don't entirely agree with

6    defendants in all the arguments, but I certainly agree that

7    what is missing from the complaint is allegations of the

8    existence of some kind of agreement or concerted action.  I

9    can't even infer that the allegations that there's parallel

10   conduct plus -- the plus factors evidences some kind of

11   proceeding agreement.  That agreement part is just missing.

12   That's one deficiency.  How would you propose to cure?  So

13   what discovery has been conducted that would allow for you to

14   cure?

15        **MR. PIERCE:**  Well, Your Honor, we've gotten initial

16   disclosures from the defendants.  We've gotten work charts.

17   We do -- that will provide some information.  If Your Honor

18   was inclined to reconsider the magistrate judge's order and

19   allow a certain amount of limited discovery on -- on this

20   issue, that would be helpful.  But we also have continued our

21   public investigation, public -- investigation of public

22   statements.  I think we've learned a great deal about how

23   Rainmaker's algorithm works, how it generates recommendations,

24   the extent to which the recommendations it generates are

25   exclusively influenced by competitor pricing, the extent to

1    which the recommendations are generated in a way where the

2    person who receives the recommendations either accepts them or

3    overrides them, which I think helps strengthen the inference

4    that these recommendations are the default and then are

5    overridden, if necessary, but that are otherwise accepted.  So

6    I think those are all factual allegations that will help

7    support a plausible inference at the pleading stage, of

8    course, of an agreement.

9            THE COURT:  What about the -- the argument that the

10   complaint doesn't answer the questions that *Kendall* requires?

11   Start with the who.  Did you in discovery learn enough

12   information so you can answer who amongst the operator hotel

13   employees were involved in accepting the recommendations or

14   making decision to accept the recommendations?

15           MR. PIERCE:  You know, in their initial disclosures

16   defendants identified individuals that they say possess

17   relevant knowledge, and I think those individuals are the who.

18   I think we also have gained a significant amount of

19   information throughout the relevant period based on public

20   statements of Rainmaker indicating that each of the clients

21   were participating in Rainmaker throughout the -- throughout

22   the relevant period which I think helps establish parallel

23   conduct.  The other thing --

24           THE COURT:  Speaking of relevant period, what's the

25   relevant period?

1          **MR. PIERCE:**  Well, that's a good question.

2          **THE COURT:**  Because it's kind of expansive in the

3     complaint.

4          **MR. PIERCE:**  Yes.  Well, we have not alleged -- you

5     know, we have not alleged fraudulent concealment.  We have

6     gone off a four-year statute of limitations period.  I think

7     for us the key period is, you know, between 2015 and 2017 I

8     would say Rainmaker strengthened its overall set of

9     algorithms.  It added Revcaster and RevTell.  In 2017 it added

10    GroupRev, which it described as sort of the final piece of the

11    puzzle.  And after it sort of created this overall set of

12    revenue management algorithms, it implemented them.  And so,

13    for us, the relevant period really starts in that 2015 to 2017

14    period where those algorithms all sort of come into place as

15    sort of a unified revenue management solution.  And then going

16    forward, you know, we've alleged a four-year class period

17    because that's what the statute of limitations provides.

18         **THE COURT:**  So the relevant period is based on the

19    algorithm pricing program that Rainmaker offers or adds to its

20    suits?

21         **MR. PIERCE:**  Yes.

22         **THE COURT:**  But it has nothing to do with the hotel

23    operators' conduct.  Because I thought that the attempt in the

24    complaint was to show similar conduct around similar of time

25    frame.  And so the similar conduct, what's the similar conduct

1    amongst the hotel operators then?

2          MR. PIERCE:  Well, the similar conduct is Rainmaker

3    rolls out, you know, a set of algorithms, and then each of the

4    hotel operators --

5          THE COURT:  What does that have to do with the hotel

6    operators?

7          MR. PIERCE:  They use them.  They use them, Your

8    Honor.  That's the similar conduct, is Rainmaker sets out --

9    you know, offers the set of algorithms, and then each of the

10   individual hotel operators makes the affirmative decision to

11   use the algorithms that Rainmaker is providing.

12         THE COURT:  So assume -- so will the allegations be

13   that, for example, as soon as Rainmaker's offer -- I think

14   2015 was the GuestRev program added?

15         MR. PIERCE:  2015 I believe was they added a

16   Revcaster, sort of a --

17         THE COURT:  Revcaster, yes.

18         MR. PIERCE:  And then 2017 I believe was GroupRev.

19         THE COURT:  The last one, the GroupRev.

20         MR. PIERCE:  Yes, GroupRev.

21         THE COURT:  So is the allegation that as soon as

22   Rainmaker add the -- the GroupRev in 2017, for example, all

23   the hotel operators then subscribe to that program and utilize

24   that program and accept the pricing recommendation?

25         MR. PIERCE:  No.  At this point we are -- our amended

1   complaint -- I'm not going to -- you know, will be based off

2   public statements and, you know, this is -- that is not a

3   question, for example, that was answered by the discovery that

4   we got.  Those were questions that would we have --

5          **THE COURT:**  But you said that the hotel operators --

6   the similar conduct is the hotel operators all then utilize

7   these programs.

8          **MR. PIERCE:**  Yes, Your Honor.

9          **THE COURT:**  How is that different than the question I

10  just asked?

11         **MR. PIERCE:**  Maybe there is no difference,

12  Your Honor --

13         **THE COURT:**  And I don't mean to trick anyone.  I'm

14  just trying to understand.

15         **MR. PIERCE:**  Yes.

16         **THE COURT:**  Because what I hear so far and I read

17  from the complaint is, as I said, there are a lot of

18  allegations about the algorithm pricing and what Rainmaker

19  claims to offer.

20         **MR. PIERCE:**  Yes.

21         **THE COURT:**  But you need conduct -- similar conduct

22  on the part of the hotel operators; right?

23         **MR. PIERCE:**  Yes.  And what we have just based on

24  public statements, even without the benefit of discovery on

25  this issue that we've found as part of our continuing

1    investigation, is Rainmaker in trade journals identifying, you

2    know, we offer GroupRev and GuestRev, and those programs are

3    used by -- listing a set of clients that include the

4    defendants, so -- and doing that throughout -- over a period

5    of time.  And so to us that's parallel conduct.  Rainmaker is

6    saying we offer these algorithms, and our clients include the

7    hotel operators.

8        THE COURT:  But that's information you've learned so

9    far in discovery?

10       MR. PIERCE:  That's information based on continuing

11   investigation that we've learned.  Obviously, if defendants

12   would, you know, answer in interrogatory to identify, you

13   know, exactly which algorithms they were using, that would

14   further answer the question.  But, you know, based just on the

15   public information, we certainly have -- we can supplement in

16   an amended complaint.

17       THE COURT:  So the alternative theory that's offered

18   in the opposition I don't read the complaint to include, and

19   that is the theory that there's a rule -- the rule of reason

20   claim.  Do you agree with that?

21       MR. PIERCE:  Well, in *Gilley II* the Ninth Circuit

22   specifically said that a set of agreements can constitute a

23   contract, combination, or conspiracy.  That's our claim, is

24   that there's a contract, combination, or conspiracy and --

25       THE COURT:  But that's conclusory, though, in the

1    allegation in the complaint.  I think -- I only see that

2    allegation in paragraph 88.

3            **MR. PIERCE:**  Yes, Your Honor.  I mean, that's where

4    we state the claim.  I mean, again, if Your Honor thinks that

5    claim was not pled in the complaint, I mean, certainly in an

6    amended complaint we can, you know, break that out as a

7    separate claim and specify it.  But I would just say the

8    Ninth Circuit has been clear.  In *Musical Instruments* it talks

9    about how a set of agreements or multiple agreements can

10   constitute a rule of reason claim.  We specifically said in

11   our claim that, you know, we're talking about either a per se

12   or a rule of reason claim.  In the claim itself we talk about

13   the agreements that were entered into.

14           So certainly, if Your Honor thinks it was not

15   sufficiently broken out in the original complaint, it's a

16   claim that we can break out in more detail in the amended

17   complaint.

18           **THE COURT:**  Anything more?

19           **MR. PIERCE:**  You know, Your Honor, I would just say

20   that this is a novel factual pattern, but I think it is an

21   important antitrust issue.  I would note that the DOJ recently

22   filed yesterday actually a -- that they were going to --

23   intended to file a statement of interest in the *RealPage* case.

24   *RealPage* involves again pricing algorithms, including pricing

25   algorithms that RealPage purchased from Rainmaker, and the

1    Department of Justice specifically discussed that the

2    algorithm pricing raises significant antitrust concerns.  So

3    we do think, although this is a novel but important factual

4    area and we do -- we do -- certainly an amended complaint we

5    would provide, you know, further support for why this factual

6    pattern fits within some of the, you know, foundations of

7    antitrust law and is actionable.  Thank you, Your Honor.

8             **THE COURT:**  Thank you.

9             **MR. BERSHTEYN:**  Your Honor, with your permission, I

10   wanted to make four quick points in response to Mr. Pierce.

11            I'll start first what Mr. Pierce said is that, with

12   the help of the discovery and other material in the public

13   record, there will be more information about how the hotel

14   defendants use or utilize the pricing recommendations.  So

15   this is -- this is where we have to watch the words very

16   carefully.  Because Your Honor refers to some confusion about

17   which question is being answered.  That's actually a really

18   important question.  The plaintiffs consistently use this word

19   "use" because it's ambiguous.  So Rainmaker provides these

20   recommendations to its clients --

21       *(Phone conference interruption in proceedings.)*

22            **MR. BERSHTEYN:**  I think it may just be an hour.

23            **THE COURT:**  I don't think it was limited --

24            **COURTROOM ADMINISTRATOR:**  I don't --

25            **THE COURT:**  The AT&T line should -- that's all right.

1    Why don't you continue?  I'm sorry, do you have -- although,

2    do you have attorneys who are listening in?

3            **COURTROOM ADMINISTRATOR:**  There was a lot of people

4    on the line.

5            **THE COURT:**  I had opened the line for that reason;

6    right?  There were interested members of the public who were

7    listening in as well as attorneys.

8            All right.  So my courtroom deputy in Reno also was

9    on the line, as well as my law clerk.  That's all right.  Why

10   don't we try to see if we can allow everyone to reconnect.

11   And it would have to be the same number, right, so members of

12   the public can dial in as well?

13           **COURTROOM ADMINISTRATOR:**  Yes.

14       *(Pause in proceedings.)*

15           **THE COURT:**  Thank you.  I apologize for that.

16           **MR. BERSHTEYN:**  Thank you, Your Honor.

17           So we were talking about the ambiguous word "use."

18   So that hotel -- that hotel might have access to the

19   recommendations.  That doesn't do anything for plaintiffs when

20   it comes to proving an agreement.  The question is:  Are those

21   recommendations being adopted as the hotel's prices?  And on

22   that issue we have provided direct interrogatory responses.

23   And I know -- I know we're at the pleading, so you don't have

24   to accept them as true, but I also -- I think it's important

25   because the plaintiffs raise discovery and because I want to

1  make sure that Your Honor doesn't think that the 90 percent

2  colloquy that we had is just some tricky math colloquy, but

3  this is -- this is actually consistent with -- with -- with

4  what the facts are, you know, at least what the discovery

5  shows.

6          So I'm reading now from Wynn's interrogatory

7  responses.  Wynn Las Vegas hotels utilize their own pricing

8  algorithm to determine and set hotel room prices and have a

9  general practice of not using the recommendations generated by

10  Rainmaker's algorithms.  Similar for Caesars.  Caesars states

11  that it does not have a practice of using prices recommended

12  by Rainmaker Group and so on.

13          So I just want to clarify that the question that's

14  important to the Court is:  Have the hotels agreed to adopt

15  these prices?  To get to that, you have to first establish

16  that the hotels adopt them in the first place, and so far

17  every indication is that they don't.  So that's -- that's sort

18  of my first point --

19          **THE COURT:**  I thought counsel mentioned that either

20  they accept the recommendation or override.  I don't know what

21  override means.  Override is not adopting; I know that.  I

22  think.

23          **MR. BERSHTEYN:**  What I heard Mr. Pierce say is that

24  maybe they have a -- you know, there's some kind of an option

25  to -- you know, maybe Rainmaker provides a recommendation; you

1   can accept it or you can override it.  That doesn't -- doesn't

2   get them anywhere when it comes to agreement.  You have to

3   prove an agreement to actually adopt them.  I mean, how would

4   an agreement to consider them and override them if you choose

5   work?  That's an agreement that's impossible to monitor and

6   wouldn't get -- wouldn't get the alleged conspirators

7   anywhere.

8          I think these are all sort of examples of, you know,

9   kind of what I described as beating around the bush and trying

10  to insinuate a fact that isn't actually true but necessary for

11  this complaint to get off the ground.

12         The second point I wanted to make is a point that I

13  think might illustrate why an amended complaint here is almost

14  certainly going to be futile.  So Your Honor focused

15  Mr. Pierce towards the end of his argument on this vertical

16  agreement.  So I think it's -- I think it's pretty clear from

17  the argument -- and I don't think that Mr. Pierce is going to

18  dispute this -- that Rainmaker doesn't require -- in this

19  vertical agreement -- so one hotel and Rainmaker -- doesn't --

20  Rainmaker doesn't require anyone to accept their

21  recommendations 100 percent of the time or any percent of the

22  time.  If Rainmaker offers a recommendation, you can take them

23  if you choose.  And it is black-letter law that such a

24  vertical agreement is not a restraint, not even an agreement

25  in restraint of trade.  In order to be an agreement in

1    restraint of trade, which is what's prohibited by Section 1 of

2    the Sherman Act, somebody in that agreement has to walk away

3    from the option of doing something.  The reason price fixing

4    is a restraint of trade is that we agree we're not going to

5    lower the price.  An agreement which says, you know, here's

6    the recommendations, you can take them or you can leave them,

7    is not an agreement in restraint of trade.  And there is some

8    cases cited in our reply brief, including from the

9    Ninth Circuit, that hold that.

10          The only way in which it could happen, if, like,

11   Rainmaker was coercing the hotel rooms somehow to accept these

12   recommendations, which I don't think anyone's going to allege

13   in this case.  So that's why this whole vertical agreement

14   line -- you know, line of thinking, which is -- I agree with

15   Your Honor, not really alleged in the complaint, is going to

16   hit a dead end.

17          Third, in the very beginning of his argument

18   Mr. Pierce said, well, the -- this sort of who, what, where,

19   when, the questions from *Kendall*, they're not really important

20   if I'm challenging a business model as opposed to some secret

21   agreement.  So one doesn't have to look anywhere further than

22   *Kendall* to know that that -- that that's inaccurate.  Because

23   *Kendall* was a case that was challenging the business model.

24   It was challenging the business model that Visa and MasterCard

25   had at the time, and there was -- there was no secret about

1    it, and yet that's exactly where that doctrine arose.

2            And then finally, fourth, I -- there is -- there is

3    another thing about the complaint that I just want to clarify

4    to make sure that there's no confusion.  Because this is

5    another one of those situations where the complaint is

6    pleading something very carefully in order to insinuate

7    something else which it can't plead.  This is about how

8    Rainmaker works.  There is nowhere in the complaint that

9    plaintiffs allege, just as a matter of plain fact, that what

10   Rainmaker does is take sensitive information from one hotel

11   and somehow give it to another hotel or that it takes

12   sensitive information from another hotel and uses that

13   information in order to recommend prices to another hotel.

14   That's what one would think that they're alleging.  That's

15   what they insinuate.  But that is not the facts alleged here.

16       **THE COURT:**  I'm going to let plaintiffs' counsel

17   respond to that because I thought --

18       *(Simultaneous crosstalk.)*

19       **MR. BERSHTEYN:**  Reading the complaint the first

20   couple of times, I did, too.  But the complaint is very

21   careful about that.  Because those things are not -- I mean,

22   they can't be alleged because they're not true.  What the

23   complaint alleges is two things.  That the Rainmaker -- that

24   Rainmaker receives sensitive, like, occupancy information and

25   booking information from hotels.  So that -- that -- that --

1    from it, it gives one hotel to Rainmaker, hotel gives that

2    information.  Because the whole point of Rainmaker is that it

3    takes this kind of information and it analyzes it in order to

4    help that hotel improve its pricing; right?  So there's

5    nothing at all remarkable about that.  So that's alleged as a

6    fact.

7            And the second fact that's alleged is that Rainmaker

8    uses the pricing of the other hotels -- so if it's making --

9    if it's making a recommendation to hotel A, it is -- one of

10   the things it can use in order to inform that recommendation

11   is pricing of hotels B and C.  But pricing of hotels B and C

12   is publicly available information.  We can log on to Expedia

13   now and see their pricing for the next six months.

14           What plaintiffs carefully don't allege is that the

15   information from other hotels that is being used to set

16   price -- to recommend prices to hotel A is the -- is the

17   confidential information that those hotels exchange with

18   Rainmaker in order to get their analytics.  And plaintiffs --

19   I hope that was clear -- and Your Honor will tell me if it's

20   not --

21           **THE COURT:**  No, I understand your argument.  I'm

22   going to look at my notes in a moment because I've taken some

23   notes about those allegations.  But I'm going to give

24   plaintiffs' counsel a chance to respond, too.

25           **MR. BERSHTEYN:**  And that's really all.  I think

1    plaintiffs don't allege the use of confidential information in

2    order to -- for a reason, which is that --

3         **THE COURT:**  So they allege -- certainly the

4    allegations that each hotel operator provide nonpublic pricing

5    information, client information, I think past pricing

6    information to Rainmaker.  Rainmaker uses their pricing

7    algorithm to then recommend pricing with not just that

8    client's information but with information from all the other

9    hotels in the market.

10        **MR. BERSHTEYN:**  Not the confidential information that

11   the other hotels give them.  That is never alleged because

12   it's not true.  What Rainmaker can access and that's

13   consistent with the reality and with plaintiffs' allegations

14   is just publicly available information about pricing.  You can

15   have a program that scrapes Expedia or Priceline or frankly

16   the websites of other hotels and collect their pricing.  And

17   that information could be used to inform -- it's obvious that

18   information like that could be used to inform pricing; right?

19   If you imagine yourself setting a price for a hotel without

20   Rainmaker or anything else, one thing you might want to do --

21   if you want to set it for a week from now, one thing you might

22   want to do is log into, you know, the hotel across the

23   street's website.  It's like, what are they charging?  Because

24   it could be that my price is totally off.

25        **THE COURT:**  As a consumer, you try to do that, too.

1          **MR. BERSHTEYN:**  Exactly.  It's publicly available

2     information, and every same competitor would want to look at

3     it.  Doesn't mean you have to match it, but you want to look

4     at it.

5          So what plaintiffs are doing here is kind of beating

6     around the bush to insinuate that there's exchange of

7     confidential information --

8          **THE COURT:**  All right.  So paragraph 8 --

9          **MR. BERSHTEYN:**  Yep.

10          **THE COURT:**  -- states that the defendant hotel

11     operators who collect -- they have market power in the

12     Las Vegas market -- provide real-time pricing and supply

13     information to the Rainmaker Group.  This competitive data is

14     taken by the Rainmaker Group and fed through its algorithms

15     which then generate forward-looking, room-specific pricing

16     recommendations to defendant hotel operators.

17          **MR. BERSHTEYN:**  Yeah.  So a hotel gives it to

18     Rainmaker in order to get -- in order to get Rainmaker's

19     analytics.  Rainmaker provides a bunch of analytics, including

20     these room recommendations.  I mean, it's almost like -- you

21     know, imagine hiring -- imagine a hotel hires a consultant,

22     McKinsey & Company, to say, hey, can you do something to

23     improve our pricing, to make our pricing more profitable?  It

24     happens all the time.  Then McKinsey will say, okay, well,

25     give us all your data, give us as much data as you can, and

1   we'll see what we can do with it.  So now you have

2   confidential information going from the client, the hotel, to

3   the consultant.  Okay?  There's no exchange of information

4   with any other competitor of that client, and none is alleged

5   here.  But what this is, is kind of artful pleading to create

6   the impression that something nefarious is going on.

7            **THE COURT:**  Give me one moment.  There's some

8   additional allegations here.

9            So paragraph 57 alleges that Rainmaker Group's

10  algorithms are fueled by information provided by hotel

11  operators, including real-time access to their competitively

12  sensitive and nonpublic data on their occupancy rate and

13  guests.

14           CW 3 stated hotel operators are providing Rainmaker

15  Group with various types of internal data, including data on

16  pricing, occupancy, and customer information on individual

17  gamblers.

18           CW 1 confirmed that Rainmaker will collect

19  transaction-level data on hotel bookings and potential

20  bookings, the details of every single bookings made or

21  bookings attempted.

22           And then the next paragraph, 58, alleges that

23  Rainmaker then feeds that data into an algorithm.  And then

24  paragraph 59 states that then the algorithms would then

25  recommend prices on a daily basis to hotel operators.

2:23-cv-00140-MMD-DJA - October 13, 2023

1          Why can't the Court reasonably infer from that that

2     means that the -- that Rainmaker utilizes confidential,

3     sensitive information from the hotel operators collectively

4     and then its algorithm then generates pricing recommendations

5     to each individual hotel?

6          So there is a sharing of -- I mean a collection of

7     information that's then transmitted some way through this

8     algorithm to individual hotel operators.

9          **MR. BERSHTEYN:**  To the same hotel operator who

10    provided it.

11         **THE COURT:**  That's not what I read -- well --

12         **MR. BERSHTEYN:**  Well, Your Honor hit it right on the

13    head.  That's an intentional ambiguity in order to insinuate

14    something that plaintiffs can't allege as true.

15         Look at it this way.  They claim they have three

16    confidential informants from Cendyn.  If it were true that

17    what Rainmaker does is actually take confidential information

18    from one hotel and use it -- use that information in order to

19    provide pricing recommendations to another hotel, that would

20    be alleged in some clear fashion.  You and I wouldn't have to

21    squint at these paragraphs and say, well, I wonder what they

22    mean.  Do they mean the same -- the same -- that's not how

23    complaints are supposed to be pleaded, and certainly not when

24    they claim to have confidential informants from the people who

25    run the algorithm.

1          THE COURT:  All right.  Thank you.

2          I'll let -- Counsel, would you address that point?

3     How would you respond to that other than in the paragraphs I

4     just pointed out?

5          MR. PIERCE:  Thank you, Your Honor.

6          I do dispute respectfully opposing counsel's

7     insinuation that we were engaging in misleading pleading.

8          We are basing it off of, you know, the things that

9     that our CW said and Rainmaker's public statements.  We don't

10    have access to how Rainmaker Group's algorithm works.  But

11    what I would direct you to, for example, is paragraph 16.

12    Najam Khan, general manager of Treasure Island, stated that

13    the system's capacity to factor in competitor rates and

14    suggest optimal room rates to maximize revenue is one of its

15    best features.  The opposing counsel did not dispute that the

16    defendants appear to give Rainmaker tremendous amounts of

17    their own data, and then the algorithm takes that data.  And I

18    think opposing counsel also doesn't dispute that the algorithm

19    does factor in information on competitor's rates and then

20    outputs a pricing recommendation.  He doesn't dispute that

21    it's the same algorithm -- same basic algorithms giving the

22    pricing recommendations to each of the defendants.  So, you

23    know --

24         THE COURT:  So -- so are plaintiffs' position that

25    the -- that Rainmaker does take information from one hotel

2:23-cv-00140-MMD-DJA - October 13, 2023

1    operator -- confidential, sensitive client information, put

2    that through its algorithm pricing program, and share that

3    with a different operator -- hotel operator?

4          **MR. PIERCE:**  Your Honor, we don't have access to

5    Rainmaker's algorithm.  We don't have --

6          **THE COURT:**  Well, what are you alleging in the

7    complaint?

8          **MR. PIERCE:**  We are alleging that the defendants give

9    Rainmaker confidential information, that the algorithm takes

10   that confidential information, that the algorithm also takes

11   information from competitors, and we don't know exactly what

12   that information from competitors is.  Certainly there are

13   public acknowledgments that that information is competitor

14   rates, and that then the algorithm with the same logic outputs

15   pricing recommendations to each of the people -- each of the

16   operators who participate in Rainmaker.  That's what we're

17   alleging in our complaint.  And I think since -- since the

18   initial complaint, based on our continuing investigation, we

19   have more information on the extent to which sort of

20   competitor rates affect the logic of what the algorithm

21   outputs to each of the competitors.  But that is, you know,

22   what we're alleging.

23          And I would also emphasize, you know, the remarks

24   from the FTC Commissioner, the guy named Bob, remarks.  The

25   idea that a set of competitors has a centralized pricing

 1    algorithm that tells them to follow a certain -- makes -- to

 2    follow a certain pricing strategy collectively does not

 3    depend -- it's a coordinated pricing strategy among the

 4    competitors, and that's -- that's what's most important in our

 5    view.

 6         **THE COURT:**  I'm sorry?  I missed that last part.  And

 7    that is what?

 8         **MR. PIERCE:**  That's what's most important in our

 9    view, the idea that the competitors are each in an agreement

10    with a centralized, you know, third party that's providing a

11    single pricing algorithm that's making recommendations to each

12    of them on the pricing strategy to pursue.

13         **THE COURT:**  Why doesn't it just amount to whatever

14    information that Rainmaker's providing, if it's -- they're

15    just recommendations and plaintiff can't allege that the hotel

16    operators are required to accept those recommendations, why

17    isn't the recommendation just another piece of information

18    that a hotel operator has to make the best pricing decision?

19    It's kind of like buying data.

20         **MR. PIERCE:**  Well, again, I think what distinguishes

21    it and why I went back to the example of why it's problematic

22    here, Your Honor, is that it involves a group of competitors

23    in a specific market.  If it was a single competitor who hired

24    McKinsey to come in and tell it how to price better, that's

25    okay.  But when a group of competitors hire the same company

1    to make pricing recommendations with the understanding that

2    these pricing recommendations are designed to decrease

3    discounting, are designed to stop them from pursuing occupancy

4    growth, designed to maximize revenues, it's that coordination

5    among competitors to adopt the same pricing strategy through

6    this pricing algorithm that, in our view, is problematic and

7    it's I think, you know, some of the same concerns that are

8    animating the Department of Justice's intention to file a

9    statement of interest in *RealPage*.  It's that fact that

10   competitors are pursuing a coordinated pricing strategy and

11   the fact that the pricing isn't always accepted 100 percent of

12   the time, I don't think that's a defense to price fixing.  I

13   mean, in many price fixing conspiracies it is not that the

14   competitors, you know, always price identically.  It is that

15   you distort the workings of a competitor market; you price in

16   a coordinated fashion in a way that you would not if you were

17   truly competing with each other.

18          **THE COURT:**  So I'll ask one last question.

19          Where in the complaint does it alleged that each of

20   the hotel operators in Las Vegas -- in this market that you

21   mention -- because your theory is based on the Las Vegas

22   market and the competitors using the same program.  Where

23   does -- in the complaint is it alleged that each hotel

24   operator, at whatever similar time, uses the same program?

25          **MR. PIERCE:**  You know, those are the statements of,

1    you know, the confidential witness 1, paragraph 7, and

2    confidential witness 2, talking about how they're used by --

3    how Rainmaker is used by 90 percent of the hotels on the Strip

4    or every hotel on the Strip.  There's also -- we identify and

5    we discuss it in detail in our opposition brief, you know,

6    that there are public statements of Rainmaker to that effect

7    identifying which competitors are using it.  And that is

8    certainly something, Your Honor, that we will be able to

9    provide additional information on in the event of an amended

10    complaint.

11            **THE COURT:**  Well, one of the deficiencies is with the

12    timeline.  Because I thought that there in footnote 6 -- in

13    the opposition you point out one of the allegations in the

14    complaint and then citing to I think footnote 6 in the

15    complaint where I think Rainmaker published a list of clients.

16    But the problem was with the timeline; right?  Because I

17    thought that was, like, from 2012 or --

18            **MR. PIERCE:**  That's from 2015, Your Honor.  And I

19    think that -- that period, as I identified, in 2015 when they

20    acquire Revcaster is sort of, to us, the start of the relevant

21    period.  And, you know, since then, based on our factual

22    investigation, we've gained I think more information about the

23    timeline that we'd be able to provide.

24            **THE COURT:**  All right.  Thank you.

25            I hope to have an order -- it may be the same order,

*2:23-cv-00140-MMD-DJA - October 13, 2023*

1   it may be two separate orders on the two pending motions in

2   the next couple weeks.

3            Thank you, Counsel, for the arguments.

4       *(Proceedings adjourned at 12:22 p.m.)*

5                      --o0o--

6            COURT REPORTER'S CERTIFICATE

7

8       I, AMBER M. McCLANE, Official Court Reporter, United

9   States District Court, District of Nevada, Las Vegas, Nevada,

10  do hereby certify that pursuant to 28 U.S.C. § 753 the

11  foregoing is a true, complete, and correct transcript of the

12  proceedings had in connection with the above-entitled matter.

13

14  DATED:  10/16/2023

15

16  /s/_____

17              AMBER McCLANE, RPR, CRR, CCR #914

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 56*