1

2

3                          UNITED STATES DISTRICT COURT

4                                DISTRICT OF NEVADA

5                                      * * *

6    RICHARD GIBSON, et al.,                    Case No. 2:23-cv-00140-MMD-DJA

7                          Plaintiffs,                       ORDER

8          v.

     MGM RESORTS INTERNATIONAL, et
9    al.,

10                         Defendants.

11   **I.     SUMMARY**

12         Plaintiffs Richard Gibson and Heriberto Valiente, on behalf of themselves and all

13   others similarly situated, allege that defendant Hotel Operators[1] on the Las Vegas Strip

14   unlawfully restrained trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C.

15   § 1, et seq. ("Sherman Act") by artificially inflating the price of hotel rooms after agreeing

16   to all use pricing software marketed by the same company, Defendant Cendyn Group,

17   LLC. (ECF No. 1 ("Complaint").) Before the Court is Defendants Cendyn, Caesars, MGM,

18   The Rainmaker Unlimited, Inc.,[2] Treasure Island, and Wynn's joint motion to dismiss.[3]

19   (ECF No. 91 ("Motion").) The Court held a hearing (the "Hearing") on the Motion on

20   October 13, 2023. (ECF Nos. 138 (hearing minutes), 139 (transcript).) As further

21   explained below, because the Complaint suffers from numerous pleading deficiencies,

22

23   _____

24        [1]Caesars Entertainment, Inc., Treasure Island, LLC, Wynn Resorts Holdings, LLC,
     and MGM Resorts International. (ECF No. 1 at 3 n.2.)

25        [2]According to the Complaint, Cendyn acquired Rainmaker in 2019, and Rainmaker
26   currently operates as a wholly owned subsidiary of Cendyn. (ECF No. 1 at 3.)

27        [3]Plaintiffs responded (ECF No. 109), and Defendants replied (ECF No. 123). While
     MGM joined the Motion, MGM also filed a separate motion to dismiss the claims against
28   it. (ECF No. 92.) The Court grants that motion in a concurrently issued order, but writes
     separately in this order to address the joint motion to dismiss because the most pertinent
     arguments and governing law are somewhat different. The Court also limited oral
     argument to the joint motion to dismiss in advance of the Hearing. (ECF No. 136.)

1    the Court will grant the Motion. But the Court will give Plaintiffs an opportunity to file an

2    amended complaint within 30 days.

3    **II.    BACKGROUND**

4            The following allegations are adapted from the Complaint. Plaintiffs "challenge an

5    unlawful agreement among Defendants to artificially inflate the prices of hotel rooms on

6    the Las Vegas Strip above competitive levels." (ECF No. 1 at 3.) The gist of the alleged

7    conspiracy is that all of the Hotel Operators agreed to use a shared set of pricing

8    algorithms offered by the Rainmaker subsidiary of Cendyn that recommend

9    supracompetitive prices to the hotel operators. (*Id.*) Plaintiffs define the Las Vegas Strip

10   as "the four-mile stretch in the unincorporated towns immediately south of the City of Las

11   Vegas." (*Id.* at 3 n.1.) Plaintiffs otherwise explain why the Las Vegas Strip allegedly

12   constitutes a relevant antitrust market, primarily because it is unique. (*Id.* at 13-14.)

13           Plaintiffs further allege that at unknown times, Hotel Operators began using

14   software offered by either Rainmaker or Cendyn that recommends prices to them, and,

15   as a result, started charging higher prices for hotel rooms than the market could otherwise

16   support. (*See generally id.*) Plaintiffs' Complaint details three different products at one

17   point offered by Rainmaker, and now offered by Cendyn. (*Id.* at 6-11.) Plaintiffs allege

18   that widespread adoption of Rainmaker products in the Las Vegas Strip hotel room

19   market subverted a previously competitive market and has harmed consumers, who now

20   have to pay higher prices for hotel rooms. (*Id.* at 16-20, 26.) Plaintiffs point to academic

21   research and public remarks from an FTC Commissioner to argue that adoption of the

22   same algorithmic pricing software by all competitors in a given market could both increase

23   prices and constitute an impermissible 'hub and spoke' antitrust conspiracy assuming that

24   the software allows the competitors to exchange nonpublic information. (*Id.* at 4, 20-22.)

25   Plaintiffs further point to certain 'plus factors' supporting their view that Defendants have

26   entered into a conspiracy in violation of the Sherman Act (*id.* at 22-24), and seek to

27   maintain this case as a class action on behalf of all consumers who have rented a hotel

28   room on the Las Vegas Strip from Hotel Operators since January 24, 2019 (*id.* at 24-26).

1    Plaintiffs allege a single claim for violation of Section 1 of the Sherman Act. (*Id.* at

2  26-29.) Plaintiffs state, "Defendants' conspiracy is a *per se* violation of Section 1 of the

3  Sherman Act. In the alternative, Defendants' conspiracy violates section 1 of the Sherman

4  Act under the Rule of Reason." (*Id.* at 27.) Defendants jointly move to dismiss the

5  Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (ECF No. 91.)

6  **III.    DISCUSSION**

7    As the Court stated at the Hearing, there are numerous deficiencies in Plaintiffs'

8  Complaint under the Sherman Act pleading standards that the United States Court of

9  Appeals for the Ninth Circuit applied in interpreting *Bell Atl. Corp. v. Twombly*, 550 U.S.

10  544 (2007). For example, Plaintiffs' "complaint does not answer the basic questions: who,

11  did what, to whom (or with whom) . . . and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d

12  1042, 1048 (9th Cir. 2008). The Court accordingly agrees with Defendants that it must

13  dismiss Plaintiffs' Complaint. However, the Court will grant Plaintiffs leave to amend, as

14  it cannot say that amendment would be futile. The Court includes a non-exhaustive

15  discussion of the deficiencies with Plaintiffs' Complaint below.

16    **A.    What Agreement?**

17    One significant issue with Plaintiffs' Complaint is that it fails to plausibly allege

18  Defendants entered into an agreement. "The crucial question prompting Section 1 liability

19  is whether the challenged anticompetitive conduct stems from lawful independent

20  decision or from an agreement, tacit or express." *In re Dynamic Random Access Memory*

21  *(DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 46 (9th Cir. 2022) (citing *Twombly*,

22  550 U.S. at 553) (internal quotation marks and brackets omitted). A Section 1 claim

23  therefore "must contain sufficient factual matter, taken as true, to plausibly suggest that

24  an illegal agreement was made." *Id.* (citing *Twombly*, 550 U.S. at 556). For plaintiffs

25  relying on allegations of parallel conduct, to state a plausible Section 1 claim, the plaintiffs

26  "must include additional factual allegations that place that parallel conduct in a context

27  suggesting a preceding agreement." *Id.* at 46-47 (citing *Twombly*, 550 U.S. at 557). In

28  other words, the plaintiffs "must allege something more than conduct merely consistent

1    with agreement in order to 'nudge[ ] their claims across the line from conceivable to

2    plausible.'" *Id.* at 47 (citing *Twombly*, 550 U.S. at 570).

3         Plaintiffs suggested at the Hearing that this requirement of an agreement applies

4    only to the particular antitrust theory at issue in *Kendall*, 518 F.3d 1042, which Plaintiffs

5    characterized as a secret per se conspiracy. (ECF No. 139 at 25.) But all Sherman Act

6    complaints must plausibly allege the existence of an agreement—at least a tacit one. For

7    example, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir.

8    2015), discusses a "hub-and-spoke conspiracy" like the theory Plaintiffs include in their

9    Complaint (ECF No. 1 at 4, 22). But *Musical Instruments* also states, "§ 1 of the Sherman

10   Act prohibits *agreements* that unreasonably restrain trade by restricting production,

11   raising prices, or otherwise manipulating markets to the detriment of consumers." 798

12   F.3d at 1191 (citations omitted, emphasis added); *see also DRAM*, 28 F.4th at 46 ("a

13   claim brought under Section 1 must contain sufficient factual matter, taken as true, to

14   plausibly suggest that an illegal agreement was made."). And indeed, even Plaintiffs

15   allege that they "challenge an unlawful agreement among Defendants to artificially inflate

16   the prices of hotel rooms on the Las Vegas Strip above competitive levels." (ECF No. 1

17   at 3.)

18        Plaintiffs must therefore include factual allegations in their Complaint that could

19   plausibly allege an agreement between Defendants, *see, e.g.*, *Kendall*, 518 F.3d at 1047,

20   but they have not. Indeed, it is unclear from the Complaint whether all Hotel Operators

21   use the same pricing algorithm even though Plaintiffs allege that Hotel Operators have

22   colluded to adopt a shared set of pricing algorithms. (ECF No. 1 at 3.) *See also Kendall*,

23   518 F.3d at 1047 ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they

24   might well be sufficient in conjunction with a more specific allegation—for example,

25   identifying a written agreement or even a basis for inferring a tacit agreement, ... but a

26   court is not required to accept such terms as a sufficient basis for a complaint.") (quoting

27   *Twombly*, 550 U.S. at 557). Plaintiffs explain in the Complaint that Rainmaker is a

28   subsidiary of Cendyn, and Rainmaker offers at least three different products, but then do

1    not state which products each Hotel Operator uses—much less that each Hotel Operator

2    uses the same one. (*See generally* ECF No. 1.)

3         For example, Plaintiffs allege that "MGM is one of Cendyn's clients and uses its

4    revenue management software." (ECF No. 1 at 12.) But Plaintiffs do not say which

5    revenue management software MGM uses. And Plaintiffs allegations are substantially

6    identical as to Caeser's, Treasure Island,[4] and Wynn. (*Id.*) The Court therefore cannot

7    say which pricing algorithms each Hotel Operator uses, making it impossible to infer that

8    all Hotel Operators agreed to use the same ones. Later in the Complaint, Plaintiffs allege

9    that Hotel Operators shifted to a new strategy of letting some rooms go unfilled "facilitated

10   by Rainmaker," but are not specific about which Rainmaker pricing algorithms they are

11   referring to. (*Id.* at 16.) Plaintiffs go on to allege that the MGM-operated Borgata Hotel in

12   Atlantic City, New Jersey uses GuestRev, but that hotel is not within Plaintiffs' defined

13   market area of the Las Vegas Strip. (*Id.* at 17.) Analogously, Plaintiffs allege that Omni

14   Hotels & Resorts uses GroupRev, but Omni Hotels & Resorts is not a Defendant. (*Id.* at

15   19.) In sum, the Complaint lacks allegations about which pricing algorithms each Hotel

16   Operator uses at its properties on the Las Vegas Strip sufficient to allow the Court to infer

17   they are all using the same pricing algorithms, which could, in turn, perhaps lead the Court

18   to infer that they entered into an agreement to use the same pricing algorithms.

19        Nor do Plaintiffs allege that Hotel Operators are required to accept the prices that

20   the unspecified pricing software recommends to them, further undermining the plausibility

21   of their conclusory allegations that Defendants entered into a conspiracy to charge higher

22   prices by accepting the prices recommended to them by algorithmic pricing software. Both

23   in their opposition and at the Hearing, Plaintiffs pointed to their allegation derived from

24   Rainmaker's website that GuestRev's pricing recommendations are accepted 90% of the

25   time in response to this argument. (ECF No. 1 at 6.) But as Defendants point out, this

26   allegation does not speak to the acceptance rate of the hotels on the Las Vegas Strip,

27

28            [4]That said, Plaintiffs otherwise allege that Treasure Island was using GuestRev in
     2012. (ECF No. 1 at 7-8.) Similar allegations are lacking for the other Hotel Operators.

and is thus not reflective of the Hotel Operators' acceptance rate. And even assuming that all Hotel Operators are using GuestRev at their properties on the Las Vegas Strip—which Plaintiffs do not allege in their Complaint—this allegation does not establish that hotels who use GuestRev must accept the prices it recommends to them. Indeed, it implies that 10% of hotels that use GuestRev do not. Plaintiffs further attempt to link this statement to the Las Vegas Strip with Confidential Witness 1's estimate that, "Rainmaker Group's products are used by 90% of the hotels on the Las Vegas Strip." (*Id.* at 4.) But GuestRev is but one of the at least three products (those described in the Complaint) that Rainmaker offers, so this statistic does not speak directly to the percentage of hotels on the Las Vegas Strip that use GuestRev. And even if it did, certain hotels operated by Hotel Operators on the Las Vegas Strip could be within the 10% that do not use Rainmaker products, and/or the 10% that do not accept recommendations from GuestRev. In sum, the Court cannot plausibly infer from the allegations in the Complaint that Hotel Operators are required to accept the recommendations provided by a particular software pricing algorithm. This is a fatal deficiency in the Complaint as currently drafted, as without an agreement to accept the elevated prices recommended by the pricing algorithm, there is no agreement that could either support Plaintiffs' theory or otherwise make out a Sherman Act violation given the other allegations in the Complaint.

### B.    Who, When?

The Complaint also does not say who entered into the purported agreement to use the same pricing algorithms beyond 'Hotel Operators.' While the Court is not persuaded that *Kendall* requires the names of the specific employees that entered into the purported agreement, Plaintiffs must say more than 'Hotel Operators.' *See Kendall*, 518 F.3d at 1048 (9th Cir. 2008) (rejecting allegations that "the Banks" "knowingly, intentionally and actively participated in an individual capacity in the alleged scheme" as too conclusory); *see also Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) ("Defendant Insurers are large organizations, and Plaintiffs' bare allegation of a conspiracy would be essentially impossible to defend against."). Plaintiffs

also allege that Rainmaker hosts annual conferences where Hotel Operators have the opportunity to network with Rainmaker employees, but the Complaint does not allege that employees of any particular Defendant attended, much less provide names or anonymized references to the individual employees from each Defendant who attended and therefore could have entered into agreements. (ECF No. 1 at 24.) *Cf. Musical Instruments*, 798 F.3d at 1196 ("mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."). Thus, to the extent Hotel Operators entered into any agreements at these Rainmaker conferences—though that is not clearly alleged, either—it is unclear who entered into such agreements.

In addition, Plaintiffs are transparent that they do not know when the purported conspiracy began. Indeed, Plaintiffs allege that the alleged conspiracy began "at a time currently unknown[.]" (ECF No. 1 at 26.) Plaintiffs mention that Treasure Island began using GuestRev in 2012, but do not allege when MGM began using any software that includes pricing algorithms on the Las Vegas Strip (much less GuestRev), or when Caesars or Wynn began using any software that includes pricing algorithms. (*Compare id.* at 7-8 *with id.*) Thus, the Court cannot plausibly infer that all Hotel Operators began using particular pricing software at or around the same time, which could potentially allow the Court to draw the inference that they entered into an agreement to do so. *See Musical Instruments*, 798 F.3d at 1195-96 (rejecting the plaintiffs' contention that manufacturers' adoption of similar policies over the course of several years could constitute a plus factor indicating parallel conduct). At the Hearing, Plaintiffs' counsel suggested that he now has a better sense of the timing based on some limited discovery received and independent investigation he has conducted since filing the initial Complaint, but those suggestions go more to whether the Court should grant Plaintiffs leave to amend than whether the allegations in the Complaint are sufficient—because Plaintiffs' counsel was referring to information admittedly not in the Complaint.

///

Between not alleging what software Hotel Operators all agreed to use, who entered into any purported agreement, and when they entered into any agreement, the Court cannot infer parallel conduct from the Complaint. "Under *Twombly*, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior." *Id.* at 1193. But as described above, Plaintiffs' allegations in the Complaint do not suggest that Hotel Operators adopted similar pricing policies around the same time—the Court has little information from the Complaint about which precise software products Hotel Operators are using, or when any of them save Treasure Island may have begun using any product now offered by Cendyn. And without plausible allegations of parallel conduct, Plaintiffs' alleged plus factors are not relevant. *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants.") (citing *Musical Instruments*, 798 F.3d at 1193-94).

### C.   Hub and Spoke

Plaintiffs further allege a hub and spoke conspiracy in their Complaint, but their allegations do not support such a theory because Plaintiffs never quite allege (though they suggest by implication) that Hotel Operators get nonpublic information from other Hotel Operators by virtue of using insufficiently specified algorithmic pricing software. (ECF No. 1 at 4, 21-22 (referring to FTC Commissioner Maureen K. Ohlhausen's public statement describing how algorithmic pricing could contribute to a valid hub-and-spoke theory), 26 ¶ 88 (referring to what appears to be a horizontal agreement between Hotel Operators (the spokes) to use algorithmic pricing software created by Rainmaker (the hub), where that horizontal agreement would make the 'rim').) Indeed, as Commissioner Ohlhausen described it, a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm. (ECF No. 1 at 4, 21-22.) And as Defendants'

8

1   counsel argued at the Hearing, Plaintiffs attempt to create an inference of the exchange

2   of nonpublic information in their Complaint without actually alleging such an exchange.

3           Paragraph 8 of the Complaint is a good example:

4           "Defendant Hotel Operators, who collectively have market power in the Las
        Vegas Strip Hotel Market, provide real-time pricing and supply information
5       to the Rainmaker Group. This competitive data is taken by the Rainmaker
        Group and fed through its algorithms, which then generate forward-looking,
6       room-specific pricing recommendations to Defendant Hotel Operators."

7   (ECF No. 1 at 4.) This says that confidential information is fed in, but less clearly out, of

8   the algorithms. One inference that can be drawn from 'through,' however, is that

9   confidential information comes back out. But this paragraph does not explicitly say that

10  one Hotel Operator ever receives confidential information belonging to another Hotel

11  Operator. Moreover, it is unclear whether the pricing recommendations 'generated' to

12  Hotel Operators include that confidential information fed in; perhaps they only get their

13  own confidential information back, mixed with public information from other sources.

14          Similar ambiguity exists in other paragraphs, such as paragraph 10; "CW2 stated

15  that Rainmaker Group's algorithms include information for Hotel Operators on whether a

16  hotel was "overbooked" as well as recommendations related to the revenue of the hotel."

17  (*Id.* at 5.) This does not say whether the 'information' and 'recommendations' include non-

18  public information from other hotels. In addition, Plaintiffs allege that GuestRev allows

19  pricing from nearby casinos to factor into pricing recommendations if clients select that

20  option, but does not say whether that information is nonpublic. (*Id.* at 6.) And the ambiguity

21  continues in paragraph 14, where "CW1 stated that hotels would tell Rainmaker Group

22  'who their competitors were,' and Rainmaker would then 'shop' the data from those

23  competitors. GuestRev would then use this data to 'forecast[] demand.'" (*Id.* at 7.) Again,

24  Plaintiffs do not specify whether that data Rainmaker is shopping around is public or

25  nonpublic. Public pricing data is available from hotel websites, Expedia, and the like—

26  that could be the information 'shopped' back to a client. In any event, paragraph 10 does

27  not explicitly state the competitor information being described as nonpublic. The same

28

1  goes for paragraphs 16 and 17; Plaintiffs do not allege the competitor information is

2  nonpublic. (*Id.* at 7-8, 8.)

3       Perhaps the paragraph that gets closest to alleging that Rainmaker facilitates the

4  exchange of nonpublic information between competitors is Paragraph 22, but the

5  statements in that paragraph are conclusory and followed by vague statements about

6  how Rainmaker clients all attend the same conferences: "Hotel Operators also

7  understand that their competitors participate in and contribute data to the pricing and

8  forecasting services offered by Rainmaker Group." (*Id.* at 10.) Paragraph 57 also gets

9  close but does not quite say that nonpublic information from one hotel would be shared

10 with another hotel; "Rainmaker Group's algorithms are fueled by information provided by

11 Hotel Operators, including real-time access to their competitively sensitive and nonpublic

12 data on their occupancy, rates, and guests." (*Id.* at 19.) This could be referring to the

13 Hotel Operators' own nonpublic information. Indeed, that is the most logical reading—that

14 'their' means 'Hotel Operators,' getting real time access to their own nonpublic data.

15      Paragraph 69 alleges it as a plus factor, "exchanges of competitively sensitive

16 information among horizontal competitors," but the corresponding paragraph that offers

17 a more fulsome explanation, paragraph 74, says:

18      "Fifth, Rainmaker Group and participating Hotel Operators have ample
        opportunities to collude. Rainmaker Group has hosted in-person "annual
19      user conferences, where feedback is really solicited". The conference
        gathers Hotel Operators with Rainmaker Group executives to network,
20      exchange insights and ideas, and discuss revenue management tools and
        new products coming. CW3, who attended Rainmaker user conferences,
21      stated "We kind of all know each other because you all show up to this little
        conference together." Hotel Operators would typically send employees from
22      their revenue management teams, although CEOs and CFOs might also
        attend."
23

24 (*Id.* at 22, 24 (footnote omitted).) This does not quite say that the Rainmaker algorithm

25 itself exchanges nonpublic information; it only says that employees of Hotel Operators

26 have the opportunity to exchange information at conferences that they may attend. And

27 of course, a possibility does not make an allegation plausible. *See DRAM*, 28 F.4th at 47

28 ("plaintiffs must allege something more than conduct merely consistent with agreement

1  in order to 'nudge[ ] their claims across the line from conceivable to plausible.'") (citation
2  omitted).

3      Finally, in paragraph 89, Plaintiffs allege that Defendants, in pertinent part,
4  "knowingly used algorithms that incorporated information from other Defendants in setting
5  pricing recommendations," but again, this does not say nonpublic information. (*Id.* at 26-
6  27.) Consulting public sources to determine how to price a hotel room by viewing your
7  competitor's rates does not violate the Sherman Act. *See, e.g.*, *In re Citric Acid Litig.*, 191
8  F.3d 1090, 1103 (9th Cir. 1999) ("Although the possession of competitor price lists is
9  consistent with conspiracy, it does not, at least in itself, tend to exclude legitimate
10  competitive behavior.") (citations omitted). In sum, Plaintiffs do not allege that—even
11  assuming all Hotel Operators use the same Rainmaker or Cendyn algorithmic pricing
12  software—Hotel Operators exchange nonpublic information with each other through their
13  use of that same software. Accordingly, Plaintiffs have not sufficiently alleged a hub and
14  spoke theory in their Complaint consistent with the theory described in *Musical*
15  *Instruments* and also included in the Complaint.[5]

16      **D.    Rule of Reason and Leave To Amend**

17      Plaintiffs allege a rule of reason theory in the alternative (ECF No. 1 at 27) at the
18  end of their Complaint and argue in their opposition that they have alleged adequate facts
19  to support such a theory in their Complaint (ECF No. 109 at 21-27). However, the Court
20  agrees with Defendants that this theory is not explicitly pleaded in the Complaint—the
21  factual allegations in the Complaint attempt to make out a hub and spoke theory of
22  Sherman Act liability. (ECF No. 1 at 3, 26.) The Court instead views this as a good reason
23  to grant Plaintiffs leave to amend. And there are others.

24      But starting with the rule of reason theory, Plaintiffs point to allegations in their
25  Complaint supported by Rainmaker's marketing materials that Hotel Defendants are
26  customers of Rainmaker, and thus now Cendyn. (ECF No. 109 at 21 (citing ECF No. 1 at

27  _____

28      [5]Indeed, and as described above, the theory is not alleged in a way that would be
   sufficient as described by Commissioner Olhausen in Plaintiffs' Complaint either. (ECF
   No. 1 at 4, 21-22.)

1  6 n.6).) It is thus possible that all Hotel Operators are using, for example, GuestRev, as

2  that is now a product offered by Cendyn. This could support a rule of reason theory, as

3  the press release tends to evidence vertical agreements, and thus supports granting

4  Plaintiffs leave to amend to allege their alternative rule of reason theory more explicitly.

5  Plaintiffs' counsel also argued at the hearing that he has received some discovery

6  from Defendants since filing this case and has continued his investigation pertinent to the

7  case through public sources, so he represented that he would have many additional facts

8  he could allege that are not present in the Complaint if given the opportunity to amend.[6]

9  The Court cannot of course say what those factual allegations might be, as they are not

10  before the Court. But based in pertinent part on these representations, the Court cannot

11  find that amendment would be futile and will therefore grant Plaintiffs leave to file an

12  amended complaint curing at least the deficiencies outlined in this order within 30 days.

13  *See, e.g.*, *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (stating that

14  leave to amend should be "freely given when justice so requires") (quoting Fed. R. Civ.

15  P. 15(a)).

16  **IV.   CONCLUSION**

17  The Court notes that the parties made several arguments and cited several cases

18  not discussed above. The Court has reviewed these arguments and cases and

19

20

21  [6]Plaintiffs' counsel further explained at the Hearing he was waiting to move to
22  amend until the Court identified any deficiencies with the Complaint so he could work to
address them. Plaintiffs' alternative request for leave to amend in opposition to the Motion
(ECF No. 109 at 30) and at the Hearing does not strictly comply with LR 15-1—and the
23  Court thus directs Plaintiffs' counsel to review the Court's Local Rules and comply with
them going forward. However, "[t]he court may *sua sponte* or on motion change, dispense
24  with, or waive any of these rules if the interests of justice so require." LR IA 1-4. The
interests of justice are better served by resolving cases on their merits, and granting
25  Plaintiffs leave to amend would give the Court a better chance at adjudicating the merits
of this case. *See, e.g.*, *Thompson v. Hous. Auth. of City of Los Angeles*, 782 F.2d 829,
26  831 (9th Cir. 1986) (mentioning "the public policy favoring disposition of cases on their
merits"). Moreover, "[i]n exercising its discretion, 'a court must be guided by the underlying
27  purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or
technicalities.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)
28  (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)). The Court thus waives
the strict application of LR 15-1, and will permit amendment.

1    determines that they do not warrant discussion as they do not affect the outcome of the

2    Motion before the Court.

3           It is therefore ordered that Defendants' joint motion to dismiss (ECF No. 91) is

4    granted as specified herein.

5           It is further ordered that the Complaint (ECF No. 1) is dismissed, in its entirety, but

6    without prejudice and with leave to amend. In particular, the Court grants Plaintiffs leave

7    to file an amended complaint. Any amended complaint must be filed within 30 days of the

8    date of entry of this order. If Plaintiffs do not comply with this amendment deadline, the

9    Court may dismiss Plaintiffs' claims with prejudice and without further advance notice to

10    Plaintiffs.

11           DATED THIS 24th Day of October 2023.

13    _____

14    MIRANDA M. DU
      CHIEF UNITED STATES DISTRICT JUDGE

13