Adam Hosmer-Henner (NSBN 12779)
Chelsea Latino (NSBN 14227)
Jane Susskind (NSBN 15099)
**McDONALD CARANO LLP**
100 West Liberty Street, Tenth Floor
Reno, Nevada 89501
(775) 788-2000
ahosmerhenner@mcdonaldcarano.com
clatino@mcdonaldcarano.com
jsusskind@mcdonaldcarano.com

Boris Bershteyn (*pro hac vice*)
Ken Schwartz (*pro hac vice*)
Michael Menitove (*pro hac vice*)
Sam Auld (*pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Ken.Schwartz@skadden.com
Michael.Menitove@skadden.com
Sam.Auld@skadden.com

*Attorneys for Defendant*
*Caesars Entertainment, Inc.*

[*Additional counsel listed on*
*Signature Page*]

J. Colby Williams (NSBN 5549)
**CAMPBELL & WILLIAMS**
710 South 7th St
Las Vegas, Nevada 89101
(702) 382-5222
jcw@cwalawlv.com

Sadik Huseny (*pro hac vice*)
Brendan McShane (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
sadik.huseny@lw.com
brendan.mcshane@lw.com

Anna M. Rathbun (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh St, NW Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com
chris.brown@lw.com

*Attorneys for Defendant*
*Cendyn Group LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| RICHARD GIBSON, and ROBERTO MANZO,<br><br>Plaintiffs,<br><br>v.<br><br>CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED, INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC, WYNN RESORTS HOLDINGS, LLC, BLACKSTONE, INC., BLACKSTONE REAL ESTATE PARTNERS VII L.P., JC HOSPITALITY, LLC,<br><br>Defendants. | Case No.  2:23-cv-00140-MMD-DJA<br><br><br>**DEFENDANTS' JOINT MOTION TO DISMISS THE FIRST AMENDED CLASS COMPLAINT WITH PREJUDICE**<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' FIRST**
**AMENDED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM**

Defendants Cendyn Group LLC ("Cendyn"), the Rainmaker Group Unlimited, Inc.

("Rainmaker"), Caesars Entertainment, Inc. ("Caesars"), Treasure Island, LLC ("Treasure Island"),

Wynn Resorts Holdings, LLC ("Wynn"), Blackstone Inc., and Blackstone Real Estate Partners VII

L.P., (collectively, the "Blackstone Entities"), by and through their counsel, move this Court to

dismiss the first amended complaint (ECF No. 144 ("FAC")) with prejudice.  This Motion is made

under Federal Rule of Civil Procedure 12(b)(6) and LR 7-2 and is based on the attached

Memorandum of Points and Authorities and supporting documentation, the papers and pleadings

on file, and any oral argument this Court may allow.

Dated: February 14, 2024

/s/ Adam Hosmer-Henner
Adam Hosmer-Henner (NSBN 12779)
Chelsea Latino (NSBN 14227)
Jane Susskind (NSBN 15099)
McDONALD CARANO LLP
100 West Liberty Street, Tenth Floor
Reno, Nevada 89501
(775) 788-2000
ahosmerhenner@mcdonaldcarano.com
clatino@mcdonaldcarano.com
jsusskind@mcdonaldcarano.com

Boris Bershteyn (*pro hac vice*)
Ken Schwartz (*pro hac vice*)
Michael Menitove (*pro hac vice*)
Sam Auld (*pro hac vice*)
  SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Ken.Schwartz@skadden.com
Michael.Menitove@skadden.com
Sam.Auld@skadden.com


*Attorneys for Defendant*
*Caesars Entertainment, Inc.*

Respectfully submitted,

/s/ J. Colby Williams
J. Colby Williams (5549)
710 South Seventh Street
Las Vegas, NV 89101
Telephone: (702) 382-5222
jcw@cwalawlv.com

Sadik Huseny (*pro hac vice*)
Tim O'Mara (*pro hac vice*)
Brendan A. McShane (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
sadik.huseny@lw.com
tim.o'mara@lw.com
brendan.mcshane@lw.com

Anna M. Rathbun (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-3381
Facsimile: (202) 637-2201
anna.rathbun@lw.com
chris.brown@lw.com

*Attorneys for Defendant Cendyn Group LLC*

1  _/s/ Patrick G. Byrne_                                    _/s/ Daniel McNutt_

2  Patrick G. Byrne                                         Daniel McNutt, Esq., Bar No. 7815
   Nevada Bar No. 7636                                      Matthew C. Wolf, Esq., Bar No. 10801
3  Bradley Austin                                           MCNUTT LAW FIRM, P.C.
   Nevada Bar No. 13064                                     11441 Allerton Park Drive, #100
4  SNELL & WILMER                                           Las Vegas, Nevada 89135
   3883 Howard Hughes Parkway                               Tel.: (702) 384-1170
5  Las Vegas, NV 89169                                      Fax.: (702) 384-5529
   Telephone: (702) 784-5200                                drm@mcnuttlawfirm.com
6  Facsimile: (702) 784-5252                                mcw@mcnuttlawfirm.com
7  pbyrne@swlaw.com
   baustin@swlaw.com                                        Matthew L. McGinnis (_pro hac vice_)
8                                                           ROPES & GRAY LLP
   Mark Holscher (_pro hac vice_)                           Prudential Tower
9  Tammy Tsoumas (_pro hac vice_)                           800 Boylston Street
   Leonora Cohen (_pro hac vice_)                           Boston, Massachusetts 02199
10 KIRKLAND & ELLIS LLP                                     Tel: (617) 951-7000
   2049 Century Park East, Suite 3700                       Fax: (617) 951-7050
11 Los Angeles, California 90067                            matthew.mcginnis@ropesgray.com
   Telephone: (310) 552-4200
12 Facsimile: (310) 552-5900                                Of counsel:
   ttsoumas@kirkland.com
13 mholscher@kirkland.com                                   David B. Hennes
   lena.cohen@kirkland.com                                  Jane E. Willis
14                                                          ROPES & GRAY LLP
15 Matthew Solum (_pro hac vice_)                           1211 Avenue of the Americas
16 KIRKLAND & ELLIS LLP                                     New York, New York 10036
   601 Lexington Ave                                        Tel: (212) 596-9000
17 New York, NY 10022                                       Fax: (212) 596-9090
   Telephone: (212) 446-4688                                david.hennes@ropesgray.com
18 Facsimile: (917) 848-7536                                jane.willis@ropesgray.com
19 msolum@kirkland.com
                                                            _Attorneys for Defendants Blackstone Inc. and_
20 _Attorneys for Defendant Wynn_                            _Blackstone Real Estate Partners VII L.P._
   _Resorts Holdings, LLC_
21

22

23

24

25

26

27

28

1

*/s/ Nicholas J. Santoro*
Nicholas J. Santoro (NV Bar No. 532)

2

300 S. 4ᵗʰ Street, Suite 1600

3

Las Vegas, NV 89101
Tel.: (702) 791-0308 / Fax: (702) 791-1912

4

nsantoro@nevadafirm.com

5

Arman Oruc (*pro hac vice*)

6

GOODWIN PROCTER LLP
1900 N Street, N.W.

7

Washington, DC 20036-1612
Tel.: (202) 346-4000 / Fax: (202) 346-4444

8

AOruc@goodwinlaw.com

9

Alicia Rubio-Spring (*pro hac vice*)

10

GOODWIN PROCTER LLP
100 Northern Avenue

11

Boston, MA 02110
Tel.: (617) 570-1000 / Fax: (617) 523-1231

12

ARubio-Spring@goodwinlaw.com

13

*Attorneys for Defendant The Rainmaker Group*

14

*Unlimited, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Patrick J. Reilly*
Patrick J. Reilly
Arthur A. Zorio
Emily Garnett (pro hac vice)
Eric D. Walther
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Ste. 1600
Las Vegas, NV 89106
Telephone:  702.382.2101
preilly@bhfs.com
azorio@bhfs.com
egarnett@bhfs.com
ewalther@bhfs.com

*Attorneys for Defendant Treasure Island, LLC*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

PRELIMINARY STATEMENT ........................................................................................ 1

THE FAC'S ALLEGATIONS ........................................................................................... 3

    I.      The Rainmaker/Cendyn Revenue Management Software Products ...................... 3

    II.     Allegations About the Las Vegas Strip and Hotel Operators ............................... 5

    III.    The Alleged Conspiracy Among Hotel Defendants To Use the Revenue Management Products and the Challenged Individual Vertical Licenses ............. 7

ARGUMENT ...................................................................................................................... 8

    I.      COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN AGREEMENT AMONG HOTEL OPERATORS ................................................................................................. 8

        A.    Plaintiffs Fail To Allege An Agreement Among Hotel Operators Because the FAC Lacks At Least Four Necessary Factual Allegations ..... 8

        B.    Plaintiffs' "New" Allegations Merely Expose More Fatal Defects ..........12

            1.    Most of the FAC Is Irrelevant.......................................................12

            2.    The FAC Fails To Allege Parallel Conduct.................................13

            3.    Plaintiffs' "Plus Factors" Are Irrelevant  And Do Not Plausibly Suggest a Conspiracy ...................................................20

    II.     COUNT II SHOULD BE DISMISSED BECAUSE LICENSING REVENUE MANAGEMENT PRODUCTS DOES NOT VIOLATE THE SHERMAN ACT ................................................................................................26

        A.    The Alleged Vertical Software Licenses Do Not Restrain Trade ............26

        B.    Plaintiffs Fail To Plausibly Allege a Relevant Market .............................27

        C.    Plaintiffs Fail To Plausibly Allege That  The Alleged Conduct Has a Substantial Anticompetitive Effect.........................................................28

            1.    There Are No Facts Showing Direct Evidence of Harm to Competition ...................................................................................28

            2.    Plaintiffs Also Fail To Allege Indirect Evidence of Harm to Competition ...................................................................................29

CONCLUSION..................................................................................................................30

i

**TABLE OF AUTHORITIES**

**CASES**                                                                          **PAGE(S)**

*1-800 Contacts, Inc. v. Federal Trade Commission*,
    1 F.4th 102 (2d Cir. 2021)...................................................................28, 29

*49er Chevrolet, Inc. v. General Motors Corp.*,
    803 F.2d 1463 (9th Cir. 1986) ..................................................................27

*Acquaire v. Canada Dry Bottling Co. of New York*,
    24 F.3d 401 (2d Cir. 1994) .......................................................................27

*Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*,
    141 F.3d 947 (9th Cir. 1998) ....................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................30

*Bay Area Surgical Management LLC v. Aetna Life Insurance Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ...............................................10, 23

*In re Beef Industry Antitrust Litigation*,
    907 F.2d 510 (5th Cir. 1990).............................................................23, 24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................13, 14

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..................................................................28

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ..................................................................24

*In re California Title Insurance Antitrust Litigation*,
    No. 08-CV-01341 (JSW), 2009 WL 1458025 (N.D. Cal. May 21, 2009)...........18

*Cascades Computer Innovation LLC v. RPX Corp.*,
    No. 12-CV-01143 (YGR), 2013 WL 316023 (N.D. Cal. Jan. 24, 2013)...........22

*In re Cedar Shakes & Shingles Antitrust Litigation*,
    No. 19-CV-288 (MJP), 2020 WL 832324 (W.D. Wash. Feb. 20, 2020)........20, 21, 25

*City of Moundridge v. Exxon Mobil Corp.*,
    429 F. Supp. 2d 117 (D.D.C. 2006)..........................................................14

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
    No. 22-943, 2024 WL 368105 (2d Cir. Feb. 1, 2024) ...........................15, 18, 19

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*,
    28 F.4th 42 (9th Cir. 2022)....................................8, 12, 13, 15, 18, 21, 24, 25

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) .................................................................................... 28

*Evans v. Meyer*,
    No. 14-CV-00103 (MMD), 2016 WL 81251 (D. Nev. Jan. 7, 2016) ................................. 12

*Federal Trade Commission v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .................................................................................... 27

*In re Finjan Holdings, Inc. Securities Litigation*,
    58 F.4th 1048 (9th Cir. 2023) ................................................................................... 15

*General Cinema Corp. v. Buena Vista Distribution Co.*,
    681 F.2d 594 (9th Cir. 1982) .................................................................................... 27

*In re German Automotive Manufacturers Antitrust Litigation*,
    No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) ............................. 18, 19, 21, 22

*Gibson v. MGM Resorts International*,
    No. 22-CV-00140 (MMD), 2023 WL 7025996
    (D. Nev. Oct. 24, 2023) ....................................... 1, 2, 8, 9, 10, 11, 12, 20, 24, 25

*Gibson v. MGM Resorts International*,
    No. 22-CV-00140 (MMD), 2023 WL 7026984
    (D. Nev. Oct. 24, 2023) ............................................. 6, 13, 14, 17, 20, 23, 24

*Gold Medal LLC v. USA Track & Field*,
    187 F. Supp. 3d 1219 (D. Or. 2016), *aff'd*, 899 F.3d 712 (9th Cir. 2018) ......................... 23

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................. 16, 18

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .......................................................................22, 23, 24, 28

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ...................................................................... 3, 23, 30

*In re ICE LIBOR Antitrust Litigation*,
    No. 19-CV-439 (GBD), 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ............................. 17

*Kelsey K. v. NFL Enterprises, LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018) ......... 16, 18

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ................................................................................ 8, 10

*Les Shockley Racing, Inc. v. National Hot Rod Ass'n*,
    884 F.2d 504 (9th Cir. 1989) ................................................................................ 28, 29

*Mandala v. NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020) ................................................................. 15, 16, 17

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
    No. 18-CV-02054 (MMC), 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019),
    *aff'd*, 811 F. App'x 422 (9th Cir. 2020) ........................................................ 29

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
    No. 21-CV-06507 (EAW), 2024 WL 371657 (W.D.N.Y. Feb. 1, 2024) .......... 16

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ...................... 8, 10, 13, 14, 15, 19, 20, 21, 25, 26

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987) ...................................................................... 26

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ................................................... 26, 27, 28, 29, 30

*Oliver v. SD-3C LLC*,
    No. 11-CV-01260 (JSW), 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) ............. 14, 15, 19

*Pacific Recovery Solutions v. United Behavioral Health*,
    481 F. Supp. 3d 1011 (N.D. Cal. 2020) ........................................................ 26

*Prosterman v. American Airlines, Inc.*,
    747 F. App'x 458 (9th Cir. 2018) .................................................................. 24

*In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
    No. 23-MD-03071 (WDC), 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) ......... 21, 24, 25

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................. 23, 29

*Rick-Mik Enterprises Inc. v. Equilon Enterprises, LLC*,
    532 F.3d 963 (9th Cir. 2008) ....................................................................... 27

*SmileDirectClub, LLC v. Tippins*,
    31 F.4th 1110 (9th Cir. 2022) ...................................................................... 14

*Street Luke's Hospital v. ProMedica Health System, Inc.*,
    8 F.4th 479 (6th Cir. 2021) .......................................................................... 26

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
    803 F.3d 1084 (9th Cir. 2015) ...................................................................... 23

*In re Travel Agent Commission Antitrust Litigation*,
    583 F.3d 896 (6th Cir. 2009) ....................................................................... 12

*Universal Grading Service v. eBay, Inc.*,
    No. 09-CV-2755 (RMW), 2012 WL 70644 (N.D. Cal. Jan. 9, 2012), *aff'd*, 563 F.
    App'x 571 (9th Cir. 2014)................................................................................22

*William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009)........................................................................30

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**PRELIMINARY STATEMENT**</u>

The "gist of the alleged conspiracy" in the FAC remains that "Hotel Operators agreed to use a shared set of pricing algorithms offered by . . . Rainmaker . . . that recommend supracompetitive prices." *Gibson v. MGM Resorts Int'l*, No. 23-CV-00140 (MMD), 2023 WL 7025996, at *1 (D. Nev. Oct. 24, 2023).  That claim (Count I) should be dismissed with prejudice because, instead of curing the "numerous pleading deficiencies" the Court identified in plaintiffs' initial complaint, *id.*, the FAC confirms those flaws are irremediable.  And while the FAC adds a new claim (Count II) challenging Hotel Operators' alleged vertical agreements with Rainmaker, that claim is just as irreparably flawed because plaintiffs do not (and cannot) allege that those agreements restrain Hotel Operators' pricing, let alone cause any anticompetitive effects.

Count I should be dismissed because plaintiffs still have not alleged an agreement among Hotel Operators to adopt prices recommended by Rainmaker's software.  <u>First</u>, the FAC demonstrates that plaintiffs fail to satisfy this Court's instructions for what an amended complaint must allege to plausibly infer such an agreement because they cannot allege:

- **"Whether all Hotel Operators use the same pricing algorithm"?**  Plaintiffs do not allege "all Hotel Operators use the same pricing algorithm," *id.* at *3, but instead concede that each price recommendation provided in Rainmaker's revenue management software products is customized and unique to each subscriber based on its own property-level data and revenue management choices.

- **Whether "all Hotel Operators began using particular pricing software at or around the same time?"**  Rather than allege that "all Hotel Operators began using particular pricing software <u>at or around the same time</u>," *id.* at *4 (emphasis added), plaintiffs allege Hotel Operators subscribed to revenue management products at many different times, and up to a <u>decade</u> apart.

- **Whether "Hotel Operators exchange nonpublic information with each other through their use of th[e] same software"?**  Even though Count I as pled "depends in part on the exchange of <u>nonpublic information</u> between competitors through the algorithm," *id.* at *4 (emphasis added), plaintiffs allege that the only "competitor information" used in or "fed . . . out . . . of the algorithms," *id.* at *5, is <u>publicly available</u>.

- **Whether "Hotel Operators are required to accept the prices that the . . . pricing software recommends to them"?**  Not only do plaintiffs fail to allege "Hotel Operators are required to accept the recommendations provided by a particular software pricing algorithm," *id.* at *3, plaintiffs suggest Hotel Operators readily reject those recommendations.

1

1    <u>Second</u>, nothing plaintiffs add to the FAC pleads direct or circumstantial evidence of a

2    purported agreement among Hotel Operators.[1]  Instead, plaintiffs try to hide their failure to allege

3    such an agreement by adding—as they previewed at the motion to dismiss hearing—hundreds "of

4    allegations about the algorithm pricing and what Rainmaker claims to offer."  (ECF No. 139

5    ("Hr'g.") at 37:16-20.)  But as this Court warned, it cannot infer the alleged agreement among

6    Hotel Operators from those allegations.  (*Id.* at 37:21-22.)  While plaintiffs pivot to "statistical"

7    charts and assert they show Hotel Operators' room rates started moving in parallel at the dawn of

8    the purported conspiracy, plaintiffs are just offering more smoke and mirrors because the data

9    underlying those charts shows that Hotel Operators' average room rates <u>were nothing alike</u> during

10   the alleged conspiracy.  And plaintiffs' "statistics"—on their face—suggest Hotel Operators'

11   pricing did <u>not</u> change relative to other hotels in Las Vegas during the supposed conspiracy.

12        Because the FAC lacks "plausible allegations of parallel conduct, [p]laintiffs' alleged plus

13   factors are not relevant."  *Gibson*, 2023 WL 7025996, at *4.  Even if the Court considered them,

14   plaintiffs' "plus factors" are far weaker than those the Ninth Circuit has previously rejected.  Far

15   from suggesting a conspiracy, they indicate that it was in Hotel Operators' self-interest to subscribe

16   to Rainmaker's products.  Hotel Operators subscribed at different times—<u>years</u> before the

17   purported conspiracy—and <u>thousands</u> of non-defendant hotels around the world did the same thing.

18        Count II should be dismissed because plaintiffs fail to plead essential facts required to

19   support their rule of reason claim challenging the "vertical" software licenses between Rainmaker

20   and individual Hotel Operators.  <u>First</u>, plaintiffs do not allege how any software license "restrains

21   trade."  The Rainmaker software utilizes a subscriber's own individual property data to analyze

22   customer revenue streams, forecast demand based on different customer segments, and recommend

23   prices.  And plaintiffs concede that each Rainmaker subscriber is free to reject the prices that

24   Rainmaker's software recommends.  This concession is fatal because if subscribers are not bound

25   to accept the recommendations, then the recommendations cannot restrain trade as a matter of law.

26        <u>Second</u>, plaintiffs fail to allege facts showing <u>how</u> the licensing, sale, or use of Rainmaker's

27   revenue management software by any individual Hotel Operator leads to anticompetitive effects.

---

[1] Plaintiffs have not sufficiently alleged that each "Hotel Operator" defendant operates any hotel, but moving defendants adopt the Court's terminology from its ruling for simplicity.

Plaintiffs offer only labels of "supracompetitive prices" without supporting facts.  They also fail to plausibly allege either a viable relevant market or any Hotel Operator's market power—both of which are necessary to allege that any challenged software license harmed competition.

Thus, the Court's reluctance in giving plaintiffs one last chance to amend their complaint was warranted, and the FAC should now be dismissed with prejudice because it "fail[s] to cure, or even meaningfully address" the "deficiencies explained in [this Court's] order."  *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 382 (9th Cir. 2018).

## THE FAC'S ALLEGATIONS

### I.   The Rainmaker/Cendyn Revenue Management Software Products

According to the FAC, Rainmaker—and Cendyn after it acquired Rainmaker (ECF No. 144 ¶ 3 & n.4)—provides revenue management software to the "most successful casino hotels in the world" (*id.* ¶ 164).  The revenue management software is a suite of customizable solutions that enable Rainmaker's thousands of hospitality customers to optimize their own property-level data to forecast demand and make more informed revenue management decisions.  (*Id.* ¶¶ 71, 106, 121, 147-48.)  The FAC includes hundreds of paragraphs that purport to describe promotional materials about Rainmaker's revenue management software products and their application to casino hotels.  (*E.g.*, *id.* ¶¶ 51-149.)  Those materials highlight that revenue management is not "just about rooms" (*id.* ¶ 51), and it "is particularly complex" for casino "hotel operators" (*id.*), which must "consider[] a guest's theoretical future gaming value" (*id.* ¶ 62).

Rainmaker's revenue management software enables a hotel to harness its own data to maximize "total customer value" across the entire property.  (*Id.* ¶ 163.)  Rainmaker uses a "data-driven methodology" to provide "total revenue optimization for casino and gaming properties." (*Id.* ¶ 195.)  The software optimizes a hotel property's data to analyze "the total value of each segment and individual customer, based on all available revenue streams, including gaming, room revenue and ancillary revenue such as [food & beverage], wellness and retail."  (*Id.* ¶ 314.)  This "total revenue management approach" allows individual casino property "revenue managers . . . to strategically price and protect room inventory for the property's most valuable guests by segment, as well as by individual spending and play patterns."  (*Id.* ¶ 195.)  In other words, "[b]y forecasting

demand for each customer segment based on total spend, casinos can determine the optimal mix of customer segments for each date and use real-time data to target them with the most strategic pricing and promotions for each [segment]."  (*Id.* ¶ 314.)

Although Cendyn offers several types of software solutions with different functionalities, the FAC discusses the same three Rainmaker products as plaintiffs' initial complaint: GuestRev, RevCaster, and GroupRev (collectively, the "Revenue Management Products").  (*Id.* ¶¶ 65-149.)

- GuestRev:  Rainmaker supposedly introduced GuestRev in 2001 (*id.* ¶ 65), and it is now used by "traditional hotels, casino hotels, [and] resort hotels" (*id.* ¶ 166; *see also id.* ¶ 67). GuestRev allegedly "analyzes total guest value across a hotel or casino property to forecast and price rooms" (*id.* ¶ 186)—providing subscribers with various tools, including demand forecasts "at the finest level of granularity" (*id.* ¶ 71), "a number of standard report types" (*id.* ¶ 121), "room-specific pricing recommendations" (*id.* ¶ 71), and the ability to upload "transaction-level data" (*id.* ¶ 86).  According to plaintiffs, a subscriber can "control[]" (*id.* ¶ 121) and "edit" GuestRev, including by "edit[ing]" the "criteria" the algorithm uses to "formulat[e] its pricing recommendations" (*id.* ¶ 108).  Subscribers are also free to "override" any price that GuestRev recommends (*id.* ¶ 123) and can provide particular users with "permission[]" to do so (*id.* ¶ 8).

- GroupRev:  Plaintiffs allege that Rainmaker introduced GroupRev in 2013 (*id.* ¶ 128) to provide subscribing hotels with tools to "forecast" demand from large groups and to "streamline[] the process of responding to group RFPs by analyzing historical data, future demand, and price sensitivity to recommend the best pricing for group business"  (*id.* ¶ 186).  GroupRev purportedly allows subscribers to "create custom personalized dashboards that display market data" and to forecast demand for "meeting space."  (*Id.* ¶¶ 129-31.)

- RevCaster:  Rainmaker allegedly acquired RevCaster in March 2015 and "integrated [it] into GuestRev."  (*Id.* ¶ 133.)  RevCaster is "a 'rate shopping' tool integrated into GuestRev that . . . 'collects market-specific hotel price information'" from publicly available sources (*id.* ¶ 68) and provides customizable "competitor rate information" (*id.* ¶ 11).  Subscribers can purportedly decide which (if any) "public pricing information" collected by RevCaster (*id.* ¶ 86) "influence[s]" the room prices suggested by GuestRev (*id.* ¶ 105), "as well as the respective weights [that a given subscriber's algorithm] give[s] each competitor's price" (*id.* ¶ 97).  As an example, plaintiffs allege that a subscriber can select the Venetian's public pricing data to influence GuestRev's pricing suggestions for that subscriber's property (*id.* ¶ 105), even though the Venetian is not a Rainmaker subscriber (*id.* ¶ 150).

The FAC still does not allege that any subscriber was required to adopt any price suggested by a Revenue Management Product.  Instead, plaintiffs repeat the allegation from their initial complaint that, when considering the "thousands of hotels and resorts around the world" subscribing to a Revenue Management Product (*id.* ¶ 211), the average adoption of room rate recommendations is 90% (*id.* ¶ 74).  The FAC quotes "StaynTouch"—a third-party hotel analytics

vendor—as stating that Rainmaker subscribers "should be able to override both forecast and price recommendations" "[i]n times of need and extreme circumstances" (*id.* ¶ 111), but plaintiffs do not allege that any subscriber overrode pricing recommendations only in those circumstances. Plaintiffs instead allege that subscribers can automatically accept pricing recommendations "as much or as little as [they] want." (*Id.* ¶ 80.)  According to plaintiffs, subscribers are free to "choose [to] . . . override" prices suggested by a Revenue Management Product and overrode them so often that Rainmaker purportedly "engaged in a 'never-ending battle'" to try to "convince" them to stop "overrid[ing] its pricing recommendations." (*Id.* ¶ 8.)

Despite this "never-ending battle" with subscribers, Rainmaker allegedly advertised the Revenue Management Products as providing "better analytics" that could assist subscribers in "captur[ing] the maximum possible profit opportunity." (*Id.* ¶ 58.)  Rainmaker also supposedly touted the Revenue Management Products as providing tools for "optimiz[ing] for profit" (by analyzing total guest value) instead of only "optimizing for revenue." (*Id.* ¶ 4.)  Rainmaker purportedly promoted "'discipline' in revenue management," e.g., "advocat[ing] that clients should 'avoid the infamous race to the bottom'" (*id.* ¶ 22) by adhering to governments' "social distancing" policies during the pandemic.[2]

## II.   Allegations About the Las Vegas Strip and Hotel Operators

During the class period, Hotel Operators allegedly managed casino-hotels on the Las Vegas Strip—Caesars operated eight, Wynn operated two, and Treasure Island, the Blackstone Entities (The Cosmopolitan of Las Vegas), and JC Hospitality, LLC (Hard Rock Hotel & Casino Las Vegas) were allegedly responsible for one each. (*Id.* ¶¶ 30-34.)[3]  Plaintiffs no longer name MGM as a defendant but label it—along with Sahara Las Vegas and Tropicana Las Vegas Hotel—as a "co-conspirator." (*Id.* ¶¶ 35-37.)

---

[2] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HospitalityNet (quoted in ECF No. 144 ¶¶ 22, 56, 208, 268), https://www.hospitalitynet.org/opinion/4098784.html.

[3] This statement about Wynn is inaccurate; defendants accept it as true for purposes of this motion only.  Newly added defendant JC Hospitality, LLC allegedly bought the Hard Rock Hotel & Casino Las Vegas ("Hard Rock") in April 2018 and operated it as Hard Rock until it began operating it as Virgin Hotels Las Vegas in 2021.  (ECF No. 144 ¶ 34.)  The Blackstone Entities, also newly added to the FAC, allegedly owned The Cosmopolitan of Las Vegas ("The Cosmopolitan") from 2014 until 2022 (*id.* ¶ 33) when it was acquired by MGM (*id.* ¶ 15 n.6).

Hotel Operators allegedly compete with other hotels in the same "class[] of properties" on the Strip (*id.* ¶ 256) as well as "other casino hotels nearby" (*id.* ¶ 347). Plaintiffs allege there are several "classes" of hotels on the Strip, but do not identify those classes or which hotels belong to them. (*Id.* ¶ 256.) Plaintiffs nevertheless acknowledge that at least some hotels purportedly run by Hotel Operators are not within the same class because "a hotel room at Treasure Island appeals to a different kind of customer than a hotel room at the Wynn." (*Id.*) When considering all classes of hotels, Hotel Operators supposedly "control[led] approximately 35-40% of the rooms" on the Strip during the class period. (*Id.* ¶ 350.) Non-defendants controlled the other 60-65%, with MGM being "one of the . . . largest players" on the Strip, operating "ten hotels." *Gibson v. MGM Resorts Int'l*, No. 23-CV-00140 (MMD), 2023 WL 7026984, at *1-2 (D. Nev. Oct. 24, 2023) ("*MGM*").

Hotel Operators allegedly began subscribing to Revenue Management Products at different times across a decade, bookended by Caesars subscribing in 2004 and The Cosmopolitan subscribing in 2014. (ECF No. 144 ¶¶ 151, 178.) The FAC excerpts LinkedIn profiles to allege Hotel Operators used Revenue Management Products' tools other than pricing algorithms, such as "optimiz[ing] revenue from pricing decisions . . . using" booking curves. (*Id.* ¶ 159.)

Importantly, the FAC does not allege that any Hotel Operator received nonpublic information about another Hotel Operator through the Revenue Management Products. Nor does it allege Hotel Operators used the same pricing algorithm by selecting the same "criteria" on which the Revenue Management Products' algorithms formulated pricing suggestions. The FAC instead concedes that Hotel Operators "have not directly exchanged information with each other," but alleges that the Revenue Management Products use "machine learning" "derived" from Hotel Operators' "collective data." (*Id.* ¶ 265.) The FAC does not allege that any "machine learning" is done from Hotel Operators' non-public "collective" data.

The FAC also does not allege that Caesars, Treasure Island, Wynn, or The Cosmopolitan ever adopted any price suggested by a Revenue Management Product—let alone did so automatically as part of an agreement. Despite adding a "confidential witness" who supposedly worked at Hard Rock (*id.* ¶ 21), the FAC alleges only that "Hard Rock automatically accepted Rainmaker's pricing recommendations in some circumstances" and "overrode the[m] . . . in other

1   cases" (*id.* ¶ 175).

2        Plaintiffs do not identify the price of any room offered by any Hotel Operator on any night

3   or how Hotel Operators' rates compared on any night.  Nor do they identify any hotel's occupancy

4   level.  Instead, the FAC includes "statistics" purportedly comparing average room prices on the

5   Strip to: a nationwide index measuring all prices for all goods and services offered by casino-

6   hotels, room prices at hotels in downtown Las Vegas, and quarterly room rate increases at the

7   Venetian.  The FAC compares some Hotel Operators' average room rates before and during the

8   alleged conspiracy.  (*Id.* ¶¶ 15, 213-19, 240.)  At defendants' request, plaintiffs provided them the

9   data underlying the FAC's statistics, and defendants submit that data in its unaltered entirety as

10  Exhibit A to the Declaration of Boris Bershteyn.

11  **III.    The Alleged Conspiracy Among Hotel Defendants To Use the Revenue**
12           **Management Products and the Challenged Individual Vertical Licenses**

13       The FAC asserts that, "[s]ince at least 2015," defendants reached a "continuing

14  agreement . . . to use pricing algorithms provided by Rainmaker" and claims that agreement "is a

15  *per se* violation of Section 1 of the Sherman Act."  (*Id.* ¶¶ 352-53, 360.)  Plaintiffs identify 2015 as

16  the "key year" when the alleged conspiracy began because Rainmaker supposedly introduced

17  GroupRev and "released" RevCaster.  (*Id.* ¶¶ 67-68.)  But plaintiffs do not identify when or how

18  the supposed agreement among Hotel Operators was formed, which employees (if any) helped

19  reach it, or how it was enforced.  Plaintiffs allege Hotel Operators attended conferences hosted by

20  Rainmaker, belonged to trade associations, and attended other industry events (*id.* ¶¶ 270-314), but

21  the FAC does not allege that Hotel Operators ever communicated with each other.  As with

22  plaintiffs' initial complaint, the FAC alleges that Hotel Operators "knew that their main

23  competitors" used Revenue Management Products (*id.* ¶ 190), but does not allege that any Hotel

24  Operator knew that any other Hotel Operator adopted prices suggested by those Products.

25       Count II alleges that each agreement between Rainmaker (or Cendyn) and a Hotel Operator

26  violates Section 1 of the Sherman Act.  (*Id.* ¶¶ 361-70.)  Plaintiffs concede that rule of reason

27  analysis applies to this claim because the parties are in a vertical relationship.  (*Id.* ¶¶ 365, 367.)

28

                                              7

## ARGUMENT

Count I should be dismissed because plaintiffs fail to plausibly allege Hotel Operators agreed to adopt prices suggested by the Revenue Management Products.  Count II should be dismissed because plaintiffs fail to allege several essential elements of their "rule of reason" claim.

## I.   COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN AGREEMENT AMONG HOTEL OPERATORS

"A Section 1 claim . . . 'must contain sufficient factual matter . . . to plausibly suggest that an illegal agreement was made.'"  *Gibson*, 2023 WL 7025996, at *2 (quoting *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 46 (9th Cir. 2022)).  Where, as here, plaintiffs attempt to plead a horizontal agreement through parallel conduct, "plaintiffs 'must include additional factual allegations that place that parallel conduct in a context suggesting a preceding agreement.'"  *Id.* (quoting *DRAM*, 28 F.4th at 46-47).  The Ninth Circuit holds plaintiffs to a "higher standard" in pleading an agreement because "proceeding to discovery in antitrust cases 'frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case.'"  *DRAM*, 28 F.4th at 47 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).  Pleading a "hub-and-spoke" conspiracy involves both vertical and horizontal agreements, requiring plaintiffs to allege: "(1) a hub . . . ; (2) spokes, such as competi[tors] that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

Plaintiffs fail to plausibly allege an agreement among Hotel Operators to "set prices based . . . on pricing recommendations provided by" the Revenue Management Products (ECF No. 144 ¶¶ 353-54) because the FAC fails to plead (A) at least four facts necessary to infer that agreement and (B) either parallel conduct or plus factors (let alone both).

### A.   Plaintiffs Fail To Allege An Agreement Among Hotel Operators Because the FAC Lacks At Least Four Necessary Factual Allegations

Count I should be dismissed because plaintiffs fail to allege at least four pieces of circumstantial evidence that this Court held were necessary to plausibly infer the alleged agreement

among Hotel Operators.  The Court identified a "non-exhaustive" list of the "deficiencies" in plaintiffs' attempt to "allege [d]efendants entered into an agreement."  *Gibson*, 2023 WL 7025996, at *2.  Those deficiencies include that plaintiffs failed to allege: (1) "whether all Hotel Operators use the same pricing algorithm"; (2) "that all Hotel Operators began using particular pricing software at or around the same time"; (3) that "Hotel Operators exchange nonpublic information with each other through their use of th[e] same software"; and (4) "that Hotel Operators are required to accept the prices that the . . . pricing software recommends to them."  *Id.* at *2-6.

Plaintiffs rectify none of those fatal defects.  <u>First</u>, plaintiffs do not cure their failure to allege "which pricing algorithms each Hotel Operator uses" and "whether all Hotel Operators use the same pricing algorithm."  *Id.* at *3.  Instead, plaintiffs speculate that Hotel Operators "used" the same pricing algorithms merely because they allegedly subscribed to Revenue Management Products (ECF No. 144 ¶¶ 30-34, 151), but concede that each subscriber can customize the "algorithms" within those products by "edit[ing]" the "criteria . . . us[ed]" by the software in "formulating its pricing recommendations" and choosing which (if any) public pricing data from other hotels influence the algorithms (*id.* ¶¶ 97, 108).  Plaintiffs identify no criteria that <u>any</u> Hotel Operator selected for any algorithm—much less allege "all Hotel Operators use the same pricing algorithm" by selecting the same criteria.  *Gibson*, 2023 WL 7025996, at *3.

<u>Second</u>, far from fixing their failure to plead that "all Hotel Operators began using particular pricing software at or around the same time," *id.* at *4, the FAC alleges that Hotel Operators started subscribing to Revenue Management Products up to a <u>decade</u> apart:



1    Plaintiffs' allegations fail to identify when <u>any</u> Hotel Operator began using <u>any</u> pricing algorithm

2    because, as explained above, subscribing to a Revenue Management Product is not the same as

3    using the pricing algorithm within that Product.  And even if plaintiffs' allegations about when

4    Hotel Operators began subscribing to Revenue Management Products said anything about when

5    they "began using particular pricing" algorithms, adopting "similar [products] over the course of

6    several years" is not "parallel conduct."  *Gibson*, 2023 WL 7025996, at *4.  Indeed, the allegations

7    that Hotel Operators subscribed to Revenue Management Products many years before the

8    purported conspiracy began defeat any suggestion of an agreement.  *See Musical Instruments*, 798

9    F.3d at 1197 (adopting pricing "years before the class period . . . does not suggest agreement").

10        Moreover, plaintiffs still do not answer the "basic" pleading questions established by the

11   Ninth Circuit in *Kendall* because all they allege is "[s]ince at least 2015, Defendants engaged in

12   a . . . conspiracy."  (ECF No 144 ¶ 352.)  *See Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,

13   166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) ("early 2010 and continuing thereafter" fails to satisfy

14   *Kendall*).  Plaintiffs allege the purported conspiracy began sometime in 2015 when Rainmaker

15   introduced RevCaster to gather public pricing data and GroupRev to forecast group demand and

16   provide "custom rates for group travel."  (ECF No. 144 ¶¶ 10-13.)  But plaintiffs make no effort to

17   explain how either of these developments plausibly suggest anything about Hotel Operators'

18   conduct, much less that they agreed to adopt prices suggested by Revenue Management Products.

19        <u>Third</u>, plaintiffs still cannot allege that "Hotel Operators exchange nonpublic information

20   with each other through their use of th[e] same" pricing algorithm.  *Gibson*, 2023 WL 7025996, at

21   *6.  Despite this Court's warning that Count I "depends in part on the exchange of nonpublic

22   information between competitors through the algorithm," *id.* at *4, plaintiffs allege that the only

23   information about a Hotel Operator that could be shared through a Revenue Management Product

24   with other Hotel Operators is "public pricing information" (ECF No. 144 ¶ 86).  But "[c]onsulting

25   public sources to determine how to price a hotel room by viewing your competitor's rates does not

26   violate the Sherman Act."  *Gibson*, 2023 WL 7025996, at *6.

27        Plaintiffs nevertheless persist in "attempt[ing] to create an inference of the exchange of

28   nonpublic information in their Complaint without actually alleging such an exchange."  *Id.* at *4.

In fact, plaintiffs recycle the same ambiguous examples this Court already rejected.  *Compare id. with* ECF No. 144 ¶¶ 86, 257, 354.  Plaintiffs double-down on that strategy throughout the FAC by claiming that Hotel Operators "pooled their data in a central hub," and the hub, through undefined "machine learning," "trains itself" on that data.  (*Id*. ¶ 265; *see also id.* ¶¶ 19, 25-58, 262.)  But those allegations suggest only that the Revenue Management Products seek to improve themselves as they receive more data.  And, critically, despite their sleights of hand, plaintiffs cannot allege "the pricing recommendations 'generated' to [one] Hotel Operator[] include . . . confidential information fed in" from "another Hotel Operator."  *Gibson*, 2023 WL 7025996, at *5.

    Fourth, plaintiffs do not heed this Court's instruction that they cannot "make out a Sherman Act violation" without alleging Hotel Operators "are required to accept the recommendations provided by a particular software pricing algorithm."  *Id.* at *3.  Rather, plaintiffs allege Hotel Operators <u>need not</u> accept those pricing recommendations (ECF No. 144 ¶¶ 8, 74, 78, 110, 123, 124, 175) and rejected them so frequently that Rainmaker waged "a 'never-ending battle'" trying to "convince clients not to override its pricing recommendations" (*id*. ¶ 8).  Indeed, plaintiffs fail to allege that Caesars, Treasure Island, Wynn, or The Cosmopolitan <u>ever</u> adopted a price suggested by a Revenue Management Product, while vaguely alleging Hard Rock adopted such prices only in "some circumstances."  (*Id*. ¶ 175.)

    Plaintiffs try to hide this flaw by claiming that Hotel Operators "overwhelmingly priced their units consistent with Rainmaker's suggested prices—according to Cendyn, at a rate of approximately 90%" (*id*. ¶ 239), that Rainmaker "require[s]" that subscribers provide users with "'override' permissions" (*id.*), and that a third-party hotel vendor stated those permissions should be exercised in "times of need and extreme circumstances" (*id*. ¶ 111).  But plaintiffs admit that Cendyn's website referred <u>only</u> to acceptance across Cendyn's many thousands of subscribers.  (*Id*. ¶ 7.)  And this Court already rejected that <u>same</u> allegation because it "does not speak to . . . Hotel Operators' acceptance rate."  *Gibson*, 2023 WL 7025996, at *3.  Plaintiffs also undermine all these generic allegations by conceding Hotel Operators give users permission to readily override prices suggested by Revenue Management Products.  (ECF No. 144 ¶¶ 8, 175.)

    Lacking any antidote to these fatal defects, plaintiffs resort to claiming they need not

allege an agreement because subscribing to Revenue Management Products while "knowing that other hotels (and one another) were also doing so" is alone sufficient.  (*Id.* ¶ 2; *see also id.* ¶¶ 190, 206-10, 354.)  But plaintiffs already made this argument, claiming that pleading "an agreement applies only to . . . a secret per se conspiracy," and this Court squarely rejected it.  *Gibson*, 2023 WL 7025996, at *2.  Not only is plaintiffs' theory legally deficient, but they also fail to plead facts suggesting that Hotel Operators subscribed to Revenue Management Products knowing that each other were also doing so.  If anything, the FAC suggests the contrary, given that Caesars supposedly subscribed to those products years before any other Hotel Operator.  (*See supra* § I.A.) *See also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (affirming dismissal because there was "no allegation in the Amended Complaint" that each defendant acted knowing other defendants were taking the same actions).

Because plaintiffs "fail[] to correct the deficiencies outlined in the Court's earlier order," the Court should dismiss their claim with prejudice.  *Evans v. Meyer*, No. 14-CV-00103 (MMD), 2016 WL 81251, at *4 (D. Nev. Jan. 7, 2016) (Du, J.).

## B.  Plaintiffs' "New" Allegations Merely Expose More Fatal Defects

Count I also should be dismissed because plaintiffs' "new" allegations are either irrelevant or confirm plaintiffs cannot allege an agreement among Hotel Operators.

### 1.  Most of the FAC Is Irrelevant

The FAC mostly adds—as plaintiffs previewed at the motion to dismiss hearing—"a lot of allegations about the algorithm pricing and what Rainmaker claims to offer."  (Hr'g. at 37:16-20.) For instance, plaintiffs added approximately 100 paragraphs that purportedly quote Rainmaker marketing materials and Rainmaker's website.  (ECF No. 144 ¶¶ 51-149.)  But this Court already warned plaintiffs that those allegations are insufficient because they say nothing about "similar conduct on the part of the [H]otel [O]perators."  (Hr'g. at 37:21-22.)

Rainmaker's marketing materials about "implementing 'revenue management discipline'" by "shift[ing] . . . focus from occupancy and rate to profitability" (ECF No. 144 ¶ 4; *see also id.* ¶¶ 22, 53, 64, 197, 238, 311) are also irrelevant because the Ninth Circuit has rejected virtually identical allegations.  *See DRAM*, 28 F.4th at 50 ("If no conspiracy existed, Defendants would

1   likely make the same public statements about . . . the benefits of exercising 'capital

2   discipline' . . . .").  In any event, plaintiffs distort those statements by claiming Rainmaker

3   represented that hotels could use Revenue Management Products to "avoid . . . [a] 'race to the

4   bottom'" when Rainmaker actually stated that "capacity constraints" created by governments

5   during the pandemic "may help hotels avoid the infamous 'race to the bottom.'"[4]

6        A hundred other "new" allegations about Hotel Operators' purported use of Revenue

7   Management Products (ECF No. 144 ¶¶ 150-202) fare no better because none plausibly suggests

8   that any Hotel Operator adopted prices suggested by Revenue Management Products, much less

9   pursuant to an agreement with other Hotel Operators.  Plaintiffs excerpt LinkedIn profiles (*id*. ¶¶

10  159-61, 167-68, 176, 202, 211), but those pages describe employees using tools provided by the

11  Revenue Management Products other than pricing algorithms, including at hotels in Atlantic City

12  (*see, e.g.*, *id.* ¶ 160).  *See MGM*, 2023 WL 7026984, at *2 (MGM's purported use of Revenue

13  Management Products in Atlantic City is irrelevant).  Tellingly, rather than scour LinkedIn,

14  plaintiffs could have cited discovery certain defendants provided to identify employees who know

15  about Revenue Management Products, but they largely declined to do so—apparently because that

16  discovery clearly states that Caesars, Wynn, and Treasure Island <u>do not</u> adopt prices suggested by

17  Revenue Management Products.[5]  Indeed, Treasure Island's initial disclosures—the lone discovery

18  plaintiffs cite (ECF No. 144 ¶ 173)—state that "Treasure Island does not use Rainmaker's rates[]."

19           2.    <u>The FAC Fails To Allege Parallel Conduct</u>

20       Because plaintiffs cannot allege that Hotel Operators adopted prices suggested by Revenue

21  Management Products in parallel, they try to allege Hotel Operators' prices began moving in

22  parallel at the start of the alleged conspiracy, but those allegations are just as deficient.  Parallel

23  conduct may include that "competitors adopt[ed] similar" prices "around the same time in response

24  to similar market conditions."  *Musical Instruments*, 798 F.3d at 1193.  But because "*Twombly*

25

---

26  [4] Dan Skodol, *Managing Capacity Constraints in a COVID-19 World*, HospitalityNet (quoted in ECF No. 144 ¶ 22, 56, 208, 268), https://www.hospitalitynet.org/opinion/4098784.html.

27  [5] For example, Wynn's July 2023 verified interrogatory responses, which counsel for Caesars read during the October 2023 motion to dismiss hearing, state that Wynn "utilize[s] their own pricing
28  algorithm to determine and set hotel room rates and have a general practice of not using the recommendations generated by Rainmaker's Pricing Algorithms."  (Hr'g. at 42:6-12.)

takes into account the economic reality that mere parallel conduct is . . . consistent with . . . independent conduct in an interdependent market," plaintiffs must plead additional facts, e.g., that the alleged conduct reflects "'[c]omplex and historically unprecedented changes in pricing structure . . . .'"  *Id.* at 1193, 1195 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 n.4 (2007)).  Plaintiffs cannot plead parallel conduct by "referring to the defendants collectively," *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119 (9th Cir. 2022), but must allege that each defendant "actively participated in an individual capacity in the [alleged] scheme," *MGM*, 2023 WL 7026984, at *2 (citation omitted).

Plaintiffs improperly rely on average quarterly pricing "statistics" that cannot plead parallel conduct.  And even if the Court considered them, plaintiffs' "statistics," on their face, demonstrate that Hotel Operators' conduct was anything but parallel.

(a)    <u>Plaintiffs' "average" statistics cannot plead parallel conduct</u>

Plaintiffs assert that they pleaded parallel conduct because Hotel Operators' "common usage of Rainmaker's products" led to "commensurate parallel" higher prices and lower occupancy levels.  (ECF No. 144 ¶¶ 24, 266.)  But as explained above, Hotel Operators allegedly began using Revenue Management Products a decade apart, and plaintiffs identify no particular algorithm that each Hotel Operator supposedly used.  Nor do plaintiffs identify any room rate or occupancy level at <u>any</u> hotel supposedly run by a Hotel Operator, let alone allege that they were the same or moved in parallel.  *See City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 132 (D.D.C. 2006) ("Without evidence of actual prices charged by these defendants, the plaintiff cannot show that the defendants' behavior was in fact parallel . . . ."); *accord Oliver v. SD-3C LLC*, No. 11-CV-01260 (JSW), 2016 WL 5950345, at *6-7 (N.D. Cal. Sept. 30, 2016).

In fact, the FAC is entirely silent about Hotel Operators' occupancy levels.  For good reason: statistics cited by the FAC indicate that, other than during the pandemic, hotel occupancy levels in Las Vegas <u>increased</u> nearly every year during the purported conspiracy.[6]  For example,

---

[6] Las Vegas Convention & Visitors Auth., Las Vegas Historic Tourism Statistics (1970-2022) (cited at ECF No. 144 ¶ 221 n.169), available at https://res.cloudinary.com/simpleview/image/upload/v1677881218/clients/lasvegas/Las_Vegas_Historical_1970_to_2022_56321dea-a3c6-4fe0-9ec9-27a5bd988cfc.pdf (occupancy levels at hotels in Las Vegas were 90% before the alleged conspiracy and increased to 95% during it).

14

1    hotel occupancy levels on the Strip <u>increased</u> from 86.8% in 2014 (the year before the alleged

2    conspiracy began) to 89.1% in 2016.[7]

3        As for room prices, plaintiffs at best rely on yearly or quarterly "statistics" that average

4    every room price at every hotel purportedly run by a Hotel Operator on the Strip—including

5    averaging together every room at Caesars' eight hotels.  (ECF No. 144 ¶¶ 15-16, 213-15, 217-20.)

6    But quarterly and annual aggregate statistics cannot establish parallel conduct as a matter of law

7    because the Ninth Circuit requires defendants' conduct to be closer in time than that to be parallel.

8    *See DRAM*, 28 F.4th at 49 (two defendants reducing production "the next quarter" after another

9    defendant is not "indicative of . . . an advance agreement"); *see also Musical Instruments*, 798 F.3d

10   at 1197 (rejecting analysis showing increase in "average retail price[s]"); *Oliver*, 2016 WL

11   5950345, at *6 (statistics that are "aggregated by year . . . do[] not show whether changes in prices

12   occurred simultaneously or at different times").

13       Plaintiffs' statistical charts also cannot plausibly suggest anything—much less an

14   agreement—because the conclusions plaintiffs try to draw from them are contradicted by the

15   underlying data in several ways.  *See In re Finjan Holdings, Inc. Sec. Litig.*, 58 F.4th 1048, 1052

16   n.1 (9th Cir. 2023) ("When a general conclusion in a complaint contradicts specific facts retold in a

17   document . . . incorporated by reference in the complaint, . . . those specific facts are controlling.").

18   "Facts are stubborn things, but statistics, . . . [a]s Mark Twain's saying suggests, . . . must be

19   consulted cautiously" because their "pliable" nature can allow litigants to manufacture an apparent

20   inference of unlawful conduct that facts cannot plausibly support.  *Mandala v. NTT Data, Inc.*, 975

21   F.3d 202, 205 (2d Cir. 2020).

22       Here, plaintiffs' "statistics" cannot plead parallel conduct for several reasons.  For starters,

23   plaintiffs "finesse[]" their "averages" to "hide trends that . . . tell a different story."  *City of Pontiac

24   Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, -- F.4th --, 2024 WL 368105, at *10 (2d Cir.

25   Feb. 1, 2024).  Indeed, plaintiffs rely solely on "averages" of quarter-on-quarter price increases and

26   "average" room rates spanning nine years (ECF No. 144 ¶¶ 15, 214-15, 240) to hide the fact that

27   the data underlying those charts belies any inference of parallel conduct:  There was no

28   _____

[7] Tourism Tracker, Las Vegas Convention & Visitors Auth. (cited at ECF No. 144 ¶ 349 n.273),
available at https://www.lvcva.com/research/?tab=tourism-tracker#tab-container.

similarity—but rather a **$172** difference—in the changes in average room rates at different Hotel Operators from the start of the alleged conspiracy until the present.



Next, plaintiffs' data shows that they have finessed the "averages" displayed in their charts to obscure gaping differences in the average room rates among Hotel Operators in any given quarter during the alleged conspiracy. For instance, during the third quarter of 2022, the Rio— operated by Caesars—supposedly had a **$66** average daily rate, while the Wynn's was **$506**. (Bershteyn Decl. Ex. A at 2.) *See Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146-47 (N.D. Cal. 2017) (no parallel conduct where "the difference is between $125 per game and $100 per game"), *aff'd*, 757 F. App'x 524 (9th Cir. 2018); *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, No. 21-CV-06507 (EAW), 2024 WL 371657, at *7 (W.D.N.Y. Feb. 1, 2024) (no parallel conduct because "the data cited by [p]laintiffs shows significant variation in the reduction of [defendants'] sales"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022-23 (N.D. Cal. 2007) (no parallel conduct where defendants' prices differed by $20). Plaintiffs' statistics also mask that several hotels run by Hotel Operators did <u>not</u> increase their room rates over the course of the alleged conspiracy and at least one (the Rio) decreased them by over $50 per night. (Bershteyn Decl. Ex. A at 1-2.)

In addition, plaintiffs bias their statistics by comparing Hotel Operators' average prices on the Strip to the St. Louis Federal Reserve's "nationwide casino hotel price index" to suggest that Hotel Operators increased their room rates more than casino-hotels nationwide. (ECF No. 144 ¶¶

1    216-22.)  In fact, plaintiffs are deliberately "relying on apples to study oranges."  *Mandala*, 975

2    F.3d at 211.  Plaintiffs do <u>not</u> compare Hotel Operators' room prices to casino-hotels' room prices

3    nationwide because the benchmark plaintiffs chose—the St. Louis Federal Reserve's "nationwide

4    casino hotel price index"—reflects <u>all prices</u> that casino-hotels charge for <u>all services and goods</u>

5    (including gaming and food).  *See In re ICE LIBOR Antitrust Litig.*, No. 19-CV-439 (GBD), 2020

6    WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) (attempting to plead parallel conduct by comparing

7    defendants' prices to other benchmarks was "unreliable and dubious" because complaint did not

8    show benchmarks were apt comparators).[8]  Plaintiffs conspicuously adopted that benchmark even

9    though the St. Louis Federal Reserve—a data source on which they rely—also publishes an index

10   measuring only <u>room</u> rates for casino-hotels nationwide.  And that apples-to-apples comparison

11   shows that Hotel Operators' room rates increased <u>less</u> than casino-hotels' room rates across the

12   country—precisely the opposite of what plaintiffs' misleading benchmark asks the Court to infer.

13   (*See* Bershteyn Decl. Ex. B.)[9]

14        Finally, plaintiffs' "statistics" should also be rejected because they are missing critical data.

15   Indeed, plaintiffs' "statistics" are based on data that is riddled with omissions that skew every chart

16   presented in the FAC.  For instance, while plaintiffs claim that the Venetian's average quarter-on-

17   quarter price increases were materially less than Hotel Operators' (*id*. ¶¶ 214-15), plaintiffs' data

18   shows that they falsely attribute 100% price decreases to the Venetian for quarters in which they

19   lack data (Bershteyn Decl. Ex. A at 2, 3Q20-4Q20; *see also id.* at 2, 1Q20-2Q21 (falsely attributing

20   price increases to the Tropicana where data is missing).  Moreover, plaintiffs admit that: they "have

21   not located [any] reliable data for prices for . . . Hard Rock" (ECF No. 144 ¶ 15 n.6); data for The

22   Cosmopolitan "only extends to the second quarter of 2022" (*id.*); and "data is limited for

23   Caesars[]," including no data for several years of the class period (*id*. ¶ 218).  *See MGM*, 2023 WL

24   7026984, at *2 ("[A complaint] must allege that each individual defendant joined the conspiracy

25

---

26   [8] The St. Louis Federal Reserve, Producer Price Index by Industry: Casino Hotels (cited at FAC ¶ 216) *available at* https://fred.stlouisfed.org/release/tables?rid=46&eid=138462#snid=138502

27   [9] And even if plaintiffs had used the appropriate nationwide pricing benchmark, comparing
28   nationwide room prices to room revenue conflates two different metrics.  (*Compare* FAC ¶¶ 217-18 (describing Wynn's and Caesars' "revenue per available room") *with id*. ¶ 216 (describing the "producer price index for casino hotel prices").)

1  and played some role in it . . . ." (citation omitted)).

2                 (b)        <u>Plaintiffs' statistics show non-parallel conduct on their face</u>

3          Even if the Court considered plaintiffs' skewed charts, they demonstrate "non-parallel

4  conduct undercut[ting] the very theory asserted by the complaint." *Kelsey K.*, 254 F. Supp. 3d at

5  1146. Those statistics indicate that Hotel Operators' average rates: (1) were more correlated before

6  the alleged conspiracy, (2) differed significantly from each other, (3) were just as close to the rates

7  of a non-subscriber to the Revenue Management Products during the alleged conspiracy, and (4)

8  are aggregated together as impermissible group pleading.

9          <u>First</u>, plaintiffs claim Hotel Operators "engaged in parallel conduct" once the alleged

10  conspiracy began in 2015 (ECF No. 144 ¶¶ 16, 213, 240), but their charts show the opposite. Far

11  from "suggesting an 'unprecedented change' in the Defendants' behavior" when the purported

12  conspiracy began, *In re Cal. Title Ins. Antitrust Litig.*, No. 08-CV-01341 (JSW), 2009 WL

13  1458025, at *7 (N.D. Cal. May 21, 2009), plaintiffs suggest Hotel Operators' quarterly prices were

14  <u>more</u> correlated <u>before</u> the alleged conspiracy (ECF No. 144 ¶ 240). *Cf. Graphics Processing*

15  *Units*, 527 F. Supp. 2d, at 1022 (parallel conduct implausible because plaintiffs made "scant

16  allegations of pricing behavior that came <u>before</u> the alleged conspiracy"). Plaintiffs' charts about

17  differences in average room prices between the Las Vegas Strip and downtown Las Vegas (ECF

18  No. 144 ¶¶ 16, 213) also fail to show any changes when the alleged conspiracy began: there was an

19  <u>$81 price difference</u> at the start of the alleged conspiracy and that price difference <u>decreased to $79</u>

20  in 2023. *See In re German Auto. Mfrs. Antitrust Litig.*, No. 20-17139, 2021 WL 4958987, at *1

21  (9th Cir. Oct. 26, 2021) (conspiracy "implausible because [plaintiffs] have not alleged any facts

22  suggesting that the price of Defendants' vehicles increased while the alleged steel conspiracy was

23  in effect"); *see also BNP*, 2024 WL 368105, at *11 ("[T]he differentials [in defendants' prices]

24  were larger after the class period than during it . . . vitiating any inference that the Treasury market

25  was . . . subject to manipulation . . . ."). Indeed, plaintiffs allege that the price differences between

26  average room rates on the Strip and downtown Las Vegas increased <u>only</u> between 2013 and 2015

27  (ECF No. 144 ¶¶ 16, 213)—<u>before</u> the alleged conspiracy. *See DRAM*, 28 F.4th at 51 (conspiracy

28  implausible where one defendant "announced its intent to stop competing on market share . . . prior

to the class period").

Second, plaintiffs' charts show that Hotel Operators' average quarterly price increases differed significantly—e.g., Treasure Island supposedly increased by 4.3% and The Cosmopolitan increased by less than 3.0%.  (ECF No. 144 ¶¶ 15, 240.)  Similarly, plaintiffs claim that Hotel Operators' "growth in revenue per available room significantly outpaces [a] nationwide index" (*id.* ¶¶ 216-20), but even on those charts' face, Treasure Island's revenue per available room allegedly <u>did not grow</u> between the beginning of the alleged conspiracy and 2023, while Wynn's growth <u>doubled</u> that of both The Cosmopolitan and Treasure Island (*id.* ¶¶ 217-20).

Third, plaintiffs claim that "[d]efendants for which there is publicly available data raised prices at significantly higher rates than the Venetian—which . . . never used Rainmaker" (*id.* ¶¶ 15, 214), but plaintiffs' data demonstrates that the Venetian experienced greater increases in average daily rates than all but one of the Hotel Operators, *see supra* at 16.  *See German Auto.*, 2021 WL 4958987, at *2 (conspiracy implausible where non-defendant took same actions as defendants).[10] Nor can plaintiffs even plausibly characterize "the Venetian" as a supposed non-conspirator benchmark (ECF No. 144 ¶¶ 15, 214) because they concede the Venetian uses an automated "revenue management system provided by the company IDeaS" (*id.* ¶ 214).[11]  As the source cited in the FAC explains, IDeaS is a competing software company that provides "automated revenue management" for "the Las Vegas market" and promises "to take better advantage" of "total revenue optimization."[12]  Given the Venetian's purported use of a similar revenue management software product, the FAC fails to plausibly allege that the Venetian is an appropriate benchmark for what pricing trends should have been in a competitive market.

Fourth, several charts (*id.* ¶¶ 15, 213, 222) are simply group pleading in another form because they include all hotels on the Strip and "do not distinguish between [d]efendants and non-

---

[10] Plaintiffs' chart shows that non-defendant Tropicana's average quarterly prices nearly doubled any average quarterly price increase by a Hotel Operator.  *See Oliver*, 2016 WL 5950345, at *6 (parallel conduct "undermine[d]" by "the prices . . . of eleven other manufacturers . . . mov[ing] in parallel").  And as explained below, plaintiffs' attempt to brand the Tropicana as a "co-conspirator" does nothing to suggest it did anything to join the alleged conspiracy.  (*See infra* § I.B.3.)

[11] (ECF No. 144 ¶ 214 (citing *The Venetian Develops a Strategic Approach to Pricing and Casino Player Value with IDeaS*, IDeaS, https://ideas.com/success-story/venetian/).)

[12] *Id.*

defendant" hotels, *BNP*, 2024 WL 368105, at *11 (citation omitted); *see also Musical Instruments*, 798 F.3d at 1197 (rejecting statistics "alleg[ing] an increase in the average retail price of <u>all</u> guitars and guitar amplifiers sold").  That flaw is acute here because plaintiffs' aggregated statistics lump non-defendant MGM—one of the "largest players" on the Strip, *MGM*, 2023 WL 7026984, at *1— together with the Hotel Operators.

3.      Plaintiffs' "Plus Factors" Are Irrelevant
<u>And Do Not Plausibly Suggest a Conspiracy</u>

Because plaintiffs lack "plausible allegations of parallel conduct, [p]laintiffs' alleged plus factors are not relevant." *Gibson*, 2023 WL 7025996, at *4.  Regardless, plaintiffs' alleged "plus factors" only render the supposed conspiracy less plausible.  Courts in the Ninth Circuit "us[e] the *Musical Instruments* yardstick ('economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action')" to analyze whether "plus factors" plausibly suggest a conspiracy.  *In re Cedar Shakes & Shingles Antitrust Litig.*, No. 19-CV-288 (MJP), 2020 WL 832324, at *8 (W.D. Wash. Feb. 20, 2020).  "Because the court is being required to <u>infer</u> an intentional course of conduct, it takes a number of different factors to build a sufficiently strong network of inferences."  *Id*. at *9.

Taken individually or in the aggregate, the FAC's alleged "plus factors" are even weaker than those the Ninth Circuit rejected in *Musical Instruments* and *DRAM*.

**No connection between plaintiffs' "statistics" and Revenue Management Products.** When plaintiffs "allege[] that retail prices of defendants[] . . . rose in tandem," plaintiffs must allege "facts connecting the purported price increase to an illegal agreement among competitors." *Musical Instruments*, 798 F.3d at 1197.  That "'plus' factor[] . . . really raises the bar for what [p]laintiffs must allege." *Cedar Shakes*, 2020 WL 832324, at *10.  To illustrate, the plaintiffs in *Musical Instruments* alleged that the defendants adopted the same pricing policies and "retail prices of defendants' guitars . . . rose in tandem as sales dropped."  798 F.3d at 1197.  But the Ninth Circuit rejected those allegations because the plaintiffs did not "allege any facts connecting the purported price increase" to an agreement to adopt the same pricing policies.  *Id*.

Like the plaintiffs in *Musical Instruments*, plaintiffs here contend that "Rainmaker's

1  products" produced "commensurate parallel pricing patterns" among Hotel Operators (ECF No.

2  144 ¶ 24), but fail to allege any facts to connect the Revenue Management Products and any Hotel

3  Operator's pricing.  Instead, plaintiffs acknowledge that there is <u>no connection</u> because they allege

4  that Hotel Operators often rejected the prices suggested by Revenue Management Products (*id*. ¶ 8)

5  and that Revenue Management Products would not produce "parallel pricing" because their

6  algorithms are customized to each user (*id*. ¶ 106).  Plaintiffs also suggest there is no plausible

7  connection between the Revenue Management Products and increases in room rates on the Strip

8  because, far from alleging "complex and historically unprecedented changes in pricing structure,"

9  *DRAM*, 28 F.4th at 48, plaintiffs suggest Hotel Operators' occupancy levels <u>increased</u> after the

10  purported conspiracy began, while also alleging that Hotel Operators' prices were more

11  "correlated" before the alleged conspiracy, and that those prices did not change relative to other

12  hotels in Las Vegas when the alleged conspiracy started.  (*See supra* § I.B.2.)  *Cf. In re RealPage,*

13  *Inc.*, No. 23-MD-03071 (WDC), 2023 WL 9004806, at *13 (M.D. Tenn. Dec. 28, 2023) (plaintiffs

14  alleged connection in conspiracy among landlords to adopt pricing recommendations because

15  "regression analyses" showed "[d]efendants had adopted a seismic shift in pricing strategy" where

16  rents increased as occupancy levels fell).  Thus, "[p]laintiffs here are in a fatally similar situation"

17  to the plaintiffs in *Musical Instruments* because "[g]eneric price increase data, without more, does

18  not suffice."  *Cedar Shakes*, 2020 WL 832324, at *10.

19      **No acts against self-interest.**  Plaintiffs assert that Hotel Operators acted against their

20  "economic self-interest" by subscribing to Revenue Management Products and optimizing for

21  profit instead of revenue.  (ECF No. 144 ¶¶ 266-69.)  Only "extreme action against self-

22  interest . . . may suggest prior agreement . . . where individual action would be so perilous in the

23  absence of advance agreement that no reasonable firm would make the challenged move without

24  such an agreement."  *Musical Instruments*, 798 F.3d at 1195.  Plaintiffs fail to allege that here

25  because they allege most Hotel Operators subscribed to the Revenue Management Products years

26  before the alleged conspiracy (ECF No. 144 ¶¶ 151, 163, 170) and that "thousands of hotels and

27  resorts around the world" decided it was in their self-interest to do the same (*id*. ¶ 211).  *See*

28  *German Auto.*, 2021 WL 4958987, at *2 (delaying release of all-electric vehicle not against

1  defendants' self-interest because "non-conspirator did not release its first all-electric vehicle until

2  2018").  Even if plaintiffs had adequately alleged that Hotel Operators used Revenue Management

3  Products to optimize profits, this Court has recognized "there's nothing suspicious about trying to

4  maximize profit."  (Hr'g. at 18:12-24.)

5      **No plausibly defined relevant market and no alleged market power.**  Plaintiffs allege

6  structural features of the "Las Vegas Strip hotel market"—high market concentration, market

7  power, "fungibility" of hotel rooms, and inelastic demand (ECF No. 144 ¶¶ 253-56)—but those

8  allegations just demonstrate that plaintiffs' theory makes no economic sense.  "Where the facts

9  alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the

10 claim must be dismissed."  *Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-CV-01143

11 (YGR), 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013); *see also Adaptive Power Sols., LLC v.*

12 *Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make

13 economic sense.").  Similarly, pleading a "relevant market must include both a geographic market

14 and a product market" that accords with "common sense."  *Hicks v. PGA Tour, Inc.*, 897 F.3d

15 1109, 1120-21 (9th Cir. 2018).

16     Plaintiffs do not plausibly define the relevant market.  *See Universal Grading Serv. v. eBay,*

17 *Inc.*, No. 09-CV-2755 (RMW), 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012) ("Plaintiffs' failure

18 to identify a cognizable market in which eBay has market power is fatal to its conspiracy claim."),

19 *aff'd*, 563 F. App'x 571 (9th Cir. 2014).  Although plaintiffs claim that "[h]otel room rentals . . . on

20 the . . . Strip comprise a distinct product and geographic market" (ECF No. 144 ¶ 346), their

21 definition is too narrow on its face because, as the FAC concedes, hotels on the Strip "compete

22 with other casino hotels nearby" (*id.* ¶ 347).  *See Hicks*, 897 F.3d at 1120-21 (market failed to

23 include all "sellers . . . who have actual or potential ability to deprive each other of significant

24 levels of business" (citation omitted)).

25     Plaintiffs alternatively suggest their purported market is too broad because properties on the

26 Strip are only "fungible" within unidentified "classes of properties."  (ECF No. 144 ¶ 256.)

27 Indeed, plaintiffs concede that some hotels allegedly run by Hotel Operators are not substitutes for

28 each other because "a hotel room at Treasure Island appeals to a different kind of customer than a

1  hotel room at the Wynn."  (*Id.*)  Plaintiffs nevertheless claim that these hotels are in the same

2  market because "a normal antitrust market is comprised of products sold at a variety of price

3  points" (*id.*), but the Court can disregard that argument because it "is not supported by the

4  [c]omplaint and instead consists purely of attorney argument."  *Bay Area*, 166 F. Supp. 3d at 996.[13]

5       Even if plaintiffs had defined a viable relevant market, they fail to plausibly allege that

6  Hotel Operators had market power.  While plaintiffs claim that Hotel Operators "possess market

7  power" on the Strip (ECF No. 144 ¶ 355), plaintiffs effectively concede the contrary by alleging

8  they only "control approximately 35-40% of the rooms" on the Strip (*id.* ¶ 350).  *See Rebel Oil Co.*

9  *v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[M]arket share of less than 50 percent is

10 presumptively insufficient to establish market power.").  Plaintiffs assert that Hotel Operators

11 could wield market power because MGM, Sahara Las Vegas, and Tropicana Las Vegas Hotel are

12 "co-conspirators," but those labels are the type of "formulaic" "labels and conclusions" entitled to

13 no weight.  *See Gold Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219, 1228 (D. Or. 2016)

14 (rejecting allegations about non-defendants that merely "label[ed] them co-conspirators"), *aff'd*,

15 899 F.3d 712 (9th Cir. 2018).  Indeed, plaintiffs do nothing to suggest any of those entities joined

16 the alleged conspiracy, especially because plaintiffs' allegations about MGM are materially

17 indistinguishable from those this Court held failed to "plausibly allege that MGM joined Plaintiffs'

18 alleged conspiracy."  *MGM*, 2023 WL 7026984, at *2.

19       Moreover, an alleged conspiracy where defendants have 35-40% of the rooms on the Strip

20 makes "little economic sense," *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084,

21 1090 (9th Cir. 2015), because plaintiffs do "not allege that other . . . competitors . . . were unable to

22 [lower prices] to offset [Hotel Operators'] alleged conduct," *Monster Energy*, 733 F. App'x at 382.

23 A conspiracy where defendants have such low market share would be "economically unfeasible" as

24 non-defendant competitors would "destroy[]" the conspiracy by lowering prices, *In re Beef Indus.*

25 *Antitrust Litig.*, 907 F.2d 510, 516 (5th Cir. 1990), particularly because "one of the . . . largest

---

26 [13] The only support plaintiffs offer is another unadorned analogy: "the market for cell phones will
   consist of both iPhones sold for $1,500 and pre-paid cell phones sold for $20."  (ECF No. 144 ¶
27 256.)  Not only is that allegation unsupported, plaintiffs' proposed market is "not natural" and is
   "contorted to meet their litigation needs," *Hicks*, 897 F.3d at 1121, because lawyers for the
28 plaintiffs have elsewhere alleged the opposite, *Affinity Credit Union v. Apple Inc.*, 22-CV-04174
   (JSW) (N.D. Cal.), ECF No. 40 ¶¶ 22-23 ("[S]martphones . . . [are] a distinct market.").

1   players" on the Strip—MGM—is not a defendant, *MGM*, 2023 WL 7026984, at *1.[14]

2      Plaintiffs' failure to plead a relevant market and that Hotel Operators had market power

3   dooms Count I altogether because those are essential elements of a claim under the "rule of

4   reason." *See Hicks*, 897 F.3d at 1120 ("Plaintiffs must plead a relevant market to state an antitrust

5   claim under the Sherman Act, unless they assert a per se claim."). Although plaintiffs suggest they

6   need not plead those elements because the "per se" standard applies (ECF No. 144 ¶ 360), "per se

7   rules are inappropriate in novel contexts" and apply only after courts have "considerable

8   experience with certain business relationships," *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d

9   1118, 1135-36 (9th Cir. 2011) (citation omitted). Plaintiffs concede "that this is a novel factual

10  pattern." (Hr'g. at 39:20; *see also id.* at 40:3.) Further, the case plaintiffs incorrectly claim is

11  "virtually identical" to this one (ECF No. 144 ¶ 322) recently held that the "per se standard is not

12  appropriate" for analyzing an alleged agreement to use revenue management software. *See

13  RealPage*, 2023 WL 9004806, at *24.

14      **No exchanges of information.** Plaintiffs assert the existence of "exchanges of

15  competitively sensitive information" (ECF No. 144 ¶¶ 242, 257), citing alleged "machine learning"

16  (*id.* ¶¶ 258-65), but those allegations are insufficient because plaintiffs fail to "explicitly say that

17  one Hotel Operator ever receives confidential information belonging to another Hotel Operator."

18  *Gibson*, 2023 WL 7025996, at *5. Plaintiffs rely on Rainmaker supposedly employing "data

19  scientists" (ECF No. 144 ¶ 263) and touting "machine learning" (*id.* ¶¶ 258-62) but do not allege

20  that any Revenue Management Product's "pricing recommendations . . . to [a] Hotel Operator[]

21  include . . . confidential information fed in" from other Hotel Operators, *Gibson*, 2023 WL

22  7025996, at *5. Rather, plaintiffs plead the opposite—that, if competitor rates were inputs to any

23  pricing algorithm, they were based on "public pricing information." (ECF No. 144 ¶ 86.) As this

24  Court held, using such public information is not anticompetitive. *See Gibson*, 2023 WL 7025996,

25  at *6; *accord Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018).

26      **Alleged opportunities to collude are insufficient.** Plaintiffs' speculation that defendants

27

28  ───────────────
    [14] Even if Hotel Operators had market power in a highly concentrated market, the *DRAM* plaintiffs
    alleged the same (and more), and the Ninth Circuit held that did not bolster their claims. 28 F.4th
    at 52 ("extreme market concentration" and parallel conduct accords with lawful conduct).

1   had "ample opportunities to collude" (ECF No. 144 ¶¶ 270-321) at conferences hosted by

2   Rainmaker and trade association meetings are just as deficient.  Plaintiffs "do not allege facts

3   demonstrating that [d]efendants actually communicated or exchanged information at the[] [alleged]

4   meetings, much less that they entered an agreement . . . while there."  *DRAM*, 28 F.4th at 52;

5   *Gibson*, 2023 WL 7025996, at *5 (rejecting "vague statements about how Rainmaker clients all

6   attend the same conferences").  Rather, plaintiffs "only say[] that employees of Hotel Operators

7   have the opportunity to" conspire, and "of course, a possibility does not make an allegation

8   plausible."  *Gibson*, 2023 WL 7025996, at *6.

9        **No plausible motive.**  Plaintiffs allege Hotel Operators had "the motive to conspire given

10   the financial difficulties" created by the Great Recession.  (ECF No. 144 ¶¶ 243-52.)  But *Musical*

11   *Instruments* held "common motive does not suggest an agreement" because every "firm that

12   believes that it could increase profits by raising prices has a motive to reach an advance agreement

13   with its competitors."  798 F.3d at 1194.

14        **The *RealPage* complaint is inapposite.**  Plaintiffs incorrectly assert that the complaint in

15   *RealPage* alleges "virtually identical conduct by landlords" using RealPage's revenue management

16   software.  (ECF No. 144 ¶¶ 242, 322.)  But as the *RealPage* court recognized in analyzing the

17   allegations in both cases, there are "critical difference[s] between the *Gibson* complaint and the

18   [RealPage] Complaint," including that "RealPage's revenue management software [allegedly]

19   inputs a melting pot of confidential competitor information . . . and spits out price

20   recommendations based on that private competitor data," *RealPage*, 2023 WL 9004806, at *17,

21   while plaintiffs here allege the Revenue Management Products rely on only "public pricing

22   information" (ECF No. 144 ¶ 86).

23        In any event, allegations about different companies in a different industry do not bolster

24   plaintiffs' claims.  The Ninth Circuit has held that allegations that a government imposed liability

25   for (not just investigated) antitrust violations against the defendants (not companies in a different

26   industry) do not suffice to plausibly allege a conspiracy.  *See Musical Instruments*, 798 F.3d at

27   1196 (rejecting reliance on FTC "consent decree"); *see also Cedar Shakes*, 2020 WL 832324, at

28   *10 (alleged DOJ investigation "does nothing to advance . . . complaints . . . .").

1                                            *        *        *

2          In sum, as in *Musical Instruments*, plaintiffs here "have indeed provided a context" for

3   hotels' alleged use of the Revenue Management Products, "but not one that plausibly suggests they

4   entered into illegal horizontal agreements."  798 F.3d at 1198.

5   **II.      COUNT II SHOULD BE DISMISSED BECAUSE LICENSING REVENUE
            MANAGEMENT PRODUCTS DOES NOT VIOLATE THE SHERMAN ACT**

6

7          Plaintiffs' allegations are equally deficient with respect to Count II.  Because plaintiffs

8   acknowledge that Count II is a "rule of reason" challenge to "vertical agreements" (ECF No. 144

9   ¶¶ 365, 370), they must plausibly allege (A) an agreement in restraint of trade, (B) a relevant

10  market, and (C) a "substantial anticompetitive effect . . . in the relevant market."  *See Ohio v. Am.*

11  *Express Co.*, 138 S. Ct. 2274, 2284 (2018); *Musical Instruments*, 798 F.3d at 1191 ("Vertical

12  agreements . . . are analyzed under the rule of reason.").

13         Plaintiffs allege none of these elements: (A) the individual software licenses do not restrain

14  Hotel Operators' pricing; (B) plaintiffs fail to identify a plausible relevant market; and (C) there are

15  no facts showing any harm to competition stemming from the relevant software licenses.

16         **A.      The Alleged Vertical Software Licenses Do Not Restrain Trade**

17         Plaintiffs' rule of reason claim fails at the outset because the FAC does not identify any

18  agreement in restraint of trade.  "It is axiomatic that '[t]o constitute a Section 1 violation, the

19  contract, combination, or conspiracy must be in restraint of trade.'"  *Newman v. Universal*

20  *Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987) (citation omitted).  Non-restrictive agreements fall

21  outside the scope of Section 1.  *See, e.g.*, *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th

22  479, 492 (6th Cir. 2021) (contract did not "restrain trade" because it did "the opposite by allowing

23  one party to back out of a cooperative venture"); *Pac. Recovery Sols. v. United Behav. Health*, 481

24  F. Supp. 3d 1011, 1023 (N.D. Cal. 2020) (dismissing claim for failure to plead restraint of trade

25  where prices were individually negotiated rather than dictated by agreement).

26         The FAC identifies the relevant "agreements" as "vertical agreements . . . to use

27  Rainmaker's revenue management system to set prices for hotel rooms."  (ECF No. 144 ¶ 365.)

28  But plaintiffs do not identify a single agreement that constrained Hotel Operators' unilateral

1  pricing decisions.  Despite plaintiffs' boilerplate contention that Hotel Operators somehow

2  "delegated pricing authority" to Rainmaker (*id.* ¶ 12), the FAC alleges the opposite: each

3  subscriber controls whether and how it uses the software, and subscribers can decline Rainmaker's

4  suggested prices at their sole discretion (*id.* ¶¶ 105, 124).  Plaintiffs' acknowledgment that any

5  hotel receiving a pricing suggestion was free to decline it dooms Count II because non-binding

6  pricing suggestions are not restraints of trade.  *See Gen. Cinema Corp. v. Buena Vista Distrib. Co.*,

7  681 F.2d 594, 597-98 (9th Cir. 1982) (vertical agreement that "contain[ed] no elements of

8  coercion" with respect to suggested prices was not unlawful under the Sherman Act); *Acquaire v.*

9  *Can. Dry Bottling Co. of N.Y.*, 24 F.3d 401, 410 (2d Cir. 1994) ("Evidence of pricing

10  suggestions . . . is not sufficient . . . to transgress § 1 of the Sherman Act.").

11       The only agreements plausibly alleged in the FAC are software licenses that are like

12  "[o]rdinary sales contracts [that] do not unlawfully restrain trade."  *49er Chevrolet, Inc. v. Gen.*

13  *Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986).  In fact, the FAC unmistakably alleges that

14  Hotel Operators have not obliged themselves to use the Revenue Management Products at all,

15  much less to "set prices."  (*See, e.g.*, ECF No. 144 ¶ 175.)  Plaintiffs allege that "thousands" of

16  hotels have licensed a software tool that they could use and can "customiz[e]" however they see fit.

17  (*See, e.g.*, *id.* ¶¶ 106, 121, 147, 227.)  Those kinds of arrangements—none of which restrains Hotel

18  Operators in any way—do not violate Section 1 because "[t]he antitrust laws are not offended by

19  agreements as such, but only by those with an anticompetitive content."  *49er Chevrolet*, 803 F.2d

20  at 1467; *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976 (9th Cir. 2008) (vertical

21  agreement "on a price to provide credit card processing services" would constitute "an '[o]rdinary

22  sales contract[,]' not an illegal antitrust agreement") (citation omitted).

23       **B.      Plaintiffs Fail To Plausibly Allege a Relevant Market**

24       Count II also should be dismissed because the FAC fails to plausibly allege a relevant

25  market.  "A threshold step in any antitrust case is to accurately define the relevant market," *FTC v.*

26  *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020), because courts "cannot properly apply the rule

27  of reason without [it]."  *Am. Express*, 138 S. Ct. at 2285.

28       While plaintiffs claim that "[h]otel room rentals . . . on the . . . Strip comprise a distinct

product and geographic market" (ECF No. 144 ¶ 346), their allegations demonstrate that market is

implausible (*see supra* § I.B.3). In fact, even though the law requires a relevant market that

includes "substitute products" that consumers would consider "reasonably interchangeable," *Hicks*,

897 F.3d at 1123, plaintiffs admit that hotels on the Strip compete with other hotels in "nearby"

areas (ECF No. 144 ¶ 347), while also conceding that consumers do not even consider rooms

offered by Hotel Operators to be substitutes for each other (*id.* ¶ 256).

### C.   Plaintiffs Fail To Plausibly Allege That The Alleged Conduct Has a Substantial Anticompetitive Effect

Even disregarding plaintiffs' failure to plead a restraint of trade and a relevant market, they

fail to allege that "the challenged restraint has a substantial anticompetitive effect that harms

consumers in the relevant market." *Am. Express*, 138 S. Ct. at 2284. To do so, plaintiffs must

plead: (1) "actual detrimental effects" on competition, "such as . . . increased prices," or (2) indirect

evidence of "substantial anticompetitive effects" by demonstrating "the defendant has market

power and . . . 'evidence that the challenged restraint harms competition.'" *Epic Games, Inc. v.

Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) (citations omitted). Plaintiffs make neither showing.

#### 1.   There Are No Facts Showing Direct Evidence of Harm to Competition

To directly plead anticompetitive effects, it is not enough to "merely recite the bare legal

conclusion that competition has been restrained unreasonably." *Les Shockley Racing, Inc. v. Nat'l

Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989). Moreover, "allegations that an agreement

has the effect of reducing consumers' choices or increasing prices to consumers do[] not

sufficiently allege an injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202

(9th Cir. 2012); *see also 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) ("When an

antitrust plaintiff advances an antitrust claim based on direct evidence in the form of increased

prices, the question is whether it can show an actual anticompetitive change in prices after the

restraint was implemented.").

Plaintiffs do not even try to meet this high bar. Rather, in two paragraphs, plaintiffs assert

in a conclusory manner that the vertical agreements have "the anticompetitive effect of artificially

inflating prices." (ECF No. 144 ¶¶ 366-67.) But mere "labels and conclusions" are not enough to

1   state an element of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And plaintiffs present no

2   facts showing how licensing the Revenue Management Products by any Hotel Operator leads to

3   anticompetitive effects. Instead, as explained above, the FAC relies on a series of statistical graphs

4   that it characterizes as evidence showing alleged price increases at hotel properties using the

5   Revenue Management Products. (ECF No. 144 ¶¶ 212-22.) These "statistics" do not show a single

6   nightly price for any Hotel Operator (*see supra* § 1.B.2), much less "an actual anticompetitive

7   change in prices after the restraint was implemented." *1-800 Contacts*, 1 F.4th at 118; *see also*

8   *Rebel Oil*, 51 F.3d at 1433 (conduct is not anticompetitive unless it "raises the price of goods above

9   competitive levels" (emphasis added)). Indeed, none of plaintiffs' statistics compare a Hotel

10  Operator's prices before and after it supposedly licensed a Revenue Management Product, and the

11  FAC indicates Hotel Operators' average room prices did not change relative to other hotels' in Las

12  Vegas between 2015 and 2023. (*See supra* § 1.B.2.) And even if plaintiffs had alleged prices for

13  any Hotel Operator, they have not plausibly alleged that any price increases were due to some

14  restrictive feature of its agreement to license the Revenue Management Products, rather than the

15  pro-competitive use of that software to effectively forecast demand.[15]

16          2.    Plaintiffs Also Fail To Allege Indirect Evidence of Harm to Competition

17          Plaintiffs fail to plausibly allege indirect evidence because they do not allege "relevant

18  geographic and product markets and . . . the restraint's anticompetitive effects within those

19  markets." *Les Shockley Racing*, 884 F.2d at 508. First, even ignoring plaintiffs' failure to

20  plausibly allege a relevant market, plaintiffs fail to allege that any Hotel Operator has market

21  power in that purported market. This failure is critical because "[v]ertical restraints often pose no

22  risk to competition unless the entity imposing them has market power." *Am. Express*, 138 S. Ct. at

23  2285 n.7. Plaintiffs also allege no facts suggesting that any Hotel Operator could by itself inflate

24  room prices throughout the Strip. *See Med Vets Inc. v. VIP Petcare Holdings, Inc.*, No. 18-CV-

25  02054 (MMC), 2019 WL 1767335, at *7 (N.D. Cal. Apr. 22, 2019) (dismissing complaint because

26  plaintiff failed to allege defendant's market power), *aff'd*, 811 F. App'x 422 (9th Cir. 2020).

27   

---

[15] The Revenue Management Products' alleged features are not anticompetitive. The Revenue
28  Management Products utilize a hotel subscriber's own property-level data to "optimize revenue" by
forecasting customer demand by segment type and "achieving the best business mix." *The Key to
Profitability: Understand Your Demand Forecast*, Cendyn (cited at ECF No. 144 ¶ 55 n.20).

1    Plaintiffs allege only that Hotel Operators have a <u>total</u> 35-40% share of the purported

2    market.  (ECF No. 144 ¶ 350.)  But the Ninth Circuit only permits an antitrust plaintiff to aggregate

3    the defendants' market shares when alleging "a network of . . . agreements" that "allow

4    [d]efendants to coordinate" pricing.  *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d

5    659, 664-65 (9th Cir. 2009).  Here, plaintiffs cannot aggregate shares because they failed to allege

6    that Hotel Operators coordinated their pricing.  (*See supra* § I.)  Plaintiffs also expressly conceded

7    that "a single vertical agreement between Rainmaker and a client where there's not the same

8    coordinated pricing strategy that is occurring among competitors" would not be "actionable."

9    (Hr'g. at 30:5-15.)  And even if plaintiffs could aggregate Hotel Operators' shares, plaintiffs

10   concede Hotel Operators do not collectively have market power by alleging that, even in the

11   aggregate, they "control approximately 35-40% of the rooms" on the Strip.  (*See supra* § I.B.3.)

12   <u>Second</u>, even if plaintiffs could plausibly allege market power, the FAC still fails to allege

13   "that the challenged restraint harms competition."  *Am. Express*, 138 S. Ct. at 2284.  And there is

14   no restraint on trade from the software licenses because plaintiffs allege Hotel Operators are free to

15   reject the Revenue Management Products' pricing recommendations.  (*See supra* § I.A.)  Similarly,

16   plaintiffs cannot allege harm to competition given the absence of allegations that: (1) Rainmaker

17   shares confidential data of one Hotel Operator with another Hotel Operator in any way; or (2)

18   Hotel Operators' room prices increased on the Strip due to their licensing of any Revenue

19   Management Product.  (*See supra* § I.A-B.2.)  Plaintiffs thus fail to plead that the alleged conduct

20   has a substantial anticompetitive effect.

21                                          **<u>CONCLUSION</u>**

22   The FAC should be dismissed because it fails to cure at least four fatal flaws this Court

23   identified in its prior order, and plaintiffs' additional allegations are either irrelevant or expose

24   more incurable defects.  Dismissal should be with prejudice because the FAC "fails to cure the

25   pleading deficiencies explained in [this Court's] original order," and the Court can thus "'conclude

26   that further amendment would be futile.'"  *Monster Energy*, 733 F. App'x at 382 (citation omitted).

27

28

Dated: February 14, 2024                     Respectfully submitted,

*/s/ Adam Hosmer-Henner*                      */s/ J. Colby Williams*
Adam Hosmer-Henner (NSBN 12779)              J. Colby Williams (5549)
Chelsea Latino (NSBN 14227)                  710 South Seventh Street
Jane Susskind (NSBN 15099)                   Las Vegas, NV 89101
McDONALD CARANO LLP                          Telephone: (702) 382-5222
100 West Liberty Street, Tenth Floor         Facsimile: (702) 382-0540
Reno, Nevada 89501                           jcw@cwalawlv.com
(775) 788-2000
ahosmerhenner@mcdonaldcarano.com             Sadik Huseny (*pro hac vice*)
clatino@mcdonaldcarano.com                   Tim O'Mara (*pro hac vice*)
jsusskind@mcdonaldcarano.com                 Brendan A. McShane (*pro hac vice*)
                                             LATHAM & WATKINS LLP
Boris Bershteyn (*pro hac vice*)             505 Montgomery Street, Suite 2000
Ken Schwartz (*pro hac vice*)                San Francisco, CA 94111-6538
Michael Menitove (*pro hac vice*)            Telephone: (415) 391-0600
Sam Auld (*pro hac vice*)                    Facsimile: (415) 395-8095
  SKADDEN, ARPS, SLATE,                      sadik.huseny@lw.com
  MEAGHER & FLOM LLP                         tim.o'mara@lw.com
One Manhattan West                           brendan.mcshane@lw.com
New York, New York 10001
(212) 735-3000                               Anna M. Rathbun (*pro hac vice*)
Boris.Bershteyn@skadden.com                  Christopher J. Brown (*pro hac vice*)
Ken.Schwartz@skadden.com                     LATHAM & WATKINS LLP
Michael.Menitove@skadden.com                 555 Eleventh Street, NW Suite 1000
Sam.Auld@skadden.com                         Washington, DC 20004-1304
                                             Telephone: (202) 637-3381
*Attorneys for Defendant*                    Facsimile: (202) 637-2201
*Caesars Entertainment, Inc.*                anna.rathbun@lw.com
                                             chris.brown@lw.com

                                             *Attorneys for Defendant Cendyn Group LLC*

*/s/ Patrick G. Byrne*                        */s/ Daniel McNutt*
Patrick G. Byrne                             Daniel McNutt, Esq., Bar No. 7815
Nevada Bar No. 7636                          Matthew C. Wolf, Esq., Bar No. 10801
Bradley Austin                               MCNUTT LAW FIRM, P.C.
Nevada Bar No. 13064                         11441 Allerton Park Drive, #100
SNELL & WILMER                               Las Vegas, Nevada 89135
3883 Howard Hughes Parkway                   Tel.: (702) 384-1170
Las Vegas, NV 89169                          Fax.: (702) 384-5529
Telephone: (702) 784-5200                    drm@mcnuttlawfirm.com
Facsimile: (702) 784-5252                    mcw@mcnuttlawfirm.com
pbyrne@swlaw.com
baustin@swlaw.com                            Matthew L. McGinnis (*pro hac vice*)
                                             ROPES & GRAY LLP
Mark Holscher (*pro hac vice*)               Prudential Tower
Tammy Tsoumas (*pro hac vice*)               800 Boylston Street

Leonora Cohen (*pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
ttsoumas@kirkland.com
mholscher@kirkland.com
lena.cohen@kirkland.com

Matthew Solum (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Ave
New York, NY 10022
Telephone: (212) 446-4688
Facsimile: (917) 848-7536
msolum@kirkland.com

*Attorneys for Defendant Wynn
Resorts Holdings, LLC*

/s/ Nicholas J. Santoro
Nicholas J. Santoro (NV Bar No. 532)
300 S. 4th Street, Suite 1600
Las Vegas, NV 89101
Tel.: (702) 791-0308 / Fax: (702) 791-1912
nsantoro@nevadafirm.com

Arman Oruc (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036-1612
Tel.: (202) 346-4000 / Fax: (202) 346-4444
AOruc@goodwinlaw.com

Alicia Rubio-Spring (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02110
Tel.: (617) 570-1000 / Fac: (617) 523-1231
ARubio-Spring@goodwinlaw.com

*Attorneys for Defendant The Rainmaker Group
Unlimited, Inc.*

Boston, Massachusetts 02199
Tel: (617) 951-7000
Fax: (617) 951-7050
matthew.mcginnis@ropesgray.com

Of counsel:

David B. Hennes
Jane E. Willis
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 596-9000
Fax: (212) 596-9090
david.hennes@ropesgray.com
jane.willis@ropesgray.com

*Attorneys for Defendants Blackstone Inc. and
Blackstone Real Estate Partners VII L.P.*

/s/ Patrick J. Reilly
Patrick J. Reilly
Arthur A. Zorio
Emily Garnett (*pro hac vice*)
Eric D. Walther
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Ste. 1600
Las Vegas, NV 89106
Telephone:  702.382.2101
preilly@bhfs.com
azorio@bhfs.com
egarnett@bhfs.com
ewalther@bhfs.com

*Attorneys for Defendant Treasure Island, LLC*