**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
Stephanie A. Verdoia (*pro hac vice*)
stephaniev@hbsslaw.com
Ted Wojcik (*pro hac vice*)
tedw@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Rio S. Pierce (*pro hac vice*)
riop@hbsslaw.com
Abby R. Wolf (*pro hac vice*)
abbyw@hbsslaw.com
715 Hearst Ave, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001

**PANISH SHEA BOYLE RAVIPUDI LLP**
Brian J. Panish (NV Bar No. 16123)
panish@psbr.law
Rahul Ravipudi (NV Bar No. 14750)
rravipudi@psbr.law
Adam Ellis (NV Bar No. 14514)
aellis@psbr.law
Ian Samson (NV Bar No. 15089)
isamson@psbr.law
300 S. Fourth Street, Suite 710
Las Vegas, NV 89101
Telephone:  (702) 560-5520

*Counsel for Plaintiffs and the Proposed Class*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| RICHARD GIBSON and ROBERTO MANZO, <br><br> Plaintiffs, <br><br> v. <br><br> CENDYN GROUP, LLC, THE RAINMAKER GROUP UNLIMITED, INC., CAESARS ENTERTAINMENT INC., TREASURE ISLAND, LLC, WYNN RESORTS HOLDINGS, LLC, BLACKSTONE, INC., BLACKSTONE REAL ESTATE PARTNERS VII L.P., JC HOSPITALITY, LLC. <br><br> Defendants. | Case No. 2:23-cv-00140-MMD-DJA <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE FIRST AMENDED COMPLAINT WITH PREJUDICE** <br><br> **ORAL ARGUMENT REQUESTED** |

1

**TABLE OF CONTENTS**

2

**Page**

3

I.    INTRODUCTION .................................................................................. 1

4

II.   BACKGROUND ................................................................................... 3

5

III.  LEGAL STANDARD ........................................................................... 6

6

IV.   ARGUMENT ........................................................................................ 6

7

8

     A.    Plaintiffs plausibly allege a per se horizontal agreement ......................... 6

9

          1.    Competitors' delegation of pricing decisions to a common pricing agent is concerted action that violates Section 1 ............................ 6

10

          2.    Plaintiffs allege "concerted action" in multiple ways................................. 7

11

12

          3.    Plaintiffs allege parallel conduct and plus factors in the alternative ................................................................................. 9

13

               a.    Plaintiffs sufficiently allege an agreement among Operators ...................................................................... 10

14

15

               b.    Plaintiffs allege parallel conduct.................................... 19

16

               c.    Plus factors are strongly indicative of an agreement ................... 23

17

     B.    Plaintiffs plead a rule of reason claim based on a set of vertical agreements ........................................................................... 27

18

19

          1.    The contracts between Operators and Rainmaker are agreements ............................................................................ 27

20

          2.    Plaintiffs allege the vertical agreements are unreasonable restraints of trade........................................................... 29

21

22

               a.    Plaintiffs allege direct evidence of substantial anticompetitive effects from the vertical restraints...................... 30

23

               b.    Plaintiffs plausibly allege indirect evidence of harm to competition ....................................................... 35

24

25

     C.    Plaintiffs state a claim against Blackstone ........................................... 38

26

V.    CONCLUSION..................................................................................... 40

27

28

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*49er Chevrolet, Inc. v. Gen. Motors Corp.*,
   803 F.2d 1463 (9th Cir. 1986) ...........................................................................29

*Acquaire v. Canada Dry Bottling Co. of New York*,
   24 F.3d 401 (2d Cir. 1994)................................................................................28

*Alvarado v. W. Range Ass'n*,
   2023 WL 4534624 (D. Nev. Mar. 21, 2023) ..........................................................15

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
   92 F.3d 781 (9th Cir. 1996) ..............................................................................27

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010).............................................................................1, 3, 6

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999)..............................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................6, 7, 9, 26

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) .......................................................................32, 33

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ...................................................................19

*City of Philadelphia v. Bank of Am. Corp.*,
   498 F. Supp. 3d 516 (S.D.N.Y. 2020).................................................................19

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962).....................................................................................23, 26

*Cornish-Adebiyi v. Caesars Entertainment, Inc.*,
   No. 1:23-cv-02536, ECF No. 80 (Jan. 29, 2024) ...................................................31

*Costco Wholesale Corp v. Maleng*,
   522 F.3d 874 (9th Cir. 2008) .......................................................................33, 34

*Don Copeland v. Energizer Holdings, Inc.*,
   2024 WL 511224 (N.D. Cal. Feb. 9, 2024) ..........................................................13

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)..........................................................................................7

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .................................................................. *passim*

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*,
   2023 WL 4677017 (9th Cir. July 21, 2023) ............................................ *passim*

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ........................................................................ 11

*Gen. Cinema Corp. v. Buena Vista Distribution Co.*,
   681 F.2d 594 (9th Cir. 1982) ...................................................................... 28

*Gibson v. MGM Resorts Int'l*,
   2023 WL 7025996 (D. Nev. Oct. 24, 2023) ............................................... 19

*Gibson v. MGM Resorts Int'l*,
   2023 WL 7026984 (D. Nev. Oct. 24, 2023) .......................................... 39, 40

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773 (1975) ................................................................................... 28

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) ........................................................ 19

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*,
   2016 WL 160263 (D. Md. Jan. 14, 2016) .................................................... 40

*Interstate Cir. v. United States*,
   306 U.S. 208 (1939) ........................................................................ 2, 8, 12, 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................ 12

*Kleen Prod. LLC v. Georgia-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ......................................................................... 7

*Las Vegas Sun v. Adelson*,
   2020 WL 7029148 (D. Nev. Nov. 30, 2020) ............................................... 35

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ............................................................................... 28, 33

*In re Loc. TV Advert. Antitrust Litig.*,
   2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ................................................ 20

*Markson v. CRST Int'l, Inc.*,
   2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) .............................................. 13

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ....................................................... 3, 20, 26, 27

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)........................................................12

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
468 U.S. 85 (1984).....................................................................................................6

*Newcal Indus., Inv. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) ....................................................................35, 36, 38

*Newman v. Universal*,
813 F.2d 1519 (9th Cir. 1987) ...............................................................................29

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004)....................................................................40

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*,
394 U.S. 700 (1969).................................................................................................28

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
838 F.2d 360 (9th Cir. 1988) ..................................................................................35

*Pac. Recovery Sols. v. United Behav. Health*,
481 F. Supp. 3d 1011 (N.D. Cal. 2020) ..................................................................29

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ................................................................................27

*In re Plasma–Derivative Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) ...................................................................6, 24

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) .................................................................8, 28, 29, 33

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017)......................................................................26

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003)......................................................................26

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023)............................................. *passim*

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ..................................................................................37

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)...................................................................................................6

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
532 F.3d 963 (9th Cir. 2008) ..................................................................................29

*In re Salmon*,
    2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) ...........................................................20

*SmileDirectClub, LLC v. Tippins*,
    31 F.4th 1110 (9th Cir. 2022) .............................................................................40

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
    8 F.4th 479 (6th Cir. 2021) .................................................................................29

*Stubhub, Inc. v. Golden State Warriors, LLC*,
    2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ....................................................36

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ..............................................................................24

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ...............................................................................25

*Twin City Sportservice, Inc. v. Charles Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ............................................................................37

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    512 F.2d 1264 (9th Cir. 1975) ............................................................................37

*U.S. v. Masonite*,
    316 U.S. 265 (1942) ..................................................................................... *passim*

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ..............................................................................................39

*United States v. Hilton Hotels Corp.*,
    467 F.2d 1000 (9th Cir. 1972) ............................................................................40

*United States v. Nat'l Ass'n of Real Est. Bds.*,
    339 U.S. 485 (1950) ...........................................................................................28

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) .............................................................................................7

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
    2022 WL 952896 (E.D. Pa. Mar. 30, 2022) .......................................................24

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011) .................................................................................7

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) .......................................................................27, 36

STATUTES

15 U.S.C. § 1 ................................................................................................ *passim*

15 U.S.C. § 2 ........................................................................................................37

OTHER AUTHORITIES

ABA Model Jury Instructions in Civil Antitrust Cases (2d ed. 2016)............................12

Fed. R. Civ. P. 12(b)(6)................................................................................35, 38

Hannah Garden-Monheit and Ken Merber, *Price fixing by algorithm is still price fixing*, Federal Trade Commission (March 1, 2024),
https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing ...................................................................................................1

Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law: An Analysis of Antitrust Principles and Their Application (Fourth & Fifth Editions 2018–2022).................................37

Lina Khan (@LinaKhanFTC), Twitter (Mar. 1, 2024, 1:22pm AM),
https://twitter.com/linakhanFTC/status/1763676330376204330.................................1

| Short Cite Used | Full Citation |
|---|---|
| Complaint | First Amended Class Action Complaint, ECF No. 144 (Nov. 27, 2023). All "Complaint" or "¶ __" references herein are to this document. |
| Mot. | Defendants' Joint Motion to Dismiss the First Amended Complaint with Prejudice, ECF No. 160 (Feb. 14, 2024). |
| Blackstone Mot. | Defendants Blackstone Inc. and Blackstone Real Estate Partners VII L.P.'s Motion to Dismiss the Amended Complaint, ECF No. 161 (Feb. 14, 2024). |
| DOJ *RealPage* Statement of Interest | Memo. of Law in Support of the Statement of Interest of the United States, *In re RealPage, Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071, ECF No. 628 (Nov. 15, 2023). |
| DOJ *Yardi* Statement of Interest | Statement of Interest of the United States, *Duffy v. Yardi Sys Inc. et al.*, No. 2:23-cv-01391-RSL, ECF No. 149 (March 1, 2024). |
| Defendants | Cendyn, Rainmaker, and Operator Defendants (as defined below). |
| Operators | Caesars, Treasure Island, Wynn, Blackstone, and Hard Rock (as defined below). |
| Bershteyn Decl. | Declaration of Boris Bershteyn in Support of Defendants' Joint Motion to Dismiss the First Amended Class Complaint with Prejudice (ECF No. 160-1) (Feb. 14, 2024). |
| **Short Cite Used** | **Full Defendant Names** |
| Rainmaker | Rainmaker Group Unlimited, Inc. |
| Cendyn | Cendyn Group, LLC |
| Caesars | Caesars Entertainment Inc. |
| Treasure Island | Treasure Island, LLC |
| Wynn | Wynn Resorts Holdings, LLC |
| Blackstone | Blackstone Inc. and Blackstone Real Estate Partners VII L.P. |
| Hard Rock | J.C. Hospitality, LLC |

# I.    INTRODUCTION

Section 1 of the Sherman Act prohibits "concerted action that restrains trade."[1] The "key" question in a Section 1 case is therefore whether an alleged arrangement "joins together separate decisionmakers" and "deprives the marketplace of independent centers of decisionmaking."[2] As the Department of Justice has emphasized in a case involving, in part, pricing algorithms first developed by Rainmaker,[3] courts have long recognized that the "joint delegation of competitive decisions constitutes concerted action under Section 1" because it "represents the joining together of separate actors with separate economic interests"[4]—a rule that applies equally where competitors delegate their pricing to "the same pricing algorithm."[5] As FTC Chairperson Lina Khan recently explained, it is "illegal for competing … firms to jointly delegate key aspects of their pricing to a common algorithm, even if the firms retain some authority to deviate from the algorithm's recommendations."[6]

At the heart of this case is a similar "joining together." Defendant Hotel Operators ("Operators"), casino-hotels that once competed for guests on the Las Vegas Strip, have jointly delegated their decisionmaking on price to Rainmaker's algorithmic pricing software with the knowledge that others were doing the same. Rainmaker in turn promises profits by effecting a fundamental change Operators' in business strategy—specifically, a shift from casino-hotels' longstanding focus on maximizing occupancy to a focus on maximizing "profitability" by charging higher room rates. This is not how a competitive market works. Unsurprisingly, by Rainmaker's own account, this "shift" requires "revenue management discipline." ¶¶ 64, 197. Another word for

---

[1] *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).

[2] *Id.*

[3] Plaintiffs generally refer to Rainmaker and Cendyn interchangeably in this motion as "Rainmaker." Cendyn acquired Rainmaker in 2019. ¶ 3. Before that, in 2017, Rainmaker sold its rent-setting software ("LRO") to the company RealPage, which is reportedly subject to a federal investigation, and is the defendant in a pending class action lawsuit, based on similar conduct. ¶¶ 322–29.

[4] DOJ *RealPage* Statement of Interest at 5–6 (collecting cases).

[5] *Id.* at 17–18.

[6] Lina Khan (@LinaKhanFTC), Twitter (Mar. 1, 2024, 1:22pm AM), https://twitter.com/linakhanFTC/status/1763676330376204330; *see also* Hannah Garden-Monheit and Ken Merber, *Price fixing by algorithm is still price fixing*, Federal Trade Commission (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing.

this "discipline" is concerted action.

In response to this Court's order, Plaintiffs have amended their complaint to add substantial new detail regarding Defendants' scheme, including allegations addressed to the Court's questions and concerns. These include:

- Allegations demonstrating that all Operators used the same Rainmaker algorithms—GuestRev and GroupRev—during the class period (¶¶ 150–205 & Appendices A, B), as well as allegations setting forth the chronology of Rainmaker use on the Las Vegas Strip, including the development of Rainmaker's specific products (¶¶ 48–70);

- Allegations demonstrating that each Operator used Rainmaker's products with the knowledge that its competitors were doing the same, including allegations documenting (a) extensive advertising in which Rainmaker identified Operators among its customers (¶¶ 190–205); (b) Operators' public praise of Rainmaker's products (¶¶ 13, 69, 154, 158, 161, 163, 166, 171, 175-76, 178–81, 274); and (c) Operators' many opportunities to conspire (¶¶ 192–205, 270–321);

- Allegations detailing how Rainmaker's algorithms work, and in particular their direct integration with Operators' systems, focus on automation, use of competitor rates to set prices, encouragement that users automatically accept rates, and use of machine learning to continuously train on Operators' data (¶¶ 71–149, 257–65);

- Allegations that Operators accepted Rainmaker's rates with sufficient frequency to disrupt the competitive process in violation of Section 1, including allegations that (a) Operators have long paid for Rainmaker's services, whose sole function is to make pricing recommendations based in part on competitor prices (¶¶ 150–205); (b) each Operator's employees, including senior executives, have touted their success with and reliance on Rainmaker's algorithms (¶¶ 13, 69, 154, 158, 161, 163, 166, 171, 175-76, 178–81, 274); and (c) Rainmaker makes automation a core tenant of its products' function and actively dissuades users from overriding pricing recommendations (¶¶ 71–127); and

- Allegations based on economic analyses that (a) Operators' pricing began to rise in parallel in 2015, coinciding almost precisely with when Rainmaker fully integrated competitor pricing, through its acquisition of RevCaster, into GuestRev (¶¶ 212–222); (b) that the price raises were far higher than that of the Venetian, a hotel on the Las Vegas Strip that does not use Rainmaker (¶¶ 214–15); and that Rainmaker thus (c) effected a basic shift in Operators' business model from maximizing occupancy to "maximizing rooms revenue" (¶¶ 49–56).

Plaintiffs state a Section 1 claim under two theories. **First**, Plaintiffs allege that Defendants formed a hub-and-spoke conspiracy consisting of Rainmaker (the hub), Operators (the spokes), and a conspiracy among Operators (the rim). Plaintiffs' allegations fall in a line of cases holding that even absent direct evidence that defendants "entered into any agreement with each other," their common assent to a scheme is sufficient to establish a horizontal agreement.[7] By using Rainmaker with the knowledge that other Defendants were as well, Operators "join[ed] together"

---

[7] *See, e.g.*, *Interstate Cir. v. United States*, 306 U.S. 208, 226–227 (1939); *see U.S. v. Masonite*, 316 U.S. 265, 274-75 (1942).

their once-separate decisionmaking regarding price and thus "depriv[ed] the market of independent centers of decisionmaking."[8] **Second**, in the alternative, Plaintiffs allege a set of vertical agreements between Operators and Rainmaker to use Rainmaker's pricing algorithms that, in the aggregate, harmed competition. The Ninth Circuit recognizes that a "collection of purely vertical agreements" may unreasonably restrain trade.3F.[9] Plaintiffs allege such a collection here: specifically, they allege that Operators and Rainmaker formed agreements to use Rainmaker's algorithms, and identify both direct evidence (higher prices) and indirect evidence (research demonstrating algorithmic pricing's anticompetitive effects) of harm to competition.

Rather than engage with Plaintiffs' new allegations or the relevant caselaw, Defendants instead again devote most of their brief to arguing that, to state a claim, Plaintiffs must allege that Operators used Rainmaker's algorithms in exactly the same way, at the same time, and hatched a conspiracy in a smoke-filled room. But that is not the law. Indeed, Defendants' brief is noteworthy for what it ignores—most noticeably, the *RealPage* action, where the court recently rejected precisely this argument.[10] Defendants' brief is also silent on two recent statements of interest submitted by the DOJ in the *RealPage* and *Yardi* actions, in which the DOJ likewise rejected most of the central arguments Defendants make here—including their claim that Plaintiffs must "identify some confidential information share among [operators], rather than shared with a common entity," in order to state a claim.[11] Instead, where "plaintiffs' allegations involve a conspiracy to *centralize* pricing decisions in a third-party algorithm, it is irrelevant to the scheme whether [competitors] share confidential information among themselves or only with the pricing agent; the alleged scheme is designed to obviate the need for competitors to share information directly with one another."[12] That is what Plaintiffs allege here.

## II.     BACKGROUND

Operators own and/or operate casino-hotels on the Las Vegas Strip. ¶¶ 30–34. Previously,

---

[8] *Am. Needle*, 560 U.S. at 195.
[9] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015).
[10] *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-MD-03071, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) ("*RealPage*").
[11] DOJ *Yardi* Statement of Interest at 7 n.4.
[12] *Id.* (emphasis in original).

1  Operators focused on maximizing occupancy—as expected in a competitive market—because

2  guests generate other sources of revenue through gaming. ¶¶ 48–51. But they have since delegated

3  their independent pricing and supply decisions to a shared revenue management system,

4  Rainmaker, designed to allow them to charge supracompetitive prices for rooms by "maximizing

5  profits" rather than "chasing after occupancy growth." ¶¶ 4, 51–56.

6      Rainmaker provides two integrated pricing algorithms to Operators: "GuestRev" and

7  "GroupRev." These algorithms gather real-time pricing and supply information, then generate

8  room-specific pricing recommendations using that data for individual rooms and group bookings,

9  respectively. ¶¶ 65–132. Rainmaker (and later Cendyn) have invited Operators to join its scheme

10  with advertising urging that they could expect to "[i]ncrease revenue by up to 12%" using

11  GuestRev (¶ 77) and "up to 8.4%" (or "in the range of 5-10%") using GroupRev (¶¶ 128, 130).

12  Rainmaker also emphasized that use of its platform would raise prices above those charged in a

13  market without its platform, counseling "revenue management discipline" (¶¶ 53, 64) and "the

14  importance of a disciplined group revenue solution" (¶ 197). Rainmaker emphasized "[s]hif[ing]

15  [operators'] focus from occupancy and rate to profitability" (¶¶ 53–55), a practice starkly at odds

16  with Las Vegas casinos' prior preference for "high resort occupancy over high ADR" (¶¶ 48–52).

17      Plaintiffs allege that each Operator gave its adherence to this scheme by entering into

18  agreements with Rainmaker to receive pricing recommendations from GuestRev and GroupRev.

19  ¶¶ 150–205. As part of those agreements, Operators gave rate and occupancy data to Rainmaker

20  on a continuous basis, which in turn generated pricing recommendations through GuestRev on a

21  continuous, automated basis. ¶¶ 71–127. Beginning in 2015, Rainmaker also acquired

22  RevCaster—a so-called "rate shopping tool" that monitors competitor pricing—and integrated it

23  into GuestRev's pricing recommendations to ensure the "most accurate market rate calculation,"

24  boasting at the time that Rainmaker was the "only revenue management solution suite that has an

25  integrated price comparison component for helping hoteliers maximize ADR and drive higher

26  profits." ¶¶ 68–70, 119, 125, 133–149. Rainmaker also advertised that GuestRev use gave users

27  "competitor insights," "making optimal pricing suggestions ... by detecting unexpected events or

28  demand patterns." ¶¶ 80–82. And it emphasized that the pricing algorithm at the hub of the

conspiracy utilizes machine learning, which in practical terms means that it continuously trains itself on the collective data provided by each Operator and, over time, steadily improves the profit-optimization recommendations that it in turn provides to each. ¶¶ 72, 84, 211, 258–265.

Plaintiffs allege many features of GuestRev that support an inference that these centralized pricing recommendations are implemented on a routine basis, including that (1) GuestRev is directly integrated with users' property management systems (¶¶ 92–94); (2) recommendations are produced on an automated, daily basis (¶ 100); (3) recommendations require manual override that is to be used "in times of need and extreme circumstance" (¶ 111); and (4) users must have specific override permissions in order to manually override the recommendations (¶ 110). Further, Plaintiffs identify statements from each of the Operators' employees, including senior executives, touting their success with—and reliance on—the GuestRev pricing algorithm and emphasizing its value, including its ability to help them "make better business decisions," "deliver the most customized pricing," and "maximize revenue at the end of the day." ¶¶ 13, 69, 154, 158, 161, 163, 166, 171, 178–81, 274. Rainmaker also publicly identified each Operator as a user of GuestRev and GroupRev from at least 2015 to 2021. *See, e.g.*, Appendices A, B.

Finally, Operators also knew others were participating in the scheme, and had scores of opportunities to conspire. For more than a decade, Rainmaker has prominently advertised its client lists, which include Operators, on its website, in industry publications, and in numerous press releases and testimonials. *See, e.g.*, ¶¶ 191–99 & Appendices A, B. Indeed, CW 4, a former Hard Rock executive, stated that Rainmaker "promoted the fact that they worked with other properties" and that Hard Rock "was aware that Rainmaker was also installed and implemented at other properties." ¶ 21. Meanwhile, Rainmaker senior executives (as well as Cendyn executives) have hosted untold conferences, events, and other meetings attended by Operators' employees at which Rainmaker use was discussed. *See generally* ¶¶ 270–321.

The effect of Defendants' scheme can be observed in preliminary economic analyses submitted with Plaintiffs' complaint, which show a clear elevation in Operators' pricing in approximately 2015, when GroupRev and RevCaster were implemented. ¶¶ 212–222. In other words, Defendants' scheme has succeeded: by jointly delegating decision making on price to

Rainmaker, Operators—through their collective discipline in prioritizing profit over occupancy—overcharge their guests for rooms on the Las Vegas Strip.

### III.   LEGAL STANDARD

A complaint need only include enough facts to give a defendant fair notice and state a plausible claim.[13] *Twombly* "does not impose a probability requirement at the pleading stage," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."[14] 10Congress drafted the antitrust laws to encourage private enforcement,11[15] and courts recognize that "[i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."1[16]

### IV.   ARGUMENT

**A.   Plaintiffs plausibly allege a per se horizontal agreement**

> **1.   Competitors' delegation of pricing decisions to a common pricing agent is concerted action that violates Section 1**

In Count I of their complaint, Plaintiffs allege that Rainmaker and Operators engaged in an illegal scheme to use Rainmaker's pricing algorithms to charge inflated prices for hotel rooms on the Las Vegas Strip. ¶¶ 351–360 ("horizontal agreement claim"). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy" that unreasonably restrains trade.[17] A claim under Section 1 has two elements: (1) a "contract, combination, or conspiracy"—i.e., "concerted action," which means the joining together of "independent centers of decisionmaking"; that (2) "unreasonably restrains trade."[18]

As the DOJ recently explained in *RealPage*, the "key" to a court's inquiry into concerted action is whether an arrangement "joins together separate decisionmakers" and thus "deprives the

---

[13] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[14] *Id.* at 556.

[15] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

[16] *In re Plasma–Derivative Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 n.10 (N.D. Ill. 2011).

[17] 15 U.S.C. § 1; *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984).

[18] *Am. Needle*, 560 U.S. at 195.

marketplace of independent centers of decisionmaking."[19] The joint delegation of competitive decisions constitutes concerted action under Section 1,[20] and a "combination" exists when there is an implied (or express) "understanding that the participants will jointly give up their trade freedom."[21] Ultimately, the relevant inquiry under Section 1 is whether "the challenged price-fixing scheme disrupted the competitive process."[22] And as the DOJ explained, even when courts look for an "agreement" among separate entities in analyzing concerted action, "[n]o formal agreement is necessary" under Section 1.[23] Instead, "[t]acit" agreements qualify,[24] which can involve merely a "wink and a nod"[25] or be an informal "gentlemen's agreement or understanding."[26] In these circumstances, "only the conspirators' actions ... indicate the existence of an agreement."[27] Indeed, it is not necessary for competitors to have ever communicated with one another about prices for a plaintiff to state a conspiracy claim.[28]

### 2. Plaintiffs allege "concerted action" in multiple ways

Plaintiffs can prove concerted action in two ways: through direct evidence or circumstantial evidence. Circumstantial evidence in turn takes many forms. One—the sole focus of Defendants' brief—is a traditional analysis of parallel conduct and plus factors. But the other, as emphasized by the DOJ in *RealPage*, is where "the evidence may disclose cooperative conduct among the defendants—such that a 'combination' of competitors joining together their decisionmaking can be inferred from their cooperative actions."[29]

---

[19] DOJ *RealPage* Statement of Interest at 5–7 (citing *Am. Needle*, 560 U.S. at 195 (citations omitted)).

[20] *Id.* at 5, 7 (citing, *inter alia*, *Am. Needle*, 560 U.S. at 204 ("decisions by [a joint licensing agent] regarding the [NFL] teams' separately owned intellectual property constitute concerted action" by the teams.); *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 309 (2d Cir. 2023) (allegations that competing entities "have 'surrendered [their] freedom of action ... and agreed to abide by the will of the association[]'" are "enough" for concerted action)).

[21] *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–37 (1961).

[22] DOJ *RealPage* Statement of Interest at 22 (collecting cases).

[23] *Id.* at 6 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946)).

[24] *Twombly*, 550 U.S. at 553.

[25] *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018).

[26] *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 252 (1940).

[27] *White v. R.M. Packer Co.*, 635 F.3d 571, 575–76 (1st Cir. 2011).

[28] DOJ *RealPage* Statement of Interest at 21 (collecting cases).

[29] *Id.* at 8.

As the Supreme Court explained in *Interstate*, "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act," holding that it was "enough that, knowing that concerted action was contemplated and invited, [defendants] gave their adherence to the scheme and participated in it."[30] Likewise, in *Masonite*, the Court held that the "circumstances surrounding the making of [bilateral agreements]," including that each competitor was "aware" that "its contract was not an isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking" sufficient to establish agreement.[31] It did not matter that "in negotiating and entering into the first agreements [defendants] ... acted independently of the others, negotiated only with [the hub defendant], desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that [the hub defendant] make such an agreement with any of the others, and had no discussions with any of the others;" instead, it was sufficient that "as the arrangement continued each became familiar with its purpose and scope."[32]

As the DOJ explains, "[t]his approach [is] distinct from the modern-day plus-factors analysis" because, "[i]nstead of looking to the sort of factors that would be termed 'plus factors' today, the Court [in *Interstate*] focused on the nature of the invitation (i.e., whether it contemplates concerted action) and competitors' responsive actions demonstrating acceptance of the invitation."[33] Consistent with this, in *PLS.com*, the Ninth Circuit recently determined that collusion was adequately alleged based on *Interstate* without parallel conduct and plus factor analysis, because invitation and acceptance was the required factual enhancement.[34] These precedents are equally relevant when the scheme in which competitors are invited to participate involves algorithmic pricing. In *Meyer v. Kalanick*, for example, the court denied Uber's motion to dismiss

---

[30] *Interstate Cir.*, 306 U.S. at 226–27; *see also PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022) (same).

[31] 316 U.S. 265, 275 (1942).

[32] *Masonite Corp.*, 316 U.S. at 274–75 (internal citations omitted).

[33] DOJ *RealPage* Statement of Interest at 8–14, 21.

[34] 32 F.4th at 843.

claims that it orchestrated a horizontal price-fixing agreement with its drivers where plaintiffs "plausibly alleged a conspiracy in which drivers sign up for Uber precisely on the understanding that the other drivers were agreeing to the same pricing algorithm."[35]

Defendants' brief does not once cite or acknowledge these authorities. And Plaintiffs' complaint includes detailed allegations of concerted action—i.e., that Operators were invited to (and did) "delegate" their "decisionmaking to a single entity." As discussed above, (1) Rainmaker "contemplated" and "invited" concerted action among Operators; (2) Operators gave their adherence to the scheme; (3) Operators jointly delegated their decisionmaking on price to Rainmaker; and (4) Operators knew others were participating in the scheme, i.e., "became familiar with its purpose and scope," regardless of when they first began using Rainmaker's products. *See supra* Section II. In other words, Plaintiffs plausibly allege that Rainmaker proposed a scheme of concerted action to Operators premised on joint adoption of a common pricing strategy, who were each aware that their competitors were also invited to participate. Then, Operators adhered to it— leading to a common understanding among competitors that they would, and in fact did, increase prices by using Rainmaker. This is concerted action. As the DOJ has explained, competitors' "delegation of decisionmaking to a common entity allows its decisions to affect actual or potential competition—even without any additional subsequent agreement or coordination among the parties[,]"[36] and thus violates Section 1.

### 3.    Plaintiffs allege parallel conduct and plus factors in the alternative

Alternatively, Plaintiffs allege concerted action in the form of parallel conduct and plus factors sufficient to "nudge[] their claims across the line from conceivable to plausible."[37] Defendants make two arguments about Plaintiffs' horizontal agreement claim: that (1) there are factual defects in Plaintiffs' complaint that prevent the Court from inferring an agreement; and (2) Plaintiffs' insufficiently allege parallel conduct and plus factors. These arguments fail.

---

[35] 174 F. Supp. 3d 817, 823–24 (S.D.N.Y. 2016) (citing *Interstate Cir.*, 306 U.S. at 226–27).
[36] DOJ *RealPage* Statement of Interest at 6; *see id.* at 5–6, 22 (collecting cases).
[37] *Twombly*, 550 U.S. at 557, 570.

1

### a.      Plaintiffs sufficiently allege an agreement among Operators

2    Defendants once again seek to limit Section 1's reach to a narrow category of cases: those

3    in which entities enter a formal agreement to engage in the same conduct at the same time. But

4    that is not the law. Specifically, Defendants argue:

5    **1.      That Plaintiffs do not allege which pricing algorithms Defendants use.**

6    Defendants abandon their argument that Plaintiffs insufficiently allege that each Operator used

7    GuestRev and GroupRev. *See* ECF No. 91 at 7–10. This is because Plaintiffs include detailed facts

8    in their complaint plausibly alleging that each Defendant used GuestRev and GroupRev during the

9    relevant period. ¶¶ 150–88 & Appendices A, B. Defendants move the goalposts and now argue

10   that, in addition to pleading that Operators all used GuestRev and GroupRev, Plaintiffs also must

11   allege either (a) the specific "criteria" that each used when using GuestRev[38] or (b) that all

12   Operators used the "same criteria," i.e., that Plaintiffs must plead the specific competitors whose

13   pricing was used as an input to GuestRev's price setting for each Operator. Mot. at 9.

14   Defendants' suggestion that they did not use the "same algorithm" if they selected different

15   "criteria" makes little sense, and has already been rejected. As *RealPage* recognized, it is not

16   necessary for each Operator to, for example, use the same competitors as inputs to pricing at each

17   hotel, or to use GuestRev and GroupRev in precisely the same way, for these products to have an

18   anticompetitive effect.[39] Instead, by using GuestRev and GroupRev—and by delegating their

19   pricing to a common decisionmaker—each Operator was able to recommend "higher prices than

20   a normally-functioning market could sustain" at its properties.[40] This is what Section 1 prohibits.

21   Indeed, GuestRev is nearly identical to the software at issue, in part, in *RealPage* (and was in fact

22   also designed by Rainmaker, *see* ¶¶ 327–29), which allows landlords to "review and comment on

23   their peer list," i.e., those competing landlords whose transaction data was used as an input to set

24

25   [38] GuestRev allows users to customize certain features, including which competitors' data is
26   "shopped" in GuestRev and the respective weight given to various' competitors' prices in
     automated price setting. ¶¶ 86, 97.
27   [39] *RealPage*, 2023 WL 9004806, at *19 (rejecting argument that plaintiffs were required to
     allege lessor defendants used same RealPage revenue management software or implemented the
     services in the same way).
28   [40] *Id.*

pricing, "and … even request that specific competitors are included on the list."[41] Ultimately, all Operators agreed to the same basic methodology, pricing individual rooms using GuestRev, and the same ultimate goal: delegating pricing decisions to Rainmaker, which—by recommending rates to Operators based largely on competitor prices—in turn "influence[d] … the starting point for prices" and disrupted the competitive process.[42]

       **2.**    **That Plaintiffs must plead Operators started using Rainmaker around the same time.** Defendants argue that, because Operators began using Rainmaker's products at various points over several years, and certain Operators were Rainmaker clients before 2015, it is implausible there could be any "agreement" between them. Mot. at 9–10.[43] Once again, this gets the facts wrong and misunderstands the law. Defendants' argument ignores the basis for Plaintiffs' claims of parallel conduct—which are not tied to each Operator's date of adoption of Rainmaker, but rather to their (1) parallel use of Rainmaker's products from 2015 onwards (the point at which Rainmaker released GroupRev and fully integrated competitor prices through RevCaster into GuestRev) and (2) parallel price increases, starting in 2015, that Operators implemented after Rainmaker introduced these new features. ¶¶ 221, 268–69.

       *RealPage* rejected a nearly identical argument, finding that plaintiffs "need not allege that Defendants simultaneously adopted this new pricing strategy for it to be considered parallel conduct,"[44] that it was sufficient they alleged "Defendants engaged in parallel conduct when they each became RealPage RMS clients and began prioritizing raising rent prices over decreasing vacancy rates,"[45] and that, in any event, "every year, each Lessor renews its license with RealPage, re-affirming its commitment."[46] The court emphasized the Supreme Court's holding in *Masonite* that horizontal competitors can join a conspiracy through vertical agreements, based on an eventual

---

[41] *Id.* at *17; *compare* ¶¶ 90–127.

[42] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016).

[43] Defendants argue that "subscribing to a Revenue Management Product is not the same as using the pricing algorithm within that product." Mot. at 9–10. This begs the question why Operators would subscribe to a product, pay for it, praise it, and attend events related to its use, but not use it. Plaintiffs plausibly allege that Operators "used" Rainmaker's algorithms.

[44] *RealPage*, 2023 WL 9004806, at *13 (citing *Interstate Cir.*, 306 U.S. at 227); *see id.* at *11.

[45] *Id.* at *13.

[46] *Id.* at *19.

1    awareness of the larger horizontal arrangement, even though "in negotiating and entering into the

2    first agreements [they] ... acted independently of the others, negotiated only with [the hub

3    defendant], desired the agreement regardless of the action that might be taken by any of the others,

4    did not require as a condition of its acceptance that [the hub defendant] make such an agreement

5    with any of the others, and had no discussions with any of the others."[47]

6            Similarly here, each year Operators make parallel decisions to share information with, and

7    delegate decision making on price to, an algorithm that they know is designed to enable

8    supracompetitive pricing by "maximizing profits" rather than "chasing after occupancy growth."

9    ¶¶ 4, 48–58, 64. Consequently, regardless of when each Operator began using Rainmaker's

10   products, what matters is their decision to begin *or* continue using them once they acquired

11   knowledge that their use of GuestRev and GroupRev was "part of a larger arrangement" that

12   entailed a "disciplined" (and fundamental) shift away from Operators' previous business model.

13   ¶¶ 50–53.[48] Under *Interstate*, plaintiffs sufficiently allege a hub-and-spoke conspiracy where they

14   plausibly plead the existence of (1) vertical agreements and (2) knowledge among horizontal

15   competitors that each was entering into the same vertical agreement.[49]

16           Defendants' claim that Plaintiffs fail to sufficiently allege when the conspiracy began (Mot.

17   at 10) fails for the same reason: Plaintiffs plausibly allege the conspiracy began in 2015 when

18   Rainmaker integrated competitor prices from RevCaster into GuestRev's pricing

19   recommendations and also launched GroupRev. Corroboratory economic analysis shows that is

20   when Operators' prices began to increase significantly faster than competitive benchmarks.

21   ¶¶ 212–22. This suffices under *Masonite* and *Interstate*: Plaintiffs allege parallel shifts in strategy,

22

23

24           [47] *Id.* at *13 (quoting *Masonite Corp.*, 316 U.S. at 274–75 (internal citations omitted)).

25           [48] *See also* ABA Model Jury Instructions in Civil Antitrust Cases at 13 (2d ed. 2016) ("A conspiracy may be formed without all parties coming to an agreement at the same time.").

26           [49] *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d
27   187, 244–45 (S.D.N.Y. 2019) (finding hub-and-spoke conspiracy sufficiently pled where defendants entered into vertical agreements with express knowledge that competitors were entering into similar agreements with hub); *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL
28   4448621, at *12 (S.D.N.Y. Sept. 23, 2022) (horizontal agreement could be inferred where plaintiff alleged defendants "knew[] that the others would be participating.").

and similar means of execution, that reflect parallel conduct indicative of an agreement.[50] *RealPage* rejected a nearly identical argument that "allegations of parallel changes to pricing strategy and parallel pricing" were "not evidence of parallel conduct," emphasizing that such allegations are indeed "evidence of parallel conduct" and that there was no requirement for plaintiffs to allege "close-in-time agreements as evidence of a horizontal conspiracy[.]"[51]

Defendants also argue that Plaintiffs "fail to plead facts suggesting that Hotel Operators subscribed to [Rainmaker's products] knowing that each other were also doing so." Mot. at 11–12. This is an incredible claim. Plaintiffs (1) allege untold conferences, events, and meetings dating back nearly two decades—many of them sponsored by Rainmaker—attended by various Operators' employees, and at which Rainmaker use was specifically discussed; (2) compile advertising in which Rainmaker broadcasts its customer list, and Operators' participation in particular, to the world, including in gaming industry-specific publications; (3) and document multiple revenue managers at Operators' hotel-casinos who used Rainmaker and worked at multiple Operators—consistent with the statements of CW 1, a former Rainmaker employee, who explained that "the whole hospitality world is so small, and the revenue managers move around from place to place, so everybody knew who was using our system" (¶¶ 203–204). It is not only plausible that each Operator began using (or continued using) Rainmaker knowing other Operators were doing so—it is implausible that they did not.[52]

---

[50] Although Defendants generally abandon their *Kendall* arguments, they still claim that *Kendall* requires alleging a *precise* start date to an alleged conspiracy. Mot. at 10. But courts reject this reading of *Kendall*. *See Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) (allegation that conspiracy was ongoing "for at least the past six years" sufficient to state claim); *see generally Don Copeland v. Energizer Holdings, Inc.*, 2024 WL 511224, at *4 (N.D. Cal. Feb. 9, 2024) (stating that it is not required for "antitrust plaintiffs" to "answer all of [the Kendall] questions to state a claim"). Nor did the court in *RealPage* require that plaintiffs identify a precise start date, instead crediting their claim, similar to Plaintiffs' here, that defendants changed their pricing strategy "around January 2016" "once a critical level of RealPage RMS adoption had been reached." *RealPage*, 2023 WL 9004806, at *10

[51] *Id.* at *11 (collecting cases).

[52] Defendants emphasize that Caesars subscribed to Rainmaker "years before any other Hotel Operator." Mot. at 12. This is a red herring. As *Masonite* and *RealPage* make clear, what matters is that, "as the arrangement continued" Caesars "became familiar with its purpose and scope." *Masonite*, 316 U.S. at 275. Plaintiffs plausibly allege it did.

**3.     That Plaintiffs must plead Operators are "required" to accept recommendations.** Defendants argue that, to state a claim under Section 1, Plaintiffs must allege that Defendants are required to accept Rainmaker's pricing recommendations 100% of the time. Mot. at 11. Plaintiffs respectfully submit that this is incorrect and that, instead, they plausibly allege Operators accepted Rainmaker's rates—or used them as a "starting point"—with sufficient frequency to disrupt the competitive process. This is prohibited by the Sherman Act.

Since Plaintiffs filed their initial complaint, both the *RealPage* court and the DOJ have rejected the argument Defendants make here. In *RealPage*, plaintiffs did "not allege that the RealPage pricing recommendations were in any way binding," and instead alleged that these recommendations were accepted between 80–90% of the time.[53] Defendants argued that the plaintiffs were required to allege that the defendants all "accepted RealPage's price recommendations 100% of the time."[54] The court disagreed, explaining (1) that defendants' payment of fees to RealPage for pricing recommendations "le[d] to the inference that Defendants intended to abide by those recommendations;" and (2) it was "baseless" to assume—as defendants urged—that "when [a] RMS Client Defendant departed from RealPage RMS's recommended price, it adopted a price consistent with ordinary market conditions."[55]

In its *RealPage* and *Yardi* statements of interest, the DOJ has likewise emphasized that, under Supreme Court precedent, horizontal price fixing is per se illegal even if fixed prices are non-mandatory, and even if a scheme does not actually succeed in raising prices, so long as the challenged conduct "disrupted the competitive process" through an agreement among defendants to use recommended prices "as a starting point."[56] As the DOJ explains, courts "have rejected attempts to impose minimum rates of adherence when assessing agreements to fix the starting point of pricing … reason[ing] that the fixed prices necessarily had some influence on the market— thus disrupting the competitive process—from the very fact that defendants bothered to fix prices

---

[53] *RealPage*, 2023 WL 9004806, at *2, 24.
[54] *Id.* at *11.
[55] *Id.* at *16, *35 & n.26.
[56] DOJ *RealPage* Statement of Interest at 22 (collecting cases); *see generally* DOJ *Yardi* Statement of Interest.

at all."[57] And as this Court recognized in *Alvarado*, "occasional[] depart[ures]" from a price fixing scheme "do[] not render the initial agreement unlawful nor diminish [its] effect[.]"[58]

Plaintiffs' allegations plausibly give rise to a similar presumption here that the competitive process was disrupted. Among other things, Plaintiffs have added specific new allegations:

- That Operators continue to pay for GuestRev, whose primary function is to make pricing recommendations based on competitor prices. ¶¶ 150–205.

- That each Operator's employees, including senior executives, have touted their success with—and reliance on—the GuestRev pricing algorithm. *See, e.g.*, ¶¶ 13, 69, 154, 158, 161, 163, 165-66, 171, 175-76, 178–81, 274.[59]

- That Rainmaker makes automation a core tenant of its products' function (¶¶ 80–127), and actively dissuades users from overriding price recommendations (¶¶ 8, 110–11).

- That preliminary economic analysis shows that, coinciding almost precisely with the release of RevCaster and GroupRev, Operators raised room prices in near lockstep to artificially high rates for a sustained period between 2015 and the present. ¶¶ 221, 268–69.

These allegations are sufficient to plausibly infer that Operators accept Rainmaker's rates, or use them as a "starting point," often enough that they "disrupted the competitive process." Further, given these facts, Defendants' protests—that Plaintiffs do not allege that Operators "ever adopted" a Rainmaker-suggested price (Mot. at 11), and that they in fact *never* accept Rainmaker's

---

[57] DOJ *Yardi* Statement of Interest at 5; *see id.* at 6 ("The same principle holds in cases involving joint delegation of pricing recommendations to a common algorithm. By altering the starting point of prices, such agreements among competitors are analogous to agreements to fix list prices—distorting the competitive pricing process that the per se rule protects.").

[58] *Alvarado v. W. Range Ass'n*, 2023 WL 4534624, at *7–8 (D. Nev. Mar. 21, 2023).

[59] For example, in a 2014 promotional video, Caesars' Vice President of Revenue Management explained that "we rely a lot on [Rainmaker's] system and information that the system produces to make better business decisions;" in a 2012 testimonial, the then CEO of Caesar's touted success following the introduction of GuestRev. ¶¶ 154, 158. In a 2016 advertisement, Wynn's Vice Present of Revenue Management and Analytics stated that Rainmaker had allowed Wynn to "deliver the most customized pricing," "helping us to be more successful through multiple economic cycles through this time period." ¶ 166. In a 2012 press release, Treasure Island's described GuestRev as a "great tool for user management" and praised its "capacity to factor in competitor rates and suggest optimal room rates to maximizer revenue" as "one of its best features. ¶ 171. The Senior Vice President of Revenue Optimization at the Cosmopolitan has repeatedly endorsed Rainmaker over the years, emphasizing the "level of continued success [GuestRev] has achieved over the years" (¶ 166) and describing Rainmaker as "an incredibly well respected revenue management technology [that] helps us maximize revenue at the end of the day" (¶ 178) and "absolutely a partner" (¶ 181). And CW 4, a former employee at the Hard Rock Hotel & Casino Las Vegas, stated that the Hard Rock automatically accepted some of Rainmaker's pricing recommendations. ¶¶ 175-76.

1  recommendations[60]—are both premature and implausible: it defies belief (and Plaintiffs' well-pled

2  allegations) that Operators would pay for Rainmaker's automated pricing services, and that their

3  employees would heap praise on them, if they did not use them. "[W]hether Plaintiffs' individual

4  [hotel room prices] were set pursuant [Rainmaker's] recommendations and, if not, whether those

5  [prices] were still inflated by the alleged conspiracy" is an issue "left to later stages of the

6  litigation."[61]

7        **4.**      **That Plaintiffs must allege Operators exchange confidential data through**

8  **Rainmaker.** Defendants argue that, to allege a conspiracy, Plaintiffs must allege that Operators

9  exchanged non-public information with one another through their use of the same algorithm. But

10  this argument dodges the core of Plaintiffs' allegations by ignoring the Sherman Act's prohibition

11  on competitors' joint delegation of competitive decisionmaking—here, decisionmaking on price—

12  to a single entity. In their complaint, Plaintiffs allege three key facts:

13  •   By using GuestRev, Operators received automated pricing recommendations that were
14      specifically based on matching competitors' prices compiled by RevCaster. ¶¶ 96–107, 113, 118–20, 123–26, 133–49.

15  •   That Rainmaker utilizes machine learning to train its algorithm, i.e., it continually trains itself
16      on voluminous non-public data collectively provided by Operators, and thus becomes "progressively smarter" in "perform[ing] complex computations that automatically evaluate market change," consistent with CW 1's (a former Rainmaker executive) statement that
17      Rainmaker "used data across all our customers for research." ¶ 259; *see generally* ¶¶ 257–65.

18  •   That Rainmaker advocated a fundamental "shift [in] focus from occupancy and rate to
19      profitability" (¶ 53) by, among other things, enabling "elasticity"-based pricing in GuestRev, which meant pricing recommendations were "more geared towards maximizing rooms revenue as opposed to filling rooms." ¶ 104; *see also* ¶¶ 4, 48–53, 311.

20        The sum of these allegations is that, rather than set prices independently, Operators

21  delegated their decisionmaking on price, and provided voluminous confidential information

22  regarding their pricing strategies to, a single "brain" that (1) continuously trained itself on

23  Operators' data; (2) made pricing recommendations based on competitor prices and (3) effected a

---

25      [60] Defendants cite their initial disclosures, in which they generally deny adopting Rainmaker's
26  rates, Mot. at 13, but make no attempt to reconcile those disclosures with these pre-litigation public statements that repeatedly trumpet the value and usefulness of Rainmaker's pricing recommendations. Defendants also misleadingly suggest they have produced "discovery" to
27  Plaintiffs, when in fact they have (with the exception of their initial disclosures) categorically refused to do so. *See* ECF Nos. 114, 126, 129.
28      [61] *RealPage*, 2023 WL 9004806, at *35.

1    basic shift in Operators' business model from maximizing occupancy to "maximizing rooms

2    revenue." ¶¶ 49–56.

3        Regardless of whether competitors used Rainmaker as a conduit for directly exchanging

4    confidential information, this type of delegation, which eliminated separate pricing decisions by

5    competing Operators, is forbidden. As the DOJ emphasized in *Yardi*, it would be "mistaken" to

6    argue "that plaintiffs must identify some confidential information shared among … defendants

7    rather than shared with a common entity" to state a claim because "[s]haring confidential pricing

8    information with a common pricing agent can be equivalent to sharing that information directly

9    with a competitors."[62] Instead where, as here, "plaintiffs' allegations involve a conspiracy to

10   *centralize* pricing decisions in a third-party algorithm, it is irrelevant to the scheme whether

11   [defendants] share confidential information among themselves or only with the pricing agent; the

12   alleged scheme is designed to obviate the need for competitors to share information directly with

13   each other."[63]

14       More broadly, Plaintiffs' allegations track squarely with academic and regulatory concerns

15   regarding algorithmic collusion. *See generally* ¶¶ 226–35. As former FTC chairman Maureen

16   Ohlhausen explained:

17       Imagine a group of competitors sub-contracting their pricing decisions to a
         common, outside agent that provides algorithmic pricing services. Each firm
18       communicates its pricing strategy to the vendor, and the vendor then programs its
         algorithm to reflect the firm's pricing strategy. But because the same outside vendor
19       now has confidential price strategy information from multiple competitors, it can
         program its algorithm to maximize industry-wide pricing. In effect, the firms
20       themselves don't directly share their pricing strategies, but that information still
         ends up in common hands, and that shared information is then used to maximize
21       market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and
         we even have an old fashioned term for it, the hub-and-spoke conspiracy. (¶ 234).
22

23   Plaintiffs' allegations closely mirror this scenario. Operators—though they do not share

24   confidential information directly with one another—(1) communicate their pricing strategy to

25   Rainmaker, which (2) has access to each Operator's confidential price strategy information, and

26   thus (3) is able to program its algorithm to maximize Operator revenues. The competitive concerns

27

28   ───────────────
     [62] DOJ *Yardi* Statement of Interest at 7 n.4 (emphasis in original).
     [63] *Id.*

Ohlhausen outlines are all the more plausible here because, as discussed above, Rainmaker utilizes machine learning to train its algorithm with voluminous non-public data collectively provided by Operators—data that makes it "progressively smarter" in "perform[ing] complex computations that automatically evaluate market change" and thus better able to facilitate collusive pricing. ¶ 259; *see generally* ¶¶ 257–65.

Finally, a comparison with *RealPage* is instructive. There, the court found most persuasive allegations that "[f]or each client … RealPage maintains a 'peer list' of that client's peers whose transaction data will be used as an input in RealPage's algorithm for that client's pricing," that "[p]eer lists explicitly state that the competitors listed will be used 'to determine the magnitude of a change in rent ...[,]'" and that landlords are "able to review and comment on their peer list, and … can even request that specific competitors are included on the list … RealPage then quickly pushes the non-public, daily, real-time data from those competitors' properties into an algorithm to influence RealPage's pricing decisions." It concluded: "In this way, each [landlord] consciously commits to using non-public data from its direct horizontal competitors to price its own units."[64]

While the competitor pricing data incorporated into GuestRev via RevCaster may be public, this is a distinction without a functional difference—indeed, it is noteworthy that Defendants make no serious attempt to distinguish this case from *RealPage*, given that nearly every factual allegation credited by the court finds a close analogue in Plaintiffs' complaint. Specifically, here (as in *RealPage*) Operators are (1) able to choose the competitors whose pricing is used to impact their own, as well as the "magnitude" of the change each should have on pricing (¶¶ 105–08, 118–20, 125–26, 137–38); (2) receive competitor pricing information is updated at least daily (¶¶ 120, 147); (3) are able to determine who among their competitors are also Rainmaker clients; (4) regularly engage directly with one another at events facilitated by Rainmaker; (5) are actively dissuaded (by Rainmaker) from overriding price recommendations; and (6) are aided by Rainmaker staff who meet regularly with Operators to provide "tactical and strategic consultation" (¶¶ 315–21).[65] And perhaps most critically, the intent and effect of both

---

[64] *RealPage*, 2023 WL 9004806, at *17.
[65] *Id.* at *16.

1  RealPage's rent-setting product and GuestRev are the same: RevCaster is intended to supplement

2  GuestRev by "helping hoteliers maximize [average daily rate] and drive higher profits." (¶ 69).

3        This delegation is prohibited under Section 1. "Agreeing to use a common pricing formula

4  is per se unlawful. And the collective delegation of pricing decisions to a common entity or agent

5  has been condemned as per se unlawful under Section 1. It makes no difference that prices are

6  fixed through joint use of an algorithm instead of by a person."[66]

7                   **b.**    **Plaintiffs allege parallel conduct**

8        The Court previously held that it could not infer parallel conduct because Plaintiffs had not

9  alleged "which precise software products Operators are using, or when any of them save Treasure

10 Island may have begun using any product now offered by Cendyn."[67] Plaintiffs now plausibly

11 allege that information. Plaintiffs provide extensive allegations, based on Rainmaker's own

12 advertisements in trade publications, that each Operator used GuestRev and GroupRev in parallel

13 from at least 2015 to 2021. Plaintiffs provide further confirmatory allegations that each Operator

14 used GuestRev, including numerous public statements from them praising its efficacy, as well as

15 statements from Operators' employees that note their usage of GuestRev as part of their job

16 responsibilities. Plaintiffs also provide allegations regarding when each Operator began using

17 Rainmaker, including two of the five Operators that implemented it in approximately 2014.

18 ¶¶ 150–82. Courts have found similar allegations sufficient to plead parallel conduct.[68]

19       Remarkably, Defendants generally do not address the exact type of allegations this Court

20 previously held would be indicative of parallel conduct. Instead, Defendants devote themselves to

21 a summary judgment-like dissection of the economic analysis in Plaintiffs' complaint, based on

22 which they argue that Plaintiffs do not allege parallel conduct. In any event, without the benefit of

23 discovery, Plaintiffs have formulated three separate, mutually corroboratory analyses—which

24 need only be plausible[69]—showing that Operators engaged in parallel pricing. *See* ¶¶ 212–222,

25

26    [66] DOJ *RealPage* Statement of Interest at 19–20 (collecting cases).

   [67] *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023).

27    [68] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017).

   [69] *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020) ("[A]

28 statistical analysis, like any other allegation, need only be plausible."); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019).

240.[70] These are: (1) an analysis showing that, beginning in 2015, Operators Treasure Island, Caesars, Wynn, and the Cosmopolitan raised prices at significantly higher rates than the Venetian, which has never used Rainmaker as a revenue management system (¶¶ 214–15); (2) analyses (using publicly available data) showing that, beginning in 2015, revenue per available room at Wynn, Caesars, the Cosmopolitan, and Treasure Island, generally outpaced that of the nationwide Casino Hotel Index (¶¶ 217–20); and (3) an analysis showing that, throughout the relevant period, Caesars, Wynn, Treasure Island, and the Cosmopolitan priced closely in sync with one another (¶ 240). Plaintiffs also tie their statistical and economic analysis of rising prices to other plausible allegations about the cartel—namely the integration of competitor pricing into GuestRev in 2015.[71]

Defendants offer a series of arguments about this data that misrepresent the law, misrepresent the underlying facts, or both—and that inadvertently confirm their claim that facts are indeed "stubborn things." Plaintiffs address these below.

**First**, Defendants argue that Plaintiffs' use of public quarterly room price data to construct their analyses "cannot establish parallel conduct as a matter of law," and make the incredible argument that, for Plaintiffs' analyses to carry any weight, they must plead specific room rates and occupancy levels at each of Operators' properties. Mot. at 14–15.[72] This is wrong as a matter of law.[73] As the Ninth Circuit recently explained, "[p]arallel pricing need not be identical so long as it is similar and reasonably contemporaneous"; it thus reversed a district court's finding of no parallel conduct at the motion to dismiss stage when plaintiffs had lacked sufficient evidence to

---

[70] Defendants argue that charts at paragraphs 213 and 222 are improper "group pleading" because they do not distinguish between defendant and non-defendant hotels. Mot. at 19–20. But Plaintiffs have provided these charts to show anticompetitive effects to the market as a whole from the usage of Rainmaker. Plaintiffs are not submitting them as evidence of parallel pricing.

[71] *Compare Musical Instruments*, 798 F.3d at 1197 ("Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors.") *with In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) ("Unlike the plaintiffs in *Musical Instruments* … Plaintiffs do not fail to connect the aggregate data to price increases; instead, they specifically allege that Defendants' conduct has caused ... prices to rise.").

[72] Defendants claim that "hotel occupancy levels increased" during the conspiracy (Mot. at 14–15), although provide no hotel-specific statistics. But Plaintiffs have provided specific allegations that total visitor traffic to Las Vegas was flat from 2015 to the present—making the large price increases Operators were able to implement during the period particularly remarkable. ¶ 221.

[73] *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) ("[P]arallel pricing does not require 'uniform prices,' and permits prices within an agreed upon range."); *In re Salmon*, 2021 WL 1109128, at *13 n.23 (S.D. Fla. Mar. 23, 2021) (collecting cases).

1    perform a statistical analysis of certain defendants' pricing.[74] Defendants' authorities are factually

2    inapposite—none of them involved statistical evidence of specific Defendants' pricing moving in

3    parallel over time in the relevant antitrust market.[75]

4        **Second**, Defendants argue that there was "no similarity … in the changes in average room

5    rates at different Operators" between 2015 and the present, and that changes in the average room

6    rates at different Operators "belie[] any inference of parallel conduct." Mot. at 15–16. This claim

7    is plainly contradicted by a separate analysis (which Defendants ignore) showing that Operators'

8    prices did in fact move closely in parallel during the class period. *See* ¶ 240. More importantly, the

9    chart at page 16 of Defendants' brief—which purports to show "changes in average room rates at

10   different Hotel Operators" between the start and end of the conspiracy—is misdirection because it

11   uses nominal prices at just two points in time (Q1 2015 and Q3 2023) without any attempt to

12   quantify the change in either percentage terms or on a quarterly basis. This analysis says nothing

13   about whether Defendants' relative prices moved in parallel over time.

14       **Third**, Defendants argue that Plaintiffs cannot allege parallel conduct because Operators

15   charge different rates and their "average quarterly price increases differed significantly." Mot. at

16   16, 18. This argument rests on the flawed premise that, to state a claim, Plaintiffs must allege

17   Operators conspired to fix room rates at the same price or exactly to the same extent.[76] But that is

18

19

20

21

22       [74] *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *1 (9th Cir. July 21, 2023).

23       [75] *See* Mot. at 14–15 (citing *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 131 (D.D.C. 2006) (plaintiffs provided affidavits that did "not reveal the prices at which defendants

24   were selling [products] to them or anyone"); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49 (9th Cir. 2022) (plaintiffs had sufficiently

25   alleged parallel conduct and "neither party disputes this finding on appeal"); *Musical Instruments*, 798 F.3d at 1197 (plaintiffs' allegations were based on industry-wide prices of "all guitars and guitar amplifiers" including products outside the relevant market, but did not include allegations

26   to the prices of defendants' products); *Oliver v. SD-3C LLC*, 2016 WL 5950345, at *7 (N.D. Cal. Sept. 30, 2016) (data was not limited to the relevant market, aggregated by year, and did not show

27   a difference between defendants' prices and that of non-defendants)).

         [76] *See supra* note 73 (collecting authorities holding that plaintiffs need not plead simultaneous

28   price increases or that price increases were identical).

1    not what Plaintiffs' claim; instead, they allege an agreement to fix rates at higher prices than a

2    normally-functioning market could sustain.[77] The court in *RealPage* rejected this argument.[78]

3        **Fourth**, Defendants argue that Plaintiffs' analyses should be simply "rejected" because

4    they are missing certain quarterly price data for some Operators (which does not appear to be

5    public). Mot. at 17. This argument is inconsistent with the Ninth Circuit's opinion in *Flextronics*

6    that plaintiffs sufficiently pled parallel conduct even when they lacked pricing from certain

7    defendants to perform a statistical analyses.[79] Here, the data that is available for Caesars and the

8    Cosmopolitan show that their price increases outpaced both the Venetian and the overall casino

9    price index beginning in 2015. Defendants also engage in factual disputes about how Plaintiffs

10   attributed certain price decreases (to the Venetian) and price increases (to the Tropicana) based on

11   gaps in the data during the COVID period. Mot. at 17. Defendants' assertions are wrong.[80] They

12   also ignore the fact that Plaintiffs' analysis in fact shows higher relative price increases among

13   Operators as compared with the Venetian (a non-Rainmaker benchmark) in the period between

14   2015–2019, i.e., the period for which Plaintiffs do not lack data. *Compare* ¶ 214 (2015–2023 price

15   increases) *with* ¶ 215 (2015–2019 price increases).

16       **Fifth**, Defendants argue that Plaintiffs' allegations of parallel conduct are undermined by

17   the fact that Operators' prices were "more correlated before the alleged conspiracy" than

18   afterwards. Mot. at 18 (citing ¶ 240). Defendants provide no statistical quantification to support

19   this assertion. Defendants also base this argument on a two year period (2013 to 2015) during

---

[77] Defendants' related argument that Treasure Island's revenue per available room "did not grow" during the conspiracy (Mot. at 19) ignores Plaintiffs' analysis that average quarter-on-quarter room price increases at Treasure Island outpaced those at non-conspirator the Venetian.

[78] *See RealPage*, 2023 WL 9004806, at *19.

[79] *Flextronics*, 2023 WL 4677017, at *1.

[80] Plaintiffs do not attribute a 100% price decrease to the Venetian in Q4 2020 for their analysis of Venetian prices. *See* Bershteyn Decl. Ex. A at 1 (Q4 2020 price change for Las Vegas Sands (Venetian/Palazzo) of -45%). Rather, in Q4 2020, the Venetian, which operates the hotel towers of the Palazzo and the Venetian, decided to temporarily close the Palazzo tower and raised prices for the Venetian tower—shifting all of its business to that tower. *See* https://vegasinc.lasvegassun. com/business/gaming/2020/dec/08/palazzo-temporarily-closes-hotel-rooms-citing-lock/. Therefore, Plaintiffs have calculated an average price change for the Venetian and the Palazzo (across the total capacity of those hotel towers) and then used that for purposes of their analysis of Venetian pricing. Plaintiffs also appropriately calculated a percentage change for the period they had data for the Tropicana (1Q21 to 2Q21) and did not calculate a change for the period for which data was missing (1Q20 to 1Q21).

1    which three of the four Operators with available data were already using GuestRev. What matters

2    is that Operators' prices rose in tandem starting in 2015 when competitor prices were fully

3    integrated into GuestRev.

4    **Sixth**, Defendants argue that the Venetian is an improper benchmark because it

5    experienced "greater increases" in nominal daily rates than other Operators. Mot. at 19. This

6    argument—which is premised on the chart at page 16 of Defendants' motion—is misleading (and

7    fundamentally incoherent) for the same reasons discussed above: Defendants' argument rests on

8    simply cherry picking prices in two quarters and taking the difference between them without any

9    inquiry into whether (or how much) relative prices changed over time. If credited, it would

10   conclude that a $50 increase on a $50 hotel room is equivalent to a $50 increase on a $500 hotel

11   room—even though one doubles the price, and the other only raises it 10%.[81]

12                    **c.    Plus factors are strongly indicative of an agreement**

13   Plus factors are factual context permitting "an inference of conspiracy [to] be

14   reasonable."[82] The complaint details numerous plus factors that courts recognize as supporting an

15   inference of an agreement.[83] Evaluated holistically, as the Supreme Court requires, these plus

16   factors strongly support the plausibility of the alleged horizontal agreement.[84]

17   **Action against self-interest**. In *Meyer*, the district court held that a horizontal agreement

18   was plausible where "drivers' agreements with Uber [to use its pricing algorithm] would be against

19   their own interests were they acting independently."[85] Here, Plaintiffs plausibly allege that it would

20   not make sense absent agreement for Operators to unilaterally raise room prices above market

21   rates, and sacrifice the maximization of occupancy. But by delegating their pricing to a single,

22   common pricing algorithm that (a) sets prices based on competitors' real time rates and (b) is

23

24   ───────────────

      [81] Defendants make other arguments related to (1) Plaintiffs' use of the St. Louis Federal
25   Reserve's "casino hotel price index" in certain of their charts and (2) the Venetian's use of a
      competing revenue management system. These arguments relate to the anticompetitive impact of
26   Defendants' conduct, rather than whether they engaged in parallel conduct—and are thus relevant
      only to Plaintiffs' rule of reason claim. Plaintiffs address them below. *See infra* Section IV.B.2.a.
         [82] *Flextronics*, 2023 WL 4677017, at *1.
27       [83] *Id.* at *2–4.
         [84] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).
28       [85] 174 F. Supp. 3d at 823–24.

continuously trained on Operators' data (including their confidential pricing strategies), Operators were able to inflate room prices without fear such a pricing strategy would be undercut by competitors.[86] As the DOJ explained in *Yardi*, this is forbidden under Section 1.[87]

Defendants protest that these allegations are insufficient because Operators began using Rainmaker's products before the conspiracy, and because hotels outside the Strip used Rainmaker's products as well. Mot. at 21–22. But as explained above, this argument (which was also rejected in *RealPage*) ignores that, each year, Operators make parallel decisions to share information with, and delegate decision making on price to, an algorithm that they know is designed to enable supracompetitive pricing by "maximizing profits" rather than "chasing after occupancy growth."[88] Thus, regardless of when each Operator began using Rainmaker's products, what matters is their decision to begin or continue using them once they acquired this knowledge, i.e., knowledge that their use of GuestRev and GroupRev was "part of a larger arrangement" that entailed a "disciplined" (and fundamental) shift away from Operators' previous business model.[89] Nor do Plaintiffs need, at this stage, to "disprove all possible reasons" for Defendants' actions to "plausibly plead the actions constituted actions against their unilateral interest ... ."[90] Instead, they "need only allege a conspiracy which is plausible in light of the competing explanations."[91]

**Market structure.** In *Flextronics*, the Ninth Circuit recognized that certain characteristics render a market conducive to collusion, including high barriers to entry, inelastic demand, and product interchangeability.[92] So too here. Plaintiffs allege that properties on the Strip cost more

---

[86] *Interstate Cir.*, 306 U.S. at 222 (affirming the finding of a horizontal conspiracy where absent agreement "there was risk of a substantial loss of the business.").

[87] DOJ *Yardi* Statement of Interest at 7 n.4.

[88] The fact that non-defendant hotels have endorsed Rainmaker says nothing about whether, or to what extent, Rainmaker has delivered those hotels comparable (i.e., supracompetitive) increases in profitability, which turns on factors such as which other hotels in the market also use Rainmaker. Indeed, it is plausible—in light of Rainmaker's own public statements—that the same anticompetitive dynamic alleged in Plaintiffs' complaint is present in other markets.

[89] *See Masonite Corp.*, 316 U.S. at 275.

[90] *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2022 WL 952896, at *5 (E.D. Pa. Mar. 30, 2022).

[91] *Plasma-Derivative*, 764 F. Supp. 2d at 1002.

[92] *Flextronics*, 2023 WL 4677017, at *4; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627–28 (7th Cir. 2010) ("industry structure that facilitates collusion constitutes supporting evidence of collusion").

1    than a billion dollars to acquire or open (¶ 253); that the Las Vegas Strip hotel market is highly

2    concentrated (¶ 254); that Operators control between 35–40% of the hotel rooms on the Strip there

3    (¶ 350); and that demand for hotel rooms on the strip is inelastic (¶ 255). Plaintiffs also include

4    detailed allegations that the Las Vegas Strip is a relevant antitrust market (¶¶ 345–50). These facts

5    make "the inference of conspiracy" … "more plausible."[93] Plaintiffs further respond to

6    Defendants' arguments related to market definition and market power below, in their discussion

7    of the rule of reason claim. *See infra* Section IV.B.2.b.(1).

8    **Exchange of competitively sensitive information.** Defendants protest that Plaintiffs do

9    not plausibly allege that each Operator ever received confidential information belonging to

10    another. Mot. at 24. But as explained above—and as the DOJ emphasized in *Yardi*—it would be

11    "mistaken" to "claim[] that plaintiffs must identify some confidential information shared among

12    the … defendants rather than shared with a common entity" to state a claim because "[s]haring

13    confidential pricing information with a common pricing agent can be equivalent to sharing that

14    information directly with a competitors."[94] Plaintiffs have alleged, in detail, that each Operator

15    (a) provided confidential information on pricing strategy to Rainmaker; and (b) that data was used

16    to continuously train Rainmaker's pricing algorithm, which then provided pricing

17    recommendations to each Operator to raise prices.

18    **Opportunities to collude.** Defendants devote just three sentences of their brief to the

19    extensive evidence of Operators' opportunities to collude (¶¶ 270–321), claiming that Plaintiffs

20    fail to plausibly allege that Operators "actually communicated or exchanged information" at these

21    many events. Mot. at 24–25. Defendants simply ignore more than 50 pages of well-pled allegations

22    in the complaint in which Plaintiffs detail the years of Rainmaker-sponsored user conferences, golf

23    invitations, events, and trade meetings, that were (a) attended by Operators' employees and

24    frequently based in Las Vegas (b) included *specific discussions* of Rainmaker use and (c) were

25    also accompanied by statements by Rainmaker employees urging "discipline" and a change in

26

27    [93] *See Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("[T]he possibility of
anticompetitive collusive practices is most realistic in concentrated industries.").

28    [94] DOJ *Yardi* Statement of Interest at 7 n.4 (emphasis in original).

1   business strategy, i.e., a shift in "focus from occupancy and rate to profitability. *See* ¶¶ 53, 192–

2   98, 270–321.

3   **Motive to conspire.** Defendants do not dispute Plaintiffs' well-pled allegations that the

4   Great Recession, which had deep (and lasting) effects on Strip revenues throughout the mid-2010s,

5   gave Operator Defendants a strong motive to inflate room prices. ¶¶ 243–252. And unlike in

6   *Musical Instruments*, Plaintiffs here allege specific "facts … suggesting that the defendants had an

7   incentive to manipulate prices"—namely the aftermath of the Great Recession.[95]

8   **Related government investigation.** Finally, Defendants argue that the *RealPage* litigation

9   (and related investigation into RealPage's conduct) is irrelevant here. But Defendants ignore the

10   key fact that a part of the software at issue in *RealPage* was developed by Rainmaker before being

11   sold to RealPage, and was described by Rainmaker executives as "appl[ying] to any industry that

12   has perishable inventory and data that you can access about supply and demand so you can

13   optimize profit" and "a pricing platform that relied on pricing of your competitors to figure out

14   what your price should be." ¶¶ 23, 327–29.

15   In sum, Plaintiffs' plus factors—considered together—provide the further factual

16   enhancement necessary to state a claim.[96] The Supreme Court instructs that the "character and

17   effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but

18   only by looking at it as a whole."[97] Thus, in *Flextronics*, the Ninth Circuit reversed the district

19   court's dismissal, because it had erred by "failing to consider the [] Complaint holistically."[98]

20   Considered together, Plaintiffs' parallel conduct and plus factors have nudged the horizontal

21   agreement claim "across the line from conceivable to plausible."[99]

22   ───────────────

23   [95] *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017).

[96] Defendants briefly argue that the rule of reason, rather than the per se rule, should apply to
Plaintiffs' horizontal agreement claim. Mot. at 24. Plaintiffs respectfully submit that per se
24   treatment is proper for the reasons set forth in the DOJ's *RealPage* Statement of Interest. *See* DOJ
Statement of Interest at 15–23. In any event, the Court need not resolve the issue now and can
25   revisit it (with the benefit of a full factual record) at summary judgment. *See, e.g., Reading Int'l,
Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 319 (S.D.N.Y. 2003).

26   [97] *Cont'l Ore*, 370 U.S. at 699.

[98] *Flextronics*, 2023 WL 4677017, at *2 (stating that "correct analysis" requires consideration
27   of "each purported plus factor in turn and cumulatively to determine whether [the plaintiff] has
alleged nonconclusory facts sufficient to state a claim under § 1.").

28   [99] *Twombley*, 550 U.S. at 570.

1

**B.      Plaintiffs plead a rule of reason claim based on a set of vertical agreements**

2         The Ninth Circuit has held that a "collection of purely vertical agreements" may

3  unreasonably restrain trade.47F[100] In Claim II, Plaintiffs plead a set of vertical agreements between

4  Operators and Rainmaker. Purely vertical agreements are analyzed under the rule of reason. To

5  prove a Section 1 violation under the rule of reason, a plaintiff must show (1) there was an

6  agreement, conspiracy, or combination between two or more entities; (2) the agreement was an

7  unreasonable restraint of trade; and (3) the restraint affected interstate commerce.[101]

8         **1.      The contracts between Operators and Rainmaker are agreements**

9         Plaintiffs plead sufficient facts to establish a set of vertical agreements between Rainmaker

10 and each of the Operators to use GuestRev, which was provided through a license to Rainmaker's

11 revenue management software. As discussed above, these allegations include statements from

12 employees of each Operator discussing their use of GuestRev, as well as public documents

13 identifying each Defendant as a user of GuestRev and GroupRev from at least 2015 to 2021.

14        Defendants do not dispute the existence of a contractual agreement between each Operator

15 and Rainmaker, and in fact state that "the only agreements plausibly alleged in the FAC are

16 software licenses." Mot. at 27. That alone is enough to establish the first element because, as the

17 Ninth Circuit held in *Paladin*, the existence of express contractual agreements satisfies the first

18 element of a Section 1 claim, regardless of whether the restraints are unreasonable under step two

19 of the analysis.[102] Similarly, in *Gilley II*, the Ninth Circuit held that a set of bilateral agreements

20 may constitute a "contract, combination, or conspiracy" provided they have an "illegal effect on

21 competition (when aggregated)."[103] *RealPage* also held that software licenses by which RealPage

22 provided its pricing software established vertical relationships between it and each defendant.[104]

23

24        [100] *Musical Instruments*, 798 F.3d at 1193 n.3.

25        [101] *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

26        [102] *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003) (signed
   written contracts were "express agreements" that "satisfy the first element of a § 1 claim" because
27 "[o]ur antitrust law is clear that a [Plaintiff] need not prove intent to control prices or destroy
   competition to demonstrate the element of "an agreement ... among two or more entities.").

28        [103] *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009).
          [104] *RealPage*, 2023 WL 9004806, at *9.

1    Defendants claim that "non-binding pricing suggestions are not restraints of trade." Mot.

2    at 27. But as the DOJ explained in the *Yardi* and *RealPage* actions, this argument ignores a long

3    line of cases holding that non-binding guidelines involving price or supply are unreasonable

4    restraints of trade.[105] For example, in *Nat'l Ass'n,* the Supreme Court held that "adherence to a

5    price schedule … is itself illegal under the Sherman Act … and the fact that no penalties are

6    imposed for deviations from the price schedule is not material."[106] Notably, many of these cases

7    involved restraints where pricing recommendations were disseminated in non-contractual

8    guidelines or handbooks, rather than the direct contractual agreement plausibly alleged here.[107]

9    Defendants do not discuss any of these cases. Instead, their principal cited authority

10   consists of two resale price maintenance cases decided during a period when such agreements

11   could constitute per se illegal vertical price fixing.[108] Resale price maintenance generally involves

12   a supplier using contractual agreement to ensure resellers of its products maintain certain prices.

13   The Supreme Court has since overruled this body of law, holding that resale price maintenance

14   agreements should be analyzed under the rule of reason.[109] However, during the period when such

15   agreements could constitute a per se illegal agreement, an essential element of this claim was that

16   the defendant/supplier used coercion to ensure adherence by resellers to the proposed resale

17   price.[110] In Defendants' cases, courts concluded that plaintiffs failed to establish the necessary

18   element of coercion for a vertical price fixing per se claim based on resale price maintenance.[111]

19

20   [105] DOJ *Yardi* Statement of Interest at 3–7 (collecting cases); DOJ *RealPage* Statement of
     Interest at 22–23 (same).

21   [106] *United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 489 (1950).

22   [107] *Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 488–89 (price schedules for realtor commissions
     prepared by real estate association with no penalties for deviation); *Norfolk Monument Co. v.
23   Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 703–04 (1969) (pamphlet from manufacturer sent
     to customers); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781–82 (1975) (county bar fee
     schedule).

24   [108] *See* Mot. at 27 (citing *Gen. Cinema Corp. v. Buena Vista Distribution Co.*, 681 F.2d 594
     (9th Cir. 1982) and *Acquaire v. Canada Dry Bottling Co. of New York*, 24 F.3d 401 (2d Cir. 1994)).

25   [109] *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

26   [110] *Gen. Cinema Corp.*, 681 F.2d at 597 ("Any claim of vertical price fixing must, therefore,
     demonstrate affirmative action that will induce customers to adhere to a uniform price rather than
     engage in price competition.").

27   [111] *Gen. Cinema Corp.*, 681 F.2d at 597 (supplier's actions were lawful because they contained
     "no element of coercion"); *Acquaire*, 24 F.3d at 410 (holding that defendant's "policy of requiring

28

These cases are inapplicable. Plaintiffs do not allege that Operators' agreements with Rainmaker constitute a form of resale price maintenance whereby Rainmaker seeks to maintain the price at which Operators resell goods from Rainmaker. And Defendants' other cases—which they cite for the claim that "[n]on-restrictive agreements fall outside the scope of Section 1" (Mot. at 26–27)—are even further afield.[112] There was no evidence in any that the challenged agreements provided a mechanism by which a centralized decisionmaker provided pricing guidelines or a pricing formula to multiple competitors in a relevant market, thus removing independent sources of decisionmaking by "jointly delegate[ing] key aspects of their pricing."[113]

## 2.   Plaintiffs allege the vertical agreements are unreasonable restraints of trade

Once the element of agreement has been satisfied, courts analyze rule of reason claims with a three-step burden-shifting framework. At the pleading stage, plaintiffs must only plausibly allege the first step: that a restraint has a substantial anticompetitive effect that harms consumers in the relevant market.[114] Plaintiffs "can establish a substantial anticompetitive effect" either "directly or indirectly."52F[115] To plead substantial anticompetitive effect *directly*, a plaintiff must provide plausible allegations "of actual detrimental effects [on competition] such as reduced output, increased prices, or decreased quality in the relevant market."53F[116] To plead substantial

---

its distributors to obtain retailers' signatures on pre-printed invoices that list … suggested wholesale prices" did not constitute the requisite coercion.).

[112] *See Newman v. Universal*, 813 F.2d 1519, 1522–23 (9th Cir. 1987) (agreements signed five years before conspiracy began could not have been affected by the conspiracy); *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 492 (6th Cir. 2021) (contractual term that simply allowed "one party to back out of a cooperative venture in view of changed business circumstances" did not unreasonably restraint trade); *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1023 (N.D. Cal. 2020) (agreement where one health insurer hired one third party to negotiate medical practitioner reimbursement restraints was not horizontal price fixing); *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 976 (9th Cir. 2008) ("ordinary sales contract" for price of credit card processing services provided by co-conspirator banks to defendant franchisor); *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1465 (9th Cir. 1986) (sales contracts between car manufacturer and vehicle transporters unrelated to car manufacturer's determination of price at which dealers would be compensated for repairs).

[113] DOJ *Yardi* Statement of Interest at 3.

[114] Courts recognize that steps two and three of the rule of reason's balancing test, which involve a balancing inquiry into a restraint's potential procompetitive rationales, are not properly resolved at the motion to dismiss stage, because "whether the alleged procompetitive benefits of [a challenged restraint] outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings." *PLS.Com*, 32 F.4th at 839.

[115] *PLS.Com*, 32 F.4th at 834 (internal citation and quotation omitted).

[116] *Id.*

---

anticompetitive effects *indirectly*, a plaintiff must provide plausible allegations that the defendant has market power and present "some evidence that the challenged restraint harms competition."54F[117] Plaintiffs allege both directly and indirectly that Operators' vertical agreements with Rainmaker have substantial anticompetitive effects.

**a.    Plaintiffs allege direct evidence of substantial anticompetitive effects from the vertical restraints**

Plaintiffs provide proof of actual detrimental effects on competition in the form of higher prices. These higher prices stem from the restraint on competition produced by the aggregate effect of the agreements. As discussed above, Plaintiffs provide detailed economic analyses plausibly demonstrating the anticompetitive effects of each agreement between Operator and Rainmaker.

**First**, Plaintiffs show that each Operator that entered a vertical agreement with Rainmaker had higher percentage-wise price increases in room prices from 2015 to 2023 as compared to the Venetian, a casino-hotel on the Strip that did not use Rainmaker's software. ¶¶ 214–15. Defendants argue that the Venetian is a flawed comparator because it uses a separate revenue management software platform. Mot. at 19. But as Plaintiffs allege in detail, it is the specific features of the GuestRev pricing algorithm—namely its explicit incorporation of competitor pricing and its prioritization of recommended prices that raise a user's prices to match that of competitors—that produce the discrete anticompetitive effect on competition from each vertical agreement, as well as the illegal effect on competition when aggregated. ¶¶ 80–127. Indeed, at the time of its acquisition of RevCaster in 2015, Rainmaker stated that GuestRev was the "only revenue management solution suite that has an integrated price comparison component for helping hoteliers maximize ADR and drive higher profits." ¶ 11.

**Second**, Plaintiffs show, using quantitative analysis, that the challenged vertical restraints had anticompetitive effects, both individually and in aggregate on the whole market. Plaintiffs show that room prices for the specific Operators, as well as for the entire relevant antitrust market (the Las Vegas Strip) increased at a significantly faster rate from 2015 to 2023 as compared to that of nationwide casino hotel prices, including both rooms and services. ¶¶ 216–222.

[117] *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023).

1  Defendants argue that Plaintiffs' "bias their statistics" in the price charts at paragraphs
2  216–22 by using the St. Louis Federal Reserve's "nationwide casino hotel price index" (hereafter
3  "Overall PPI")—which reflects all prices casino hotels charge for services and goods—rather than
4  a separate index measuring only room rates for casino-hotels nationwide ("Room PPI") that rose
5  more quickly than the Casino Hotel PPI. Mot. at 16-17. The problem with Defendants' argument
6  is that the Room PPI is measured based largely on prices of casino hotel rooms on both the Las
7  Vegas Strip and in Atlantic City—both markets where cases have been filed alleging
8  anticompetitive effects from the usage of Rainmaker.[118] Thus, using the Room PPI as a benchmark
9  for a "healthy" or "normal" market is in fact tantamount to comparing the conduct challenged here
10 to itself—the Room PPI itself shows the effect of Rainmaker's usage in the two major casino hotel
11 markets in the country. By contrast, while the Overall PPI is not immune from this contamination,
12 it is sufficiently aggregated with other proxies of hotel demand that it provides a conservative
13 reference point for observing the impact of the anticompetitive conduct on guestroom prices.

14  Plaintiffs' economic evidence of higher prices is also specifically linked to the challenged
15 restraint—namely the complete integration of competitor pricing into GuestRev in 2015. Until that
16 point, there was little difference between the Room and Overall PPIs. That is what one would
17 expect in a competitive market, because variation in demand for casino hotel services should
18 determine price levels for both hotel rooms and associated services.[119] After 2015, however, the
19 Room PPI rapidly outpaced the Overall PPI, i.e., room prices accelerated rapidly in a way that
20 other hotel goods and services did not. Remarkably, as shown in Plaintiffs' attached chart, this
21 same divergence after 2015 did not happen for non-casino hotels, where the room and overall
22 indexes continue to track each other. *See* Berman Decl. Ex. A. All of this is direct evidence that
23 the set of vertical agreements between Operators and Rainmaker—which provided pricing

24

25  [118] In a separate case pending in the District of New Jersey, plaintiffs allege that defendants
26 (generally the same Operators named here) engaged in a similar scheme to inflate prices in Atlantic City by using Rainmaker. *See* Consolidated Amended Class Action Complaint, *Cornish-Adebiyi v. Caesars Entertainment, Inc.*, No. 1:23-cv-02536, ECF No. 80 (Jan. 29, 2024).
27  [119] This is because both PPIs reflect the same demand conditions, i.e., casino hotel goers who
28 rent rooms in casino hotels are overwhelmingly the same customers who purchase other goods and services a casino offers.

1   recommendations for casino hotel rooms, but not for other casino hotel services—had an

2   anticompetitive effect on competition in the form of higher prices for hotel rooms, as compared to

3   other hotel services—even as demand for both remained the same.

4        Defendants also claim that Plaintiffs have "not plausibly alleged that any prices increases

5   were due to some restrictive feature of its agreement to license to the Revenue Management

6   Products." Mot. at 29. But Plaintiffs' complaint walks through, in extensive detail, how the

7   GuestRev algorithm, Rainmaker's core revenue management product, provides semi-automated

8   pricing recommendations that (1) explicitly incorporate competitor pricing and (2) provide pricing

9   recommendations that prioritize raising Operator's prices to match that of their competitors. *See*

10   *e.g.*, ¶¶ 96–105, 119–122. As set forth in detail in the complaint, GuestRev calculates a market

11   rate based on competitors' near real-time pricing. ¶¶ 96–97. GuestRev then compares the hotel

12   operator's room rates to the market rate and provides pricing recommendations that are ranked

13   with an "action index" (from 0 to 100) to categorize the amount of revenue opportunity available.

14   ¶ 124. In one example provided by Cendyn itself in a tutorial, the action index is set to 100 in a

15   situation where the Operator's room rate is $119 and the market rate is $144.35—the significant

16   revenue opportunity available from the pricing recommendation stems from the Operator raising

17   its pricing to match that of its competitors. ¶ 118. As discussed above, Plaintiffs have further

18   explained the many features of GuestRev that support an inference that the automated pricing

19   recommendations are regularly implemented, including that overrides are monitored (and

20   discouraged) and that users require special permission to perform overrides (¶¶ 92–94, 100, 110–

21   111, 122). These allegations support the plausible inference that the supracompetitive prices shown

22   in Plaintiffs' empirical analysis are caused by the centralized pricing recommendations (based on

23   competitor pricing) provided by Rainmaker through its vertical agreements with each Operator.

24        Defendants then claim (incredibly) that higher prices to consumers, in themselves, do not

25   sufficiently allege injury to competition. Mot. at 28.[120] But the Ninth Circuit, applying recent

26   ───────────────

27   [120] Defendants rely for this argument exclusively on a statement by the Ninth Circuit in *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012). That discussion of higher prices, however, was focused on a particular kind of tying arrangement where a company contractually

28   requires that a consumer purchase a tying product and a tied product together, and the higher price

Supreme Court precedent, has repeatedly held that "proof of actual detrimental effects on competition" includes "increased prices."[121] And Plaintiffs' economic evidence is not merely increased prices; it consists of multiple empirical analyses that show supracompetitive prices charged by Operators as compared to both a competitor hotel in the same market and to a nationwide benchmark price that reflects demand for casino hotels. Further, Defendants' primary cited authority on this point, *Brantley*, specifically recognized that "vertical agreements can … injure competition by facilitating horizontal collusion."[122] And as the Supreme Court explained in *Leegin*, whether a vertical agreement or set of vertical agreements is anticompetitive under the rule of reason because it facilitates horizontal collusion is a separate and independent question from whether it is also evidence of the existence of a horizontal cartel.[123] Here, regardless of whether the Court separately finds the existence of a horizontal agreement as pled in Claim I, the vertical agreements pled in Claim II are anticompetitive under the rule of reason because Plaintiffs have pled sufficient facts that the vertical agreements injure competition by facilitating horizontal collusion.

Consistent with this, courts strike down vertical restraints that facilitate horizontal collusion, regardless of whether there is a separately established horizontal agreement. In *Maleng*, the Ninth Circuit struck down a Washington state requirement that beer and wine manufacturers publicly post their wholesale prices, and then adhere to them for at least 30 days once posted.[124] The court held this requirement violated the Sherman Act, explaining that "such agreements to adhere to posted prices are anticompetitive because they are highly likely to facilitate horizontal collusion among market participants. When firms in a market are able to coordinate their pricing and production activities, they can increase their collective profits and reduce consumer welfare

---

is related to the fact that the consumer is purchasing multiple products. Specifically, in *Brantley*, consumers were required to purchase cable channels together rather than a la carte. *Id.* at 1201.

[121] *PLS.Com*, 32 F.4th at 834 (emphasis added); *Epic Games*, 67 F.4th at 983 (same).

[122] *Brantley*, 675 F.3d at 1198.

[123] *Leegin*, 551 U.S. at 893 ("To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate [a horizontal cartel], it … would need to be held unlawful under the rule of reason. This type of agreement may also be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.").

[124] *Costco Wholesale Corp v. Maleng*, 522 F.3d 874 (9th Cir. 2008).

1    by raising price and reducing output."[125] And it struck down this restraint even though no

2    horizontal conspiracy among beer and wine manufacturers was alleged, and even though the

3    restraint did not dictate the prices a manufacturer would post.

4           The vertical agreements here facilitate horizontal collusion because each Operator has

5    delegated a portion of its pricing decision-making to a central organizer, Rainmaker, which then

6    provides semi-automated pricing recommendations using a common algorithmic formula,

7    GuestRev, that are based on dampening price competition. Indeed, as documented in Plaintiffs'

8    complaint, GuestRev is specifically designed to produce coordinated pricing—GuestRev explicitly

9    factors in competitor pricing and prioritizes pricing recommendations where competitors can

10   realize "revenue opportunities" by raising prices to match those of their competitors. ¶¶ 90–127.

11          Defendants also mischaracterize Plaintiffs' statements at the prior hearing, claiming they

12   conceded a "single vertical agreement between Rainmaker and a client" would not be "actionable."

13   Mot. at 30. But Plaintiffs' counsel was discussing a vertical agreement between Rainmaker and a

14   "client" where "Rainmaker provides pricing recommendations to a casino that doesn't have any

15   competitors within 200 miles." Hearing Tr. at 30:9–15. The pricing recommendations provided

16   pursuant to such an agreement could not meaningfully be based on competitor pricing in the same

17   market—because there are no competitors in the same market. Such a vertical agreement thus

18   would not facilitate horizontal collusion.

19          But here, Plaintiffs plausibly allege that, through each vertical agreement, Rainmaker

20   provides pricing recommendations that are explicitly based on the pricing of competitors not just

21   in the same market but on the same street. Each vertical agreement has a discrete effect on

22   competition because it partially deprives the market of an independent center of decisionmaking,

23   as an Operator delegates a portion of its pricing to a centralized pricing formula that is based on

24   competitor prices. And, in the aggregate, those vertical agreements have an adverse effect on

25   competition because they result in multiple competitors each adopting the same pricing strategy,

26   provided through GuestRev, that is based on raising prices to match competitors rather than

27

28   ─────────────────
     [125] *Id.* at 896.

1    lowering prices to beat competitors. Thus, Plaintiffs have plausibly alleged direct evidence of

2    anticompetitive effects, in the form of elevated prices, caused by the dampening of price

3    competition—which results from the aggregate effect of Rainmaker's vertical agreements.

4                    **b.    Plaintiffs plausibly allege indirect evidence of harm to competition**

5            Plaintiffs can also allege substantial anticompetitive effects indirectly by showing that

6    Operators have market power and "some evidence that the challenged restraint harms

7    competition;" this "some evidence" inquiry "need not always be extensive or highly technical,"

8    and it is sufficient that the plaintiff prove the defendants' conduct "as a matter of economic theory,

9    harms competition."[126] Plaintiffs plausibly allege both that Operators possess market power in a

10   relevant market, and some evidence that the set of vertical agreements harms competition.

11                    **(1)    Plaintiffs have plausibly alleged market power**

12           Plaintiffs allege that the Las Vegas Strip Hotel market is a relevant antitrust market and

13   that Defendants possess market power in that market. ¶¶ 345–50. Although Defendants dispute the

14   proposed market and the existence of market power, their arguments are contrary to well-

15   established case law that market power and market definition are "essentially questions of fact"

16   that should generally not be resolved at the motion to dismiss stage.[127]

17           *First*, Defendants dispute the proposed market definition. Defendants claim Plaintiffs'

18   proposed market is too narrow because it fails to include non-Strip casino hotels, and attempt to

19   contort Plaintiffs' allegation that Strip hotels "may compete with other casino hotels nearby." Mot.

20   at 22 (quoting ¶ 347). But the question, in defining a relevant market, is not whether non-Strip

21   casino-hotels impose any competitive constraint on Strip casino-hotels, but instead whether that

22   constraint is sufficient to discipline their pricing—a quintessentially fact intensive inquiry.

23   Plaintiffs have provided well-pled allegations that Strip hotels were consistently able to charge

24

25           [126] *Epic Games*, 67 F.4th at 983–984.

26           [127] *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988) ("Our ... decisions
     establish that both market definition and market power are essentially questions of fact."); *see also*
27   *Las Vegas Sun v. Adelson*, 2020 WL 7029148, at *6 (D. Nev. Nov. 30, 2020); *Newcal Indus., Inv.
     v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (alleged relevant market survives scrutiny
28   under Rule 12(b)(6) "unless it is apparent from the face of the complaint that the alleged market
     suffers a fatal legal defect.").

1    more than 5% more than downtown hotels (¶ 213)—thus indicating that Plaintiffs' proposed

2    market definition satisfies the "small but significant nontransitory increase in price" ("SSNIP")

3    test.[128] Plaintiffs have also provided well-pled allegations regarding public recognition of the Strip

4    as a distinct market. *See* ¶¶ 346, 349. Defendants also claim that Plaintiffs' market is "too broad"

5    because it includes rooms sold at various price points. Mot. at 22–23. But the Ninth Circuit has

6    made clear that a relevant market is not made up of perfect substitutes but includes (a) "all

7    economic substitutes for the product" and (b) "the group or groups of sellers or producers who

8    have actual or potential ability to deprive each other of significant levels of business."42F[129] Courts

9    routinely reject identical arguments that price differences between products—even substantial

10   ones—"suffice to support the existence of two separate markets, as 'the scope of the relevant

11   market is not governed by the presence of a price differential between competing products.'"[130]

12          *Second*, Defendants assert that they lack market power because Operators' market shares

13   cannot be aggregated, arguing that the Ninth Circuit only permits an antitrust plaintiff to aggregate

14   defendants' market shares when alleging a "network of agreements that allow defendants to

15   coordinate" pricing. Mot. at 30. Defendants cite to *Gilley II* for this proposition, but Plaintiffs can

16   identify nothing in the case that supports Defendants' proposition. The quote Defendants stitch

17   together (a combination of both the district court's holding and the Ninth Circuit's discussion of

18   it) does not discuss market power at all. In fact, *Gilley II* nowhere mentions the term market share.

19   Rather, the portion of the case Defendants cite discusses whether plaintiffs had alleged that each

20   agreement at issue had a discrete effect on competition.[131] Here, as discussed above, Plaintiffs have

21   alleged that each agreement had a discrete effect on competition.

22

23          [128] *Epic Games*, 67 F.4th at 975. The test asks what would happen if a monopolist imposed a
     "small but significant nontransitory increase in price" ("SSNIP") in the market. If consumers still
24   stay in the market—despite the room price increase—then the market is properly defined. Here,
     consumers did not substitute downtown Las Vegas hotel rooms for rooms on the Las Vegas Strip
25   after Strip hotel prices rose more than 5% relative to downtown hotels.

          [129] *Newcal*, 513 F.3d at 1045.

26          [130] *Stubhub, Inc. v. Golden State Warriors, LLC*, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5,
     2015) (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th
27   Cir. 1975) and collecting cases).

          [131] *See William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 664–65 (9th Cir.
28   2009).

Moreover, the Ninth Circuit in *Twin City* specifically held that "it was proper for the district court to have aggregated [Defendant]'s contracts in the relevant market in order to assess the Sherman Act violations resulting from these contracts."[132] And in *Toys R' Us*, the Seventh Circuit found the defendants had market power based on the aggregation of agreements that covered "some 40% of the traditional toy market."[133] The leading antitrust treatise confirms that separate vertical agreements sharing a common element should be aggregated to evaluate their anticompetitive effect.[134] And in *RealPage*, the district court aggregated the market shares of each RealPage user for the purpose of evaluating the existence of market power.

*Third*, Defendants argue that market shares of between 35–40% are insufficient to allege market power. But many courts have rejected identical arguments and found that, in Section 1 cases, market shares as low as 24% can suffice to show market power—including the court in *RealPage*, which found alleged market shares between 25–50% sufficient to plead market power.[135] Indeed, in in Defendants' primary case, the Ninth Circuit went on to recognize a 44% market share as "sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing."[136] Plaintiffs allege market shares among Defendant Operators of 35–40%.[137] Moreover, Plaintiffs here have alleged barriers to entry far more significant than in *RealPage*—namely, that the cost of either acquiring or building a hotel on the Strip is in the billions of dollars, and that just

---

[132] *Twin City Sportservice, Inc. v. Charles Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir. 1982).

[133] *Toys "R" Us*, 221 F.3d at 937.

[134] Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 310 (Fourth & Fifth Editions 2018–2022) (stating that four contracts, each of which forecloses approximately 15 percent of the market, should be aggregated in considering their anticompetitive effect).

[135] *RealPage*, 2023 WL 9004806, at *29; *see also Twin City*, 676 F.2d at 1299 (affirming district court's finding of Section 1 liability where defendant controlled 24% of relevant market).

[136] *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Defendants' brief also misleadingly conflates monopolization cases under Section 2 of the Sherman Act, where courts generally require that defendants possess higher market share, with Section 1 cases, where lower market shares are generally found sufficient to establish market power.

[137] Plaintiffs note that co-conspirators also possess an additional cumulative market share of approximately 45%. Plaintiffs, in the complaint, have added specific allegations regarding each co-conspirator's usage of Rainmaker's pricing algorithms, including statements regarding MGM Mirage's (the predecessor of MGM Resorts) usage of Rainmaker in its Las Vegas hotels. ¶¶ 183–189. However, Plaintiffs have sufficiently pled market power regardless of whether co-conspirators' market shares are included.

---

1    one new hotel has been built since 2007. ¶ 253.

2    In sum, Plaintiffs sufficiently allege that Defendants possess market power in a relevant

3    antitrust market, particularly given the Ninth Circuit guidance that "[a]n antitrust complaint …

4    survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged

5    market suffers a fatal legal defect."[138]

6                  **(2)    Plaintiffs allege indirect evidence of harm to competition**

7    In addition to market power, Plaintiffs also plausibly allege that the vertical agreements

8    harm competition. This evidence "need not be highly technical," and it is sufficient that the

9    plaintiff prove the defendants' conduct "as a matter of economic theory, harms competition."[139]

10   Here, in addition to their empirical analysis and allegations regarding the specific mechanism by

11   which GuestRev provides pricing recommendations, Plaintiffs provide extensive allegations,

12   based on economic theory, that multiple competitors in a market using the same pricing algorithm

13   harms competition, including empirical studies that elevated prices are only observed when

14   multiple competitors use the same algorithm. ¶¶ 223–35.

15   As Doha Mekkhi, principal deputy assistant attorney general of the DOJ's antitrust

16   division, recently summarized: "where competitors adopt the same pricing algorithms, our concern

17   is only heightened. Several studies have shown that these algorithms can lead to tacit or express

18   collusion in the marketplace, potentially resulting in higher prices, or at minimum a softening of

19   competition." ¶ 214. In total, the combination of Defendants' market power, the nature of the

20   central pricing algorithm (including its explicit focus on using competitor prices), and this well-

21   established economic theory is sufficient to plausibly allege substantial anticompetitive effects

22   indirectly. Plaintiffs have sufficiently pled that the vertical agreements between Operators and

23   Rainmaker unreasonably restrain trade under the rule of reason.

24   **C.    Plaintiffs state a claim against Blackstone**

25   Plaintiffs provide specific, detailed allegations, supported by citations to Blackstone's

26   public statements, that Blackstone owned and operated the Cosmopolitan from 2014 to 2022. ¶ 33.

27

28   [138] *Newcal*, 513 F.3d at 1045.
     [139] *Epic*, 67 F.4th at 983–84.

1   Plaintiffs allege that the Cosmopolitan used GuestRev throughout that period, and identify
2   statements from Colleen Birch, a then revenue manager at the Cosmopolitan, discussing use of
3   GuestRev and praising its effectiveness in both 2015 and 2019. ¶¶ 69, 152, 178–81. Plaintiffs also
4   identify Rainmaker advertising materials identifying the Cosmopolitan as a GuestRev user from
5   at least 2015 through 2021. ¶¶ 178–82. Indeed, this Court has already found that a 2019 video from
6   Cendyn touting the "Cosmopolitan as a success story" supported a plausible inference "that the
7   Cosmopolitan used Rainmaker before MGM took over its operations" i.e. the period during which
8   Blackstone owned and operated the property.[140]

9       Blackstone moves for dismissal primarily on the basis of its repeated assertion that "the
10  Cosmopolitan is separate and distinct from the Blackstone entities." Blackstone Mot. at 1. But this
11  is contradicted by Plaintiffs' well-pled allegations. Plaintiffs allege, with reference to Blackstone's
12  public statements, that the Cosmopolitan was controlled by the Blackstone entities—specifically,
13  that it was owned by one Blackstone defendant (Blackstone Real Estate Partners) and operated by
14  another Blackstone defendant (Blackstone Inc.) from 2014 to 2022. ¶ 33. This is how Blackstone
15  described its ownership and control over the Cosmopolitan. In a 2021 press release, Blackstone
16  stated that Blackstone Real Estate Partners "had reached an agreement to sell" the Cosmopolitan
17  and that "since acquiring The Cosmopolitan in 2014, Blackstone, alongside a best-in-class
18  management team, transformed the resort … [and] implemented significant operational changes."
19  ¶ 33 n.9. In a 2018 video, senior Blackstone executives describe their control over the
20  Cosmopolitan's operation and tout the "operational efficiencies" they brought to its management.
21  ¶ *Id.* n.10.

22      Blackstone relies on *U.S. v. Bestfoods* for the principle that an "alleged owner or investor
23  in a company is not liable for alleged acts of the company." Blackstone Mot. at 8. But in that case,
24  the Supreme Court held that "a corporate parent that actively participated in, and exercised control
25  over, the operations of the facility itself may be held directly liable in its own right as an operator
26  of the facility."[141] This is what happened here. Plaintiffs allege that Blackstone Inc. operated the

27
28
_____

[140] *Gibson v. MGM Resorts Int'l*, 2023 WL 7026984, at *3 (D. Nev. Oct. 24, 2023).
[141] *United States v. Bestfoods*, 524 U.S. 51, 55 (1998).

1   Cosmopolitan during the period when it used GuestRev and GroupRev. Blackstone thus may be

2   held liable as an operator of the Cosmopolitan for its use of Rainmaker software. The same

3   principle has been repeatedly applied in antitrust cases to hold parent companies liable for actions

4   of affiliates that they controlled and directed.[142]

5       Blackstone also attempts to distance itself from the actions of the Cosmopolitan's

6   personnel and revenue management team, stating that the "Cosmopolitan had its own personnel

7   and management team, with duties relating to revenue management." Blackstone Mot. at 2. But a

8   corporation cannot evade liability under the Sherman Act for actions of its employees: the "breadth

9   and critical character of the public interests protected by the Sherman Act … support a construction

10  holding business organizations accountable, as a general rule, for violations of the Act by their

11  employees in the course of their business."[143] Plaintiffs identify specific Cosmopolitan employees,

12  during the period the Cosmopolitan was owned and operated by Blackstone, who publicly

13  discussed their use of GuestRev and the value of its pricing recommendations.

14      Plaintiffs have provided allegations "sufficient to plausibly suggest that" the

15  Cosmopolitan, during the period it was owned and operated by Blackstone, "use[d] the Rainmaker

16  software."[144] Blackstone's motion should be denied because the Blackstone entities, through their

17  ownership and operation of the Cosmopolitan during the period that it used the Rainmaker

18  software, "actively participated" in the alleged conspiracy.[145]

19                          **V.    CONCLUSION**

20      For the reasons set forth above, Defendants' motions should be denied in whole. However,

21  Plaintiffs respectfully request that, if the Court grants Defendants' motions in whole or in part, it

22  provide Plaintiffs with 21 days to file a motion for leave to amend pursuant to Local Rule 15-1.

23

24      [142] *Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2016 WL 160263, at *5 (D. Md. Jan.
        14, 2016) (plaintiff adequately alleged participation where defendant was "a parent company,
25      controlling or directing the anticompetitive conduct" of its affiliates); *Nobody in Particular
        Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004)
26      (same).
        [143] *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1005 (9th Cir. 1972) (corporation was
27      liable for agent's participation in conspiracy despite its antitrust compliance policy).
        [144] *Gibson*, 2023 WL 7026984, at *3.
28      [145] *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119 (9th Cir. 2022) (citations omitted).

DATED:  March 6, 2024                        Respectfully submitted,

                                             HAGENS BERMAN SOBOL SHAPIRO LLP

                                             By: */s/ Steve W. Berman*
                                                    Steve W. Berman (*pro hac vice*)
                                             Stephanie A. Verdoia (*pro hac vice*)
                                             Ted Wojcik (*pro hac vice* forthcoming)
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1301 Second Avenue, Suite 2000
                                             Seattle, WA 98101
                                             Telephone: (206) 623-7292
                                             Facsimile:  (206) 623-0594
                                             steve@hbsslaw.com
                                             stephaniev@hbsslaw.com
                                             tedw@hbsslaw.com

                                             Rio S. Pierce (*pro hac vice*)
                                             Abby R. Wolf (*pro hac vice*)
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             715 Hearst Avenue, Suite 300
                                             Berkeley, CA 94710
                                             Telephone: (510) 725-3000
                                             Facsimile:  (510) 725-3001
                                             riop@hbsslaw.com
                                             abbyw@hbsslaw.com

                                             Rahul Ravipudi (NV Bar No. 14750)
                                             Adam Ellis (NV Bar No. 14514)
                                             Ian P. Samson (NV Bar No. 15089)
                                             PANISH SHEA BOYLE RAVIPUDI LLP
                                             300 S. 4th Street, Suite 710
                                             Las Vegas, NV 89101
                                             Telephone: (702) 560-5520
                                             Facsimile:  (702) 975-2515
                                             rravipudi@psblaw.com
                                             aellis@psblaw.com
                                             isamson@psblaw.com

                                             Brian J. Panish (NV Bar No. 16123)
                                             PANISH SHEA BOYLE RAVIPUDI LLP
                                             11111 Santa Monica Blvd., Suite 700
                                             Los Angeles, CA 90025
                                             Telephone: (310) 477-1700
                                             Facsimile:  (310) 477-1699
                                             panish@psbrlaw.com

                                             *Counsel for Plaintiffs and the Proposed Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED:  March 6, 2024

_/s/ Steve W. Berman_
Steve W. Berman