1  Adam Hosmer-Henner (NSBN 12779)
   Chelsea Latino (NSBN 14227)
2  Jane Susskind (NSBN 15099)
   **McDONALD CARANO LLP**
3  100 West Liberty Street, Tenth Floor
   Reno, Nevada 89501
4  (775) 788-2000
   ahosmerhenner@mcdonaldcarano.com
5  clatino@mcdonaldcarano.com
   jsusskind@mcdonaldcarano.com
6
   Boris Bershteyn (*pro hac vice*)
7  Ken Schwartz (*pro hac vice*)
   Michael Menitove (*pro hac vice*)
8  Sam Auld (*pro hac vice*)
   **SKADDEN, ARPS, SLATE, MEAGHER &**
9  **FLOM LLP**
   One Manhattan West
10 New York, New York 10001
   (212) 735-3000
11 Boris.Bershteyn@skadden.com
   Ken.Schwartz@skadden.com
12 Michael.Menitove@skadden.com
   Sam.Auld@skadden.com
13
   *Attorneys for Defendant*
14 *Caesars Entertainment, Inc.*

15 [*Additional counsel listed on*
   *Signature Page*]
16

J. Colby Williams (NSBN 5549)
**CAMPBELL & WILLIAMS**
710 South 7th St
Las Vegas, Nevada 89101
(702) 382-5222
jcw@cwalawlv.com

Sadik Huseny (*pro hac vice*)
Brendan McShane (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
sadik.huseny@lw.com
brendan.mcshane@lw.com

Anna M. Rathbun (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh St, NW Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
anna.rathbun@lw.com
chris.brown@lw.com

*Attorneys for Defendant*
*Cendyn Group LLC*

17                    **UNITED STATES DISTRICT COURT**

18                         **DISTRICT OF NEVADA**

19 RICHARD GIBSON, and ROBERTO MANZO,          Case No. 2:23-cv-00140-MMD-DJA

20              Plaintiffs,

21       v.                                     **REPLY MEMORANDUM OF LAW IN**
                                                **SUPPORT OF DEFENDANTS' JOINT**
22 CENDYN GROUP, LLC, THE RAINMAKER            **MOTION TO DISMISS THE FIRST**
   GROUP UNLIMITED, INC., CAESARS             **AMENDED CLASS COMPLAINT WITH**
23 ENTERTAINMENT INC., TREASURE               **PREJUDICE**
   ISLAND, LLC, WYNN RESORTS HOLDINGS,
24 LLC, BLACKSTONE, INC., BLACKSTONE          **ORAL ARGUMENT REQUESTED**
   REAL ESTATE PARTNERS VII L.P., JC
25 HOSPITALITY, LLC,
26
27              Defendants.

28

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 2

I.      COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT ALLEGE A HORIZONTAL AGREEMENT AMONG HOTEL OPERATORS ............................................................................................. 2

     A.    Plaintiffs Fail To Remedy Their Previous Errors ...................................... 2

          1.    Plaintiffs Fail To Fix Four Fatal Defects in Their Initial Complaint ....................................................................... 2

          2.    The Court Should Again Reject Plaintiffs' Misreading of *Interstate Circuit* .................................................... 6

     B.    The Opposition Confirms That Plaintiffs' "New" Allegations Fail To Plead Parallel Conduct and Plus Factors .................................. 8

          1.    The FAC Fails To Allege Parallel Conduct.................................. 8

          2.    Plaintiffs' "Plus Factors" Remain Irrelevant and Insufficient To State a Claim........................................... 11

II.     COUNT II SHOULD BE DISMISSED BECAUSE LICENSING REVENUE MANAGEMENT PRODUCTS DOES NOT VIOLATE THE SHERMAN ACT ............................................................................... 13

     A.    The Vertical Software License Agreements Do Not Restrain Trade ........ 13

     B.    Plaintiffs' Proposed Market Is Implausible ............................................. 14

     C.    The FAC Lacks Well-Pleaded Allegations of Anticompetitive Effects .... 15

          1.    "Higher Prices" Are Not Direct Evidence of Anticompetitive Effects................................................................ 15

          2.    Plaintiffs' Indirect Evidence of Anticompetitive Effects Also Fails ................................................................... 16

CONCLUSION.................................................................................................................... 17

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**                                                                                                      **PAGE(S)**

3

*Alaska v. Federal Subsistence Board*,
    544 F.3d 1089 (9th Cir. 2008) ...................................................................................... 3

4

5

*In re Amazon.com, Inc. eBook Antitrust Litigation*,
    No. 21-CV-00351 (GHW), 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ........................... 17

6

*Bay Area Surgical Management LLC v. Aetna Life Insurance Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ............................................................................ 4

7

8

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013) ............................................................................ 16

9

*Calvillo v. Experian Information Solutions, Inc.*,
    No. 19-CV-00277 (RFB), 2020 WL 1549574 (D. Nev. Apr. 1, 2020) ......................... 9, 10

10

11

*Castellanos v. City of Reno*,
    No. 19-CV-00693 (MMD), 2024 WL 229669 (D. Nev. Jan. 22, 2024) .............................. 2

12

13

*Dearaujo v. PNC Bank, National Ass'n*,
    No. 12-CV-00981 (MMD), 2012 WL 5818131 (D. Nev. Nov. 15, 2012) ......................... 17

14

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*,
    28 F.4th 42 (9th Cir. 2022) ............................................................................................ 10

15

16

*Flextronics International USA, Inc. v. Panasonic Holdings Corp.*,
    No. 22-15231, 2023 WL 4677017 (9th Cir. July 21, 2023) ............................................ 12

17

18

*In re German Automotive Manufacturer Antitrust Litigation*,
    612 F. Supp. 3d 967 (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th
    Cir. Oct. 26, 2021) ........................................................................................................ 15

19

20

*Gibson v. MGM Resorts International*,
    No. 23-CV-00140 (MMD), 2023 WL 7025996 (D. Nev. Oct. 24, 2023) ...............................
    ......................................................................................1, 2, 3, 4, 5, 6, 8, 11, 13, 17

21

22

*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975) ..................................................................................................... 14

23

24

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ....................................................................................... 15

25

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010) ............................................................................................ 7

26

27

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939) ..................................................................................................... 6, 7

28

*Kelsey K. v. NFL Enterprises, LLC*,
   254 F. Supp. 3d 1140 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018)...........9, 11

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ..............................................................................4

*Meyer v. Kalanick*,
   174 F. Supp. 3d 817 (S.D.N.Y. 2016)......................................................11, 12

*In re Musical Instruments & Equipment Antitrust Litigation*,
   798 F.3d 1186 (9th Cir. 2015) .........................................3, 8, 10, 12, 13, 16

*Newcal Industries, Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................................17

*Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*,
   394 U.S. 700 (1969)..............................................................................................14

*PLS.Com, LLC v. National Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .................................................................................7

*Quintero v. Palmer*,
   No. 13-CV-00008 (MMD), 2017 WL 2909712 (D. Nev. July 7, 2017)...............................3

*Ralph C. Wilson Industries v. American Broadcasting Cos.*,
   598 F. Supp. 694 (N.D. Cal. 1984), *aff'd sub nom. Ralph C. Wilson Industries v. Chronicle Broadcasting Co.*, 794 F.2d 1359 (9th Cir. 1986)..............................................16

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
   No. 23-MD-03071, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) .....................................
   ............................................................................1, 3, 4, 5, 6, 7, 8, 9, 12, 13, 14

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ..............................................................................16

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004).................................................................................................3

*In re Text Messaging Antitrust Litigation*,
   630 F.3d 622 (7th Cir. 2010)..............................................................................12

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ..............................................................................12

*Toys "R" Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000)..............................................................................16

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) ...........................................................................16

*United States v. National Ass'n of Real Estate Boards*,
    339 U.S. 485 (1950)........................................................................................................ 14

**PRELIMINARY STATEMENT**

Plaintiffs' opposition (ECF No. 167 ("Opp.")) confirms that the FAC should be dismissed with prejudice because it admits that plaintiffs lack any cure for the "fatal" defects this Court had identified in their initial complaint. *Gibson v. MGM Resorts Int'l*, No. 23-CV-00140 (MMD), 2023 WL 7025996, at *3 (D. Nev. Oct. 24, 2023). Instead, plaintiffs resort to baselessly seeking reconsideration of this Court's well-reasoned order—wrongly asserting it "misunderstands the law." (Opp. 11.) This Court should adhere to its sound analysis and dismiss this case for good.[1]

First, Count I should be dismissed because plaintiffs do not dispute that the FAC fails to allege the four facts that this Court held were necessary to infer an agreement among Hotel Operators. Rather, plaintiffs improperly ask this Court to overturn its own analysis in favor of *In re RealPage, Inc., Rental Software Antitrust Litig.*, No. 23-MD-03071, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023), and the Department of Justice's statements of interest in *RealPage* and *Duffy v. Yardi Systems*, 23-CV-01391 (W.D. Wash.). Not only are those inapposite sources not binding on this Court, but their allegations spotlight "critical difference[s]" that—according to *RealPage*— "destroy[] the analogy" to this case. 2023 WL 9004806, at *17. Indeed, unlike the allegations in *RealPage*, plaintiffs here finally admit that "the competitor pricing data incorporated into GuestRev [is] public" (Opp. 18), confirming the merits of this Court's earlier dismissal.

Plaintiffs also confirm that their statistics fail to allege parallel conduct suggestive of a conspiracy because they do not dispute that, according to those statistics, Hotel Operators' prices did not change relative to other hotels. Plaintiffs' "plus factors" are just as deficient as their initial effort and plaintiffs do not distinguish Ninth Circuit decisions that have rejected them.

Second, Count II should be dismissed because plaintiffs cannot plead any element of their "rule of reason" claim. Plaintiffs fail to explain how the challenged software licenses restrain trade. In addition, they essentially concede that they do not allege a plausible relevant market because they fail to dispute that guests do not view Hotel Operators' rooms as substitutes. Plaintiffs also cannot show that Hotel Operators had market power or that licensing the Revenue Management Products' use of "public" competitor data produced any anticompetitive harm.

---

[1] Capitalized terms not defined here have the meanings in defendants' moving brief. (ECF No. 160 ("Mot.").) All internal brackets, citations, and quotations are omitted unless otherwise noted.

1

**ARGUMENT**

2   **I.   COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT ALLEGE A HORIZONTAL AGREEMENT AMONG HOTEL OPERATORS**

3

4        Plaintiffs fail to plausibly allege an agreement among Hotel Operators because plaintiffs

5   (A) concede they did not fix their previous errors and (B) abandon most of their statistics, while the

6   few that remain do not plead parallel conduct, much less parallel conduct supported by plus factors.

7        **A.   Plaintiffs Fail To Remedy Their Previous Errors**

8        Plaintiffs effectively admit they failed to fix the four fatal defects this Court identified in

9   their initial complaint and instead improperly relitigate this Court's rulings that (1) all four missing

10  facts are necessary to allege an agreement, and (2) mere awareness that other hotels subscribe to

11  the same Revenue Management Products is not enough to plead an agreement among subscribers.

12             1.   Plaintiffs Fail To Fix Four Fatal Defects in Their Initial Complaint

13       Plaintiffs do not dispute that the FAC fails to allege Hotel Operators (1) began using the

14  "same pricing algorithm," (2) "around the same time," (3) were "required" to accept the Revenue

15  Management Products' pricing suggestions, and (4) that those products used competitors' "non-

16  public information" to suggest prices to subscribers. *Gibson*, 2023 WL 7025996, at *2-6. Instead,

17  plaintiffs argue that this Court "misunderstands the law" by requiring them to allege those facts

18  because "*RealPage* [and the DOJ statements of interest in *RealPage* and *Yardi*] recognized" they

19  are "not necessary." (Opp. 10, 11, 14.) This Court can "disregard[] all of these arguments on these

20  already resolved issues" because plaintiffs are merely relitigating the Court's order. *Castellanos v.*

21  *City of Reno*, No. 19-CV-00693 (MMD), 2024 WL 229669, at *3 (D. Nev. Jan. 22, 2024) (Du,

22  C.J.). And "[t]he proper vehicle for [p]laintiffs' challenge to the Court's prior rulings" is only

23  through "a motion for reconsideration" under "LR IC 2-2." *Id.* at *3 n.10. Having already been

24  admonished by this Court "to review the Court's Local Rules," *Gibson*, 2023 WL 7025996, at *7

25  n.6, plaintiffs' counsel flout those rules once again.

26       Moreover, this Court has no reason to reconsider its order because, rather than identifying

27  "new[] . . . evidence," "clear error," or an "intervening change in controlling law," *Castellanos*,

28  2024 WL 229669, at *3 n.10, plaintiffs point to only *RealPage* and the DOJ's statements of interest

in *RealPage* and *Yardi* (Opp. 11-14).  But those sources are not binding on this Court.  *See*
*Quintero v. Palmer*, No. 13-CV-00008 (MMD), 2017 WL 2909712, at *2 (D. Nev. July 7, 2017)
(Du, J.) (rejecting reconsideration based on district court opinion); *see also Republic of Austria v.*
*Altmann*, 541 U.S. 677, 701 (2004) (agencies' views on litigation "merit no special deference");
*accord Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008).

Regardless, the dispositive differences between the allegations in *RealPage/Yardi* and the
FAC as to all four defects in plaintiffs' pleading only validate the Court's dismissal:

**Not the same algorithms.**  Plaintiffs argue they need not allege "all Hotel Operators use
the same pricing algorithm," *Gibson*, 2023 WL 7025996, at *3, because this Court required them to
plead only that Hotel Operators subscribed to a Revenue Management Product, and "*RealPage*
recognized [that] it is not necessary" to allege that competitors used the same algorithms (Opp. 10).
But unlike plaintiffs' initial complaint and the allegations in *RealPage*, the FAC now alleges that
the algorithms within the Revenue Management Products are unique to each subscriber and that the
pricing recommendations differ depending on the subscriber's customized selections.  (ECF No.
144 ¶¶ 97, 108.)  And plaintiffs do not dispute that they identified no customizations used by any
Hotel Operator, much less that "Hotel Operators have colluded to adopt a shared set of pricing
algorithms" by adopting the same customized inputs.  *Gibson*, 2023 WL 7025996, at *3.[2]

**Deficient timing.**  Plaintiffs concede that the FAC alleges Hotel Operators began
subscribing to Revenue Management Products at different times across a decade.  (Opp. 11.)  But
they argue that this Court "misunderst[ood] the law" (*id.*) by holding that adopting "similar
[products] over the course of several years" is not "parallel conduct," *Gibson*, 2023 WL 7025996,
at *4.  In doing so, plaintiffs flout not only this Court's order, but also Ninth Circuit law holding
that allegations that defendants "adopted the [same pricing] policies over . . . several years . . . do[]
not raise the specter of collusion."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d
1186, 1196 (9th Cir. 2015).  *RealPage* offers plaintiffs no help because it held that, "[w]hile
Defendants [were not alleged to] have contracted with RealPage close-in-time to one another," they

---

[2] Plaintiffs argue that Hotel Operators "agreed to the same basic methodology" by "pricing
individual rooms using GuestRev."  (Opp. 11.)  But the FAC does not identify any "methodology"
and concedes that hotels routinely rejected GuestRev's pricing suggestions.

1    were alleged to have contributed "sensitive . . . data for use by RealPage to recommend prices for

2    competitor units." *RealPage*, 2023 WL 9004806, at *15.  In contrast, plaintiffs here allege that the

3    only competitive set data incorporated into the Revenue Management Products for any Hotel

4    Operator was publicly reported data.  (Opp. 16-19.)

5        Plaintiffs argue they fixed the FAC's other timing defect by alleging that defendants

6    engaged in a conspiracy "[s]ince at least 2015" (ECF No. 144 ¶ 352) because "the court in

7    *RealPage* [did not] require that plaintiffs identify a precise start date" to survive a motion to

8    dismiss.  (Opp. 11 & n.43, 13 n.50.)  But courts in the Sixth Circuit have not adopted the pleading

9    standard in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), and plaintiffs fail to address

10   the cases in the Ninth Circuit holding that allegations indistinguishable from theirs are insufficient

11   to state a claim.  *See, e.g.*, *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d

12   988, 995 (N.D. Cal. 2015) ("early 2010 and continuing thereafter" fails to satisfy *Kendall*).

13       **Only public competitor data.**  Plaintiffs concede that "the competitor pricing data

14   incorporated into GuestRev" is "public."  (Opp. 18.)  In a shift, plaintiffs now argue that whether a

15   pricing algorithm uses only public "competitor pricing data" "is a distinction without a functional

16   difference" because Hotel Operators supposedly "delegated their decisionmaking on price . . . to a

17   single 'brain.'"  (*Id.* at 16-18.)  But this Court has already held that there is a "functional"

18   difference between an algorithm using competitors' public and non-public data because

19   "[c]onsulting public sources to determine how to price a hotel room by viewing your competitor's

20   rates does not violate the Sherman Act."  *Gibson*, 2023 WL 7025996, at *6.

21       Plaintiffs also contradict their own claim (quoting former FTC Chair Maureen Ohlhausen)

22   that a hub-and-spoke conspiracy requires that the algorithm "facilitate the exchange of confidential

23   business information" among competitors.  (ECF No. 144 ¶ 234.)  Having conceded that the only

24   information Revenue Management Products use about a subscriber's competitors is public,

25   plaintiffs' "theory is not alleged in a way that would be sufficient as described by Commissioner

26   [Ohlhausen]."  *Gibson*, 2023 WL 7025996, at *6 n.5.  Nor can plaintiffs speculate that "[t]he

27   competitive concerns Ohlhausen outlines are . . . plausible here because . . . Rainmaker utilizes

28   machine learning to train its algorithm with voluminous non-public data collectively provided by

Operators." (Opp. 17-18.) Plaintiffs' pleadings about "machine learning" do not allege that "the pricing recommendations 'generated' to [one] Hotel Operator[] include . . . confidential information fed in" from "another Hotel Operator." *Gibson*, 2023 WL 7025996, at *5.

Finally, plaintiffs egregiously misrepresent the *RealPage* decision when they argue that there is no "functional difference" between an algorithm using competitors' public or non-public data because "nearly every factual allegation" in *RealPage* and *Yardi* "finds a close analogue in Plaintiffs' complaint." (Opp. 18; *see also id*. at 3, 10, 14, 26.) In fact, *RealPage* expressly held that the plaintiffs' allegations that the algorithm there uses competitors' confidential, non-public data was not only a functional difference, it was the "critical difference" from the allegations here:

> [*Gibson*] found that "it is unclear whether the pricing recommendations generated to Hotel Operators include [competitors'] confidential information" . . . . Here, the Multifamily Complaint unequivocally alleges that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data . . . . This critical difference between the *Gibson* complaint and the Multifamily Complaint destroys the analogy [between the two complaints].

*RealPage*, 2023 WL 9004806, at *17.[3] That same critical difference destroys plaintiffs' attempt to analogize to *Yardi*, where the plaintiffs—represented by the same counsel as plaintiffs here—attempted to distinguish this Court's order because, unlike their complaint here, their *Yardi* "[c]omplaint . . . clearly alleges that Yardi's pricing recommendations are based on its clients' confidential data." Pl. Opp. to Defs.' Mot. to Dismiss, at 11-12, *Yardi*, ECF No. 142.

**No requirement to adopt pricing suggestions.** Finally, rather than fix their "fatal" defect, plaintiffs argue this Court was also "incorrect" to require them to allege Hotel Operators must accept prices recommended by the Revenue Management Products. (Opp. 14.) Plaintiffs assert that *RealPage* and the DOJ's statements of interest suggest that plaintiffs need only allege that Hotel Operators "accepted Rainmaker's rates—or used them as a 'starting point'—with sufficient frequency to disrupt the competitive process." (Opp. 14-16.) But plaintiffs again ignore a

---

[3] Plaintiffs argue that "it is noteworthy that Defendants make no serious attempt to distinguish this case from *RealPage*" (Opp. 18) and are "silent" on the DOJ's statement of interest in *Yardi* (*id.* at 3). But plaintiffs ignore that defendants demonstrated that "RealPage . . . is inapposite" (Mot. 25) and that defendants could not have addressed the DOJ's statement of interest in *Yardi* because it was filed weeks after defendants moved to dismiss the FAC here.

dispositive difference: the FAC here alleges that Hotel Operators <u>rejected</u> prices suggested by Revenue Management Products so often that Rainmaker "engaged in a 'never-ending battle'" trying to convince Hotel Operators to stop overriding them.  (ECF No. 144 ¶ 8.)

Plaintiffs argue that this Court can nevertheless infer Hotel Operators often adopted prices suggested by Revenue Management Products because they "continue to pay for GuestRev," "senior executives . . . touted their . . . reliance on the GuestRev pricing algorithm," and "Rainmaker . . . actively dissuades users from overriding price recommendations."  (Opp. 15.)  But, as this Court has held, merely alleging that Hotel Operators subscribe to (and pay for) Revenue Management Products "does not speak to the acceptance rate of the hotels on the Las Vegas Strip," *Gibson*, 2023 WL 7025996, at *3, especially because the FAC alleges those products have other tools, including demand forecasts, property-level data optimization, and customer segmentation analysis to predict customer value "at the finest level of granularity" (ECF No. 144 ¶¶ 71, 186, 261).  And unlike *RealPage*, which included allegations of public statements by certain defendants that they "accept RealPage's pricing recommendations . . . 99% of the time," 2023 WL 9004806, at *19, the Hotel Operators' alleged statements here have nothing to do with price suggestions, much less acceptance rates.  (*E.g.*, ECF No. 144 ¶ 163 ("The Rainmaker . . . Product Suite uses mathematical modeling processes to forecast demand and maximize revenue . . . .").)  Moreover, plaintiffs' argument that Rainmaker "actively dissuades users from overriding price recommendations" (Opp. 15) is immaterial because plaintiffs allege any efforts were unsuccessful (ECF No. 144 ¶ 8).

2.    The Court Should Again Reject Plaintiffs' Misreading of *Interstate Circuit*

Plaintiffs again incorrectly rely on *Interstate Circuit v. United States*, 306 U.S. 208 (1939), to argue that "Rainmaker . . . 'invited' concerted action among [Hotel] Operators," and Hotel Operators "jointly delegated their decisionmaking on price to Rainmaker" knowing that other Hotel Operators did too.  (Opp. 9.)  They made the same argument in opposing defendants' first motion to dismiss (ECF No. 91 at 6-10) and this Court rejected it (Mot. 11-12).

Even if the Court reconsidered plaintiffs' arguments, plaintiffs still fail to meet *Interstate Circuit*'s prerequisites.  To begin, plaintiffs concede they must allege that Hotel "Operators jointly delegated their decisionmaking on price to Rainmaker," leading to a "joint adoption of a common

1  pricing strategy." (Opp. 9.) But the FAC—along with verified interrogatory responses provided

2  by most Hotel Operators—confirms that those Hotel Operators do not accept prices suggested by

3  Revenue Management Products, much less delegate their pricing decisions to Rainmaker. (*See*

4  *supra* § I.A.1.)[4]

5      Plaintiffs also fail to satisfy *Interstate Circuit* because they do not allege that it would be

6  economically self-defeating for a Hotel Operator to license a Revenue Management Product unless

7  it knew that others were doing so. In *Interstate Circuit*, a theater chain wrote to eight distributors

8  at the same time asking them to restrict further distribution to second-run theatres, and each

9  distributor "was aware" that "without substantially unanimous action . . . there was risk of a

10 substantial loss of the business and good will." 306 U.S. at 222; *see also PLS.Com, LLC v. Nat'l*

11 *Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022) (plaintiffs adequately alleged defendants had

12 "a conscious commitment to a common scheme" to adopt pricing policies because defendants

13 "conceived of the [policy] through 'private interfirm communications'") (cited at Opp. 8). Thus,

14 the "[k]ey to *Interstate Circuit*'s conspiracy finding" was that each distributor's decision to accede

15 to Interstate's demands "would have been economically self-defeating unless the other distributors

16 did the same." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010).

17     That "key" allegation is absent here. Plaintiffs do not allege that a Hotel Operator would

18 only use a Revenue Management Product if all Hotel Operators did so. In fact, plaintiffs allege

19 that: (1) Caesars licensed the Revenue Management Products years before other defendants (Mot.

20 9, 12), and (2) the Revenue Management Products provide other countervailing benefits, including

21 "demand forecast[s]" (ECF No. 144 ¶ 88). The FAC's allegations are also far different from

22 *RealPage*, where plaintiffs alleged that "RealPage discloses to its RMS clients exactly whose non-

23 public data is being used" and that it "would clearly not be in any individual Defendant's economic

24 self-interest to contribute its data to RealPage without knowing that it would benefit from its

25

---

26 [4] Plaintiffs acknowledge that defendants' discovery responses "deny adopting Rainmaker's rates," but assert that defendants "misleadingly suggest they have produced 'discovery' to [p]laintiffs,

27 when in fact they have (with the exception of their initial disclosures) categorically refused to do so." (Opp. 16 n.60.) Not so. Defendants answered some of plaintiffs' interrogatories, including

28 answering that certain Hotel Operators "utilize[] their own pricing algorithm to determine and set hotel room rates and have a general practice of not using the recommendations generated by Rainmaker's Pricing Algorithms." (Mot. 13 n.5.)

1  horizontal competitors doing the same." *RealPage*, 2023 WL 9004806, at *15-16.  Plaintiffs make
2  none of those allegations here.

3       **B.      The Opposition Confirms That Plaintiffs' "New"**
              **Allegations Fail To Plead Parallel Conduct and Plus Factors**
4

5              1.      The FAC Fails To Allege Parallel Conduct

6       Plaintiffs argue that they plead parallel conduct by adding "the exact type of allegations this
7  Court previously held would be indicative of parallel conduct" and through statistical "analyses."
8  (Opp. 19.)  But plaintiffs (a) misconstrue this Court's order and (b) abandon most of their
9  "statistics," while (c) their remaining statistics show only non-parallel conduct.

10                     (a)      Plaintiffs misconstrue this Court's order

11      Plaintiffs wrongly argue that "[d]efendants . . . do not address the exact type of allegations
12  this Court previously held would be indicative of parallel conduct," namely that Hotel Operators
13  allegedly "used" Revenue Management Products "in parallel from at least 2015 to 2021."  (Opp.
14  19.)  Plaintiffs, however, distort this Court's order because it never suggests that plaintiffs could
15  plead parallel conduct by alleging that Hotel Operators happened to be subscribers to Revenue
16  Management Products at any given time.  Instead, the Court directed plaintiffs to allege "that all
17  Hotel Operators <u>began</u> using particular pricing software <u>at or around the same time</u>."  *Gibson*, 2023
18  WL 7025996, at *4 (emphases added).  Plaintiffs allege the opposite: Hotel Operators subscribed to
19  Revenue Management Products up to a decade apart.  (*See supra* § I.A.1.)

20                     (b)      Plaintiffs abandon several statistics and their substitutes are worse

21      Plaintiffs argue their statistics plead parallel conduct because they reflect that "the heart of
22  this case is  . . . a shift from casino-hotels' longstanding focus on maximizing occupancy to" using
23  Revenue Management Products to "charg[e] higher room rates."  (Opp. 1, 19-23.)  But plaintiffs
24  concede that the FAC suggests the opposite: that Hotel Operators <u>increased</u> their occupancy levels
25  during the alleged conspiracy.  (*Id.* at 20 n.72.)  That admission destroys any "connect[ion]
26  [between] the purported price increase [and] an illegal agreement among competitors," *Musical
27  Instruments*, 798 F.3d at 1197, because plaintiffs' theory hinges on Hotel Operators' supposed shift
28  in business practices to jointly license Revenue Management Products to "prioritiz[e] profit over

                                          8

1    occupancy" (Opp. 5-6).  It also further extinguishes plaintiffs' analogy to *RealPage* because

2    plaintiffs there "offer[ed] regression analyses" allegedly showing that defendants "adopted a

3    seismic shift in pricing strategy . . . to prioritiz[e] rent increases over occupancy."  2023 WL

4    9004806, at *13.

5         Although plaintiffs argue that defendants "devote themselves to a summary judgment-like

6    dissection" of the FAC's pricing statistics (Opp. 19), those statistics have facial defects and

7    plaintiffs flagrantly misstate what those statistics show (Mot. 13-20).  Indeed, plaintiffs abandoned

8    most of their "statistical" analyses in their opposition.  For example, the FAC alleges that

9    "beginning in approximately 2015," there is a "notable inflation of Las Vegas Strip prices as

10   compared to prices in downtown Las Vegas."  (ECF No. 144 ¶¶ 16, 213.)  Plaintiffs no longer rely

11   on those statistics and do not dispute that their statistics plead the opposite.  (Mot. 18.)

12        In addition, although the FAC alleged that Hotel Operators increased their room rates more

13   than casino-hotels nationwide during the alleged conspiracy (ECF No. 144 ¶¶ 216-22), plaintiffs

14   admit the nationwide benchmark they used to compare Hotel Operators' room prices reflects <u>all</u>

15   prices that casino-hotels charge for <u>all</u> services and goods, not just prices charged for their rooms.

16   (Opp. 31.)  Plaintiffs also admit that comparing Hotel Operators' prices to an index measuring <u>only</u>

17   room rates for casino-hotels nationwide shows that Hotel Operators' room rates increased <u>less</u> than

18   casino-hotels nationwide.  (Mot. 16-17.)[5]

19        Recognizing that their statistics are defective, plaintiffs try to amend the FAC through the

20   opposition by attaching additional charts comparing (1) the differences between prices that all

21   casino-hotels charged for all their goods and services and their room prices, and (2) the differences

22   between prices all non-casino hotels charged for their non-room goods and services and their room

23   prices.  (ECF No. 167-2.)  "It is axiomatic that a party may not amend its complaint through its

24   _____

25   [5] Plaintiffs now argue that the index measuring only room rates for casino-hotels nationwide is
     "contaminat[ed]" because it is "based largely on prices of casino hotel rooms on both the Las
     Vegas Strip and in Atlantic City—both markets where cases have been filed alleging
26   anticompetitive effects from [using] Rainmaker."  (Opp. 31.)  This new "contamination" theory is
     not in the FAC, and "[a]rguments in a brief . . . are not a substitute for well-pled factual allegations
27   in the actual complaint."  *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1147 (N.D. Cal.
     2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018).  Plaintiffs' argument also gets them nowhere
28   because the complaint in the Atlantic City case is just as meritless as the FAC.  *See* Joint Mot. to
     Dismiss, *Cornish-Adebiyi v. Caesars*, No: 23-CV-02536, ECF No. 89 (D.N.J. Feb. 20, 2024).

opposition to a motion to dismiss." *Calvillo v. Experian Info. Sols., Inc.*, No. 19-CV-00277 (RFB), 2020 WL 1549574, at *4 (D. Nev. Apr. 1, 2020).  Plaintiffs' new charts also weaken their claims because they include Hotel Operators within all casino-hotels, suggesting only that Hotel Operators' pricing was in line with non-defendants' pricing—not a conspiracy.  *See Musical Instruments*, 798 F.3d at 1197 (plaintiffs only "allege an increase in the average retail price of all guitars . . . sold").

        (c)     The few statistics that remain say nothing
                about occupancy and reveal non-parallel pricing

      Plaintiffs are left with charts comparing average quarterly room prices (Opp. 20-23), but those statistics fare no better (Mot. 15-20).  On their face, this data say nothing about plaintiffs' theory that Hotel Operators reduced occupancy and increased prices.  In addition, plaintiffs incorrectly argue that defendants are "wrong as a matter of law" that quarterly price statistics cannot establish parallel conduct.  (Opp. 20.)  Although plaintiffs rely on decisions from the Third Circuit and Florida, they do not dispute that the Ninth Circuit held that two defendants reducing production "the next quarter" after another defendant is not "indicative of . . . an advance agreement."  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49 (9th Cir. 2022).  Plaintiffs' quarterly charts are also insufficient because plaintiffs effectively concede they demonstrate <u>non</u>-parallel conduct:

      **Average quarterly prices.**  (ECF No. 144 ¶ 240.)  Plaintiffs do not dispute that this chart shows Hotel Operators' prices were more correlated before the alleged conspiracy than after, which undercuts any inference of conspiracy.  (Mot. 18, 21.)  It is no help for plaintiffs to argue that defendants "provide no statistical quantification" and "base this argument on a two year period." (Opp. 22.)  No "statistical quantification" is needed: plaintiffs do not dispute that their chart on its face demonstrates that Hotel Operators' prices had <u>less variation</u> before the alleged conspiracy. (ECF No. 144 ¶ 240.)  Plaintiffs also get nowhere by faulting defendants for using a two-year period because those two years cover <u>the entire</u> "pre-conspiracy" pricing data provided by <u>plaintiffs</u>.  (*Id.*)  Given these admissions, plaintiffs cannot plead "historically unprecedented changes in pricing structure" necessary to allege parallel conduct.  *DRAM*, 28 F.4th at 48.

**Average quarter-on-quarter price increases.**  (ECF No. 144 ¶¶ 214-15.)  Plaintiffs do not dispute that the data underlying these charts (as displayed in the chart on page 16 of defendants' motion) show a $172 difference in the changes in average room rates among Hotel Operators from the start of the alleged conspiracy until the present.  (Opp. 21.)  Instead, plaintiffs argue that (1) defendants "ignore" their other chart in paragraph 240 "showing" prices "move[d] closely in parallel" and (2) defendants use "nominal prices at just two points in time . . . without any attempt to quantify the change in . . . percentage terms."  (*Id.*)  Not so.  Far from "ignor[ing]" plaintiffs' chart in paragraph 240, defendants demonstrated that this same chart shows that defendants' prices were more correlated before the alleged conspiracy than during it.  (*See supra* at 10.)  In addition, the $172 difference in Hotel Operators' average rates is not just measuring two random points—it measures the difference between the beginning of the purported conspiracy and the last quarterly pricing data provided by plaintiffs.  (Mot. 16.)

Plaintiffs make no headway by arguing that defendants should have "quantif[ied] the change in . . . percentage terms" because "a $50 increase on a $50 hotel room is [not] equivalent to a $50 increase on a $500 hotel."  (Opp. 21, 23.)  But the percentage changes in Hotel Operators' average room rates from the start of the alleged conspiracy until the present are wildly different: Wynn's average increased by over 50%, Caesars' increased by about 20%, and Treasure Island's increased by less than 5%.  (Bershteyn Declaration dated Feb. 14, 2024, Ex. A at 24-26.)  Those "admissions of non-parallel conduct . . . undercut the very theory asserted by the complaint." *Kelsey K.*, 254 F. Supp. 3d at 1146 (no parallel conduct because "the difference [in defendants' prices] is . . . 20 or 25 percent").

2.  Plaintiffs' "Plus Factors" Remain
    <u>Irrelevant and Insufficient To State a Claim</u>

Plaintiffs' alleged plus factors "are not relevant" without parallel conduct.  *Gibson*, 2023 WL 7025996, at *4.  But even if the Court considered plaintiffs' "plus factors," they are insufficient under Ninth Circuit law.

**No actions against self-interest.**  Plaintiffs argue that their case is analogous to *Meyer v. Kalanick*, where the plaintiffs alleged "that Uber sets mandatory prices for drivers to charge," and

those drivers had "no practical mechanism . . . [to] charge anything but the App-dictated fare."  174 F. Supp. 3d 817, 822 n.3 (S.D.N.Y. 2016).  But there is nothing mandatory about prices suggested by the Revenue Management Products.  (Opp. 14-16.)  Plaintiffs also cannot explain how subscribing to Revenue Management Products years before any alleged conspiracy was "so perilous in the absence of advance agreement that no reasonable firm would" do so, especially when thousands of non-defendant casino-hotels (and Caesars) did just that. *Musical Instruments*, 798 F.3d at 1195.  Plaintiffs assert it was against Hotel Operators' self-interest to <u>decrease</u> occupancy (Opp. 23), but the FAC only suggests that Hotel Operators <u>increased</u> their occupancy (*see supra* § I.B.1.b).

**No market structure plus factors.**  Plaintiffs' attempt to plead market structure plus factors is doomed because they failed to plead a plausible relevant market.  (*See infra* § II.B.) Although plaintiffs argue that the "Strip hotel market is highly concentrated" (Opp. 25), Hotel Operators' alleged 35-40% collective share of that "market" is a far cry from the extreme levels of concentration in the authorities plaintiffs cite.[6]  And plaintiffs do not dispute that an alleged conspiracy where defendants have only 35-40% market share is implausible and makes no "economic sense" (*see* Mot. 23-24), especially given plaintiffs' assertion that customers would book at any of the many non-defendant hotels on the Strip (ECF No. 144 ¶ 256).

Plaintiffs argue that their failure to plead a relevant market and Hotel Operators' market power does not sink their case because Count I alleges a per se claim.  (Opp. 26 n.96.)  But plaintiffs do not dispute that even *RealPage* held that the "per se standard is not appropriate" for alleged agreements to use revenue management software and dismissed a complaint because its proposed market was "implausible."  *In re RealPage*, 2023 WL 9004806, at *24, *31.  Nor do plaintiffs dispute that the Ninth Circuit rejects applying the per se standard to "novel" claims, even though plaintiffs themselves characterize their antitrust claims here as "novel."  (Mot. 24.)

**No exchange of information.**  Rather than arguing that the FAC alleges any exchanges of competitively sensitive information, plaintiffs repeat their argument that they need not allege the

---

[6] *See Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *4 (9th Cir. July 21, 2023) (defendants "controlled at least 73% of the market"); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (defendants sell "90[%] of [the services at issue]"); *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) (defendants had "80-90% market share").

exchange of competitively sensitive information.  (Opp. 25.)  But this contradicts both this Court's prior dismissal order and the *RealPage* decision.  And plaintiffs' reference to "machine learning" fails because plaintiffs admit that none of the Revenue Management Products commingled competitors' <u>confidential</u> data when suggesting prices.  (*See supra* § I.A.1.)

**Opportunities to collude are insufficient**.  Plaintiffs argue they have "more than 50 pages of well-pled allegations" of opportunities to collude (Opp. 25), but none of those pages identifies a single meeting at which Hotel Operators even communicated (Mot. 24-25).  And even if they did, "only say[ing] that employees of Hotel Operators have the opportunity to exchange information at conferences . . . does not make an allegation plausible."  *Gibson*, 2023 WL 7025996, at *6.

**No plausible motive to conspire.**  Plaintiffs are wrong that the alleged conspiracy is made plausible because Hotel Operators had a motive to earn profits in the wake of the Great Recession. (Opp. 26.)  While plaintiffs rely on a district court case from New York (Opp. 26), the Ninth Circuit has squarely held that "common motive" to "increase profits by raising prices . . . does not suggest an agreement."  *Musical Instruments*, 798 F.3d at 1194.

***RealPage* remains irrelevant.**  Plaintiffs argue that "the *RealPage* litigation (and related investigation into RealPage's conduct)" is a plus factor (Opp. 26), but they again ignore the *RealPage* court's emphasis of the "critical difference" between those allegations—all of which relate to different companies in a different industry—and this case (*see supra* § I.A.1).

## II.   COUNT II SHOULD BE DISMISSED BECAUSE LICENSING REVENUE MANAGEMENT PRODUCTS DOES NOT VIOLATE THE SHERMAN ACT

Plaintiffs' rule of reason claim in Count II should be dismissed because plaintiffs do not allege facts to show: (A) how individual software licenses restrain trade; (B) the existence of a plausible relevant market; or (C) anticompetitive effects in that relevant market.

### A.   The Vertical Software License Agreements Do Not Restrain Trade

Plaintiffs identify the agreements underlying Count II as "license[s] to Rainmaker's revenue management software," but fail to allege how any of these bilateral software licenses restrain trade.  (Opp. 27.)  Nor could they.  The Rainmaker software uses a subscriber's individual property data to analyze customer revenue, forecast demand based on different customer segments,

1   and recommend prices for that property.  (Mot. 3-4.)  Although plaintiffs repeatedly characterize

2   the software licenses as Hotel Operators "delegating" their pricing decisions to Rainmaker (*see,*

3   *e.g.*, Opp. 1, 4-7), the FAC alleges the opposite:  each subscriber controls whether and how it uses

4   the software, and subscribers are entirely free to—and routinely did—reject the individualized

5   prices that the software recommends.  (ECF No. 144 ¶¶ 8, 123-24.)

6          The opposition's own cited cases highlight these pleading deficiencies.  All the cases

7   plaintiffs cite about "adherence to a price schedule" are either contrary to the FAC's allegations or

8   inapposite because they address circumstantial evidence of price fixing.  (Opp. 28.)  *United States*

9   *v. National Ass'n of Real Estate Boards*, 339 U.S. 485 (1950), is instructive.  There, the Supreme

10  Court concluded that a board's publication of "standard rates of commissions for its members,"

11  which required members to "agree" not to "solicit[] at lower rates," was a per se violation.  *Id.* at

12  488-89.[7]  That is far different from software that uses a hotel's own property-level data to forecast

13  its demand and recommend individualized prices, without obliging the hotel to adopt those

14  recommendations.  Indeed, *National Association* held that a different association was "not laced

15  into the conspiracy" because its membership agreement was "advisory only."  *Id.* at 495.

16         Plaintiffs' reliance on *RealPage* is also meritless.  (Opp. 28.)  The district court there held

17  that the plaintiffs alleged a restraint of trade where each defendant allegedly agreed "as part of [its]

18  written contract" to allow RealPage to use its confidential data as an input for the pricing

19  recommendations that RealPage made to competitors.  *See RealPage*, 2023 WL 9004806, at *9.

20  Plaintiffs characterize the <u>use</u> of <u>public</u> price data here as "the challenged restraint" (Opp. 31), but

21  that does not allege an <u>agreement</u> and ignores the "critical difference" the *RealPage* court found

22  between the allegations in the two cases (*see supra* § I.A.1).[8]

23     **B.   <u>Plaintiffs' Proposed Market Is Implausible</u>**

24         Count II also fails because plaintiffs' "Las Vegas Strip Hotel" market is facially

25  implausible.  As plaintiffs acknowledge, a plausibly defined market includes only the "economic

---

26  [7] *See also Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781-82 (1975) (finding a "naked
27  agreement" to fix prices where state bar published "fee schedules that cannot be ignored"; "purely
    advisory fee schedule" would present "a different question"); *Norfolk Monument Co. v. Woodlawn
    Mem'l Gardens, Inc.*, 394 U.S. 700, 701-03 (1969) (array of "restrictive rules").

28  [8] By alleging that the use of public pricing data is the but-for cause of higher prices, plaintiffs
    concede that all alleged "harm" results from <u>lawful</u> conduct.  (*See supra* at 4-5.)

1    substitutes for the product" and the "groups of sellers" with "potential ability to deprive <u>each other</u>

2    of significant levels of business."  (Opp. 36 (emphasis added).)  But plaintiffs do not dispute that

3    their own allegations suggest Hotel Operators' rooms are not "economic substitutes" (*id.*) for each

4    other because guests do not view "a hotel room at Treasure Island" as a substitute for a "room at

5    the Wynn."  (ECF No. 144 ¶ 256.)  Plaintiffs assert these are "questions of fact"(Opp. 35), but the

6    Ninth Circuit has upheld dismissal where the market was not limited to "substitutes" that

7    consumers view as "reasonabl[y] interchangeab[le]."  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109,

8    1120 (9th Cir. 2018).  And where a complaint's own allegations render its market implausible,

9    dismissal is appropriate.  *See, e.g.*, *In re German Auto. Mfr. Antitrust Litig.*, 612 F. Supp. 3d 967,

10   980 (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).

11       Despite alleging that Hotel Operators compete with "other casino hotels nearby" (ECF No.

12   144 ¶ 347), plaintiffs argue their alleged market should be limited to the Strip because "Strip

13   Hotels were consistently able to charge more than 5% more than downtown hotels."  (Opp. 35-36.)

14   But citing that price difference merely demonstrates the implausibility of plaintiffs' proposed

15   market because their data show price differences among the Hotel Operators' own properties that

16   far exceed 5%.  (Mot. 16 (over 750% difference in Hotel Operators' room prices).)

17       **C.    <u>The FAC Lacks Well-Pleaded Allegations of Anticompetitive Effects</u>**

18       Plaintiffs are also unable to plausibly allege direct or indirect evidence of anticompetitive

19   effects arising from the individual software license agreements challenged in Count II.

20           1.    <u>"Higher Prices" Are Not Direct Evidence of Anticompetitive Effects</u>

21       Plaintiffs incorrectly point to "higher prices" as direct evidence of harm to competition.

22   (Opp. 30.)  As an initial matter, plaintiffs do not allege how any individual Hotel Operator's

23   <u>licensing</u> of the Revenue Management Products results in marketwide price increases.  In fact,

24   plaintiffs do not even allege that the software license agreements—which were entered into over

25   the course of a decade-plus—coincided with price changes.  Rather, plaintiffs claim that the

26   supposedly "higher prices" began in 2015 when Rainmaker incorporated the use of <u>public</u>

27   competitor price data (via its RevCaster product) into its GroupRev product, which plaintiffs

28   characterize as "the challenged restraint."  (*Id.* at 30-31.)  But plaintiffs do not explain how

1   incorporating public price data into software is either a restraint or led to higher prices.  And courts

2   dismiss cases where plaintiffs fail to allege facts <u>connecting</u> the challenged restraint to alleged

3   price increases.  *See, e.g.*, *Musical Instruments*, 798 F.3d at 1197 ("Plaintiffs do not allege any

4   facts connecting the purported price increase to an illegal agreement among competitors.").

5   Even if plaintiffs could tie an individual license agreement to marketwide price changes,

6   plaintiffs fail to show that the alleged "higher prices" are higher than the relevant metric—what

7   prices would have been <u>but for</u> the allegedly anticompetitive restraint.  (Mot. 28-29.)  Instead,

8   plaintiffs' statistics show that Hotel Operators' pricing did not change relative to hotels in

9   downtown Las Vegas or casino-hotels nationwide during the alleged conspiracy.  (*See supra* §

10  I.B.1.b.)[9]

11              2.      <u>Plaintiffs' Indirect Evidence of Anticompetitive Effects Also Fails</u>

12  Plaintiffs also fail to plausibly allege indirect evidence of anticompetitive effects because

13  they do not allege facts showing (1) each Hotel Operator has market power in a relevant market, or

14  (2) any anticompetitive effects within any purported market.  (Mot. 29-30.)

15  **No market power.**  Plaintiffs argue that the licensing agreements collectively impair

16  competition, and Hotel Operators' market share, in aggregate, totals 35-40% share of the purported

17  market.  (Opp. 36-37.)  But "[a]bsent a conspiracy among defendants, plaintiff[s] may not

18  aggregate the respective market shares of individual defendants to establish market power."  *Ralph*

19  *C. Wilson Indus. v. Am. Broad. Comp.*, 598 F. Supp. 694, 704 & n.10 (N.D. Cal. 1984), *aff'd*, 794

20  F.2d 1359 (9th Cir. 1986); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1437 (9th Cir.

21  1995) (aggregating "market shares . . . is justified *if* the rivals are alleged to have conspired"

22  (emphasis added)); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612,

23  622 (S.D.N.Y. 2013) (no aggregation because there was no horizontal conspiracy).  The authorities

24  plaintiffs cite, *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000), and *Twin City*

25  *Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982), do not change this

26  _____

27  [9] Plaintiffs double-down on comparing changes in Hotel Operators' room prices to the Venetian's (Opp. 30) even though the difference is explained by plaintiffs' manipulation of data (Mot. 19).

28  Plaintiffs claim they did "not attribute a 100% price decrease to the Venetian in Q4 2020" (Opp. 22 n.80), but their data indisputably demonstrates that is exactly what they did.  (Declaration of Boris Beshteyn, ¶¶ 2-4, dated Mar. 20, 2024).

analysis because they permitted aggregation where plaintiffs showed a horizontal agreement or the effect of exclusive dealing agreements.  *See In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-CV-00351 (GHW), 2024 WL 918030, at *7 (S.D.N.Y. Mar. 2, 2024) (refusing to aggregate outside exclusive dealing).[10]

Even if aggregation were permitted, plaintiffs identify no cases concluding that 35-40% market share is enough to establish market power in the Ninth Circuit.  (Mot. 30.)  Plaintiffs argue that the Ninth Circuit's presumption that "[m]arket share of less than 50 percent is . . . insufficient to establish market power" (Mot. 23) "misleadingly conflates monopolization cases under Section 2 of the Sherman Act" (Opp. 37 n.136).  But the Ninth Circuit has squarely held that the "'market power' requirements apply identically under the two different sections of the [Sherman] Act." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008).

**No alleged harm to competition**.  Plaintiffs cite only a speech about algorithmic pricing generally, where "competitors adopt the same pricing algorithm," to argue that "economic theory" suggests competitive harm is possible.  (Opp. 38.)  That does not substitute for facts.  The speech also concerned algorithms that facilitate the "exchange of competitively sensitive information."[11] Plaintiffs cannot allege such harm to competition because they admit the Revenue Management Products only share "public" competitor data.  (*Id.* at 18.)

## CONCLUSION

The FAC should be dismissed because plaintiffs do not dispute that they cannot cure the flaws this Court identified in its prior order.  Despite admitting—after a year of obfuscating—that Revenue Management Products uses only public competitor data, plaintiffs alternatively request leave to amend.  (Opp. 40.)  But "plaintiffs' alternative request for leave" should be rejected because plaintiffs again do not "comply with LR 15-1," *Gibson*, 2023 WL 7025996, at *7 n.6, and identify no "additional facts" that would cure the FAC's infirmities, *see Dearaujo v. PNC Bank, National Ass'n*, No. 12-CV-00981 (MMD), 2012 WL 5818131, at *4 (D. Nev. Nov. 15, 2012).

---

[10] The treatise Plaintiffs cite similarly discusses aggregation in the tying or exclusive dealing context.  *See* Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 310(c)(1) (4th ed. 2014).

[11] Doha Mekki, Principal Deputy Assistant Attorney General of the Antitrust Division, *Remarks at GCR Live: Law Leaders Global* (Feb. 2, 2023).

Dated: March 20, 2024

Respectfully submitted,

/s/ Adam Hosmer-Henner

Adam Hosmer-Henner (NSBN 12779)
Chelsea Latino (NSBN 14227)
Jane Susskind (NSBN 15099)
McDONALD CARANO LLP
100 West Liberty Street, Tenth Floor
Reno, Nevada 89501
(775) 788-2000
ahosmerhenner@mcdonaldcarano.com
clatino@mcdonaldcarano.com
jsusskind@mcdonaldcarano.com

Boris Bershteyn (*pro hac vice*)
Ken Schwartz (*pro hac vice*)
Michael Menitove (*pro hac vice*)
Sam Auld (*pro hac vice*)
  SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Ken.Schwartz@skadden.com
Michael.Menitove@skadden.com
Sam.Auld@skadden.com

*Attorneys for Defendant*
*Caesars Entertainment, Inc.*


/s/ Patrick G. Byrne

Patrick G. Byrne
Nevada Bar No. 7636
Bradley Austin
Nevada Bar No. 13064
SNELL & WILMER
3883 Howard Hughes Parkway
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
pbyrne@swlaw.com
baustin@swlaw.com

Mark Holscher (*pro hac vice*)
Tammy Tsoumas (*pro hac vice*)

/s/ J. Colby Williams

J. Colby Williams (5549)
710 South Seventh Street
Las Vegas, NV 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540
jcw@cwalawlv.com

Sadik Huseny (*pro hac vice*)
Tim O'Mara (*pro hac vice*)
Brendan A. McShane (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
sadik.huseny@lw.com
tim.o'mara@lw.com
brendan.mcshane@lw.com

Anna M. Rathbun (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-3381
Facsimile: (202) 637-2201
anna.rathbun@lw.com
chris.brown@lw.com

*Attorneys for Defendant Cendyn Group LLC*


/s/ Daniel McNutt

Daniel McNutt, Esq., Bar No. 7815
Matthew C. Wolf, Esq., Bar No. 10801
MCNUTT LAW FIRM, P.C.
11441 Allerton Park Drive, #100
Las Vegas, Nevada 89135
Tel.: (702) 384-1170
Fax.: (702) 384-5529
drm@mcnuttlawfirm.com
mcw@mcnuttlawfirm.com

Matthew L. McGinnis (*pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street

18

Leonora Cohen (*pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
ttsoumas@kirkland.com
mholscher@kirkland.com
lena.cohen@kirkland.com

Matthew Solum (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Ave
New York, NY 10022
Telephone: (212) 446-4688
Facsimile: (917) 848-7536
msolum@kirkland.com

*Attorneys for Defendant Wynn
Resorts Holdings, LLC*

/s/ Nicholas J. Santoro
Nicholas J. Santoro (NV Bar No. 532)
300 S. 4th Street, Suite 1600
Las Vegas, NV 89101
Tel.: (702) 791-0308 / Fax: (702) 791-1912
nsantoro@nevadafirm.com

Arman Oruc (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036-1612
Tel.: (202) 346-4000 / Fax: (202) 346-4444
AOruc@goodwinlaw.com

Alicia Rubio-Spring (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02110
Tel.: (617) 570-1000 / Fac: (617) 523-1231
ARubio-Spring@goodwinlaw.com

*Attorneys for Defendant The Rainmaker Group
Unlimited, Inc.*

Boston, Massachusetts 02199
Tel: (617) 951-7000
Fax: (617) 951-7050
matthew.mcginnis@ropesgray.com

Of counsel:

David B. Hennes
Jane E. Willis
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 596-9000
Fax: (212) 596-9090
david.hennes@ropesgray.com
jane.willis@ropesgray.com

*Attorneys for Defendants Blackstone Inc. and
Blackstone Real Estate Partners VII L.P.*

/s/ Patrick J. Reilly
Patrick J. Reilly
Arthur A. Zorio
Emily Garnett (*pro hac vice*)
Eric D. Walther
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Ste. 1600
Las Vegas, NV 89106
Telephone:  702.382.2101
preilly@bhfs.com
azorio@bhfs.com
egarnett@bhfs.com
ewalther@bhfs.com

*Attorneys for Defendant Treasure Island, LLC*