# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KAREN CORNISH-ADEBIYI, *et al.*,

                    *Plaintiffs*,

       -v.-

CAESARS ENTERTAINMENT, INC., *et al.*,

                    *Defendants*.

Civil Action No. 1:23-cv-02536-KMW-EAP

**Motion Date: April 15, 2024**

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Boris Bershteyn (*pro hac vice*)
Ken Schwartz (*pro hac vice*)
Michael Menitove (*pro hac vice*)
Tansy Woan
Andrew Muscato
Sam Auld (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Ken.Schwartz@skadden.com
Michael.Menitove@skadden.com
Tansy.Woan@skadden.com
Andrew.Muscato@skadden.com
Sam.Auld@skadden.com

*Attorneys for Defendants
Caesars Entertainment, Inc., Boardwalk
Regency LLC, Harrah's Atlantic City
Operating Company, LLC, and
Tropicana Atlantic City Corporation*

Harry H. Rimm
WOMBLE BOND DICKINSON
(US) LLP
950 Third Avenue, Suite 2400
New York, NY 10022
Telephone: 332-258-8480
Harry.Rimm@wbd-us.com

Bethany W. Kristovich (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Bethany.Kristovich@mto.com

Justin R. Raphael (*pro hac vice*)
Juliana M. Yee (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Justin.Raphael@mto.com
Juliana.Yee@mto.com

*Attorneys for MGM Resorts International and Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa.*

Jennifer L. Del Medico
Laura W. Sawyer (*pro hac vice*)
JONES DAY
250 Vesey Street, 34th Floor
New York, NY 10281
Telephone: 212-326-3658
jdelmedico@jonesday.com
lwsawyer@jonesday.com
David C. Kiernan (*pro hac vice*)
Matthew Silveira (*pro hac vice*)

Gregory Mortenson (Bar No. 070542013)
Lawrence Buterman (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Gregory.Mortenson@lw.com
Lawrence.Buterman@lw.com

Sadik Huseny (*pro hac vice*)
Tim O'Mara (*pro hac vice*)
Brendan McShane (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Sadik.Huseny@lw.com
Tim.O'Mara@lw.com
Brendan.McShane@lw.com

Anna M. Rathbun (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh St, NW Suite 1000
Washington, DC 20004-1304
Anna.Rathbun@lw.com
Chris.Brown@lw.com

*Attorneys for Defendant Cendyn Group, LLC*

Craig Carpenito
Thomas J. Scrivo
David S. Lesser (*pro hac vice*)
Jamie Dycus (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
ccarpenito@kslaw.com

ii

JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
dkiernan@jonesday.com
msilveira@jonesday.com

*Attorneys for Hard Rock
International Inc. and Seminole
Hard Rock Support Services, LLC*

tscrivo@kslaw.com
dlesser@kslaw.com
jdycus@kslaw.com

*Attorneys for Boardwalk 1000, LLC
d/b/a Hard Rock Hotel & Casino
Atlantic City*

iii

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................vi

PRELIMINARY STATEMENT .............................................................................1

THE AMENDED COMPLAINT'S ALLEGATIONS ..........................................4

      A.    The Rainmaker/Cendyn Revenue Management Products ...................4

      B.    Defendants and Casino-Hotels in Atlantic City ..................................6

      C.    The Alleged Agreement Among Casino-Hotel Defendants To Use Prices Suggested By Revenue Management Products ...............10

      D.    Procedural History ...........................................................................11

LEGAL STANDARD............................................................................................12

ARGUMENT ........................................................................................................13

I.     THE CAC FAILS TO PLAUSIBLY ALLEGE AN AGREEMENT AMONG CASINO-HOTEL DEFENDANTS ............................................13

      A.    Plaintiffs Plead No Direct Evidence of a Conspiracy .......................13

      B.    Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of a Conspiracy ........................................................................................16

            1.    The CAC Fails To Allege Parallel Conduct ...........................17

            2.    Plaintiffs' "Plus Factors" Are Irrelevant And Fail To Plausibly Suggest a Conspiracy ...............................................23

            3.    The CAC Fails To Plead Any "Common Hallmarks" of a Purported Conspiracy................................................................33

            4.    Alleged "Knowing" Use of Revenue Management Products Is Insufficient ...........................................................35

      C.    Plaintiffs Fail To Allege Sufficient Facts About Casino-Hotel Defendants' Parents and Affiliates....................................................37

II.    PLAINTIFFS' CLAIM IS PARTIALLY TIME-BARRED........................38

CONCLUSION ...................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                       **PAGE(S)**

*Acquaire v. Canada Dry Bottling Co. of N.Y.*,
    24 F.3d 401 (2d Cir. 1994)...........................................................................37

*In re Aetna UCR Litigation*,
    No. 07-CV-3541 (KHS),
    2015 WL 3970168 (D.N.J. June 30, 2015).....................................32, 33, 34

*Allen v. Verizon Communications, Inc.*,
    No. 18-CV-8918 (PGS),
    2019 WL 399922 (D.N.J. Jan. 31, 2019)................................... 17, 29, 32, 34

*Battle v. Mercedes Benz of Cherry Hill*,
    No. 22-CV-06642 (KMW),
    2023 WL 5003921 (D.N.J. Aug. 4, 2023) ...................................................12

*In re Beef Industry Antitrust Litigation*,
    907 F.2d 510 (5th Cir. 1990)......................................................................35

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................26

*Black v. JP Morgan Ch*ase & Co.,
    No. 10-CV-848 (LPL),
    2011 WL 4102802 (W.D. Pa. Aug. 10, 2011),
    *report and recommendation adopte*d, 2011 WL 4089379 (W.D. Pa.
    Sept. 14, 2011)....................................................................................14, 15

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)....................................12, 13, 14, 15, 18, 19, 30

*In re Cattle Antitrust Litigation*,
    19-CV-1129 (JRT),
    2020 WL 5884676 (D. Minn. Sept. 29, 2020)............................................18

*City of Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998)......................................................................12

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
  No. 22-943,
  2024 WL 368105 (2d Cir. Feb. 1, 2024) ...................................................23

*Concord Associates, L.P. v. Entertainment Properties Trust*,
  817 F.3d 46 (2d Cir. 2016)....................................................................28, 29

*Eichorn v. AT & T Corp.*,
  248 F.3d 131 (3d Cir. 2001).........................................................................29

*Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*,
  877 F.3d 487 (3d Cir. 2017).........................................................................12

*Gibson v. MGM Resorts International*,
  No. 23-CV-00140 (MMD),
  2023 WL 7025996 (D. Nev. Oct. 24, 2023)
  ........................................................ 1, 2, 3, 11, 17, 19, 20, 21, 24, 25, 27, 36

*Giordano v. Saks Inc.*,
  654 F. Supp. 3d 174 (E.D.N.Y. 2023) .........................................................27

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
  602 F.3d 237 (3d Cir. 2010)...................................................................13, 36

*Insurance Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010)....3, 12, 13, 14, 15, 17, 24, 30, 32, 33, 34, 37, 38

*Johnson v. Chevron Corp.*,
  No. 21-CV-20548 (KMW),
  2022 WL 4817592 (D.N.J. Sept. 30, 2022) .................................................40

*Kleen Products LLC v. International Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017),
  *aff'd*, 910 F.3d 927 (7th Cir. 2018) .......................................................14, 15

*Litovich v. Bank of America Corp.*,
  568 F. Supp. 3d 398 (S.D.N.Y. 2021) .........................................................35

*Lungu v. Antares Pharma Inc.*,
  No. 21-1624,
  2022 WL 212309 (3d Cir. Jan. 25, 2022) ....................................................25

*Nelson v. County of Allegheny*,
60 F.3d 1010 (3d Cir. 1995) ...........................................................38

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993) ..........................................................34

*In re Processed Egg Products Antitrust Litigation*,
No. 08-MD-02002 (GEKP),
2011 WL 5980001 (E.D. Pa. Nov. 30, 2011) ...............................38

*In re Processed Egg Products Antitrust Litigation*,
No. 08-MD-2002 (GEKP),
2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) .........................39, 40

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) ...........................................................29

*Quigley v. East Bay Management, Inc.*,
No. 13-CV-3998 (JLS),
2014 WL 2765076 (E.D. Pa. June 18, 2014) ................................40

*In re RealPage Rental Software Antitrust Litigation (No. II)*,
Nos. 3:23-md-03071, 3071
2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023)......................27, 29

*Resco Prods., Inc. v. Bosai Mins. Grp. Co.*,
158 F. Supp. 3d 406 (W.D. Pa. 2016) ............................................17

*Superior Offshore International, Inc. v. Bristow Group, Inc.*,
490 F. App'x 492 (3d Cir. 2012) ....................................................16

*In re Travel Agent Commission Antitrust Litigation*,
583 F.3d 896 (6th Cir. 2009) ..........................................................36

*TruePosition, Inc. v. LM Ericsson Telephone Co.*,
844 F. Supp. 2d 571 (E.D. Pa. 2012)..............................................14

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017) ...........................................................32

*Willow Creek Fuels, Inc. v. Farm & Home Oil Co.*,
No. 08-CV-5417 (CDJ),
2009 WL 3103738 (E.D. Pa. Sept. 18, 2009) ...............................18

**STATUTES**

15 U.S.C. § 15b ....................................................................................38

**RULES**

Rule 9(b) of the Federal Rules of Civil Procedure...........................................38, 39

Rule 11 of the Federal Rules of Civil Procedure ...................................................27

## PRELIMINARY STATEMENT

The "gist" of plaintiffs' sole claim is that Casino-Hotel Defendants "agreed to collectively use pricing algorithms" provided by Cendyn's revenue management products. *Gibson v. MGM Resorts Int'l*, No. 23-CV-00140 (MMD), 2023 WL 7025996, at *1 (D. Nev. Oct. 24, 2023).[1]  But that claim should be dismissed because it "suffers from numerous pleading deficiencies," including the <u>same</u> ones that prompted the *Gibson* court to dismiss a claim alleging basically the <u>same</u> purported conspiracy among casino-hotels in Las Vegas.  *Id*.

<u>First</u>, the complaint fails to allege direct evidence—or even the most basic outline—of any agreement among Casino-Hotel Defendants.  Plaintiffs claim that Cendyn's public posts about its revenue management software products are direct evidence of Casino-Hotel Defendants agreeing to use those products to raise room rates and decrease occupancy levels, but none of those posts even mention any Casino-Hotel Defendant.  At most, those posts (the contents of which are incorporated by reference into the amended complaint) state that social distancing laws may reduce hotel occupancy during the pandemic.

<u>Second</u>, plaintiffs also fail to allege circumstantial evidence of an agreement

---

[1] Casino-Hotel Defendants are Hard Rock Atlantic City, Borgata Hotel Casino & Spa, and three properties affiliated with defendant Caesars Entertainment, Inc.: Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City.  Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted.

through parallel conduct and plus factors.  Rather than plead any parallel conduct, plaintiffs allege that Casino-Hotel Defendants began subscribing to revenue management products as many as 14 years apart.  By contrast, the Third Circuit has held that actions by defendants three months apart are too distant in time to be parallel.  Even if plaintiffs could allege that Casino-Hotel Defendants began subscribing to the same products around the same time, the complaint suffers from the same "fatal deficiency" as the *Gibson* complaint: plaintiffs fail to allege that Casino-Hotel Defendants were "required to accept the recommendations provided by a particular software pricing algorithm."  2023 WL 7025996, at *3.  Instead, plaintiffs' own allegations imply that Casino-Hotel Operators could—and did— decline those recommendations.  Plaintiffs also fail to allege all Casino-Hotel Defendants raised their room rates at similar times and by similar amounts.  On the contrary, they allege that two of the three Casino-Hotel Defendants lowered room prices during the alleged conspiracy.

"[W]ithout . . . parallel conduct, [p]laintiffs' alleged plus factors are not relevant."  *Id*. at *4.  In any event, far from alleging any "plus factor" showing that a conspiracy explains a Casino-Hotel Defendant's use of any Cendyn revenue management product, plaintiffs provide many reasons why a hotel would independently decide to use those products.  Plaintiffs are also missing a plus factor that they cannot do without because their claim "depends" on alleging "the

2

exchange of nonpublic information between competitors through the algorithm,"
but they "never quite allege . . . that [Casino-Hotel Defendants] get nonpublic
information from other [Casino-Hotel Defendants] by virtue of using [Cendyn's]
algorithmic pricing software." *Id*.

Nor do plaintiffs plead basic facts about the supposed conspiracy. They
identify no individual who participated in the alleged agreement or even any
communication between Casino-Hotel Defendants. Plaintiffs fail to allege any
facts supporting their unadorned theory that Casino-Hotel Defendants'
"agreement" to use Cendyn products somehow sprang into existence when Hard
Rock Atlantic City opened. And plaintiffs' virtual silence about Casino-Hotel
Defendants' parents and affiliates compels dismissal of those defendants.

As a last gambit, plaintiffs claim they have adequately alleged an agreement
because each Casino-Hotel Defendant supposedly knew others were using
Cendyn's revenue management products. But the Third Circuit has held that
"allegations that each [defendant] knew about [conduct by competitors] manifestly
do[es] not describe a horizontal conspiracy." *In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300, 331 (3d Cir. 2010).

Finally, while plaintiffs' claim should be dismissed in full, the portion of
their claim based on conduct prior to August 21, 2019 also should be dismissed
because it is barred by the four-year statute of limitations. Plaintiffs invoke tolling

based on fraudulent concealment, but they do not plead that defendants did anything to conceal the alleged conspiracy or that plaintiffs conducted due diligence. Nor could they—according to plaintiffs, direct evidence of the purported conspiracy was publicly available in May 2018. Plaintiffs' failure to file suit until five years later renders the portion of their claim based on pre-August 21, 2019 conduct untimely.

## THE AMENDED COMPLAINT'S ALLEGATIONS

### A.      The Rainmaker/Cendyn Revenue Management Products

The Rainmaker Group developed revenue management software in the 1990s and was acquired by Cendyn in 2019. (Consolidated Amended Class Action Complaint ¶¶ 113, 121, 126 ("CAC"), ECF No. 80.)[2] Rainmaker's software came to include "three separate . . . products: GuestREV, GroupREV, and REVCaster" (the "Revenue Management Products"). (*Id.* ¶ 131.)

The Revenue Management Products offer several functionalities, including "generat[ing] recommended optimal room rates" and forecasting "'granular' demand." (*Id.* ¶¶ 134, 153.) In order to do so, those products allegedly collect and optimize a subscribing hotel's individual property-level data, taking into account a guest's total value based on all available revenue streams (including gaming, room

---

[2] Defendants treat the CAC's factual allegations as true only for purposes of this motion.

revenue, and food and drink), to help subscribers forecast "the most accurate valuation of [guests'] true revenue potential." (*Id.* ¶¶ 145, 171.) Those products provide a subscribing hotel with various tools, including demand forecasts and "recommended room rates" based on the data that the subscriber has uploaded to the product's platform. (*Id.* ¶ 226.) These functionalities provided by Revenue Management Products allegedly boosted unidentified hotels' revenues by "'up to 15%.'" (*Id.* ¶ 169.)

The CAC does not allege that the Revenue Management Products' pricing recommendations for any hotel were in any way based on non-public information provided by any other hotel. While plaintiffs claim that the Revenue Management Products "'collect[]market-specific hotel price information' from a client's competitors' non-public, real-time pricing and supply data" (*id.* ¶ 160), the source plaintiffs quote specifies that the Revenue Management Products collect only public information, namely room prices from "hundreds of branded sites and online travel agencies."[3] Another source quoted by the CAC states that Cendyn marketed its products' ability to provide competitors' publicly available room prices as a way for a subscribing hotel to "ensur[e] [its] pricing is as competitive as

---

[3] *The Rainmaker Group Acquires Revcaster*, CoStar (quoted in CAC ¶¶ 160, 162), https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster.

possible when the hotel needs to capture more market share to boost occupancy."[4]

As part of those marketing efforts, Dan Skodol, a former Cendyn employee, allegedly wrote three blog posts between 2018 and 2020.  For instance, in a May 2020 blog post titled *Managing Capacity Constraints in a COVID-19 World*, Mr. Skodol wrote that hotels "must adhere to strict guidelines around social distancing . . . and reduce[] capacity across rooms," and that "these capacity constraints may help hotels avoid the infamous 'race to the bottom' when competition on price inevitably becomes fierce within a market."[5]  The CAC does not allege that any defendant read or agreed with any of Mr. Skodol's blog posts.

**B.   Defendants and Casino-Hotels in Atlantic City**

Plaintiffs allege that "Atlantic City . . . is synonymous with casino-hotels that offer a full array of upscale gambling . . . and lodging under one roof."  (CAC ¶ 72.)  From 2007 until 2017, all casino-hotels in Atlantic City allegedly "suffered a substantial downturn in visitors and revenue."  (*Id.* ¶ 296; *see also id.* ¶¶ 297-302.)  By 2018, however, the "[m]arket had finally rebounded" (*id.* ¶ 10), and two new casino-hotels opened, Hard Rock Atlantic City and non-defendant Ocean

---

[4] *Examining Trends in Rate and Revenue Management*, Hotelier (quoted in CAC ¶ 146), https://www.hoteliermagazine.com/examining-trends-in-rate-and-revenue-management/?cn-reloaded=1.

[5] *Managing capacity constraints in a COVID-19 world*, HospitalityNet (quoted in CAC ¶¶ 18, 173, 224, 251 (misquoted as "inevitable race to the bottom")), https://www.hospitalitynet.org/opinion/4098784.html.

Resort (*id.* ¶¶ 98, 246).  That "market rebound" (*id.* ¶ 10) was disrupted when hotels in Atlantic City were "hit hard" by the pandemic (*id.* ¶ 238), but demand returned in 2021 (*id.* ¶ 239; *see also* Ex. A (annual reports from New Jersey Division of Gaming Enforcement (excerpted in CAC ¶¶ 238, 242-47))).

As defined in footnote 1, Casino-Hotel Defendants are the Borgata (CAC ¶ 48), Hard Rock Atlantic City (*id.* ¶ 55), and three Caesars-affiliated properties—Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City (*id.* ¶ 37).  Other defendants named in the CAC are parents and affiliates of Casino-Hotel Defendants, including Caesars Entertainment, Inc., MGM Resorts International, Hard Rock International Inc., and Seminole Hard Rock Support Services, LLC.  (*Id.* ¶¶ 36-59.)

Caesars' affiliates operated Bally's Atlantic City for some of the class period, but sold it to non-defendant Premier Entertainment in November 2020.  (*Id.* ¶ 44.)  Non-defendant competitors in Atlantic City operate other casino-hotels, including the Golden Nugget, Ocean Resort, and Resorts Casino Hotel.  (*See id.* ¶ 246; *see also* Ex. A.)  Besides competing with non-defendant casino-hotels in Atlantic City, Casino-Hotel Defendants "compete directly with other casino[s] in the . . . surrounding areas."  (CAC ¶ 82.)  In doing so, Casino-Hotel Defendants allegedly sell rooms to guests through their websites and "through arrangements with online travel agencies ('OTAs')."  (*Id.* ¶¶ 103-06.)  A "main" way that OTAs

sell Casino-Hotel Defendants' rooms in Atlantic City is by purchasing them at "wholesale prices" and subsequently "set[ting] room rates and sell[ing] the rooms . . . on their own sites."  (*Id*. ¶ 105 n.3.)

The CAC alleges that Casino-Hotel Defendants' hotels began subscribing to Revenue Management Products at different times across 14 years:



Caesars-owned hotels purportedly used different features of those products other than suggested prices, such as "booking curves" to forecast demand (*id*. ¶¶ 140, 179, 218), while a revenue manager at the Borgata allegedly "used GuestREV to validate her pricing recommendations to management" (*id*. ¶ 229(j)). Cendyn's marketing materials also allegedly note that when one considers the "tens of thousands of hotels across the globe" subscribing to Cendyn's software solutions (*id*. ¶ 62), the average adoption of room rate recommendations is 90% (*id*. ¶ 15).  From that supposed global average, plaintiffs apparently extrapolate that

Casino-Hotel Defendants, too, "on average adopt 9 out of every 10 recommended room rates." (*Id*. ¶ 174.)  Nevertheless, the CAC does not identify any instance when any Casino-Hotel Defendant adopted a price recommended by a Revenue Management Product.  (*Id*. ¶ 138.)  By contrast, the CAC alleges that subscribers can provide users "permission" to "override" any recommended price.  (*Id*.)  The CAC quotes a third-party "industry website" as stating that subscribers "should be able to override both forecast and price recommendations" "[i]n times of need and extreme circumstances" (*id*.), but does not allege that subscribers overrode recommendations only in those circumstances.

The CAC does not identify the price of any hotel room offered by any Casino-Hotel Defendant on any night, or how their prices compared to each other on any night.  Nor does the CAC identify any Casino-Hotel Defendant's nightly occupancy rate.  Instead, plaintiffs include charts of average statistics (*id*. ¶¶ 243-47).  These charts show that Hard Rock Atlantic City and the Borgata ended the period from 2018 to 2022 with lower average daily room rates than they started with, while Hard Rock Atlantic City ended with a higher occupancy rate than it started with (*id*. ¶ 245).  Plaintiffs' charts also show that Ocean Resort and Golden Nugget, two <u>non-defendant</u> hotels, had the <u>highest</u> average daily room prices and <u>lowest</u> occupancy rates, respectively, in virtually every reported year of the alleged conspiracy.  (*Id*. ¶ 246.)

C.   **The Alleged Agreement Among Casino-Hotel Defendants
      To Use Prices Suggested By Revenue Management Products**

Plaintiffs assert that, starting "no later than" June 28, 2018 (when Hard Rock Atlantic City opened), defendants reached a "continuing agreement to knowingly and collectively use the Rainmaker pricing algorithm platform."  (*Id.* ¶¶ 1, 98, 399-400.)  The CAC does not identify when or how the supposed agreement was formed, which employees reached it, or how it was supposedly enforced.

The CAC also does not allege that Casino-Hotel Defendants communicated with each other about anything—let alone about Revenue Management Products, room rates, or any Casino-Hotel Defendant's supposed use of any rate suggested by a Revenue Management Product.  Nor does the CAC allege that all defendants attended an industry event during the purported conspiracy.  (*Id.* ¶¶ 209-20.)

Plaintiffs allege that purported "plus factors" render a conspiracy among Casino-Hotel Defendants more likely, including their purported "radical change in business practice," "exchange of competitively sensitive pricing and capacity data," and a "pending federal antitrust investigation into . . . a similar pricing algorithm" offered by a non-defendant (called RealPage) in a different industry (apartment rentals).  (*Id.* ¶¶ 19-20.)  Plaintiffs also allege that defendants had "motive to conspire given the structural features of the market and financial setbacks Casino-Hotel Defendants faced in the years preceding the class period." (*Id.* ¶ 20.)

10

D.     **Procedural History**

On January 25, 2023, the *Gibson* plaintiffs filed suit, asserting that the defendants violated the Sherman Act by agreeing to "use" the Revenue Management Products to set room rates at casino-hotels on the Las Vegas Strip. *See* No. 23-CV-00140, ECF No. 1 (D. Nev.).  After the defendants moved to dismiss the *Gibson* complaint, *id*. at ECF No. 91, plaintiffs Heather Altman and Eliza Wiatroski commenced this case, alleging essentially the same purported conspiracy as alleged in *Gibson*, but in Atlantic City rather than Las Vegas (ECF No. 1).  Nearly eight months later, on August 21, 2023, counsel for Altman and Wiatroski filed an amended complaint, dropping Altman and Wiatroski and substituting new plaintiffs.  (ECF No. 53.)

Meanwhile, the *Gibson* court dismissed the plaintiffs' complaint on October 24, 2023, identifying a "non-exhaustive" list of "fatal" deficiencies.  2023 WL 7025996, at *2-3.  Those deficiencies include the plaintiffs' failure to allege: (1) "whether all Hotel Operators use the same pricing algorithm"; (2) "that all Hotel Operators began using particular pricing software at or around the same time"; (3) that "Hotel Operators exchange nonpublic information with each other through their use of th[e] same software"; and (4) "that Hotel Operators are required to accept the prices that the . . . pricing software recommends to them."  *Id*. at *2-6. Plaintiffs in this case filed their CAC on January 29, 2024.

11

## LEGAL STANDARD

"The essence of a Section 1 claim . . . is the existence of an agreement," and the complaint therefore must plausibly suggest there was "a 'unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement.'" *Battle v. Mercedes Benz of Cherry Hill*, No. 22-CV-06642 (KMW), 2023 WL 5003921, at *2 (D.N.J. Aug. 4, 2023) (Williams, J.). The complaint cannot plead an agreement by resting on "labels and conclusions" because those "are not entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011). Nor can a complaint plausibly allege an agreement if "'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *Brokerage Antitrust*, 618 F.3d at 326. The Third Circuit "insist[s] upon some specificity in pleading" because "'antitrust cases[] are big cases and the defendant[s] should not be put to the expense of big-case discovery on the basis of a threadbare claim.'" *Id.* at 370.

When deciding a motion to dismiss, the court may consider "the allegations contained in the complaint . . . and matters of public record," *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998), as well as documents "'integral to or explicitly relied upon' in the complaint," *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017).

12

## ARGUMENT

### I.     THE CAC FAILS TO PLAUSIBLY ALLEGE
####        AN AGREEMENT AMONG CASINO-HOTEL DEFENDANTS

The CAC should be dismissed because it lacks allegations reflecting direct or circumstantial evidence of an agreement among Casino-Hotel Defendants.  "To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence."  *Burtch*, 662 F.3d at 225.  Evidence of agreement is critical where, as here, plaintiffs claim that defendants "operated a hub-and-spoke conspiracy."  (CAC ¶ 223.)  "Such a conspiracy 'involves a hub . . . and the spokes, [with the] rim of the wheel [being] the connecting agreements among the horizontal competitors . . . that form the spokes.'"  *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010).  "[T]he critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other," i.e., facts plausibly suggesting an agreement among them.  *Brokerage Antitrust*, 618 F.3d at 327.

Here, plaintiffs do not allege direct or circumstantial evidence plausibly suggesting Casino-Hotel Defendants agreed with each other to use a Revenue Management Product's pricing algorithm.  Nor do they allege much of anything about defendants that are affiliated with Casino-Hotel Defendants.

### A.     Plaintiffs Plead No Direct Evidence of a Conspiracy

Plaintiffs fail to plead direct evidence because no allegation directly

establishes that Casino-Hotel Defendants agreed with each other to use any Revenue Management Product's pricing algorithms.  "Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"  *Burtch*, 662 F.3d at 225 (quoting *Brokerage Antitrust*, 618 F.3d at 324 n.23).  To qualify as direct evidence, the allegation must be "the proverbial 'smoking gun,'" *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571, 593-94 (E.D. Pa. 2012), such as "[a] document or conversation explicitly manifesting the existence of the agreement," *Brokerage Antitrust*, 618 F.3d at 324 n.23.

To plead direct evidence, plaintiffs must identify the "particular individuals [who] made such an agreement" and "specify a time or place that any actual agreement . . . occurred." *Burtch*, 662 F.3d at 225.  In addition, mere "one way communications" stating the position of only one alleged conspirator "fall[] short of the required meeting of the minds to infer an agreement." *Black v. JP Morgan Chase & Co.*, No. 10-CV-848 (LPL), 2011 WL 4102802, at *13 (W.D. Pa. Aug. 10, 2011), *report and recommendation adopted*, 2011 WL 4089379 (W.D. Pa. Sept. 14, 2011); *see also Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 839 (N.D. Ill. 2017) (statement "has little probative value with regard to any Defendant other than [the one that made it] since there is no evidence that any other Defendant was even aware of [it]"), *aff'd,* 910 F.3d 927 (7th Cir. 2018).

14

Here, plaintiffs claim that they pleaded direct evidence by selectively quoting three public blog posts written by a former Cendyn employee between 2018 and 2020.  Plaintiffs contend those posts suggest that unidentified hotels should "avoid a 'race to the bottom,'" find "a disciplined group revenue solution," and "not chas[e] after occupancy growth."  (CAC ¶¶ 18-19, 173, 224, 251.)  But even accepting plaintiffs' selective recitation of these blog posts, they are not direct evidence because they do not "specify a time or place that any actual agreement . . . occurred, nor do they indicate that any particular individuals . . . made such an agreement." *Burch*, 662 F.3d at 225.  Instead, the posts are, at best, "one way" communications from Cendyn, *Black*, 2011 WL 4102802, at *13, that do not even mention any Casino-Hotel Defendant, let alone "manifest[] the existence of the agreement" to use a Revenue Management Product's pricing algorithm, *Brokerage Antitrust*, 618 F.3d at 324 n.23.  Indeed, plaintiffs fail to allege "that any other Defendant was even aware of, much less adopted," those blog posts. *See, e.g.*, *Kleen Prods.*, 276 F. Supp. 3d at 839.

Plaintiffs assert that Cendyn's blog posts "promoted collective adherence to the platform's pricing recommendations" (CAC ¶ 18), but those posts actually say nothing about "collective adherence" by anyone to do anything.  For instance, plaintiffs claim that one blog post stated that hotels could use Revenue Management Products to reduce occupancy levels and "avoid . . . [a] 'race to the

bottom.'" (*Id.*)  It does not.  What the post actually says is that "capacity constraints" created by the COVID-19 pandemic, such as government-imposed limits on occupancy, "may help hotels avoid the infamous 'race to the bottom' when competition on price inevitably becomes fierce within a market."[6]

The other two Cendyn blog posts lend no more plausibility to plaintiffs' claim.  They state that hotels should try to "maximiz[e] profits across all revenue streams" instead of only "chasing after occupancy growth," and consider a "disciplined" "revenue solution" for bookings by "large group[s]."  (*See, e.g.*, *id.* ¶¶ 7, 18, 173.)  Those statements, one of which was made before the alleged conspiracy began (*see id.* ¶ 173), are too vague to even suggest an agreement among Casino-Hotel Defendants because they say <u>nothing</u> about their collective adherence to prices recommended by Revenue Management Products.  *See Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 490 F. App'x 492, 498 (3d Cir. 2012) ("[V]ague statements such as an admonition to competitors to 'play by the rules' do not constitute direct evidence.").  Plaintiffs thus fail to allege any direct evidence of an agreement among Casino-Hotel Defendants.

### B.    Plaintiffs Do Not Plausibly Allege <u>Circumstantial Evidence of a Conspiracy</u>

The CAC also fails to plead facts reflecting circumstantial evidence of an

---

[6] *Managing Capacity Constraints in a COVID-19 World*, HospitalityNet (quoted at CAC ¶¶ 18, 173, 224, 251), https://www.hospitalitynet.org/opinion/4098784.html.

agreement among Casino-Hotel Defendants to adopt a Revenue Management Product, much less to use its pricing algorithms.  "Plaintiffs relying on circumstantial evidence of an agreement must make a showing" of (1) "parallel conduct" <u>and</u> (2) "plus factors that . . . ensure that courts punish . . . an actual agreement . . . ."  *Brokerage Antitrust*, 618 F.3d at 322-23.  The Court need not consider purported "plus factors" unless the CAC adequately alleges parallel conduct among Casino-Hotel Defendants because "plus factors are only supplemental to a threshold showing of parallel behavior."  *Resco Prods., Inc. v. Bosai Mins. Grp. Co.*, 158 F. Supp. 3d 406, 423 (W.D. Pa. 2016); *see also Gibson*, 2023 WL 7025996, at *4 ("[W]ithout plausible allegations of parallel conduct, Plaintiffs' alleged plus factors are not relevant.").

The CAC here makes clear that Casino-Hotel Defendants' actions were anything but parallel.  But even ignoring plaintiffs' failure to plead parallel conduct, their alleged "plus factors" and other allegations would be insufficient under settled precedent to state a viable claim.

      1.    <u>The CAC Fails To Allege Parallel Conduct</u>

In order "to sufficiently plead parallel conduct," plaintiffs must allege that defendants' "conduct was . . . identical," such that every defendant took the same action at or about the same time.  *Allen v. Verizon Commc'ns, Inc.*, No. 18-CV-8918 (PGS), 2019 WL 399922, at *4 (D.N.J. Jan. 31, 2019).  By contrast,

allegations that defendants took the same action several months apart, or that one or more defendants acted differently, cannot plead parallel conduct. *See Burtch*, 662 F.3d at 228-29. Plaintiffs also cannot plead parallel conduct by "resort[ing] to group pleading" because they must allege how each "individual Defendant[] acted" relative to every other defendant. *In re Cattle Antitrust Litig.*, 19-CV-1129 (JRT), 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020); *see also Willow Creek Fuels, Inc. v. Farm & Home Oil Co.*, No. 08-CV-5417 (CDJ), 2009 WL 3103738, at *4 (E.D. Pa. Sept. 18, 2009) (complaint "d[id] not even allege parallel conduct by F & H and any other defendant").

In *Burtch*, for example, the plaintiff claimed that the defendants conspired to refuse it credit. The Third Circuit affirmed dismissal, holding that the plaintiff's "allegations fall far short of demonstrating parallel behavior" for two reasons. 662 F.3d at 228. First, the plaintiff alleged that the defendants began the alleged conduct at different times: one began refusing to extend credit on "April 23, 2003," and another began doing so three months later on "July 22, 2003." *Id.* Second, the plaintiff alleged that one conspirator acted contrary to the alleged conspiracy by "extending at least some credit" during the alleged conspiracy. *Id.*

The exact same deficiencies afflict each of plaintiffs' attempts to plead parallel conduct:

**Subscription to Revenue Management Products**. Plaintiffs' allegations

18

about when Casino-Hotel Defendants' subscribed to Revenue Management Products demonstrate the absence of parallel conduct because, as in *Burtch*, defendants engaged in the alleged conduct at "different time periods." 662 F.3d at 228; *see also Gibson*, 2023 WL 7025996, at *4 ("[T]he Court cannot plausibly infer that all Hotel Operators began using particular pricing software at or around the same time."). Indeed, plaintiffs allege a 14-year gap between when a Caesars-owned hotel began subscribing to a Revenue Management Product in 2004 (CAC ¶ 176) and when Hard Rock Atlantic City did so in 2018 (*id*. ¶ 196). Plaintiffs' allegations about the Borgata do not bridge that yawning chasm because the Borgata allegedly began subscribing to a Revenue Management Product five years after a Caesars-owned property and nine years before Hard Rock Atlantic City. (*Id*. ¶ 184.) These temporal gaps far exceed the three months that the *Burtch* court held was too long to plead parallel conduct.

**Adoption of Prices Suggested By Revenue Management Products.** Like the *Gibson* complaint, the CAC has a "fatal deficiency" because it does not allege that Casino-Hotel Defendants "are required to accept the recommendations provided by a particular software pricing algorithm." *Gibson*, 2023 WL 7025996, at *3. The *Gibson* plaintiffs claimed that the court could infer "a conspiracy to charge higher prices by . . . point[ing] to their allegation . . . that GuestRev's pricing recommendations are accepted 90% of the time . . . ." *Id*. Plaintiffs recycle

19

that tactic here by alleging that—when measuring by the "<u>thousands</u> of hotels"
subscribing to Cendyn's platforms (CAC ¶¶ 62, 229(b))—"<u>on average</u>, for every
100 room rates the algorithm recommends for a given Cendyn client, the client
accepts 90" (*id*. ¶ 15).  Plaintiffs extrapolate from that average to assert that the
handful of Casino-Hotel Defendants' hotels "on average adopt 9 out of every 10
recommended room rates" (*id*. ¶ 174).

But as the *Gibson* court recognized in rejecting those same allegations,
asserting "that GuestRev's pricing recommendations are accepted 90% of the
time" across all subscribers reveals two "fatal" flaws in the CAC.  2023 WL
7025996, at *3.  First, a 90% acceptance rate across all subscribing hotels "does
not speak to the acceptance rate of the hotels [in Atlantic City because] certain
hotels operated by [Casino-Hotel Defendants] . . . could be within . . . the 10% that
do not accept recommendations from GuestRev."  *Id*.  Second, if the 90% average
plausibly suggests anything about Casino-Hotel Defendants, it actually "implies"
they are <u>never</u> "required to accept the recommendations provided by a particular
software pricing algorithm."  *Id*.  As in *Gibson*, this is a "fatal" flaw because
"without an agreement to accept the elevated prices recommended by the pricing
algorithm . . . [p]laintiffs[] [cannot] . . . make out a Sherman Act violation."  *Id*.

Plaintiffs cannot mask that "fatal" flaw by generically alleging users must
"override . . . GuestRev pricing recommendations" or by quoting a third-party's

20

website stating that such overrides should be exercised in "times of need and extreme circumstances." (CAC ¶ 138.) These allegations fall short because they "do[] not speak to . . . [Casino-Hotel Defendants'] acceptance rate," *Gibson*, 2023 WL 7025996, at *3, and, in fact, admit that Casino-Hotel Defendants were not required to accept prices suggested by Revenue Managements Products.

**Casino-Hotel Defendants' Average Room and Occupancy Rates**. Citing statistics of Casino-Hotel Defendants' average room and occupancy rates from 2018 through 2022, plaintiffs argue that "[Casino-Hotel] Defendants' room rates trended upward and in similar proportion while the occupancy rates for all but [one] . . . meaningfully decreased." (CAC ¶ 249 (incorrectly describing Ocean Casino Resort as a defendant).) Those statistics, however, warrant dismissal under *Burtch* because they show that two out of three Casino-Hotel Defendants acted contrary to the alleged conspiracy. From the start of the alleged conspiracy in 2018 through 2022, the CAC alleges that average room rates at Hard Rock Atlantic City and the Borgata decreased, while average rates at Caesars' casino-hotels and non-defendant casino-hotels increased:



Casino-Hotel Defendants' average annual occupancy rates similarly moved in opposite directions.  Like the defendant that extended credit while others refused to do so in *Burtch*, Hard Rock Atlantic City allegedly increased its occupancy by over 27% during the alleged conspiracy, while occupancy at the Borgata decreased by about 15% and occupancy at Caesars Atlantic City decreased by about 4%.  (*Id.* ¶ 245.)  And between 2021 and 2022, all but one hotel owned by a Casino-Hotel Defendant acted contrary to the alleged conspiracy by increasing occupancy.  (*Id.*)  In sum, as in *Burtch*, Casino-Hotel Defendants' actions bar any inference of parallel conduct because the CAC alleges their room prices and occupancy rates moved in different directions and at vastly different rates.

Plaintiffs theorize that "Hard Rock Atlantic City's ability to successfully increase its occupancy levels without undercutting prices" shows that "Casino-Hotel Defendants exercised 'discipline'" to refrain from competing by "dropp[ing]" their room rates.  (*Id.* ¶¶ 250-51.)  But plaintiffs allege the opposite:

22

several Casino-Hotel Defendants <u>actually reduced</u> their room prices and increased occupancy rates.  (*Id*. ¶ 245 (alleging that, between 2021 and 2022, Tropicana Atlantic City reduced average rates by $10 and increased occupancy by 5%, the Borgata reduced average rates by $10 and increased occupancy by 17%, and Harrah's reduced average rates by $2.30).)  And the CAC shows that Hard Rock Atlantic City <u>undercut</u> other Casino-Hotel Defendants' room rates between 2020 and 2022.  (*Id*.)  The CAC thus alleges facts suggesting the opposite of the conspiracy that plaintiffs attempt to conjure.

**Aggregate Statistics**.  Plaintiffs also cite "annual aggregate" revenue and occupancy statistics for every casino-hotel in Atlantic City.  (*Id*. ¶¶ 242-43.)  But those allegations are deficient as a matter of law because, by including all casino-hotels in Atlantic City, they fail to "distinguish between Defendants and non-defendant [hotels]."  *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, -- F.4th --, 2024 WL 368105, at *11 (2d Cir. Feb. 1, 2024).

Thus, plaintiffs fail to plead that Casino-Hotel Defendants engaged in parallel conduct.  For this reason alone, plaintiffs cannot allege a viable claim through circumstantial evidence.

> 2.   Plaintiffs' "Plus Factors" Are Irrelevant
>       <u>And Fail To Plausibly Suggest a Conspiracy</u>

Even setting aside plaintiffs' failure to plead parallel conduct, the CAC's alleged "plus factors" would not sustain its claim.  Plaintiffs are missing the one

23

plus factor that the *Gibson* court held is necessary to infer an agreement among Casino-Hotel Defendants, and the rest have been repeatedly held "legally insufficient" by the Third Circuit.  *See Brokerage Antitrust*, 618 F.3d at 321-22.

**Alleged Information Exchanges**.  Plaintiffs' "hub and spoke theory . . . based on the use of algorithmic pricing <u>depends</u> in part on the exchange of nonpublic information between competitors through the algorithm." *Gibson*, 2023 WL 7025996, at *4 (emphasis added).  To support this theory, plaintiffs must allege that "confidential information . . . fed in" by one competitor "comes back out" to another competitor through the Revenue Management Products.  *Id*. at *5.

The CAC once again suffers from the same defect as the *Gibson* complaint because it fails to allege "that one [Casino-Hotel Defendant] ever receives confidential information belonging to another [Casino-Hotel Defendant]." *Id*. Recognizing that this eviscerates their claim, plaintiffs borrow from the *Gibson* plaintiffs' failed playbook by using misleading "ambiguity," but "<u>never</u> quite allege . . . that Hotel Operators get nonpublic information from other Hotel Operators by virtue of using . . . algorithmic pricing software."  *Id*. at *4 (emphasis added).  The *Gibson* plaintiffs alleged hotels "fed in" their "confidential information" to the Revenue Management Products, and the pricing suggestions "'generated'" by those products "include that confidential information."  *Id*. at *5. But the *Gibson* plaintiffs conspicuously did not specify what "that confidential

information" means: whether subscribers "only get their own confidential information back" in the pricing suggestions or "receive[] confidential information belonging to another Hotel Operator." *Id*. The *Gibson* court caught their sleight of hand, and dismissed the case.

Here, the CAC similarly alleges that each Casino-Hotel Defendant "provided real-time, non-public room pricing and occupancy data" to Cendyn (CAC ¶ 22; *see also id*. ¶ 136), and that the Revenue Management Products then "utilize[] . . . non-public pricing and supply data supplied by . . . clients" to suggest prices (*id.* ¶ 139). *Cf. Gibson*, 2023 WL 7025996, at *5 ("Hotel Operators . . . provide real-time pricing and supply information" to Cendyn, and this "competitive data is . . . fed through its algorithms, which then generate . . . room-specific pricing recommendations."). As in *Gibson*, however, all that the CAC alleges is that "confidential information is fed in[to]" the Revenue Management Products, and plaintiffs are careful to "not quite say that nonpublic information from one hotel" is delivered to a different hotel. *Id*. But this misleading ambiguity is fatal to plaintiffs' claim.

Tellingly, plaintiffs are so desperate to "create an inference of the exchange of nonpublic information . . . without actually alleging such an exchange," *id.* at *4, that they resort to manipulating (and contradicting) sources on which the CAC is based. *See Lungu v. Antares Pharma Inc.*, No. 21-1624, 2022 WL 212309, at *5

n.14 (3d Cir. Jan. 25, 2022) ("When an allegation in the complaint is contradicted by a document incorporated in it by reference, the document controls and the allegation is not accepted as true."); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) ("The complaint quoted a reported statement of [defendant's CEO], to suggest that [defendants] declined to compete against each other," but that was "only part of what he reportedly said . . . and the District Court was entitled to take notice of the full contents of the published articles . . . ."). Those sources state clearly that information a Revenue Management Product provides to a given subscriber about its competitors is obtained through <u>public sources</u>, yet plaintiffs delete that critical fact and replace it with "non-public":

| Plaintiffs' source (*The Rainmaker Group Acquires Revcaster, CoStar* (quoted in CAC ¶¶ 160, 162), <u>https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster</u>): | Plaintiffs' changes to that source (CAC ¶ 160): |
|---|---|
| "Developed by hoteliers for hotel operators, Revcaster's application collects market-specific hotel price information **from hundreds of branded sites and online travel agencies** and provides easy-to-use reports and data downloads that increase revenue for clients." (emphasis added). | "'Developed by hoteliers for hotel operators,' the tool 'collects market-specific hotel price information' from ~~hundreds of branded sites and online travel agencies~~ **a client's competitors' non-public, real-time pricing and supply data** and 'provides easy-to-use reports and data downloads that increase revenue for clients.'" |

Once these sleights of hand are laid bare, it is plain that plaintiffs do not—

and cannot, consistent with Rule 11 of the Federal Rules of Civil Procedure—
allege that Casino-Hotel Defendants "get nonpublic information from other
[Casino-Hotel Defendants]." *Gibson*, 2023 WL 7025996, at *4.[7]

    **RealPage Litigation**.  Plaintiffs invoke the Department of Justice's
"statement of interest" filed in a case involving a <u>different</u> algorithm provider
(RealPage) in a <u>different</u> industry (apartment rentals).  (CAC ¶¶ 269-81, 364-72.)
The allegations relating to the *RealPage* litigation are irrelevant because that case
has no connection to Casino-Hotel Defendants or the Revenue Management
Products.  *See Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 199 n.17 (E.D.N.Y.
2023) (statement of interest filed in a different case is "not relevant"), *appeal filed*,
No. 23-600 (2d Cir. Apr. 17, 2023).

    While plaintiffs claim the *RealPage* litigation is "closely analogous" (CAC ¶
270), the "critical difference between the [Cendyn Revenue Management Products]
and the [RealPage software]" is that, allegedly, "RealPage's revenue management
software [allegedly] inputs a melting pot of confidential competitor
information . . . and spits out price recommendations based on that private
competitor data," *RealPage*, No. 3:23-MD-03071, 2023 WL 9004806, at *17

---

[7] Plaintiffs also rely on purported bilateral discussions between hotels and Cendyn
regarding "best practices for maximizing room revenue and profitability."  (CAC ¶
360.)  But the CAC fails to identify which individuals supposedly participated in
those discussions or any specific information that was shared during Cendyn's
alleged meetings with any of those unidentified individuals.

(M.D. Tenn. Dec. 28, 2023).  Plaintiffs cannot make those allegations here, and the CAC quotes sources confirming that the Revenue Management Products use only competitor information collected from public "branded sites and online travel agencies."[8]

**Alleged Market Structure**.  Plaintiffs assert that Casino-Hotel Defendants' alleged 72% share of the "Atlantic City Casino-Hotel Market" renders the purported conspiracy plausible (*see* CAC ¶¶ 285-93), but that argument is based on an unsupported, gerrymandered geographic market definition.  "Courts generally measure a market's geographic scope . . . by determining the areas . . . where consumers can turn, as a practical matter, for supply of the relevant product." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).

The CAC itself alleges that each Casino-Hotel Defendant competes with OTAs that sell their rooms online at prices set by the OTAs.  (CAC ¶ 105 n.3.) The CAC also acknowledges that Casino-Hotel Defendants "compete directly with other casino facilities operating in the . . . surrounding areas."  (*Id.* ¶ 82.)  As the Second Circuit reasoned in *Concord*, consumers view casino-hotels in Connecticut and New York as "reasonably interchangeable substitutes" for casino-hotels in

---

[8] *The Rainmaker Group Acquires Revcaster*, CoStar (quoted in CAC ¶¶ 160, 162), https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster.

Atlantic City, because they are "tourist destinations, where tourists could gamble and have access to natural resources and other related activities."  817 F.3d at 54; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal because "proposed relevant market . . . d[id] not encompass all interchangeable substitute products").  In any event, plaintiffs' market structure allegations (*see* CAC ¶¶ 285-93) are the type of generic "plus factors" courts in this jurisdiction have rejected as insufficient to render an alleged conspiracy plausible.  *See, e.g.*, *Allen*, 2019 WL 399922, at *4.

In fact, plaintiffs' failure to plead a relevant market also dooms their complaint because it is an essential element of a "rule of reason" claim.  *Queen City*, 124 F.3d at 436 (rule of reason claim failed because "the relevant market is legally insufficient").  Plaintiffs are wrong that they need not define a relevant market because the alleged conduct is "per se" unlawful.  (CAC ¶ 407.)  The "per se rule" applies to a narrow sliver of anticompetitive behavior, and certainly does not apply when "no . . . cases . . . have applied [it] in similar factual circumstances."  *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001).  Plaintiffs identify no cases applying the per se rule to revenue management software, and the case they characterize as "closely analogous" (CAC ¶ 270) held that the "per se standard is not appropriate" for analyzing an alleged agreement to use revenue management software, *RealPage*, 2023 WL 9004806, at *24.

29

**Alleged Motive to Conspire**.  Plaintiffs claim that Casino-Hotel Defendants had a "motive" to collude to "achieve . . . significant revenue increases" after a period of economic hardship.  (CAC ¶¶ 294-305.)  But those allegations do not "constitute evidence of a 'plus factor'" because "all entrepreneurs have a legitimate understandable motive to increase profits."  *Burtch*, 662 F.3d at 229.

**Alleged Actions Against Independent Self-Interest**.  Plaintiffs cannot plausibly claim that Casino-Hotel Defendants acted against their own self-interest (CAC ¶¶ 306-09) because the CAC suggests "obvious alternative explanations"— that is, reasons why each Casino-Hotel Defendants would subscribe to Revenue Management Products without an agreement between them to do so and purportedly increase room rates.  *See Brokerage Antitrust*, 618 F.3d at 322, 350 ("Where . . . the 'obvious alternative explanation' for . . . an industry practice is that each member of the industry believes its profits would suffer without the practice, it is not plausible to infer that [it] . . . is the product of an agreement.").

The CAC pleads many reasons why it would be in a hotel's independent interest to use Revenue Management Products, including because they are advertised as providing "the most accurate valuation of [guests'] true revenue potential," helped boost revenues for unidentified hotels by "'up to 15%,'" and ensured hotels' pricing was as "competitive as possible when the hotel needs to capture more market share."  (*See* CAC ¶¶ 15, 145-46, 169.)  And the allegations

30

that the Caesars-affiliated properties and the Borgata separately began subscribing to Revenue Management Products many years before the alleged conspiracy undermine any claim that using those products was against a hotel's self-interest.

Plaintiffs claim that Casino-Hotel Defendants did not undercut each other on price to fill a "higher share of their rooms" (*id.* ¶ 307), but the CAC's allegations demonstrate that Casino-Hotel Defendants did exactly that, with Hard Rock Atlantic City and the Borgata consistently lowering prices and <u>all but one</u> hotel increasing occupancy between 2021 and 2022.  (*See supra* § I.B.1.)  The CAC also provides several non-conspiratorial explanations for why an Atlantic City casino-hotel's room prices might rise during the alleged conspiracy.  For example, except when casino-hotels in Atlantic City were "hit hard by the . . . pandemic" (CAC ¶ 238), demand increased throughout the alleged conspiracy, as Atlantic City experienced a "market rebound[]" (*id.* ¶ 9).  Indeed, it was <u>non-defendants</u> Ocean Resort and Golden Nugget that had the highest daily average room prices and lowest occupancy rates, respectively, during the alleged conspiracy.  (*Id.* ¶ 246.)

Moreover, the CAC itself suggests that increasing room prices and falling occupancy rates were driven by factors other than the purported conspiracy.  To illustrate, Bally's Atlantic City allegedly subscribed to unidentified Revenue Management Products while Caesars owned it (CAC ¶ 176), but may have stopped when Caesars sold it to Premier Entertainment in November 2020 (*id.* ¶ 182; *see*

*also id.* ¶ 46).  Yet Bally's room rates increased by <u>over 40%</u> and its occupancy

rate fell by <u>over 10%</u> after Caesars sold it to non-defendant Premier.  (*See id.*

¶¶ 245-46.)  Thus, increases in casino-hotels' room prices or decreases in their

occupancy rates do not plausibly suggest a conspiracy, but instead suggest normal

"market dynamics."  *See Brokerage Antitrust*, 618 F.3d at 328.

  **Alleged "Radical Change" in Conduct**.  Plaintiffs' conclusory claim that

Casino-Hotel Defendants' subscriptions to Revenue Management Products reflects

a "radical change" from past practices (CAC ¶¶ 310-14) is entitled to no weight

because that "radical" change allegedly spanned nearly 14 years.  (*See supra*

§ I.B.1.)  *Cf. Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 196

(3d Cir. 2017) ("A change in industry practices must be 'radical' or 'abrupt' to

'create an inference of a conspiracy.'"); *In re Aetna UCR Litig.*, No. 07-CV-3541

(KHS), 2015 WL 3970168, at *22 (D.N.J. June 30, 2015) (conspiracy implausible

where conduct occurred over a decade before conspiracy allegedly began).  And

Hard Rock Atlantic City could not have changed its practices, as it opened

simultaneously with the start of the alleged conspiracy.

  **Alleged Opportunities To Conspire**.  Plaintiffs wrongly claim that trade

association meetings and industry events reflect "opportunit[ies] to collude,"

rendering the alleged conspiracy plausible.  (CAC ¶¶ 318-56.)  To the contrary,

defendants' "mere participation in [trade associations] and their attendance at

[industry] meetings and conferences does not suggest any conspiracy." *Allen*,
2019 WL 399922, at *4.

*     *     *

Thus, even ignoring that plaintiffs' "plus factors" are irrelevant because of
their failure to plead parallel conduct, the CAC fails to allege any plus factor
rendering a conspiracy among Casino-Hotel Defendants plausible, and this failure
separately bars plaintiffs from stating a claim through circumstantial evidence.

### 3.    The CAC Fails To Plead Any "Common Hallmarks" of a Purported Conspiracy

Plaintiffs must allege "precisely (1) who was in agreement with whom, and
(2) about what?" *Brokerage Antitrust*, 618 F.3d at 339.  Those allegations provide
"traditional hallmarks of a conspiracy," *Aetna*, 2015 WL 3970168, at *22,
"consist[ing] of 'non-economic evidence that there was an actual . . . agreement
not to compete,' which may include 'proof that the defendants got together and
exchanged assurances of common action.'" *Brokerage Antitrust*, 618 F.3d at 322.

Here, the CAC does not identify any personnel from any defendant who
purportedly entered into the conspiracy.  *See Aetna*, 2015 WL 3970168, at *22
(dismissing conspiracy claim because plaintiffs failed to identify "which
individuals were involved in its formation").  Plaintiffs also fail to provide a
"common hallmark of antitrust agreement—a sensible timeline of the conspiracy
itself." *Id.*  Instead, plaintiffs offer only the implausible claim that the conspiracy

33

somehow sprang to life when Hard Rock Atlantic City opened in June 2018. (CAC ¶¶ 304-05, 399.)  Tellingly, plaintiffs do not allege that any Casino-Hotel Defendant ever met or communicated with another Casino-Hotel Defendant, much less did so in or before June 2018.  *See Allen*, 2019 WL 399922, at *5 (dismissing antitrust claim because the plaintiff failed to allege whether anticompetitive conduct "occurred before or after the 'private' meeting").

Plaintiffs' alleged timeline is also implausible because the CAC fails to explain "why some of the conduct happened well before . . . the alleged conspiracy."  *Aetna*, 2015 WL 3970168, at *22.  Indeed, plaintiffs allege that a Caesars-owned hotel began subscribing to a Revenue Management Product 14 years before (and MGM-affiliated Borgata nine years before) the alleged conspiracy began.  (CAC ¶¶ 176, 184.)  *See Aetna*, 2015 WL 3970168, at *22 (dismissing claim because the "same data points have been in use . . . decades before the inception of the alleged agreement").

Finally, plaintiffs do not plausibly allege how the alleged agreement among Casino-Hotel Defendants operated.  "[A] cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993); *cf. Brokerage Antitrust*, 618 F.3d at 343-44, 383 (vacating dismissal because "[t]he complaint . . . provides a coherent mechanism for

34

disciplining recalcitrant insurers"). The CAC here fails to allege that Casino-Hotel Defendants had any mechanism to enforce their alleged agreement or that Casino-Hotel Defendants ever "disciplined" each other.

Nor does the CAC allege how the purported conspiracy could have functioned when OTAs sell rooms at Casino-Hotel Defendants' properties—indistinguishable from those sold directly by Casino-Hotel Defendants—at prices set by the OTAs. (CAC ¶ 105 n.3.) *See Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 431-32 (S.D.N.Y. 2021) ("[g]iven [defendants' resales] there is no way for any Defendant . . . to control [prices]"). Nor does it address how Casino-Hotel Defendants could have sustained their purported conspiracy when four non-defendant casino-hotels offered many rooms and could have undercut defendants' prices if they had been inflated. (*See* Ex. A.) *Cf. In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 516 (5th Cir. 1990) (conspiracy "unfeasible" because non-conspirators would "destroy[]" it).

### 4. Alleged "Knowing" Use of Revenue Management Products Is Insufficient

Plaintiffs incorrectly claim that an agreement among Casino-Hotel Defendants can be inferred through "their knowing and purposeful shared use of the same Rainmaker pricing algorithm platform to set room rates." (CAC ¶ 228.) Plaintiffs claim that each Casino-Hotel Defendant knew that every other Casino-Hotel Defendant adopted prices recommended by a Revenue Management Product

because "marketing materials" identified certain Casino-Hotel Defendants as clients and through their attendance at industry events.  (*Id*. ¶ 316.)  But plaintiffs do not identify marketing materials stating that each Casino-Hotel Defendant adopted the Revenue Management Products' pricing recommendations.  *See Hess*, 602 F.3d at 255 ("[I]t does not suffice to simply say that the defendants had knowledge; there must be factual allegations to plausibly suggest as much.").[9]

In addition, plaintiffs' own allegations undercut any inference that Casino-Hotel Defendants subscribed to Revenue Management Products because they knew that others were doing so.  For example, the Caesars-affiliated properties allegedly began subscribing to those products many years before any other Casino-Hotel Defendant.  (*See supra* § I.B.1).  *See also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (affirming dismissal because there was "no allegation in the Amended Complaint" that each defendant acted knowing other defendants were taking the same actions).

Even had plaintiffs adequately pleaded that each Casino-Hotel Defendant knew that every other Casino-Hotel Defendant was adopting prices recommended by Revenue Management Products and that such knowledge was relevant, the *Gibson* court rejected such pleadings as inadequate as a matter of law.  2023 WL

---

[9] An employee of the Borgata allegedly made the only reference to a Revenue Management Product's pricing suggestions, but only indicated that the Borgata reviewed them while independently determining room rates.  (*See* CAC ¶ 229(j).)

7025996, at *2.  So has the Third Circuit by holding that "allegations that each [competitor] knew about [actions taken] by the other [competitors] manifestly do not describe a horizontal conspiracy." *Brokerage Antitrust*, 618 F.3d at 331.  Thus, the CAC should be dismissed because it fails to plausibly allege that Casino-Hotel Defendants agreed to use a Revenue Management Product.[10]

### C.   Plaintiffs Fail To Allege Sufficient Facts About Casino-Hotel Defendants' Parents and Affiliates

Defendants Caesars Entertainment, Inc., MGM Resorts International, Hard Rock International Inc., and Seminole Hard Rock Support Services, LLC (SHRSS) also should be dismissed because the CAC contains virtually no allegations about them, let alone allegations suggesting they participated in the alleged conspiracy.

The CAC merely alleges that Caesars Entertainment, MGM Resorts, and Hard Rock International "operate" affiliated casino-hotels in Atlantic City through non-defendant "wholly owned" subsidiaries (CAC ¶¶ 37, 48, 55) and that SHRSS "coordinates Hard Rock-branded casino-hotels' use of IT and revenue management systems including the Rainmaker pricing algorithm platform" (*id*. ¶ 56).  But those

---

[10] Plaintiffs also fail to allege a vertical agreement between any Casino-Hotel Defendant and Cendyn to adopt room prices provided by a Revenue Management Product.  Instead, plaintiffs allege that those room prices were mere "recommendations" (CAC ¶ 402(b)) that subscribing hotels could—and did— reject (*id*. ¶¶ 15, 138, 142, 174).  Non-binding pricing suggestions cannot constitute an agreement that is actionable under Sherman Act § 1.  *See Acquaire v. Canada Dry Bottling Co. of N.Y.*, 24 F.3d 401, 410 (2d Cir. 1994) ("Evidence of pricing suggestions . . . is not sufficient . . . to transgress § 1 of the Sherman Act.").

allegations are plainly insufficient because these affiliate entities "are not plausibly alleged to have themselves entered into unlawful agreements," and a corporation is not liable for the actions of its "sister corporations simply by dint of the corporate relationship." *Brokerage Antitrust*, 618 F.3d at 341 n.44.

## II.   **PLAINTIFFS' CLAIM IS PARTIALLY TIME-BARRED**

Plaintiffs' claim based on pre-August 21, 2019 conduct should be dismissed as untimely.  Federal antitrust laws have a four-year statute of limitations, *see* 15 U.S.C. § 15b, which "begins to run when a defendant commits an act that injures a plaintiff's business." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-MD-02002 (GEKP), 2011 WL 5980001, at *1 (E.D. Pa. Nov. 30, 2011).  Plaintiffs allege that defendants conspired "[b]eginning no later than June 28, 2018." (CAC ¶ 399.)  But because these plaintiffs did not bring suit until August 21, 2023, their claim based on pre-August 21, 2019 conduct is untimely.[11]

Plaintiffs assert that fraudulent concealment excuses their delay, but plead none of its elements.  To plead fraudulent concealment, Rule 9(b) of the Federal Rules of Civil Procedure requires plaintiffs "to allege particularized facts sufficient to suggest '(1) that the defendant actively misled the plaintiff; (2) which prevented

---

[11] Plaintiffs' first amended complaint does not relate back to the original complaint.  *See, e.g.*, *Nelson v. Cnty. of Allegheny*, 60 F.3d 1010, 1015 (3d Cir. 1995) (no relation back where new plaintiffs were substituted in and did not show mistake).

the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not [due] to her lack of reasonable due diligence . . . .'" *In re Processed Egg Prods. Antitrust Litig.*, No. 08-MD-2002 (GEKP), 2013 WL 4504768, at *3 (E.D. Pa. Aug. 23, 2013) ("*Eggs II*").

To begin, plaintiffs fail to allege—let alone with particularity—that defendants did anything to conceal the alleged agreement among Casino-Hotel Defendants from them.  The CAC instead relies on certain defendants' statements about offering the "Best Available Rate."  (CAC ¶¶ 379-81.)  Those statements are too generic to satisfy plaintiffs' burden under Rule 9(b); nor do plaintiffs allege they relied on them.  *See Eggs II*, 2013 WL 4504768, at *6 (holding defendants' statements blaming "exports" for increase in egg prices insufficient, where plaintiffs "fail[ed] to plead . . . the particular persons to whom they were made").

Plaintiffs cannot plead that defendants' supposed statements prevented them from learning of their claim because the CAC demonstrates that plaintiffs had all the knowledge they needed to bring their case years ago.  Indeed, plaintiffs cannot both assert that Cendyn's public blog post from May 2018 unambiguously establishes the alleged conspiracy (*see* CAC ¶¶ 18-19) and maintain that it did not put them on notice of it, *see Eggs II*, 2013 WL 4504768, at *5 (plaintiffs had notice of their claim because they "were aware that egg prices were increasing").

Finally, plaintiffs cannot meet their burden to "specifically plead how [they]

39

exercised due diligence." *Id.* at *3-4.  Plaintiffs do not allege that they conducted

<u>any</u> due diligence, relying instead on only the insufficient statement that they

"could [not] have discovered [their claim] through the exercise of reasonable

diligence."  (CAC ¶ 373.)  *See Eggs II*, 2013 WL 4504768, at *5 (allegations "that

it would have been 'pointless' . . . to exercise due diligence . . . are insufficient").[12]

Thus, plaintiffs' claim based on pre-August 21, 2019 conduct is time-barred.

## <u>CONCLUSION</u>

The CAC should be dismissed because it fails to plausibly allege an

agreement among Casino-Hotel Defendants to adopt the Revenue Management

Products, let alone use those products' pricing algorithms to inflate room prices.

Having amended twice—including several months after the *Gibson* court identified

the fatal flaws in their claim—plaintiffs have proved they cannot "cure the

deficiencies of the pleading," and the CAC should be dismissed with prejudice.

*See Johnson v. Chevron Corp.*, No. 21-CV-20548 (KMW), 2022 WL 4817592, at

*7 (D.N.J. Sept. 30, 2022) (Williams, J.).

---

[12] Plaintiffs assert that the alleged conspiracy was "self-concealing" (CAC ¶ 374), but "diligence remains a separate element . . . even when there is a so-called 'self-concealing conspiracy.'"  *Quigley v. E. Bay Mgmt., Inc.*, No. 13-CV-3998 (JLS), 2014 WL 2765076, at *3 (E.D. Pa. June 18, 2014).

Dated: February 20, 2024                  Respectfully submitted,


s/ Tansy Woan                             s/ Gregory Mortenson
Boris Bershteyn (*pro hac vice*)          Gregory Mortenson (Bar
Ken Schwartz (*pro hac vice*)             No. 070542013)
Michael Menitove (*pro hac vice*)         Lawrence Buterman (*pro hac vice*)
Tansy Woan                                LATHAM & WATKINS LLP
Andrew Muscato                            1271 Avenue of the Americas
Sam Auld (*pro hac vice*)                 New York, NY 10020
SKADDEN, ARPS, SLATE,                     Gregory.Mortenson@lw.com
  MEAGHER & FLOM LLP                      Lawrence.Buterman@lw.com
(A Delaware Limited Liability
Partnership)                              Sadik Huseny (*pro hac vice*)
One Manhattan West                        Tim O'Mara (*pro hac vice*)
New York, New York 10001                  Brendan McShane (*pro hac vice*)
(212) 735-3000                            LATHAM & WATKINS LLP
Boris.Bershteyn@skadden.com               505 Montgomery Street, Suite 2000
Ken.Schwartz@skadden.com                  San Francisco, CA 94111-6538
Michael.Menitove@skadden.com              Sadik.Huseny@lw.com
Tansy.Woan@skadden.com                    Tim.O'Mara@lw.com
Andrew.Muscato@skadden.com                Brendan.McShane@lw.com
Sam.Auld@skadden.com
                                          Anna M. Rathbun (*pro hac vice*)
*Attorneys for Defendants*                Christopher J. Brown (*pro hac vice*)
*Caesars Entertainment, Inc.,*            LATHAM & WATKINS LLP
*Boardwalk Regency LLC, Harrah's*         555 Eleventh St, NW Suite 1000
*Atlantic City Operating Company,*        Washington, DC 20004-1304
*LLC, and Tropicana Atlantic City*        Anna.Rathbun@lw.com
*Corporation*                             Chris.Brown@lw.com

                                          *Attorneys for Defendant Cendyn*
                                          *Group, LLC*


41

s/ Harry H. Rimm
Harry H. Rimm
WOMBLE BOND DICKINSON
(US) LLP
950 Third Avenue, Suite 2400
New York, NY 10022
Telephone: 332-258-8480
Harry.Rimm@wbd-us.com

Bethany W. Kristovich (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Bethany.Kristovich@mto.com

Justin R. Raphael (*pro hac vice*)
Juliana M. Yee (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Justin.Raphael@mto.com
Juliana.Yee@mto.com

*Attorneys for MGM Resorts International and Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa.*

s/ Craig Carpenito
Craig Carpenito
Thomas J. Scrivo
David S. Lesser (*pro hac vice*)
Jamie Dycus (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
ccarpenito@kslaw.com

s/ Jennifer L. Del Medico
Jennifer L. Del Medico
Laura W. Sawyer (*pro hac vice*)
JONES DAY
250 Vesey Street, 34th Floor
New York, NY 10281
Telephone: 212-326-3658
jdelmedico@jonesday.com
lwsawyer@jonesday.com

David C. Kiernan (*pro hac vice*)
Matthew Silveira (*pro hac vice*)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
dkiernan@jonesday.com
msilveira@jonesday.com

*Attorneys for Hard Rock International Inc. and Seminole Hard Rock Support Services, LLC*

42

tscrivo@kslaw.com
dlesser@kslaw.com
jdycus@kslaw.com

*Attorneys for Boardwalk 1000, LLC*
*d/b/a Hard Rock Hotel & Casino*
*Atlantic City*