UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

RICHARD GIBSON, *et al.*,

                           Plaintiffs,

      v.

CENDYN GROUP, LLC, *et al.*,

                           Defendants.

Case No. 2:23-cv-00140-MMD-DJA

ORDER

## I.   SUMMARY

Plaintiffs Richard Gibson and Roberto Manzo, on behalf of themselves and all others similarly situated, allege that defendant hotel operators on the Las Vegas Strip unlawfully restrained trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.* ("Sherman Act") by artificially inflating the price of hotel rooms after agreeing to all use pricing software marketed by the same company. (ECF No. 144 ("FAC").) Before the Court is Defendants Blackstone Real Estate Partners VII L.P. and Blackstone, Inc.'s (collectively, "Blackstone") motion to dismiss.[1] (ECF No. 161 ("Motion").) As further explained below, because Plaintiffs plausibly allege that Blackstone engaged in coordinated activity with the management of the Cosmopolitan Hotel to set prices using RevCaster and GroupRev, the Court will deny the Motion.

## II.   BACKGROUND

The following allegations are adapted from the FAC. Plaintiffs "challenge an unlawful agreement among Defendants to artificially inflate the prices of hotel rooms on the Las Vegas Strip above competitive levels." (ECF No. 144 at 7.) The gist of the alleged conspiracy is that all of the defendant hotel operators agreed to use a shared set of pricing

---

[1]Plaintiffs responded (ECF No. 167 at 46-48), and Blackstone replied (ECF No. 169). This order does not address the other motion to dismiss, which Blackstone also joined in full. (ECF No. 160.)

1    algorithms offered by The Rainmaker Unlimited, Inc. subsidiary of Defendant CENDYN
2    Group, LLC that recommended supracompetitive prices to the hotel operators. (*Id.* at 8.)
3    Plaintiffs define the Las Vegas Strip as "the four-mile stretch in the unincorporated towns
4    immediately south of the City of Las Vegas." (*Id.* at 6 n.1.)

5         The Cosmopolitan is one of the hotels allegedly involved in the alleged conspiracy
6    to inflate hotel prices above competitive prices through use of the same pricing software.
7    (*Id.* at 19-20, 57, 103-06, 111.) Blackstone allegedly owned and operated the
8    Cosmopolitan from 2014 through 2022. (*Id.* at 19.)

9    **III.   DISCUSSION**

10        Blackstone argues in the Motion that there are insufficient allegations in the FAC
11   that Blackstone entered into any pertinent agreements or participated in the alleged
12   scheme, and the allegations in the FAC about Blackstone's involvement with the
13   Cosmopolitan are insufficient to impute liability to Blackstone. (ECF No. 161.) Plaintiffs
14   counter that Blackstone's argument is contradicted by their well-pleaded allegations in
15   their FAC that plausibly suggest Blackstone actively operated the Cosmopolitan during
16   the putative class period. (ECF No. 167 at 46-48.) While it is a close call, the Court agrees
17   with Plaintiffs.

18        One of the general principles key to proper resolution of the Motion is that a parent
19   corporation is not liable for the acts of its subsidiaries. *See United States v. Bestfoods*,
20   524 U.S. 51, 61 (1998). But there is an equally fundamental principle that the corporate
21   veil may be pierced when the corporate form is misused to accomplish certain wrongful
22   purposes. *See id.* at 62. To balance the tension between these two principles in the
23   Sherman Act context, "commonly-owned-but-legally-distinct entities are considered a
24   'single entity' for antitrust purposes where they engage in 'coordinated activity.'" *Arandell*
25   *Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018). This is
26   consistent with the related requirement that, to state an antitrust claim against a particular
27   defendant, the operative pleading must contain allegations consistent with some
28   evidence, "direct or circumstantial—that the defendants 'actively participated in an

2

individual capacity in the scheme.'" *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119 (9th Cir. 2022) (citations omitted). Thus, the key question for resolution of the Motion is whether Plaintiffs plausibly allege Blackstone engaged in coordinated pricing activity with the Cosmopolitan such that Blackstone could be held liable for antitrust violations because Plaintiffs' antitrust theory focuses on the use of Cendyn's pricing algorithms. *See Arandell*, 900 F.3d at 633-34.

Plaintiffs' pertinent allegations cross the plausibility line. Plaintiffs allege that Blackstone operated the Cosmopolitan from 2014 to 2022, implementing significant operational changes and investing over $500 million into it over that time period. (ECF No. 144 at 19.) Plaintiffs further allege that Blackstone controlled—not just invested in—the Cosmopolitan during this time, in part by focusing on implementing 'operational efficiencies' at the Cosmopolitan. (*Id.*) And during Blackstone's control and operation of the Cosmopolitan, the hotel had an agreement with the Rainmaker and eventually Cendyn to use Guestrev and Grouprev. (*Id.* at 20.)

While Blackstone characterizes these allegations as conclusory (ECF No. 161 at 11-12), Blackstone ignores that each of the three sentences summarized above ends with a footnote. The content of the sources cited in these footnotes helps push Plaintiffs' allegation that Blackstone participated in the alleged scheme over the line from conceivable to plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (explaining this is the line that Plaintiffs must cross with their allegations), particularly when the Court, as it must, draws "all reasonable inferences in favor of the" Plaintiffs, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). And the Court deems the content of these sources cited in these three footnotes properly incorporated by reference because their content forms the basis of Plaintiffs' claim against Blackstone. *See id.* (suggesting that a blog post cited in the footnote of a complaint may have been—though was not in that case—properly incorporated by reference if it forms the "basis of any claim in the Complaint").

///

3

To start, and as the FAC alleges, Blackstone stated in a press release announcing its sale of the Cosmopolitan that it "implemented significant operational changes" there and "brought our expertise and experience in the lodging space to create the most dynamic destination on the Las Vegas Strip." (ECF No. 144 at 19, 19 n.9.) *See also* Blackstone, *Blackstone Announces Sale of the Cosmopolitan of Las Vegas* (Sept. 27, 2021), https://perma.cc/3J3V-W68L. This does not suggest merely passive ownership. Further, in a YouTube video explaining how Blackstone 'transformed the Cosmopolitan,' Rob Harper, whose title is listed as Blackstone's Head of U.S. Real Estate Asset Management, said, "[w]e leveraged Blackstone's strong track record on hospitality investing to look at every line item on the revenue and expense side to try to operate as efficiently as possible on the bottom line." (ECF No. 144 at 19, 19 n.10.) *See also* Blackstone, *An Inside Look at Blackstone Core+ Real Estate: The Cosmopolitan of Las Vegas,* YouTube Video at 1:44-1:55 (Dec. 18, 2018), https://perma.cc/P6GR-SML5. And Colleen Birch, whose title is listed as Senior Vice President, Revenue Optimization at the Cosmopolitan of Las Vegas, explained in another YouTube video on Cendyn's YouTube page and dated 2019 how the Cosmopolitan used Guestrev and Grouprev to make pricing decisions. (ECF No. 144 at 20, 20 n.11.) *See also* Cendyn, *Revenue Cloud success story: Cosmopolitan of Las Vegas*, YouTube Video (Nov. 14, 2019), https://perma.cc/C4EK-APKE.

If Blackstone 'looked at every line item on the revenue and expense side' while it owned the Cosmopolitan, the Court reasonably infers in Plaintiffs' favor that Blackstone agreed with executives at the Cosmopolitan such as Colleen Birch that the Cosmopolitan should use Guestrev and Grouprev to make pricing decisions—and collaborated with her and her colleagues in making those decisions. *See supra.* Plaintiffs certainly allege that the Cosmopolitan used Guestrev and Grouprev. *See supra.* The Cosmopolitan must have paid something to use those products, so they logically would have come up as one of the line items Blackstone employees looked at. And indeed, participation in the Cosmopolitan's decision to use Guestrev and Grouprev while Blackstone owned the

Cosmopolitan is consistent with the sort of operational control that Blackstone itself said it exercised over the Cosmopolitan when it announced Blackstone was selling it in September 2021. *See supra*. In sum, Plaintiffs have plausibly alleged that Blackstone coordinated with the management team at the Cosmopolitan in using Guestrev and Grouprev to make pricing decisions.

For this reason, Blackstone's Motion is denied. *See Arandell Corp.*, 900 F.3d at 633 (stating that coordinated activity may render one commonly-owned-but-legally distinct entity liable for the antitrust violations of another).

**IV.    CONCLUSION**

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Blackstone's motion to dismiss (ECF No. 161) is denied.

DATED THIS 24th Day of April 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE